**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRUST BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 21 cv 2576 |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, LLC, and | ) | |
| BOULDER HILL APARTMENTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## <u>COMPLAINT</u>

Plaintiff, Centrust Bank, N.A. ("Centrust"), for its Complaint against Defendants Ruben

Ybarra ("Ybarra"), YRY Holdings, LLC, a Delaware limited liability company ("YRY"), and

Boulder Hill Apartments, LLC, an Illinois limited liability company ("BHA"), states as follows:

### <u>NATURE OF THE CASE</u>

1.      Ybarra is an individual with a long history of using straw companies to defraud and

harass Centrust.  Ybarra has used straw companies to fraudulently obtain loans from Centrust; he

has used straw companies to avoid repaying his debts to Centrust; and he has used straw companies

to harass and threaten Centrust with frivolous litigation.  Centrust commenced this case to: (a)

protect itself from the frivolous threats of Ybarra's straw companies; and (b) recover damages

from Ybarra and his straw companies for their past litigation abuses.

2.      From 2006 to 2008, Ybarra was employed by Centrust as a Vice President and loan

officer.  During his tenure, Ybarra repeatedly used straw entities to conceal his ownership and

control over Centrust borrowers.  Ybarra even acted as Centrust's loan officer for such loans

without revealing his control over the borrowers.  In addition, Ybarra received bribes, made

undisclosed personal loans to Centrust's borrowers, and released Centrust's collateral without the bank's knowledge or consent.

3.     Eventually, the Office of the Comptroller of Currency (the "OCC") discovered Ybarra's illegal activities and commenced enforcement proceedings against him pursuant to 12 U.S.C. § 1818.  To avoid prosecution by the OCC, Ybarra agreed to a consent order that barred him from the banking industry and required him to make restitution to Centrust.

4.     Predictably, Ybarra and his companies also defaulted on the loans Centrust made to them.  In 2010, Centrust sued Ybarra to collect the debts.  In that litigation, Centrust was awarded judgments totaling more than $2.6 million.  Ybarra has never satisfied the judgments.

5.     Instead, Ybarra created an asset protection plan to shield his assets from Centrust. The plan was apparently implemented in 2011 – shortly after Centrust's judgments were entered against Ybarra.  Pursuant to his asset protection plan, Ybarra uses straw companies to retain de facto ownership and control over a wide variety of assets, including several apartments located in Montgomery, Illinois.  Centrust was informed of Ybarra's asset protection plan by one of Ybarra's former business associates.  Centrust also obtained confirmation of Ybarra's asset protection plan through post-judgment discovery proceedings.

6.     Among other things, Centrust discovered:

    a.     The Montgomery apartments were transferred to BHA for less than $100;

    b.     BHA is 100% owned and controlled by YRY;

    c.     YRY is managed by Ybarra; and

    d.     Ybarra owns, directly or indirectly, an interest of 100% in YRY's profits, losses, or capital.

7.     Based on the information it discovered, Centrust's attorneys reasonably concluded Ybarra was using YRY and BHA as his alter egos to unjustly shield the Montgomery apartments

2

from Centrust's collection efforts. Centrust's attorneys also reasonably concluded the Montgomery apartments were transferred to BHA with the intent to hinder, delay, or defraud Centrust.

8.      As a result, Centrust's attorneys tried to attach the Montgomery apartments in post-judgment proceedings before the state court. Centrust believes the attachment proceedings would have been successful if they had been completed, but unfortunately, the attachment proceedings were never completed. Before it could complete the attachment proceedings, Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"). Shortly thereafter, ABS sold the judgments to PTCV Development, LLC ("PTCV") and PTCV eventually withdrew the attachment proceedings.

9.      So, in the end, Ybarra's asset protection plan worked, but Ybarra is still not satisfied. Now he wants to use his straw companies to punish Centrust for having the audacity to challenge his plan. For the better part of a year, Ybarra has been using YRY and BHA to threaten Centrust with a malicious prosecution suit regarding the state-court attachment proceedings. The constant threats from Ybarra's straw companies have forced Centrust to notify its insurer of a potential claim. They have also caused Centrust to incur substantial attorneys' fees and costs.

10.     To add insult to injury, Ybarra also used his straw companies to extend the state-court attachment proceedings for his own ulterior motives. Specifically, upon information and belief, Ybarra secretly created PTCV to acquire the judgments Centrust sold to ABS. Then, upon information and belief, Ybarra had PTCV, YRY, and BHA pose as adversaries in the state-court proceedings to: (a) prolong the proceedings; (b) use the proceedings as a discovery vehicle for his anticipated malicious-prosecution suit; and (c) engineer a resolution of the state-court proceedings that would bolster his anticipated malicious-prosecution suit.

11.     In the end, Ybarra's efforts to defraud the state court were only partially successful. He did manage to prolong the state-court proceedings long enough to issue several abusive discovery requests to Centrust and others, but the bizarre, non-adversarial behavior of Ybarra's straw companies eventually aroused the state court's suspicions, prompting the state court to authorize an investigation of their apparent collusion.  The prospect of an investigation promptly ended the attachment proceedings.  Faced with an investigation, Ybarra's straw companies simply sought leave to drop the attachment proceedings and retreated from the state court.

12.     In this case, Centrust is seeking to end Ybarra's machinations once and for all. Centrust is seeking a declaration that neither Ybarra nor his straw companies have any legitimate claim against the bank for malicious prosecution or abuse of process.  Centrust is also seeking to recover damages from Ybarra and his straw companies for their own abuse of process in connection with the state-court proceedings.

<u>**PARTIES**</u>

13.     Centrust is a national banking association.  Centrust's main office is located at 385 Waukegan Rd, Northbrook, Illinois 60062.

14.     Ybarra is an individual that, upon information and belief, is domiciled in Texas. Ybarra resides in Texas, and upon information and belief, intends to remain in Texas.

15.     YRY is a Delaware limited liability company.  Upon information and belief, YRY's members are all citizens of Texas either because they are individuals that resides in Texas with the intent to remain, or because they are trusts with trustees that reside in Texas with the intent to remain.

16.     BHA is an Illinois limited liability company with only one member: YRY.

4

JURISDICTION

17.     The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.

18.     This Court has personal jurisdiction over Defendants because they have each regularly conducted business in Illinois, they have each owned property in Illinois (either directly or indirectly), and they were each involved in the transactions and events described below (which occurred in Illinois).

FACTUAL BACKGROUND

**A.      YBARRA'S MISCONDUCT AS A CENTRUST LOAN OFFICER**

19.     From 2006 to 2008, Ybarra was employed as a loan officer and Vice President by Centrust.

20.     In his capacity as a loan officer, Ybarra was required to evaluate, authorize, and/or recommend the approval of loans that would be in Centrust's best interests to make.

21.     As a loan officer, Ybarra was also responsible for monitoring a portfolio of existing Centrust loans for the purpose of making, authorizing, and/or recommending any necessary actions or adjustments by the bank, such as loan extensions, modifications, or collection activities.

22.     As a loan officer, Ybarra was prohibited from receiving any undisclosed personal benefits from Centrust customers, such as bribes or kickbacks.  He was also prohibited from having any undisclosed personal business dealings with Centrust customers.

23.     As a loan officer, Ybarra was required to disclose any material ownership interest he held in Centrust's customers or prospective customers.

5

24. As a loan officer, Ybarra was required to place Centrust's interests ahead of his own when dealing with Centrust's customers. He was certainly prohibited from releasing Centrust's collateral without its knowledge or consent.

25. Unfortunately, Ybarra did not faithfully discharge his duties as a Centrust loan officer. According to the OCC, Ybarra engaged in a pattern and practice of misconduct during his tenure at Centrust which included personal dishonesty, breaches of fiduciary duties, unjust enrichment, and flagrant disregard for banking laws. Ybarra's misconduct caused Centrust to suffer substantial losses.

26. In 2012, the OCC initiated an enforcement proceeding against Ybarra based on his fraudulent activities (the "OCC Case"). The OCC Case culminated in the entry of a consent order against Ybarra (the "Consent Order") on January 22, 2013 which barred him from any future involvement with an insured depository institution and required him to reimburse Centrust for some of its losses. A true and correct copy of the Consent Order is attached hereto as **Exhibit 1**.

27. According to the Consent Order, Ybarra's misconduct as a Centrust loan officer included:

a. Receiving a bribe from a Centrust borrower in exchange for inducing the bank to make an uncollectable loan to the borrower;

b. Receiving a bribe from a property seller in exchange for inducing Centrust to finance the purchase of the seller's property with an uncollectable loan;

c. Making several undisclosed high-interest, short-term loans to a Centrust borrower with his own personal funds;

d. Employing a straw borrower to conceal from Centrust that he owned a controlling interest in an entity that received a $1.4 million loan from the bank;

e. Purchasing an undisclosed controlling interest in a company that had received several loans from Centrust and acting as the loan officer for the company both before and after his acquisition of the undisclosed controlling interest;

      f.      Purchasing an undisclosed controlling interest in a Centrust borrower and thereafter acting as the bank's loan officer with respect to several additional loans the bank made to the borrower;

      g.      Recording a personal mortgage against a property that was already security for a Centrust loan; and

      h.      Releasing Centrust's mortgage in a property without its knowledge or consent.

**B.**    **CENTRUST'S JUDGMENTS AGAINST YBARRA**

28.    During his tenure at Centrust, Ybarra also obtained loans (collectively, the "Loans")

totaling more than $2.5 million from the bank for entities that he owned and controlled, including:

      a.      <u>Loan 427</u>. Loan number *****427 ("Loan 427") was made to Fox Valley II, a Series of Develco Investments, LLC, an Illinois limited liability company ("Fox Valley II"). The loan was memorialized by a promissory note dated August 31, 2009 for the principal amount of $659,652.63. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Fox Valley II.

      b.      <u>Loan 763</u>. Loan number *****763 ("Loan 763") was made to Higgins-G&W, a Series of Develco Investments, LLC, an Illinois limited liability company ("Higgins-G&W"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $380,000. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-G&W.

      c.      <u>Loan 766</u>. Loan number *****766 ("Loan 766") was made to Higgins-AW, a Series of Develco Investments, LLC, an Illinois limited liability company ("Higgins-AW"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $1,130,000. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-AW.

      d.      <u>Loan 769</u>. Loan number *****769 ("Loan 769") was made to Higgins-NP, a Series of Develco Investments, LLC, an Illinois limited liability company ("Higgins-NP"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $152,000. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-NP.

      e.      <u>Loan 826</u>. Loan number *****826 ("Loan 826") was made to Fox Valley II. The loan was memorialized by a promissory note dated August 31, 2009

for the principal amount of $199,998.97. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Fox Valley II.

29.     Ybarra and his companies eventually defaulted on the Loans. As a result, Centrust initiated several lawsuits (collectively, the "Collection Lawsuits") against Ybarra in the Circuit Court of Cook County, Illinois (the "Circuit Court"). In the Collection Lawsuits, the Circuit Court entered judgments in favor of Centrust against Ybarra for more than $2.6 million (collectively, the "Judgments") as follows:

a.      Case No. 50077. In Circuit Court case number 10-L-50077 ("Case Number 50077"), Centrust obtained a money judgment concerning Loan 766 against Ybarra on January 28, 2010 for $1,142,414.88, plus costs.

b.      Case No. 50078. In Circuit Court case number 10-L-50078 ("Case Number 50078"), Centrust obtained a money judgment concerning Loan 763 against Ybarra on January 28, 2010 for $384,565.22, plus costs.

c.      Case No. 50079. In Circuit Court case number 10-L-50079 ("Case Number 50079"), Centrust obtained a money judgment concerning Loan 769 against Ybarra on January 28, 2010 for $154,275.77, plus costs.

d.      Case No. 50286. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 427 against Ybarra on February 26, 2010 for $710,583.95, plus costs.

e.      Case No. 50287. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 826 against Ybarra on February 26, 2010 for $216,135.04, plus costs.

**C.     CENTRUST'S AGREEMENT WITH CDR**

30.     In February 2012, the current management group, including, but not limited to, James McMahon, were retained by Centrust.

31.     After Centrust's new management team took over, the Judgments remained dormant and substantively unknown to them.

32.     By the summer of 2015, the amount Ybarra owed to Centrust based on the Judgments had increased to more than $3.3 million.

33. Given Ybarra's prior history of employing straw entities and concealing his assets, Centrust's attorneys reasonably suspected Ybarra might be employing similar tactics to protect his assets from Centrust.

34. In or about the summer of 2015, Centrust was approached by Bruce Teitelbaum ("Teitelbaum"). Teitelbaum informed Centrust that: (a) Ybarra was his former business associate; (b) Ybarra owed him money too; and (c) Ybarra was concealing his assets from his creditors. Teitelbaum also indicated he was willing to retain an attorney at his own expense to represent Centrust and himself in collection proceedings against Ybarra if Centrust would agree to share the recovery with Teitelbaum.

35. Eventually, on or about August 18, 2015, Centrust and a corporation Teitelbaum formed known as Cntrst Debt Recovery Corporation ("CDR") entered into an Agreement of Creditors (the "Agreement") that gave CDR the authority to collect the Judgments on the bank's behalf. A true and correct copy of the Agreement is attached hereto as **Exhibit 2**.

36. Under the terms of the Agreement, CDR promised to openly share with Centrust whatever information CDR possessed or acquired regarding the location of Ybarra's assets. CDR also agreed to retain and pay for lead counsel to jointly represent Centrust and CDR in all post-judgment collection actions.

37. In exchange for CDR's engagement of joint counsel for the parties, as well as CDR's agreement to openly share information with Centrust regarding Ybarra's assets, Centrust granted CDR the right to receive 70% of any amount recovered with respect to the Judgments after it was reimbursed for legal expenses. Thus, Centrust retained only a minority stake (30%) in the net amount, if any, recovered from Ybarra after CDR was reimbursed for legal expenses. Centrust also forfeited the right to select its own counsel.

### D. YBARRA'S ASSET PROTECTION PLAN

38.     Shortly after Centrust obtained the Judgments – in or about 2011 – Ybarra surreptitiously created an elaborate asset protection plan designed to conceal and shield his assets from creditors.

39.     In connection with his plan, Ybarra created YRY to act as a holding company for many (probably most) of his assets.  YRY operated as a central vehicle in Ybarra's asset protection scheme.  It was apparently designed to own and control most (perhaps all) of Ybarra's business ventures and investments.

40.     Ybarra of course made himself manager of YRY, thereby vesting himself with complete control over the management of YRY's affairs.  Ybarra also gave himself and his wife 100% beneficial ownership of YRY.  Thus, YRY was 100% owned (directly or indirectly) and controlled by Ybarra.

41.     To further shield his assets, Ybarra also created several subsidiary entities that were owned and controlled by him (indirectly through YRY).

### E. BHA AND THE BOULDER HILL APARTMENTS

42.     BHA is one of YRY's subsidiaries that Ybarra created to shield  his assets from his creditors.  BHA is the record owner of several units in an apartment complex located in Montgomery, Illinois commonly known as the Boulder Hill Apartments (the "Apartments").  Through YRY and BHA, Ybarra indirectly owns and controls the Apartments.

43.     YRY is the sole manager of BHA, thereby vesting Ybarra with complete de facto control over the management of BHA's affairs.  YRY is also the sole member of BHA, which means Ybarra and his wife beneficially own 100% of BHA.

44.     Upon information and belief, Teitelbaum also owned (directly or indirectly) some membership interest in BHA which he transferred to YRY prior to entering into the Agreement with Centrust.   Teitelbaum's former affiliation with BHA presumably afforded him inside information regarding how Ybarra uses BHA and YRY to conceal his assets.

###     F.     MARKOFF'S POST-JUDGMENT PURSUIT OF THE APARTMENTS

45.     Following Centrust's execution of the Agreement, CDR engaged Markoff Law, LLC ("Markoff") to collect the Judgments and generally pursue collection activities against Ybarra.   In connection with its engagement, Markoff took a variety of steps to discover Ybarra's assets and collect the Judgments.

46.     Among other things, Markoff instituted post-judgment proceedings against Ybarra in the Collection Lawsuits by serving citations to discover assets upon Ybarra and others. Eventually, Markoff was able to confirm Ybarra is the beneficial owner of the Apartments through YRY and BHA.

47.     For example, Markoff discovered YRY filed a tax return in which it indicated Ybarra owns, directly or indirectly, an interest of 100% in YRY's profits, losses, or capital.  A true and correct copy of the relevant excerpt from the tax return Markoff discovered is attached hereto as **Exhibit 3**.

48.     Markoff also discovered BHA's Operating Agreement, which indicates YRY is BHA's sole member and manager.  A true and correct copy of BHA's Operating Agreement is attached hereto as **Exhibit 4**.

49.     Markoff also discovered BHA received a quit claim deed (the "Deed") for most of the Apartments from an Illinois limited liability company named Boulder Hill Condominiums, LLC ("BHC") in or about 2018.  A true and correct copy of the Deed is attached hereto as **Exhibit**

**5**. According to the Deed, BHC's manager was YRY, YRY's manager was Ybarra, and BHC received less than $100 from BHA in exchange for the Deed.

50.     In discovery, Markoff was also able to obtain a copy of BHC's Operating Agreement.  Predictably, BHC's Operating Agreement indicated YRY was BHC's sole member and manager.  A true and correct copy of BHC's Operating Agreement is attached hereto as **Exhibit 6**.

51.     Based on the information Markoff was able to develop through discovery, as well as Ybarra's history of employing straw companies to conceal his assets, Markoff reasonably concluded Ybarra was using YRY and BHA as his alter egos or instrumentalities to unjustly shield the Apartments from his creditors.  Markoff also reasonably believed it could develop facts establishing the Apartments were transferred to BHA to hinder, delay, or defraud Ybarra's creditors.  As a result, Markoff ultimately recommended to institute proceedings in the Collection Lawsuits to attach the Apartments.

52.     As a result, Markoff filed a Motion for Judicial Determination and Other Relief Pursuant to 735 ILCS 5/2-1401 (the "Motion for Judicial Determination") on its behalf in Case 50077.  A true and correct coy of the Motion for Judicial Determination – which was filed on May 30, 2019 – is attached hereto as **Exhibit 7**.  In the Motion for Judicial Determination, Centrust sought to attach the Apartments and have them sold to satisfy its Judgments.

53.     The parties never completed discovery regarding the Motion for Judicial Determination, nor did the Circuit Court ever conduct a final evidentiary hearing regarding the motion, or rule on the motion.

54. Before any of that could happen, Centrust assigned the Judgments to ABS, ABS assigned the Judgments to PTCV, and PTCV eventually withdrew the Motion for Judicial Determination.

### G. YBARRA'S CONTINUED USE OF STRAW ENTITIES

55. Although the parties never completed discovery regarding the Motion for Judicial Determination, further evidence did emerge in the Collection Actions of Ybarra's use of straw entities to conceal his assets and implement his hidden agendas.

56. Specifically, upon information and belief, it appears Ybarra established PTCV to acquire the Judgments from Centrust's successor, ABS. Upon information and belief, Ybarra then had PTCV, YRY, and BHA pose as adverse parties to keep the post-judgment proceedings in Case 50077 alive, not for the purpose of satisfying the Judgments, but rather for the surreptitious purpose of conducting discovery regarding a potential malicious-prosecution suit Ybarra planned to have YRY and BHA bring against Centrust for having attempted to attach the Apartments.

57. In connection with his scheme, upon information and belief, Ybarra had YRY and BHA issue burdensome discovery requests to Centrust, CDR, Teitelbaum, and Markoff that primarily focused on their past efforts to collect the Judgments, rather than the merits of the pending Motion for Judicial Determination. Meanwhile, upon information and belief, Ybarra had PTCV keep the Motion for Judicial Determination pending for the sole purpose of giving the Circuit Court the false impression that there was some pending adverse claim among YRY, BHA, and PTCV regarding the Apartments that would someday require adjudication.

58. Eventually, the Circuit Court grew suspicious that Ybarra, YRY, BHA, and PTCV might not truly be adverse parties when CDR and Teitelbaum pointed out:

> a. PTCV never took any concrete steps to prosecute the Motion for Judicial Determination;

      b.      PTCV never conducted any discovery to support the pending Motion for Judicial Determination or defend against the adverse claims of YRY and BHA concerning the Apartments;

      c.      PTCV relied on the discovery of YRY and BHA, which were supposedly PTCV's adversaries;

      d.      PTCV exhibited tremendous passivity, if not indifference, towards YRY, BHA, and the outcome of proceedings concerning the Motion for Judicial Determination;

      e.      Ybarra's former counsel appeared to have some continuing, behind-the-scenes role in orchestrating the litigation strategies of YRY, BHA, and PTCV;

      f.      PTCV's lead attorney in Case 50077 had a long-time, close working relationship with Ybarra's former counsel;

      g.      PTCV's principal office is located at the law firm that represented PTCV in Case 50077;

      h.      The individuals behind the ownership and management of PTCV could not be determined from its filings with the Illinois Secretary of State.

      i.      PTCV was formed in the fall of 2020 by the law firm that represented it in Case 50077;

      j.      CDR and Teitelbaum tried to determine who owned PTCV from ABS, but ABS refused to disclose that information;

      k.      One of PTCV's attorneys never appeared in Case 50077 after CDR and Teitelbaum filed a motion for sanction against her; and

      l.      Ybarra, PTCV, YRY, and BHA never denied they have a friendly relationship.

59.      Due to its suspicions, the Circuit Court entered an order on May 3, 2021 granting Centrust, CDR, Teitelbaum, and Markoff leave to conduct discovery regarding potential collusion among Ybarra, PTCV, YRY, and BHA. A true and correct copy of the Circuit Court's May 3, 2021 order is attached hereto as **Exhibit 8**.

60.      Almost immediately after the Circuit Court entered its May 3, 2021 order, Ybarra, PTCV, YRY, and BHA suddenly submitted a joint proposed agreed order to the Circuit Court that

would withdraw the Motion for Judicial Determination and withdraw the adverse claims of YRY and BHA. Upon information and belief, Ybarra caused PTCV, YRY, and BHA to submit the above-referenced agreed order to the Circuit Court because he wanted to terminate the post-judgment proceedings in Case 50077 before Centrust, CDR, Teitelbaum, and Markoff could conduct discovery regarding Ybarra's secret control over PTCV, YRY, and BHA, as well as the collusion among PTCV, YRY, BHA, and Ybarra.

### H.    YRY AND BHA'S THREATS AGAINST CENTRUST

61.    To make matters worse, YRY and BHA have also repeatedly threatened Centrust with legal action.

62.    According to YRY and BHA, they intend to sue Centrust for "abusive" and "frivolous" prosecution of the Motion for Judicial Determination and certain related matters. A true and correct copy of a notice of claim (the "Notice of Claim") YRY and BHA's attorneys served on Centrust regarding their alleged claims is attached hereto as **Exhibit 9**.

63.    YRY and BHA served the Notice of Claim on Centrust more than seven months ago. In the Notice of Claim, YRY and BHA expressly demanded that Centrust notify its insurers of their claims. Since they served their Notice of Claim on Centrust, YRY and BHA have repeated their threats of litigation on numerous occasions, but they have never actually filed a lawsuit.

64.    Upon information and belief, Ybarra is the party responsible for causing YRY and BHA to threaten Centrust with litigation.

### COUNT I – DECLARATORY JUDGMENT (NO MALICIOUS PROSECUTION)

65.    Centrust incorporates by reference Paragraphs 1 through 64 of its Complaint.

66.    As alleged above, there is a substantial controversy between Centrust and Defendants regarding the issue of whether Centrust maliciously prosecuted claims in the Circuit

Court concerning the Apartments. Defendants assert Centrust maliciously prosecuted the Motion for Judicial Determination and certain related matters in the Circuit Court; whereas Centrust denies it maliciously prosecuted the Motion for Judicial Determination or any other matter in the Circuit Court.

67.     As alleged above, the parties have adverse legal interests in the resolution of the controversy between them. Defendants are seeking to recover damages from Centrust; whereas Centrust is seeking to avoid paying any damages to Defendants.

68.     As alleged above, the controversy between Centrust and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court. Defendants have served the Notice of Claim on Centrust and repeatedly threatened to file a lawsuit against Centrust. Due to Defendants' threats, Centrust has been forced to notify its insurer of a potential claim.

69.      Under the Declaratory Judgment Act, this Court may resolve the controversy between Centrust and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of malicious prosecution.

70.     In this regard, Centrust respectfully submits that it did not maliciously prosecute any claims against Defendants in the Collection Lawsuits.

71.     As alleged above, Centrust did not commence or continue any cause of action against Defendants in the Collection Lawsuits that was terminated in Defendants' favor.

72.     Nor did Centrust commence or continue any cause of action against Defendants in the Collection Lawsuits with malice or without probable cause.

73.     Instead, Centrust merely attempted to attach the Apartments because its attorneys reasonably suspected Ybarra was using YRY and BHA as his alter egos or instrumentalities to

16

unjustly shield his assets from his creditors. As alleged above, there is an abundance of documentary proof that readily reveals Ybarra directly or indirectly owns and controls YRY and BHA. Moreover, Ybarra has a long history of employing straw companies to shield his assets and implement his hidden agendas.

74.     In addition, as alleged above, BHA received the Apartments for less than $100 from another company (BHC) directly or indirectly owned and controlled by Ybarra. As result, Centrust's attorneys also reasonably suspected the Apartments were transferred to BHA with the intent to hinder, delay, or defraud Ybarra's creditors.

75.     Given these facts and circumstances, Defendants do not have any valid claim against Centrust for malicious prosecution.

WHEREFORE, Centrust respectfully requests asks this Court to enter an order:

A.     Declaring Centrust did not commence or continue any cause of action against Defendants in the Collection Lawsuits with malice or without probable cause;

B.     Declaring Defendants have no valid claim against Centrust for malicious prosecution or otherwise concerning the Collection Lawsuits or Apartments; and

C.     Granting Centrust such further relief as this Court deems just.

### COUNT II – DECLARATORY JUDGMENT (NO ABUSE OF PROCESS)

76.     Centrust incorporates by reference Paragraphs 1 through 75 of its Complaint.

77.     As alleged above, there is a substantial controversy between Centrust and Defendants regarding the issue of whether Centrust committed an abuse of process in connection with the Collection Lawsuits. Defendants assert the Motion for Judicial Determination and certain related matters pursued by Centrust in the Circuit Court were an abuse of process; whereas Centrust denies any such abuse of process ever occurred.

78.     As alleged above, the parties have adverse legal interests in the resolution of the controversy between them.  Defendants are seeking to recover damages from Centrust; whereas Centrust is seeking to avoid paying any damages to Defendants.

79.     As alleged above, the controversy between Centrust and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court.  Defendants have served the Notice of Claim on Centrust and repeatedly threatened to file a lawsuit against Centrust.  Due to Defendants' threats, Centrust has been forced to notify its insurer of a potential claim.

80.      Under the Declaratory Judgment Act, this Court may resolve the controversy between Centrust and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of abuse of process.

81.     In this regard, Centrust respectfully submits that it did not commit any abuse of process in the Collection Lawsuits.

82.     Centrust had no ulterior purpose or motive for pursuing the Motion for Judicial Determination, seeking attachment of the Apartments, or attempting to collect the Judgments.  Centrust's sole objective was the satisfaction of the Judgments by proper legal means.

83.      Furthermore, Centrust did not employ any legal process in the Collection Lawsuits that was not proper in the regular prosecution of those proceedings.

84.     As a result, Defendants have no valid claim for abuse of process against Centrust.

WHEREFORE, Centrust respectfully requests asks this Court to enter an order:

A.     Declaring Centrust did not have any ulterior motive or purpose for pursuing any of the matters it pursued in the Collection Actions;

B. Declaring Centrust did not employ any legal process in the Collection Lawsuits that was not proper in the regular course of those proceedings;

C. Declaring Defendants have no valid claim against Centrust for abuse of process or otherwise concerning the Collection Lawsuits or Apartments; and

D. Granting Centrust such further relief as this Court deems just.

<u>COUNT III – ABUSE OF PROCESS (AGAINST DEFENDANTS)</u>

85. Centrust incorporates by reference Paragraphs 1 through 84 of its Complaint.

86. As alleged above, Defendants caused YRY and BHA's counsel to serve discovery requests on Centrust in connection with the Collection Lawsuits.

87. Defendants pretended the discovery requests were served for the purpose of developing evidence to defeat the Motion for Judicial Determination and prevent PTCV from attaching the Apartments. However, Defendants' true purpose and motive for serving the discovery on Centrust was to develop evidence for a subsequent lawsuit against Centrust and others.

88. As alleged above, Defendants also conspired to perpetuate the post-judgment proceedings in Case 50077 even though there was no legitimate adverse claim among PTCV, YRY, and BHA regarding the Motion for Judicial Determination or Apartments. Defendants perpetuated the state-court proceedings for the sole purpose of keeping those proceedings alive while they pursued unrelated discovery designed to develop evidence for subsequent litigation against Centrust and others.

89. It was not proper for Defendants to serve abusive discovery on Centrust in the Collection Lawsuits for information that was unrelated to the claims pending in those cases, nor was it proper for Defendants to perpetuate the post-judgment proceedings when there was no

legitimate controversy among them regarding the Motion for Judicial Determination or Apartments.

90.     Centrust has suffered significant damage because of Defendants' abuse of process in the Collection Lawsuits, including, without limitation, attorneys' fees and costs related to the Collection Lawsuits and above-referenced abusive discovery.

WHEREFORE, Centrust respectfully asks this Court to enter an order awarding damages to Centrust and such other relief as this Court deems just.

<u>**JURY DEMAND**</u>

Centrust hereby demands a jury trial on all matters triable by jury alleged in their Complaint.

Dated: May 12, 2021                                    Respectfully submitted,

                                                       **CENTRUST BANK, N.A.**

                                                       By: /s/ Adam B. Rome
                                                              One of Its Attorneys

Adam B. Rome (ARDC 6278341)
Zachary Mulcrone (ARDC 6300387)
GREIMAN, ROME & GRIESMEYER, LLC
205 W. Randolph Street, Suite 2300
Chicago, Illinois 60606
(312) 428-2750
arome@grglegal.com
zmulcrone@grglegalcom

# EXHIBIT 1

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

| | |
|---|---|
| In the Matter of: ) | |
| ) | AA-EC-12-139 |
| Ruben Ybarra, former loan officer, ) | |
| ) | |
| CenTrust Bank, N.A. ) | |
| Northbrook, IL ) | |

### CONSENT ORDER

WHEREAS, the Comptroller of the Currency of the United States of America

("Comptroller"), intends to initiate an enforcement proceeding pursuant to

12 U.S.C. § 1818 against Ruben Ybarra ("Mr. Ybarra" or "Respondent"), former loan

officer, CenTrust Bank, N.A., Northbrook, Illinois ("Bank"); and

WHEREAS, in the interest of cooperation and to avoid the costs associated with

future administrative and judicial proceedings with respect to this matter, Mr. Ybarra,

without admitting or denying any wrongdoing, desires to enter into this Consent Order

("Order") issued pursuant to 12 U.S.C. §§ 1818(b), (e), and (i);

NOW, THEREFORE, in consideration of the above premises, it is stipulated by

and between the Comptroller, through his duly authorized representative, and Mr. Ybarra

that:

1

Initials: _____
Date: 12/31/12

## Article I

## JURISDICTION

(1)     The Bank is a national banking association, chartered and examined by the Comptroller, pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 et seq.  Accordingly, the Bank is an "insured depository institution" as that term is defined in 12 U.S.C. § 1813(c)(2).

(2)     Respondent served as a loan officer of the Bank and is an "institution-affiliated party" of the Bank as that term is defined in 12 U.S.C. § 1813(u), having served in such capacity within six (6) years from the date hereof (see 12 U.S.C. § 1818(i)(3)).

(3)     Pursuant to 12 U.S.C. § 1813(q), the Comptroller is the "appropriate Federal banking agency" to maintain an enforcement proceeding against institution-affiliated parties.  Therefore, Respondent is subject to the authority of the Comptroller to initiate and maintain prohibition and cease and desist actions against him pursuant to 12 U.S.C. §§ 1818 (b), (e), and (i).

## Article II

## COMPTROLLER'S FINDINGS

The Comptroller finds, and Respondent neither admits nor denies, the following:

(1)     From 2006 to 2008, Respondent worked as a loan officer at the Bank.

(2)     During 2007 and 2008, Mr. Ybarra did not disclose to the Bank that he received two $10,000 payments in return for inducing the Bank to make certain loans: one from a borrower on one loan ("Customer A") and one from the seller of a property that was the subject of another loan.  He also failed to disclose to the Bank that he had

2

Initials: _____
Date: 12/31/12

made several high-interest, short-term loans, using his own funds, to Customer A. The borrowers defaulted on these Bank loans, causing the Bank to incur significant financial losses.

(3)    In 2007, Mr. Ybarra used a straw borrower to conceal from the Bank that he held a controlling ownership interest in an entity that received a $1.4 million loan from the Bank. This loan caused the Bank to unknowingly violate 12 C.F.R. § 32.3(a) and 12 U.S.C. § 84 because, when aggregated with other loans made by the Bank to Mr. Ybarra, the loans outstanding to Mr. Ybarra exceeded limits on loans to one borrower.

(4)    In 2007, Mr. Ybarra purchased a controlling interest in a company that had received several loans from the Bank, on which loans Mr. Ybarra had served as loan officer. Mr. Ybarra did not inform the Bank of his purchase of a controlling interest in this borrower, despite continuing to serve as loan officer on several additional loans by the Bank to this company. Further, Mr. Ybarra put his own interests ahead of the Bank's by recording his own mortgage on a property securing the Bank's loans and by releasing the Bank's mortgage on that property without the knowledge or consent of the Bank.

(5)    By reason of the foregoing conduct, Respondent also engaged in violations of law, including 18 U.S.C. §§ 215, 656 and 1344. Respondent also committed reckless unsafe or unsound practices; engaged in a pattern or practice of misconduct; breached his fiduciary duty to the Bank; and exhibited personal dishonesty and a willful and continuing disregard for the law that resulted in personal gain and unjust enrichment to himself and substantial losses to the Bank.

3

Initials: _____
Date: 12/21/1L

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby ORDERS that:

<u>Article III</u>

<u>ORDER OF PROHIBITION</u>

(1)      With respect to the institutions and agencies set forth in paragraph (2) of this Article, Respondent hereby agrees that he shall not:

      (a)      participate in any manner in the conduct of their affairs;

      (b)      solicit, procure, transfer, attempt to transfer, vote, or attempt to vote any proxy, consent, or authorization with respect to any voting rights;

      (c)      violate any voting agreement previously approved by the "appropriate Federal banking agency," as defined in 12 U.S.C. § 1813(q) (as amended); or

      (d)      vote for a director, or serve or act as an "institution-affiliated party," as defined in 12 U.S.C. § 1813(u) (as amended).

(2)      The prohibitions in paragraph (1) of this Article apply to the following institutions and agencies:

      (a)      any insured depository institution, as defined in 12 U.S.C. § 1813(c);

      (b)      any institution treated as an insured depository institution under 12 U.S.C. §§ 1818(b)(3), (b)(4) or (b)(5), any insured credit union under the Federal Credit Union Act; any institution chartered under

4

Initials: 
Date:

the Farm Credit Act of 1971; any appropriate Federal depository

institution regulatory agency; and the Federal Housing Finance

Board and any Federal Home Loan Bank.

(3)     The prohibitions of paragraphs (1) and (2) of this Article shall cease to

apply with respect to a particular institution if Respondent obtains the prior written

consent of both the Comptroller and the institution's "appropriate Federal financial

institutions regulatory agency," as defined in 12 U.S.C. § 1818(e)(7)(D) (as amended).

(4)     This Order shall be enforceable to the same extent and in the same manner

as an effective and outstanding order that has been issued and has become final pursuant

to 12 U.S.C. § 1818.

## Article IV

## CEASE AND DESIST ORDER FOR REIMBURSEMENT OF LOSS

(1)     Mr. Ybarra shall reimburse the Bank for $25,000 of the losses it has

suffered with respect to the aforementioned loans.  The full amount of the reimbursement

is due upon execution of this document.   Respondent shall make payment by certified

check or money order and shall deliver the payment to the Board of Directors, CenTrust

Bank, N.A., 385 Waukegan Road, Northbrook, IL 60062.  Respondent shall send a copy

of the check or money order to the Director, Enforcement and Compliance Division, 250

E Street, SW, Washington, DC 20219.

(2)     This Order shall be enforceable to the same extent and in the same manner

as an effective and outstanding order that has been issued and has become final pursuant

to 12 U.S.C. § 1818.

5

Initials: _____
Date: 12/31/1_

## Article V

## WAIVERS

(1)     By executing this Order, Respondent waives:

    (a)    the right to the issuance of a Notice of Charges under 12 U.S.C. § 1818;

    (b)    all rights to a hearing and a final agency decision pursuant to 12 U.S.C. § 1818 and 12 C.F.R. Part 19;

    (c)    all rights to seek judicial review of this Order;

    (d)    all rights to contest in any way the validity of this Order; and

    (e)    any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or this Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412.

(2)     Respondent shall not cause, participate in or authorize the Bank (or any subsidiary or affiliate thereof) to incur, directly or indirectly, any expense for any legal (or other professional) expense relative to the negotiation and issuance of this Order except as permitted by 12 C.F.R. § 7.2014 and Part 359; and Respondent shall not, directly or indirectly, obtain or accept any indemnification (or other reimbursement) from the Bank (or any subsidiary or affiliate thereof) with respect to such amounts except as permitted by 12 C.F.R. § 7.2014 and Part 359.

6

Initials: _TRA_
Date: _12/31/12_

(3)     Respondent has read and understands the premises and obligations of this Order and declares that no separate promise or inducement of any kind has been made by the Comptroller, his agents or employees to cause or induce Respondent to agree to consent to the issuance of this Order and/or to execute this Order.

(4)     This Order constitutes a settlement of the prohibition and reimbursement of loss proceeding contemplated by the Comptroller and arising out of the specific acts, omissions, or violations described in Article II of this Order.  However, the specific acts, omissions or violations described in Article II of this Order may be used by the Comptroller in future enforcement actions to establish a pattern or practice of misconduct or the continuation of a pattern or practice of misconduct.

(5)     The provisions of this Order shall not be construed as an adjudication on the merits and, except as set forth above in paragraph (4), shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any action affecting Respondent if, at any time, he deems it appropriate to do so to fulfill the responsibilities placed upon him by the several laws of the United States of America.

(6)     Respondent understands that nothing herein shall preclude any proceedings brought by the Comptroller to enforce the terms of this Order, and that nothing herein constitutes, nor shall Respondent contend that it constitutes, a waiver of any right, power, or authority of any other representatives of the United States or agencies thereof, including the Department of Justice, to bring other actions deemed appropriate.

7

Initials: _RH_
Date: _12/31/12_

IN TESTIMONY WHEREOF, the undersigned have hereunto set their hands.

_____          ___1/22/13_____
Kristina B. Whittaker                     Date
Deputy Comptroller for Special Supervision

_____          ___12/31/12____
Ruben Ybarra                              Date

8

Initials: _RY_
Date: 12/31/12

# EXHIBIT 2

## AGREEMENT OF CREDITORS

This Agreement is made on August *18*, 2015 by and between Cntrst Debt Recovery Corporation (*"Cntrst"*), and Centrust Bank, N.A.(*"Bank"*) (Cntrst and Centrust are collectively the *"Creditors"*), for the purpose of reaching an agreement of cooperation among the Creditors for the sharing of information and asset recovery related to the following common and/or related debtors: Higgins-NP, a Series of Develco Investments, LLC (*"Higgins-NP"*), Higgins-AW, a Series of Develco Investments, LLC (*"Higgins-AW"*), Fox Valley II, a series of Develco, Investments, LLC (*"Fox Valley II"*), Ruben Ybarra (*"Ruben"*), (Higgins-NP, Higgins-AW and Fox Valley II, are collectively referred to as the *"Debtors"*).

### RECITALS

WHEREAS, Bank has a claim for payment against Higgins-NP, Higgins-AW, Fox Valley II, and Ruben (as defined below, "Centrust's Claim");

WHEREAS, the Cntrst and Bank wish to recover property and assets from the Debtors (the "Debtors' Estate") towards satisfaction of the Creditor's respective Claims;

WHEREAS, the Cntrst and Bank believe that the Debtors' Estate contains property and assets to satisfy both of the Creditors' Claims in full;

WHEREAS, the Cntrst and Bank believe that the Debtors' Estate lack sufficient property and assets to satisfy both of the Creditors' Claims in full;

WHEREAS, the Cntrst and Bank understand that they are currently competing to locate and recover assets and property from the Debtors' Estate toward satisfaction of their respective Claims;

WHEREAS, the Cntrst and Bank understand that they mutually stand to benefit through a cooperative effort in the recovery of assets and property from the Debtors' Estate through the sharing of information, or recovery of assets (the "Cooperative Effort");

WHEREAS, Cntrst and the Bank each understand that the Cooperative Effort will allow the Creditors to mitigate the risk that one Creditor recovers substantially all of the Debtor's Assets thereby impairing the other Creditor's ability to satisfy its Claim;

NOW THEREFORE, in consideration of the promises and covenants set forth, and other good and valuable consideration, it is stipulated and agreed, as follows:

1. **Recitals.** The foregoing recital paragraphs are incorporated into and form a part of this Agreement.

2. **The Creditors' Claims.** The Creditors' Claim consist of their respective right to payment from the Debtors as described in this paragraph, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. The Creditor's Claims are as follows:

   a. **Bank Claim.** Bank has a claim against Higgins-NP, Higgins-AW, Fox Valley II, and Ruben which it is renewing by assignment from CenTrust Bank, National Association, as described herein:

      i. A judgment in case number 2010 L 050287 in the amount of $1,142,414.88 as of January 8, 2010 pursuant to an October 25, 2007 promissory note under loan

1

number 5000766;

    ii.    A judgment in case number 2010 L 050079 in the amount of $154,275.77 as of January 8, 2010 pursuant to a October 25, 2007 promissory note under loan number 5000769;

    iii.    A judgment in case number 2010 L 050286 in the amount of $710,583.95 as of January 14, 2010 pursuant to an August 31, 2009 promissory note under loan number 5000427; and

    iv.    A judgment in case number 2010 L 050287 in the amount of $216,134.04 as of January 14, 2010 pursuant to a August 21, 2009 promissory note under loan number 5000826.

As of August 25, 2015, the total amount of Bank's Claim with post-judgment interest is $3,332,447.20 plus costs.

3.    **The Cooperative Effort.** In an effort to mitigate the risks and costs of independently seeking to locate and recover assets and property from the Debtors' Estate. The Cooperative Effort shall continue until this agreement is terminated, as defined in Paragraph 6, below.

    a.    **The Joint Asset Recovery Action.** The "Joint Asset Recovery Action" means any legal or equitable proceeding to locate or recover assets or property from the Debtor's Estate. The Joint Asset Recovery Action does not include any legal or equitable proceeding involved in reducing Cntrst's Claim to a judgment.

    b.    **Sharing of Information.** The Creditors agree to openly share any and all information each has concerning the Debtors' Estate, that could lead to information concerning the Debtor's Estate, or that might otherwise aid the Creditors in the Joint Asset Recovery Action, subject to any applicable Illinois or Federal Law.

    c.    **Lien Priority and Sharing.** Any lien in favor of either Creditor in any asset or property shall be treated by Creditors as if the Creditors have an interest in the secured asset or property consistent with the proportion set forth in subparagraph (g) of this paragraph.

    d.    **Litigation Costs.** Counsel retained by Cntrst shall act as lead counsel for both Creditors in the Joint Asset Recovery Action ("Lead Counsel"). Cntrst may retain additional counsel ("Additional Counsel") to solely represent Cntrst's interest and claim in the Joint Asset Recovery Action. Additional Counsel shall assist Lead Counsel to meet the goal of this Agreement, but shall not be deemed Counsel for Bank. Cntrst is responsible for payment of all costs and attorney's fees due to "lead counsel" in the joint recovery action.

    e.    **Global Settlement.** Neither Creditor shall settle, transfer, impair, encumber or assign its Claim, or any rights stemming therefrom, without the express written consent of the other Creditor. Subject to Paragraph 5, The Creditors agree that Cooperative Effort and the Joint Asset Recovery Action shall continue until the Creditors agreed to a Global Settlement with the Debtors.

    f.    **Sharing of Recovery.** The Creditors under and agree that in exchange for Cntrst's investment into the Joint Asset Recovery Action (through Cntrst payment of Attorneys' Fees and Costs), Cntrst and Bank shall be entitled to a proportional share in the entire Recovery that may exceed the amount necessary to satisfy Cntrst's Claim. Subject to Paragraph 4, and in consideration of

2

the sharing of costs described in subparagraph (d) of this paragraph, the Creditors agree that the Distribution of Gross Proceeds shall occur as follows:

    i.    30% of the Gross Proceeds to Bank ("Bank's Proceeds")

    ii.    70% of the Gross Proceeds to Cntrst ("Cntrst's Proceeds")

4. **Distribution of Recovery.** Any and all assets or property recovered from any of the Debtors (each a "Recovery") shall be immediately distributed to the Creditors as follows (each a "Distribution")

    a.    First, if the Recovery is of non-cash property or assets, said property or assets shall be liquidated by a means that would maximize its value and that is authorized under Illinois law, unless otherwise agreed to by the Creditors;

    b.    Second, Banks' Proceeds shall be distributed to Bank subject to Illinois Law and any representation agreement with Additional Counsel. There shall be no deduction for Attorney's Fees or Costs from Bank's Proceeds.

    c.    All monies or assets received pursuant to this agreement shall be first paid to the Bank. Bank will hold funds in escrow and distribute funds, first to itself in the amount of 30% and then to Cntrst in the amount of 70% as outlined herein.

5. **Termination.** This Agreement shall remain in full force and effect from the date of this Agreement to the earliest of the following: (1) termination of this Agreement by mutual written agreement of both Creditors or (2) a global settlement of both of the Creditors' Claims (as defined in Paragraph 3(e), above). This Agreement is not terminated by the filing of any bankruptcy by any of the Debtors.

6. **Waiver of Conflict.**

    a.    **Attorney Conflict.** The law firm of Markoff Law LLC hereby discloses that it has previously represented CenTrust Bank National Association in an unrelated matter and that it was retained by CenTrust Bank National Association to draft this Agreement (the "Attorney Conflict").

        i.    **Previous Representation and Drafting.** Cntrst acknowledges that it was encouraged to review this Agreement by independent counsel, had an opportunity to review this Agreement with independent counsel, and after thoughtful review and consideration of this Agreement's term agrees that the drafting of this Agreement was an arms-length transaction in the best interest of both Creditors and hereby gives its informed consent to waive any conflict stemming from the Attorney Conflict.

    b.    **Creditors Conflict.** The Creditors understand that each has a potential for a greater recovery of assets or property from the Debtors' Estate by retaining independent counsel who have an incentive to locate and recover assets from the Debtors' Estate prior to any creditor. The Creditors also understand the Debtors' Estate may lack sufficient assets to fully satisfy both of the Creditors' Claims. However, the Creditors agree that it is preferable to mitigate the risk of Costs, Attorneys Fees, and non-recovery through cooperation under this Agreement. The Creditors hereby gives their informed consent to waive any conflict stemming therefrom.

7. **Advice of Counsel.** The Creditors have had the benefit of the advice of counsel of its own choice in the negotiating, drafting, and execution of this Agreement, and the language in all parts of this

3

Agreement is a product of the efforts of all counsel. Accordingly, neither the entire Agreement nor any provision contained herein shall be deemed to have been proposed or drafted by any party or construed against any party. This Agreement shall be construed as a whole according to its plain meaning.

8. **Counterparts.** This Agreement may be executed in separate counterparts, each of which shall be deemed to be a fully executed original as to all parties that have executed any one or more of those separate counterparts.

9. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties, and each and all of their heirs, personal representatives, successors, and assigns.

10. . **Governing Law & Forum.** This Agreement shall in all respects be interpreted, enforced and governed by and under the laws of the State of Illinois. Any action, motion, or pleading related to this Agreement shall be brought in in the Illinois Circuit Court of Cook County in Chicago.

11. **Construction.** This Agreement shall be construed without regard to the party or parties responsible for its preparation and shall be deemed as having been prepared jointly by the parties. Any ambiguity or uncertainty existing herein shall not be interpreted or construed against any party.

12. **Entire Agreement.** This Agreement constitutes the entire agreement of the parties and supersedes all prior or contemporaneous agreements, discussions, or representations, oral or written, with respect to the subject matter, and each of the parties states that they have read each of the paragraphs and that they understand the same and understand the legal obligations created.

13. **Notices.** Any notices given or required to be given under this Agreement shall be in writing and delivered either personally or by first class mail or via commercial overnight courier as follows:

    a. All notice given to Bank shall be sent to the following address:

       **James McMahon**
       **President**
       **CenTrust Bank, N.A.**
       **385 Waukegan Road**
       **Northbrook, Illinois 60062**

    b. All notice given to Cntrst shall be sent to the following address:

       **Cntrst**
       **c/o Bruce Teitelbaum**
       **1363 Shermer Rd., Ste. 212**
       **Northbrook, Illinois 60062**

    Notices delivered personally, by overnight courier, electronic mail, or by facsimile shall be deemed given when received. Notices delivered by mail shall be deemed received three business days after mailing. Parties may change their address for notices in a notice given pursuant to this paragraph.

14. **Confidentiality.** Except as necessary to implement and enforce this Agreement, and as otherwise may

4

be required by law, Creditors and their respective counsel agree to keep the terms and conditions of this Agreement in strict confidence, and shall not discuss the same with any person, except their respective attorneys, accountants and staff, except as may be required by law. Other than disclosures permitted pursuant to the foregoing provisions of this paragraph, in the event that either party or any representative of either party is or becomes legally obligated (whether by applicable law, rule, order, regulation, or similar enactment now existing or hereafter promulgated) or legally compelled (by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand or similar process) to disclose the existence of any of the terms of this Agreement or any document executed or delivered in connection herewith, then the party so compelled shall provide the other party to this Agreement with reasonably prompt notice prior to such disclosure (and in no event less than five business days' notice) so that such other party may seek a protective order or other appropriate remedy to attempt to prevent the disclosure if it so desires.

*[END OF AGREEMENT. SIGNATURE PAGE TO FOLLOW]*

5

*AGREED TO AND EXECUTED BY*

Dated: August __ 2015

CenTrust Bank, National Association

By: _____

Its:

*OFFICIAL SEAL*
*CYNTHIA R. CAREY*
*NOTARY PUBLIC, STATE OF ILLINOIS*
*MY COMMISSION EXPIRES 3/5/2018*

COUNTY OF COOK   )
                 ) ss:
STATE OF ILLINOIS  )

On August __, 2015, before me, _____, a Notary Public in and for said State, personally appeared _____, known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged that they executed the same.

*Witness my hand and official seal.*

NOTARY PUBLIC

Dated: August __ 2015

Cntrst

By: _____

Its: President

COUNTY OF COOK   )
                 ) ss:
STATE OF ILLINOIS  )

*OFFICIAL SEAL*
*ERIC P FERLEGER*
*NOTARY PUBLIC - STATE OF ILLINOIS*
*MY COMMISSION EXPIRES:03/06/18*

On August __, 2015, before me, _____, a Notary Public in and for said State, personally appeared _____, known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged that they executed the same.

*Witness my hand and official seal.*

NOTARY PUBLIC

6

# EXHIBIT 3

**SCHEDULE B-1**
**(Form 1065)**
(Rev. December 2011)

Department of the Treasury
Internal Revenue Service

# Information on Partners Owning 50% or More of the Partnership

▶ Attach to Form 1065. See instructions on back.

OMB No. 1545-0099

Name of partnership

YRY HOLDINGS, LLC

Employer identification number (EIN)

**Part I** Entities Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3a)

Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, tax-exempt organization, or any foreign government that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| YBARRA CHILDREN INVESTMENT | | TRUST | US | 50.000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II** Individuals or Estates Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3b)

Complete columns (i) through (iv) below for any individual or estate that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| RUBEN YBARRA | Redacted - Personally Identifiable Information | US | 100.000 |
| YOLANDA YBARRA | | US | 100.000 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 1065.

Schedule B-1 (Form 1065) (Rev. 12-2011)

JSA
6P1038 1.000

0194NQ 701Y

V16-7.14F

CONFIDENTIAL

BDO-Ybarra 000436

FILED DATE: 5/30/2019 4:11 PM    2010L050077

# EXHIBIT 4

OPERATING AGREEMENT

OF

## BOULDER HILL APARTMENTS

An Illinois Limited Liability Company

## ARTICLE I

## FORMATION

**1.1** **Formation**. BOULDER HILL APARTMENTS, LLC, an Illinois limited liability company (the "Company"), was formed by filing its Articles of Organization (the "Articles") with the Illinois Secretary of State on May 20th, 2015, pursuant to and in accordance with the Illinois Limited Liability Company Act, as amended (the "Act"). The sole member of the Company shall be YRY Holdings, LLC, ("Sole Member"), a Delaware limited liability company. In the event of any conflict between the provisions of this Agreement and the provisions of the Articles, the provisions of the Articles shall govern.

**1.2** **Name**. The name of the Company is Boulder Hill Apartments, LLC. All business of the Company shall be conducted in the name the Company and the Company shall hold all of its assets in its own name. The Sole Member may change the name of the Company.

**1.3** **Principal Place of Business**. The principal place of business of the Company shall be 4 Rocky Way, Unit #13, Montgomery, IL 60538. The Sole Member may change the principal place of business of the Company, and may establish additional places of business of the Company both within and without the State of Illinois.

**1.4** **Registered Agent and Registered Office**. The registered agent and registered office of the Company in Illinois shall be Ruben Ybarra, 4 Rocky Way, Unit #13, Montgomery, IL 60538. The Sole Member may change the registered agent and/or registered office of the Company at any time.

**1.5** **Purpose**. The Company is formed for the purpose of engaging in any business for which a limited liability company may be formed pursuant to the Act.

**1.6** **Term**. The term of the Company shall commence on the date the Articles was filed with the Illinois Secretary of State and shall continue until the Company is dissolved and liquidated pursuant to the terms of this Agreement or of the Act.

## ARTICLE II

## TAX TREATMENT

The Company shall be treated as a sole proprietorship for tax purposes unless and until at least one additional Member is added in which event the Company shall thereafter be treated as a partnership for tax purposes.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

Upon execution of this Agreement the Sole Member contributed One Hundred and No/100 Dollars ($100.00) in exchange for one hundred percent (100%) of the membership interests in the Company and was admitted as the sole member (the "Sole Member") of the Company. The Sole Member may, from time to time, make additional capital contributions to the Company or the Company may borrow such capital from any person or persons, including the Sole Member, but in no event shall the Sole Member be required to make additional capital contributions to the Company, to loan money to the Company, or to cause the Company to borrow money from any other person.

## ARTICLE IV

## DISTRIBUTIONS

Interim distributions from the Company shall be payable at the times and in the amounts determined by the Sole Member in its sole discretion.

## ARTICLE V

## ALLOCATIONS

Except as may be required by the Internal Revenue Code of 1986, as amended, or the provisions of any successor statute (the "Code"), all items of income, gain, loss, deduction and credit of the Company shall be allocated to the Sole Member.

## ARTICLE VI

## MANAGEMENT

**6.1** <u>Management</u>. The business of the Company shall be managed by the Sole Member. The Sole Member shall have full authority to bind the Company and to enter into and execute any contract, agreement or other document on behalf of the Company.

**6.2** <u>No Required Meetings</u>. The Sole Member shall not be required to hold or conduct any meetings at any time.

**6.3** <u>Liability of Sole Member</u>. Unless otherwise provided by law or expressly assumed, the Sole Member shall not be liable for the acts, debts or liabilities of the Company.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS

The Sole Member may transfer all or any part of its membership interest in the Company to any person at any time. The membership interest of the Sole Member in the Company shall be freely transferable.

## ARTICLE VIII

## BOOKS, RECORDS, TAX MATTERS

**8.1** <u>Required Books and Records</u>. The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act and such books and records shall be kept at the Company's principal place of business and shall in all respects be independent of the books, records and transactions of the Sole Member. The calendar year shall be the fiscal year of the Company for tax and accounting purposes.

**8.2** <u>Inspection</u>. The Sole Member shall have the right to inspect the books and records of the Company at any time.

**8.3** <u>Tax Matters Partner</u>. The Sole Member shall be the Tax Matters Partner of the Company within the meaning of Section 6223 of the Internal Revenue Code of 1986, as amended.

**8.4** <u>Other Matters</u>. On or before the 90th day following the end of each fiscal year during the term of the Company, the Company shall furnish to the Sole

Member a federal (and, where applicable, state) income tax reporting Form K-1 or its equivalent.

## ARTICLE IX

## DISSOLUTION

9.1     **Events of Dissolution**.     The Company shall dissolve (i) upon the bankruptcy or dissolution of the Sole Member; (ii) upon the written election of the Sole Member; or (iii) upon the entry of a decree of judicial dissolution of the Company.

9.2     **Winding Up**.  In the event of the dissolution of the Company for any reason, the Sole Member shall commence to wind up the affairs of the Company and to liquidate its investments in an orderly manner.  The Sole Member shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions.

9.3     **Allocation and Distribution of Proceeds**. Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Sole Member to set up such cash reserves as it may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds or assets of the Company shall be distributed to the Sole Member.

9.4     **Articles of Dissolution**.  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Sole Member (or such other person or persons as the Act may require or permit) shall file an Articles of Dissolution with the Secretary of State of Illinois and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE X

## MISCELLANEOUS

10.1     **Amendment**.  This Agreement may be amended at any time by a written document executed by the Sole Member.

10.2     **Governing Law; Severability**.  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Illinois excluding any conflict of laws rule or principle that might refer to the governance or the construction of this Agreement to the law of another jurisdiction.

10.3    __Liability of the Sole Member__.    Except as otherwise provided by applicable law or expressly agreed to in writing by any the Sole Member, the Sole Member shall not have any personal liability whatsoever, whether to the Company or to the creditors of the Company, for the actions, debts or liabilities of the Company or any of its losses beyond the amount committed by such the Sole Member to the capital of the Company.

10.4    __Third Party Beneficiaries__.    The provisions of this Agreement are not intended to be for the benefit of any creditor or any other person (other than the Sole Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has a claim against), the Company or the Sole Member, and no such creditor or other person shall obtain any rights under such provisions or shall by reason of such provisions make any claim in respect of any of the aforesaid debts, liabilities or obligations (or otherwise) against the Company or the Sole Member.

10.5    __Binding Effect__.    Except as herein otherwise specifically provided, the Agreement shall be binding upon and inure to the benefit of the Sole Member and its legal representatives, heirs, administrators, executors, successors and assigns.

10.6    __Entire Agreement__.    This Agreement constitutes the entire agreement with respect to the subject matter hereof. It supersedes any prior agreement or understandings, and it may not be modified or amended in any manner other than as set forth herein.

10.7    __Captions__.    Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope of any provision hereof.

10.8    __Gender and Number__.    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine line, feminine and neuter.

10.9    __Severance__.    If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

10.10    __Other Activities__.    The Sole Member may have other business interests and may engage in other activities in addition to those relating to the Company, including, without limitation, acting as a manager for other limited liability companies, or as a general partner for partnerships. The Company shall not have any right by virtue of this Agreement or otherwise in or to such other ventures or activities of any the Sole Member or to the income or proceeds derived therefrom, and the pursuit of such ventures shall not be deemed wrongful or improper.

10.11    __Transactions with Affiliates__.    The validity of any transaction, agreement or payment involving the Company and the Sole Member and any affiliate of the Sole Member, otherwise permitted by the terms of this Agreement, shall not be affected by

reason of the relationship between the Company and the Sole Member and/or the affiliate of the Sole Member, as the case may be.

**THIS AGREEMENT** is executed as of May 20th, 2015.

_____
Ruben Ybarra

Manager

YRY Holdings, LLC

# EXHIBIT 5



THIS DOCUMENT PREPARED BY AND
AFTER RECORDING, RETURN TO:
Joel M. Hurwitz
Saul Ewing Arnstein & Lehr LLP
161 North Clark Street, Suite 4200
Chicago, Illinois 60601

Send Subsequent Tax Bill to:
Boulder Hill Apartments, LLC
4 Rocky Way, Unit 13
Montgomery, Illinois 60538

20180000009269
DEBBIE GILLETTE
RECORDER - KENDALL COUNTY, IL
RECORDED: 7/3/2018 02:35 PM
QCD: 41.00 RHSPS FEE: 10.00
PAGES: 6

8982533*(3)

This section for Recorder Office

### QUIT CLAIM DEED

THE GRANTOR, **BOULDER HILL CONDOS, LLC**, an Illinois limited liability company ("Grantor") having an address of 4 Rocky Way, Montgomery, Illinois 60538 for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and for other good and valuable consideration, the receipt and sufficiency of which consideration is hereby acknowledged, hereby CONVEYS AND QUIT CLAIMS unto **BOULDER HILL APARTMENTS, LLC**, an Illinois limited liability company ("Grantee"), whose address is 4 Rocky Way, Montgomery, Illinois 60538 all of its rights and interest in the following described real estate situation in the Montgomery, County of Kendall, and State of Illinois, to-wit:

### See Attached Exhibit A – Legal Description

together with any and all rights and interest thereto, and any and all of the improvements located thereon (said real property, together with any and all of the related improvements, rights, and appurtenances belonging or appertaining thereto, and any and all of the improvements located thereon, being herein collectively referred to as the "Property").

This transfer is exempt per 35 ILCS 200/31-45 (e)
JUNE 11TH 2018

[Remainder of Page Intentionally Left Blank – Signature Page Follows]

CHICAGO TITLE INSURANCE CO.
Aurora/Yorkville Office

114897706.1

1

IN WITNESS WHEREOF, the Grantor has executed and delivered this Quit Claim Deed this 11 day of _June_, 2018.

**BOULDER HILL CONDOS, LLC,**
an Illinois limited liability company

BY:     YRY HOLDINGS, LLC
ITS:    Manager

By: _____
Name: Ruben Ybarra
Its:    Manager

State of _Texas_            )
County of _Dallas_          )

I, _G Sonnier Sonnier_, a Notary Public in and for the County and State aforesaid, do hereby certify that Ruben Ybarra, Manager of YRY Holdings, LLC, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that she signed and delivered the said instrument as her own free and voluntary act for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this ___ day of _June_, 2018.

_____
Notary Public     1125851Y

114897706.1

2

**EXHIBIT A**
**LEGAL DESCRIPTION**

PARCEL 1:
UNITS 1, 2, 4, 5, 6, 7, 8 AND 9 IN BUILDING "M" IN BOULDER HILL CONDOMINIUM, AS
DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND:
THAT PART OF THE SOUTHEAST QUARTER OF SECTION 5, TOWNSHIP 37 NORTH, RANGE
8, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT
THE SOUTHWESTERLY CORNER OF BOULDER HILL UNIT 9, BEING A SUBDIVISION OF
PART OF THE SAID SOUTHEAST QUARTER; ACCORDING TO THE PLAT THEREOF
RECORDED NOVEMBER 4, 1959 IN BOOK 10 OF PLATS, PAGE 20 AS DOCUMENT NO. 127365,
SAID POINT BEING ALSO A NORTHERLY CORNER OF THE GARDENS OF BOULDER HILL
BEING A SUBDIVISION OF PART OF THE SAID SOUTHEAST QUARTER, ACCORDING TO
THE PLAT THEREOF RECORDED AUGUST 24, 1971 IN BOOK 13 OF PLATS, PAGES 65 AND 66
AS DOCUMENT NO. 71-3071; THENCE SOUTHERLY 17.61 FEET ALONG A WESTERLY LINE
OF SAID GARDENS OF BOULDER HILL, BEING ALONG A CURVE TO THE LEFT HAVING A
RADIUS OF 1741.09 FEET, THE CHORD OF WHICH BEARS SOUTH 14 DEGREES 36 MINUTES
48 SECONDS WEST, FOR A DISTANCE OF 17.61 FEET TO A NORTHERLY CORNER OF SAID
GARDENS OF BOULDER HILL; THENCE NORTH 75 DEGREES 37 MINUTES 04 SECONDS
WEST ALONG A NORTHERLY LINE OF SAID GARDENS OF BOULDER HILL 120.73 FEET TO
THE EASTERLY LINE OF THE CHICAGO, BURLINGTON AND QUINCY RAILROAD
COMPANY; THENCE NORTHEASTERLY 172.86 FEET ALONG SAID EASTERLY LINE, BEING
ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 1862.30 FEET, THE CHORD OF
WHICH BEARS NORTH 17 DEGREES 21 MINUTES 22 SECONDS EAST, FOR A DISTANCE OF
172.80 FEET; THENCE NORTH 20 DEGREES 00 MINUTES 55 SECONDS EAST ALONG SAID
EASTERLY LINE, 56.25 FEET; THENCE SOUTH 70 DEGREES 14 MINUTES 34 SECONDS EAST,
119.59 FEET TO THE WEST RIGHT-OF-WAY LINE OF HILLSTONE ROAD; THENCE SOUTH 19
DEGREES 45 MINUTES 26 SECONDS WEST ALONG SAID WEST RIGHT-OF-WAY LINE, 58.01
FEET; THENCE SOUTHERLY 142.20 FEET, ALONG SAID WEST RIGHT-OF-WAY LINE, BEING
ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 1678.50 FEET, THE CHORD OF
WHICH BEARS SOUTH 17 DEGREES 19 MINUTES 49 SECONDS WEST, FOR A DISTANCE OF
142.16 FEET TO THE PLACE OF BEGINNING, IN KENDALL COUNTY, ILLINOIS. WHICH PLAT
OF SURVEY IS ATTACHED AS EXHIBIT "C" TO THE DECLARATION OF CONDOMINIUM
RECORDED FEBRUARY 7, 2008 AS DOCUMENT NUMBER 200800003287 AND AMENDED
FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE
COMMON ELEMENTS, IN KENDALL COUNTY, ILLINOIS.

PARCEL 2:
UNITS 1, 2, 5, 6, 7 AND 8 IN BUILDING J IN BOULDER HILL CONDOMINIUM, AS
DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND:
LOT 6 OF BOULDER HILL, UNIT 9, IN THE TOWNSHIP OF OSWEGO, KENDALL COUNTY,
ILLINOIS; WHICH PLAT OF SURVEY IS ATTACHED AS EXHIBIT "C" TO THE DECLARATION
OF CONDOMINIUM RECORDED FEBRUARY 7, 2008 AS DOCUMENT NUMBER 200800003287
AND AMENDED FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE
INTEREST IN THE COMMON ELEMENTS, IN KENDALL COUNTY, ILLINOIS.

PARCEL 3:
UNITS 5, 6, 9, 10, 11, 12, 13 14 IN BUILDING "E" IN BOULDER HILL CONDOMINIUM, AS
DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND:
LOT 2 OF RESUBDIVISION OF LOTS 2, 3, AND 4, BOULDER HILL, UNIT 9, IN THE TOWNSHIP
OF OSWEGO, KENDALL COUNTY, ILLINOIS; WHICH PLAT OF SURVEY IS ATTACHED AS

3

EXHIBIT "C" TO THE DECLARATION OF CONDOMINIUM RECORDED FEBRUARY 7, 2008 AS DOCUMENT NUMBER 200800003287 AND AMENDED FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS.

PARCEL 4:
UNITS 12, 13, 14, 15 AND 16 IN BUILDING "C" IN BOULDER HILL CONDOMINIUM, AS DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND: PART OF LOT 1 OF RESUBDIVISION OF LOTS 2, 3, AND 4, BOULDER HILL, UNIT 9, IN THE TOWNSHIP OF OSWEGO, KENDALL COUNTY, ILLINOIS; WHICH PLAT OF SURVEY IS ATTACHED AS EXHIBIT "C" TO THE DECLARATION OF CONDOMINIUM RECORDED FEBRUARY 7, 2008 AS DOCUMENT NUMBER 200800003287 AND AMENDED FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS.

| Common Address | PIN: |
|---|---|
| 129 Hillstone | 03-05-401-007 |
| 131 Hillstone | 03-05-401-008 |
| 133 Hillstone | 03-05-401-009 |
| 135 Hillstone | 03-05-401-010 |
| 137 Hillstone | 03-05-401-011 |
| 139 Hillstone | 03-05-401-012 |
| 141 Hillstone | 03-05-401-013 |
| 143 Hillstone | 03-05-401-014 |
| 145 Hillstone | 03-05-401-015 |
| 10 Hillstone | 03-05-403-008 |
| 12 Hillstone | 03-05-403-009 |
| 18 Hillstone | 03-05-403-012 |
| 20 Hillstone | 03-05-403-013 |
| 22 Hillstone | 03-05-403-014 |
| 24 Hillstone | 03-05-403-015 |
| 30 Rocky Way #5 | 03-05-403-022 |
| 30 Rocky Way #6 | 03-05-403-023 |
| 20 Rocky Way #9 | 03-05-403-026 |
| 20 Rocky Way #10 | 03-05-403-027 |
| 22 Rocky Way #11 | 03-05-403-028 |
| 22 Rocky Way #12 | 03-05-403-029 |
| 20 Rocky Way #13 | 03-05-403-030 |
| 20 Rocky Way #14 | 03-05-403-031 |
| 4 Rocky Way #13 | 03-05-403-040 |
| 4 Rocky Way #14 | 03-05-403-041 |
| 4 Rocky Way #15 | 03-05-403-042 |
| 4 Rocky Way #16 | 03-05-403-043 |

4

114897706.1

Unofficial

| ACCOUNT | OWNER NAME | NUMBER | SERVICE ADD NAME | SERVICE ADD 2 | LAST BILL DATE | LAST BILL | BALANCE |
|---|---|---|---|---|---|---|---|
| 1000493700* | BOULDER HILL APARTMENTS, LLC | 103 BOULDER HILL PASS | | BUILDING #2 | 20180601 | 489.45 | 489.45 |
| 1000497100* | BOULDER HILL APARTMENTS, LLC | 125 HILLSTONE RD | BUILDING #1 | | 20180601 | 583.95 | 583.95 |
| 1000500300* | BOULDER HILL APARTMENTS, LLC | 123 HILLSTONE RD | | | 20180601 | 64.20 | 64.20 |
| 1000514100* | BOULDER HILL APARTMENTS, LLC | 121 HILLSTONE RD | | | 20180601 | 84.45 | 84.45 |
| 1000533600* | BOULDER HILL APARTMENTS, LLC | 119 HILLSTONE RD | | | 20180601 | 57.45 | 57.45 |
| 1000534300* | BOULDER HILL APARTMENTS, LLC | 99 HILLSTONE RD | | | 20180601 | 84.45 | 84.45 |
| 1000537200* | BOULDER HILL APARTMENTS, LLC | 105 HILLSTONE RD | | | 20180601 | 57.45 | 57.45 |
| 1000537300* | BOULDER HILL APARTMENTS, LLC | 107 HILLSTONE RD | | | 20180601 | 57.45 | 57.45 |
| 1000537400* | BOULDER HILL APARTMENTS, LLC | 109 HILLSTONE RD | | | 20180601 | 64.20 | 64.20 |
| 1000537500* | BOULDER HILL APARTMENTS, LLC | 117 HILLSTONE RD | | | 20180601 | 64.20 | 64.20 |
| 1000537600* | BOULDER HILL APARTMENTS, LLC | 111 HILLSTONE RD | | | 20180601 | 70.95 | 70.95 |
| 1000537800* | BOULDER HILL APARTMENTS, LLC | 89 HILLSTONE RD | | | 20180601 | 64.20 | 64.20 |
| 1000539100* | BOULDER HILL APARTMENTS, LLC | 91 HILLSTONE RD | | | 20180601 | 77.70 | 77.70 |
| 1000539200* | BOULDER HILL APARTMENTS, LLC | 93 HILLSTONE RD | | | 20180601 | 70.95 | 70.95 |
| 1000539300* | BOULDER HILL APARTMENTS, LLC | 95 HILLSTONE RD | | | 20180601 | 57.45 | 57.45 |
| 1000539400* | BOULDER HILL APARTMENTS, LLC | 97 HILLSTONE RD | | | 20180601 | 50.70 | 50.70 |
| 1000539500* | BOULDER HILL APARTMENTS, LLC | 101 HILLSTONE RD | | | 20180601 | 91.20 | 91.20 |
| 1000539600* | BOULDER HILL APARTMENTS, LLC | 101 HILLSTONE RD | | | 20180601 | 64.20 | 64.20 |
| 1000539700* | BOULDER HILL APARTMENTS, LLC | 103 HILLSTONE RD | | | 20180601 | 70.95 | 70.95 |
| 1000539800* | BOULDER HILL APARTMENTS, LLC | 115 HILLSTONE RD | | | 20180601 | 77.70 | 77.70 |
| 1000542000* | BOULDER HILL APARTMENTS, LLC | 129 HILLSTONE RD | | | 20180601 | 151.95 | 151.95 |
| 1000542100* | BOULDER HILL APARTMENTS, LLC | 131 HILLSTONE RD | | | 20180601 | 97.95 | 97.95 |
| 1000542200* | BOULDER HILL APARTMENTS, LLC | 135 HILLSTONE RD | | | 20180601 | 118.20 | 118.20 |
| 1000542300* | BOULDER HILL APARTMENTS, LLC | 139 HILLSTONE RD | | | 20180601 | 131.70 | 131.70 |
| 1000542400* | BOULDER HILL APARTMENTS, LLC | 145 HILLSTONE RD | | | 20180601 | 91.20 | 91.20 |
| 1000542500* | BOULDER HILL APARTMENTS, LLC | 143 HILLSTONE RD | | | 20180601 | 124.95 | 124.95 |
| 1000542600* | BOULDER HILL APARTMENTS, LLC | 141 HILLSTONE RD | | | 20180601 | 111.45 | 111.45 |
| 1000543000* | BOULDER HILL APARTMENTS, LLC | 137 HILLSTONE RD | | | 20180601 | 111.45 | 111.45 |
| 1000547800* | BOULDER HILL APARTMENTS, LLC | 127 HILLSTONE RD | | | 20180601 | 104.20 | 104.20 |
| 1000548800* | BOULDER HILL APARTMENTS, LLC | 113 HILLSTONE RD | | | 20180601 | 50.70 | 50.70 |
| 1000549800* | BOULDER HILL APARTMENTS, LLC | 133 HILLSTONE RD | | | 20180601 | 70.95 | 70.95 |
| 1000556900* | BOULDER HILL APARTMENTS, LLC | ROCKY WAY | | BUILDING #9 | 20180601 | 644.70 | 644.70 |
| 1000557000* | BOULDER HILL APARTMENTS, LLC | ROCKY WAY | | BUILDING #10 | 20180601 | 1,184.70 | 1,184.70 |
| 1000562200* | BOULDER HILL APARTMENTS, LLC #11,12 | 13 BOULDER HILL PASS | | BOULDER HILL PASS | 20180601 | 1,522.20 | 1,522.20 |
| 1000718000* | BOULDER HILL APARTMENTS, LLC | HILLSTONE RD  BLDG #3 | | | 20180601 | 644.70 | 644.70 |
| 1000718100* | BOULDER HILL APARTMENTS, LLC | HILLSTONE RD  BLDG #4 | | | 20180601 | 914.70 | 914.70 |
| 1000718200* | BOULDER HILL APARTMENTS, LLC | HILLSTONE RD  BLDG. #8 | | | 20180601 | 847.20 | 847.20 |

## AFFIDAVIT

### (FILE WITH PAUL P. ANDERSON, RECORDER OF DEEDS OF KENDALL COUNTY)

STATE OF ILLINOIS

COUNTY OF KENDALL } SS.

DOCUMENT #_____

_Ren Young_____, being duly sworn on oath, states that

_he_ resides at _Werthke TX_____. That the
attached deed represents:

1. A distinct separate parcel on record prior to July 17, 1959.

2. A distinct separate parcel qualifying for a Kendall County building permit prior to August 10, 1971.

3. The division or subdivision of the land is into parcels or tracts of five acres or more in size which does not involve any new streets or easements of access.

4. The division is of lots or blocks of less than one acre in any recorded subdivision which does not involve any new streets or easements of access.

5. The sale or exchange of parcels of land is between owners of adjoining and contiguous land.

6. The conveyance is of parcels of land or interests therein for use as right of way for railroads or other public utility facilities, which does not involve any new streets or easement of access.

7. The conveyance is of land owned by a railroad or other public utility which does not involve any new streets or easements of access.

8. The conveyance is of land for highway or other public purposes or grants or conveyances relating to the dedication of land for public use or instruments relating to the vacation of land impressed with a public use.

9. The conveyance is made to correct descriptions in prior conveyances.

10. The sale or exchange is of parcels or tracts of land following the division into no more than two parts of a particular parcel or tract of land existing on July 17, 1959, and not involving any new streets or easements of access.

11. The sale is of a single lot of less than five acres from a larger tract, evidenced by a survey made by a registered surveyor which single lot is the first sale from said larger tract as determined by the dimensions and configurations thereof on October 1, 1973, and which sale does not violate any local requirements applicable to the subdivision of land.

### CIRCLE NUMBER ABOVE WHICH IS APPLICABLE TO ATTACHED DEED.

Affiant further states that __11__ makes this affidavit for the purpose of inducing the Recorder of Deeds of Kendall County, Illinois, to accept the attached deed for recording.

SUBSCRIBED AND SWORN to before me

this _11/12_ day of _June_, _2018_

_____
Notary Public

KATHY M MCCOY
Official Seal
Notary Public – State of Illinois
My Commission Expires Apr 3, 2022

KEPLATAF

# EXHIBIT 6

OPERATING AGREEMENT

OF

## BOULDER HILL CONDOS

An Illinois Limited Liability Company

## ARTICLE I

### FORMATION

    **1.1**   **Formation.**  BOULDER HILL CONDOS, LLC, an Illinois limited liability company (the "Company"), was formed by filing its Articles of Organization (the "Articles") with the Illinois Secretary of State on May 20th, 2015, pursuant to and in accordance with the Illinois Limited Liability Company Act, as amended (the "Act"). The sole member of the Company shall be YRY Holdings, LLC, ("Sole Member"), a Delaware limited liability company. In the event of any conflict between the provisions of this Agreement and the provisions of the Articles, the provisions of the Articles shall govern.

    **1.2**   **Name.**  The name of the Company is Boulder Hill Condos, LLC. All business of the Company shall be conducted in the name the Company and the Company shall hold all of its assets in its own name. The Sole Member may change the name of the Company.

    **1.3**   **Principal Place of Business.**  The principal place of business of the Company shall be 4 Rocky Way, Unit #13, Montgomery, IL 60538. The Sole Member may change the principal place of business of the Company, and may establish additional places of business of the Company both within and without the State of Illinois.

    **1.4**   **Registered Agent and Registered Office.**  The registered agent and registered office of the Company in Illinois shall be Ruben Ybarra, 4 Rocky Way, Unit #13, Montgomery, IL 60538. The Sole Member may change the registered agent and/or registered office of the Company at any time.

    **1.5**   **Purpose.**  The Company is formed for the purpose of engaging in any business for which a limited liability company may be formed pursuant to the Act.

    **1.6**   **Term.**  The term of the Company shall commence on the date the Articles was filed with the Illinois Secretary of State and shall continue until the Company is dissolved and liquidated pursuant to the terms of this Agreement or of the Act.

## ARTICLE II

### TAX TREATMENT

The Company shall be treated as a sole proprietorship for tax purposes unless and until at least one additional Member is added in which event the Company shall thereafter be treated as a partnership for tax purposes.

## ARTICLE III

### CAPITAL CONTRIBUTIONS

Upon execution of this Agreement the Sole Member contributed One Hundred and No/100 Dollars ($100.00) in exchange for one hundred percent (100%) of the membership interests in the Company and was admitted as the sole member (the "Sole Member") of the Company. The Sole Member may, from time to time, make additional capital contributions to the Company or the Company may borrow such capital from any person or persons, including the Sole Member, but in no event shall the Sole Member be required to make additional capital contributions to the Company, to loan money to the Company, or to cause the Company to borrow money from any other person.

## ARTICLE IV

### DISTRIBUTIONS

Interim distributions from the Company shall be payable at the times and in the amounts determined by the Sole Member in its sole discretion.

## ARTICLE V

### ALLOCATIONS

Except as may be required by the Internal Revenue Code of 1986, as amended, or the provisions of any successor statute (the "Code"), all items of income, gain, loss, deduction and credit of the Company shall be allocated to the Sole Member.

## ARTICLE VI

## MANAGEMENT

6.1     <u>Management</u>.  The business of the Company shall be managed by the Sole Member.  The Sole Member shall have full authority to bind the Company and to enter into and execute any contract, agreement or other document on behalf of the Company.

6.2     <u>No Required Meetings</u>.  The Sole Member shall not be required to hold or conduct any meetings at any time.

6.3     <u>Liability of Sole Member</u>.   Unless otherwise provided by law or expressly assumed, the Sole Member shall not be liable for the acts, debts or liabilities of the Company.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS

The Sole Member may transfer all or any part of its membership interest in the Company to any person at any time.  The membership interest of the Sole Member in the Company shall be freely transferable.

## ARTICLE VIII

## BOOKS, RECORDS, TAX MATTERS

8.1     <u>Required Books and Records</u>.  The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act and such books and records shall be kept at the Company's principal place of business and shall in all respects be independent of the books, records and transactions of the Sole Member. The calendar year shall be the fiscal year of the Company for tax and accounting purposes.

8.2     <u>Inspection</u>.  The Sole Member shall have the right to inspect the books and records of the Company at any time.

8.3     <u>Tax Matters Partner</u>.  The Sole Member shall be the Tax Matters Partner of the Company within the meaning of Section 6223 of the Internal Revenue Code of 1986, as amended.

8.4     <u>Other Matters</u>.  On or before the 90th day following the end of each fiscal year during the term of the Company, the Company shall furnish to the Sole

Member a federal (and, where applicable, state) income tax reporting Form K-1 or its equivalent.

## ARTICLE IX

## DISSOLUTION

**9.1    Events of Dissolution.**   The Company shall dissolve (i) upon the bankruptcy or dissolution of the Sole Member; (ii) upon the written election of the Sole Member; or (iii) upon the entry of a decree of judicial dissolution of the Company.

**9.2    Winding Up.**  In the event of the dissolution of the Company for any reason, the Sole Member shall commence to wind up the affairs of the Company and to liquidate its investments in an orderly manner.  The Sole Member shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions.

**9.3    Allocation and Distribution of Proceeds.** Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Sole Member to set up such cash reserves as it may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds or assets of the Company shall be distributed to the Sole Member.

**9.4    Articles of Dissolution.**  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Sole Member (or such other person or persons as the Act may require or permit) shall file an Articles of Dissolution with the Secretary of State of Illinois and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE X

## MISCELLANEOUS

**10.1    Amendment.**  This Agreement may be amended at any time by a written document executed by the Sole Member.

**10.2    Governing Law; Severability.**  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Illinois excluding any conflict of laws rule or principle that might refer to the governance or the construction of this Agreement to the law of another jurisdiction.

10.3    **Liability of the Sole Member**.    Except as otherwise provided by applicable law or expressly agreed to in writing by any the Sole Member, the Sole Member shall not have any personal liability whatsoever, whether to the Company or to the creditors of the Company, for the actions, debts or liabilities of the Company or any of its losses beyond the amount committed by such the Sole Member to the capital of the Company.

10.4    **Third Party Beneficiaries**.    The provisions of this Agreement are not intended to be for the benefit of any creditor or any other person (other than the Sole Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has a claim against), the Company or the Sole Member, and no such creditor or other person shall obtain any rights under such provisions or shall by reason of such provisions make any claim in respect of any of the aforesaid debts, liabilities or obligations (or otherwise) against the Company or the Sole Member.

10.5    **Binding Effect**.    Except as herein otherwise specifically provided, the Agreement shall be binding upon and inure to the benefit of the Sole Member and its legal representatives, heirs, administrators, executors, successors and assigns.

10.6    **Entire Agreement**.    This Agreement constitutes the entire agreement with respect to the subject matter hereof. It supersedes any prior agreement or understandings, and it may not be modified or amended in any manner other than as set forth herein.

10.7    **Captions**.    Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope of any provision hereof.

10.8    **Gender and Number**.    Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine line, feminine and neuter.

10.9    **Severance**.    If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

10.10    **Other Activities**.    The Sole Member may have other business interests and may engage in other activities in addition to those relating to the Company, including, without limitation, acting as a manager for other limited liability companies, or as a general partner for partnerships. The Company shall not have any right by virtue of this Agreement or otherwise in or to such other ventures or activities of any the Sole Member or to the income or proceeds derived therefrom, and the pursuit of such ventures shall not be deemed wrongful or improper.

10.11    **Transactions with Affiliates**.    The validity of any transaction, agreement or payment involving the Company and the Sole Member and any affiliate of the Sole Member, otherwise permitted by the terms of this Agreement, shall not be affected by

reason of the relationship between the Company and the Sole Member and/or the affiliate of the Sole Member, as the case may be.

**THIS AGREEMENT** is executed as of May 20th, 2015.

_____

Ruben Ybarra

Manager

YRY Holdings, LLC

# EXHIBIT 7

FILED DATE: 5/30/2019 4:11 PM   2010L050077

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED
5/30/2019 4:11 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2010L050077

5240702

| | |
|---|---|
| CENTRUST, N.A. A NATIONAL BANKING ASSOCIATION | |
| Plaintiff, | No. 10 L 050077 |
| v. | |
| RUBEN YBARRA | |
| Defendant. | |

**MOTION FOR JUDICIAL DETERMINATION**
**AND OTHER RELIEF PURSUANT TO 735 ILCS 5/2-1402**

Now comes Plaintiff CENTRUST, N.A., A NATIONAL BANKING ASSOCIATION (Plaintiff or

"CENTRUST"), by and through its attorneys, MARKOFF LAW, LLC, and as and for its Motion for

Judicial Determination and Other Relief pursuant to 735 ILCS 5/2-1402 against Assets belonging to or

related to Defendant RUBEN YBARRA ("RUBEN") and Third-Parties Yolanda R. Ybarra Revocable

Trust (the "Yolanda Trust"), and Trust Agreement Establishing Ybarra Children Investment Trust (the

"Childrens' Trust"), CENTRUST states as follows:

**BACKGROUND**

1.      On January 28, 2010, Plaintiff obtained a Judgment against Defendant RUBEN in the

amount of $1,853,685.51.

2.      Plaintiff recorded a certified copy of such Order with the Cook County Recorder of

Deeds on February 9, 2010 as Document #1004018082, thereby creating a Judgment Lien against any and

all real property located within Cook County to which Defendant RUBEN held an interest as of or after

February 9, 2010.

3.      Thereafter, in order to enforce the Judgment Order, Plaintiff issued and served a Citation

to Discover Assets upon Defendant RUBEN, the same being served on RUBEN on February 27, 2016.

*See* Exhibits "1" and "2" attached hereto.

4.      On April 4, 2017, the Judgment was Revived, and the same remains in full force and

effect. *See* Exhibit "3" attached hereto.

5.      All Citations and Liens remain in full force and effect.

FILED DATE: 5/30/2019 4:11 PM    2010L050077

6.      As of the date of this Motion, no payments have been received towards the Judgment Balance.

7.      Since service of the RUBEN Citation, Plaintiff has learned that RUBEN holds an interest in YRY Holdings, LLC, an Illinois limited liability company ("YRY, LLC").

8.      Specifically, RUBEN is the Manager of YRY, LLC. *See* Exhibits "4" and "5" attached hereto.

9.      Further, on information and belief, the owners of YRY, LLC include RUBEN, the Yolanda Trust and the Childrens' Trust.

10.     Finally, on information and belief, YRY, LLC holds title to certain real property located at 1625 E. 74th Street, Chicago, Illinois, 60649 and 4 Rocky Way, Montgomery, Illinois 60538 (the "Real Properties").

11.     By virtue of the Citation to Discover Assets issued and served against Defendant RUBEN, as well as the Judgment Lien created by the recorded Certified Judgment Order, Plaintiff is entitled to the entry of an Order for Turnover of the YBARRA Properties, as well as for an Order authorizing Counsel for Plaintiff to sell the beneficial interest of the Trust, as well as all Real Property held by YBARRA in a commercially reasonable manner by virtue of a UCC/Levy Sale, with any and all proceeds from such sale (the "Sale Proceeds") to be used to satisfy the Judgment Balance, either in full or partially.

12.     Plaintiff is entitled to such relief pursuant to 735 ILCS 5/2-1402, which authorizes a judgment debtor to deliver property to be sold at a public sale, with the proceeds of such sale applied towards the payment of the costs of such sale and the satisfaction of the judgment. *See* 735 ILCS 5/2-1401(c) and (e).

WHEREFORE, for the foregoing reasons, Plaintiff CENTRUST, N.A., A NATIONAL BANKING ASSOCIATION respectfully requests that this Court enter an Order which:

a)    granting the instant Motion for Turnover of Assets,

b)    prohibits Defendant RUBEN YBARRA from further encumbering and/or transferring the YBARRA Properties;

FILED DATE: 5/30/2019 4:11 PM    2010L050077

c)  requires Defendant RUBEN YBARRA to turn-over title of the YBARRA Properties within fourteen (14) days from the entry of an Order granting the instant Motion, to Markoff Law, LLC, as selling agent only, for purposes of sale of same, either in-bulk or property-by-property, with such determination to be made by Plaintiff at the time of Sale:

    i.    Unit 1, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    ii.    Unit 2, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    iii.    Unit 3, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    iv.    Unit 4, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    v.    Unit 5, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    vi.    Unit 6, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    vii.    Unit 7, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    viii.    Unit 8, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    ix.    Unit 5, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1;

    x.    Unit 1, Building J in Common Area Boulder Hill Condominium Parcel 2;

    xi.    Unit 2, Building J in Common Area Boulder Hill Condominium Parcel 2;

    xii.    Unit 5, Building M in Common Area Boulder Hill Condominium Parcel 2;

    xiii.    Unit 6, Building J in Common Area Boulder Hill Condominium 2 of Parcel 2;

    xiv.    Unit 7, Building J in Common Area Boulder Hill Condominium 2 of Parcel 2;

    xv.    Unit 8, Building J in Common Area Boulder Hill Condominium 2 of Parcel 2;

    xvi.    Unit 5, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xvii.    Unit 6, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xviii.    Unit 9, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xix.    Unit 10, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xx.    Unit 11, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xxi.    Unit 12, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xxii.    Unit 13, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xxiii.    Unit 14, Building E in Common Area Boulder Hill Condominium Parcel 3;

    xxiv.    Unit 13, Building E in Common Area Boulder Hill Condominium Parcel 4;

| | |
|---|---|
| xxv. | Unit 14, Building E in Common Area Boulder Hill Condominium Parcel 4; |
| xxvi. | Unit 15, Building E in Common Area Boulder Hill Condominium Parcel 4; |
| xxvii. | Unit 16, Building E in Common Area Boulder Hill Condominium Parcel 4; |
| xxviii. | Lot 5 in Boulder Hill Subdivision of Parcel 5; |
| xxix. | Lot 1 in Boulder Hill Subdivision of Parcel 5; |
| xxx. | Lot 1 in Boulder Hill Subdivision of Parcel 6; |
| xxxi. | Lot 4 in Boulder Hill Subdivision Unit 9 of Parcel 7; |
| xxxii. | Lot 3 in Boulder Hill Subdivision Unit 9 of Parcel 7; and, |
| xxxiii. | Parcel 8; |

d) authorizes Counsel for Plaintiff to Sell the YBARRA Properties at a public sale pursuant to 735 ILCS 5/2-1402, either in-bulk or property-by-property, with the proceeds to be applied to the Outstanding Judgment Balance;

e) authorizes Plaintiff to credit bid all or part of its Outstanding Judgment Balance at such Sale;

f) provides that Plaintiff will supply the Court with a Report of Sale after the same is held; and,

g) which grants such further or other relief as this Court determines to be just and equitable.

One of Plaintiff's Attorneys

**DOUGLAS C. GIESE**

MARKOFF LAW LLC
Robert G. Markoff
Douglas C. Giese (ARDC #6242975)
Attorneys for Plaintiff – 55932
29 N. Wacker Drive # 1010
Chicago, IL 60606
Tel. (312) 698-7300 - Fax. (312) 698-7399
service@markofflaw.com

368313    CBL / CLD

FILED DATE: 5/30/2019 4:11 PM 2010L050077

FILED DATE: 5/30/2019 4:11 PM 2010L050077

# EXHIBIT "A"

REVIVAL OF JUDGMENT   (This form replaces CCM1 0641)          (Rev. 3/26/01)  CCM 0641

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### MUNICIPAL DEPARTMENT / LAW____ DISTRICT

CENTRUST BANK, N.A.,

                                        Plaintiff(s)

             v.                                                    No.  2010 L 050077

RUBEN YBARRA

                                        Defendant(s)

## REVIVAL OF JUDGMENT

This matter coming on to be heard on the Petition of Plaintiff to revive a judgment, the Court does find, based upon the allegations of the petition, the representations of the Plaintiff and evidence taken, that:

1.  A judgment was entered in this Court on January 28_____, 2010____ in the amount of $ 1,142,414.88_____, plus costs of suit.

2.  Principal payments have been made against the judgment in the amount of $0_____.

3.  The unpaid amount of the judgment at this date is $ 1,853,685.51_____.

4.  The defendant has been given due notice by _Special Order of Court_____ service.
                                                    (Personal - Substituted)

5.  The Plaintiff has not received notice of any discharge in bankruptcy of the defendant.

WHEREFORE, IT IS HEREBY ORDERED: That the aforesaid judgment, as set out in paragraph 1 above, shall be, and hereby is, revived in the amount of $ 1,853,685.51_____ with costs and interest.

Atty #30417
M Reas Bowman
65 E. Wacker Pl, Ste 730
Chicago IL 60601
317-701-6777

**ENTERED**
JUDGE ALEXANDER P. WHITE • 0241
ENTER:  APR 04 2017
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL
DEPUTY CLERK

                                                    Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

FILED DATE: 5/30/2019 4:11 PM  2010L050077

FILED DATE: 5/30/2019 4:11 PM   2010L050077

# EXHIBIT "B"

2-27-17

FILED DATE: 5/30/2019 4:11 PM   2010L050077

2016-02-29 12:40   WellsFargo Bank, NA        5612046604 >>        FAXTRAN61  P 1/1

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

CENTRUST BANK, N.A., a national banking
association,

Plaintiff(s)

VS.

Court No.: 2010 L 050077

RUBEN YBARRA,

Defendant(s)

### AFFIDAVIT OF SERVICE OF PROCESS

I, Denise Sucato, depose that I am authorized to serve this process

Type of Process: Alias Citation to Discover Assets, Alias Citation Notice, and Income and Asset Form

Received by Denise Sucato, on 2/26/2016 @ 9:00 AM to be served upon Ruben Ybarra at The Boca Grand Condominiums 233 S. Federal Highway Apt. 611 , Boca Raton, FL, 33432.

SERVED the within named defendant on: 2/27/2016 3:30 PM.

X SUBSTITUTE SERVICE by leaving a copy of this process at his/her usual place of abode with: Yolanda Ybarra, (Relationship): Wife, a person residing therein who is the age of 15 years or upwards confirmed the defendant resides at the above address and informed that person of the contents thereof.

THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY OF THIS PROCESS WAS LEFT IS AS FOLLOWS: Age: Early 30's  Gender: Female  Race: Caucasian  Height: 5-3  Weight: 126-150  Hair: Brown  Glasses: Yes

MILITARY  Refused
MARRIED  Married
Additional Comments:
In the company of Asset Recovery Specialist Faust Villazan, observed individual as she left Apt 611 with her daughter and baby in the stroller. Approached individual and asked her if she was Yolanda. Ms. Ybarra stated, "No" and asked her daughter, "What is my name?" The daughter stated, "Yolanda." Papers were placed on the top of the stroller because Ms. Ybarra would not take them in hand. Ms. Ybarra refused to provide any additional information.

I certify that I am a United States citizen, over the age of 18 and not a party to, nor otherwise interested in the above action.

Subscribed and sworn before me on 02 / 29 / 2016

Signature of Process Server
Identification Number: 574

Notary Public

Personally Known ___ OR Produced Identification  X

Type of Identification Produced  Florida Driver's License



Norman Ura
Notary Public
State of Florida
MY COMMISSION # FF 245940
Expires June 30, 2019

(11/18/93) CCG-0648

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT – LAW DIVISION

### ALIAS CITATION NOTICE

| | |
|---|---|
| CENTRUST BANK, N.A., a national banking association, | No. 2010 L 050077 |
| Plaintiff, | Return Date: March 14, 2016 |
| v. | Time: Time: 9:30 Room 2503 |
| RUBEN YBARRA, | |
| JUDGMENT DEBTOR | |

**Judgment Debtor's last known:**

| | | **Judgment Creditor/Creditor's Attorney:** | |
|---|---|---|---|
| Name: | RUBEN YBARRA | Name: | CENTRUST BANK, N.A. / RICHARD JONES & ASSOCIATES, LTD. |
| Address: | 303 North Ashland Avenue | Address: | 1100 W. Northwest Highway, Suite 108 |
| City: | Park Ridge, Illinois 60068 | City: | Mount Prospect, Illinois 60056 |
| SSN: | XXX-XX-_____ (only last four digits) | Phone: | (847) 818-1705 |

Judgment in the amount of $1,142,414.88, plus costs

Name of person receiving citation: RUBEN YBARRA

NOTICE: The court has issued a citation against the person named above. The citation directs that person to appear in court to be examined for the purpose of allowing the judgment creditor to discover income and assets belonging to the judgment debtor or in which the judgment debtor has an interest. The citation was issued on the basis of a judgment against the judgment debtor in favor of the judgment creditor in the amount stated above. On or after the court date shown above, the court may compel the application of any discovered income or assets toward payment on the judgment.

The amount of income or assets that may be applied toward the judgment is limited by federal and Illinois law. THE JUDGMENT DEBTOR HAS THE RIGHT TO ASSERT STATUTORY EXEMPTIONS AGAINST CERTAIN INCOME OR ASSETS OF THE JUDGMENT DEBTOR WHICH MAY NOT BE USED TO SATISFY THE JUDGMENT IN THE AMOUNT STATED ABOVE:

(1) Under Illinois or federal law, the exemptions of personal property owned by the debtor include the debtor's equity interest, not to exceed $2,000 in value, in any personal property as chosen by the debtor.
(2) Social Security and SSI benefits;
(3) Public assistance benefits;
(4) Unemployment compensation benefits;
(5) Worker's compensation benefits;
(6) Veteran's benefits;
(7) Circuit breaker property tax relief benefits;
(8) The debtor's equity interest not to exceed $750 in value, in any implements professional books, or tools of the trade of the debtor.
(9) Under Illinois law every person is entitled to an estate in homestead, when it is owned and occupied as a residence, to the extent in value of $7,500, which homestead is exempt from judgment.

S:\G Drive (Client Files)\CNTRST\Ruben Ybarra Litigation\Higgins-AWM\Alias Citation Notice (R. Ybarra) #4.doc

**(OVER)**

(11/18/93) CCG-0648

(10)   Under Illinois law, the amount of wages that may be applied toward a judgment is limited to the lesser of (i) 15% of gross weekly wages or (ii) the amount by which disposable earnings for a week exceed the total of 45 times the federal minimum hourly wage.

(11)   Under federal law, the amount of wages that may be applied toward a judgment is limited to the lesser of (i) 25% of disposable earning for a week exceed 30 times the federal minimum hourly wage.

(12)   Pension and retirement benefits and refunds may be claimed as exempt under Illinois Law.

The judgment debtor may have other possible exemptions under the law.

**THE JUDGMENT DEBTOR HAS THE RIGHT AT THE CITATION HEARING TO DECLARE EXEMPT CERTAIN INCOME OR ASSETS OR BOTH.** The judgment debtor also has the right to seek a declaration at an earlier date, by notifying the clerk in writing at the office of the Clerk of the Circuit Court of Cook County, Chancery Division, RICHARD J. DALEY CENTER, 50 West Washington Street, Chicago, Illinois. When so notified, the Clerk of the Circuit Court will provide a hearing date and the necessary forms that must be prepared by the judgment debtor or the judgment debtor's attorney and sent to the judgment creditor regarding the time and location of the hearing.

**This notice may be sent by regular first class mail.**

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

S:\G Drive (Client Files)\CNTRST\Ruben Ybarra Litigation\Higgins-AW\Alias Citation Notice (R. Ybarra) #4.doc

(Rev. 12/04/00)  CCG-0005 A

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

**CENTRUST BANK, N.A. a national banking association,**

**Plaintiff,**

v.                                                                                    **No. 2010 L 050077**

**RUBEN YBARRA,**

**Defendant.**

## ALIAS CITATION TO DISCOVER ASSETS

**To:**    RUBEN YBARRA, 303 N. Ashland Avenue, Park Ridge, Illinois 60068

YOU ARE COMMANDED to appear before Judge Alexander White, or any judge sitting in his stead in Room 2503 of the RICHARD J. DALEY CENTER, 50 West Washington Street, Chicago, Illinois, on March 1, 2016 at 9:30 A.M. to be examined under oath to discover assets or income not exempt from the enforcement of the judgment.

A judgment in favor of CENTRUST BANK, N.A., and against RUBEN YBARRA, was entered on January 28, 2010 in the amount of $1,142,414.88, plus costs, and $131,573.86, plus interest and costs, remains unsatisfied.

YOU ARE COMMANDED to produce at the examination:

### CITATION TO DISCOVER ASSETS – INCOME AND ASSET FORM; and
### SEE EXHIBIT "A" ATTACHED HERETO

and all books, papers or records in your possession or control which may contain information concerning the property or income of, or indebtedness due judgment debtor.

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings.  You are not required to withhold the payment of any money beyond double the amount of the judgment.

**WARNING:  YOUR FAILURE TO APPEAR IN COURT AS HEREIN DIRECTED MAY CAUSE YOU TO BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE COUNTY JAIL.**

### CERTIFICATE OF ATTORNEY (OR NON-ATTORNEY)
NOTE:    This citation must be accompanied at the time of service by either a copy of the underlying judgment or a certification by either the clerk that entered the judgment or the attorney for the judgment creditor setting forth:

In the Circuit Court of Cook County on January 28, 2010, a judgment in the amount of $1,142,414.88, plus costs, was entered in favor of CenTrust Bank, N.A. and against RUBEN YBARRA in Case No. 2010 L 050077 and a balance of $131,573.86, plus interest and costs, remains unsatisfied.

I, the undersigned certify to the Court, under penalties as provided by law pursuant to 735 ILCS 5/1-109 that all information stated herein is true. is true.

Richard C. Jones, Jr., Esq.
rjones@rjoneslaw.com                                          _____
Carolyn D. Strahammer, Esq.                                          (Signature of Attorney)
cstrahammer@rjoneslaw.com
RICHARD JONES & ASSOCIATES, LTD.
1100 W. Northwest Highway – Suite 108          WITNESS: DOROTHY BROWN   JAN 2 8 2016
Mount Prospect, Illinois 60056
(847) 818-1705
Attorney No. 49045

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

S:\G Drive (Client Files)\CNTRST\Ruben Ybarra Litigation\Higgins-AW\Alias Citation to Discover Assets (Ruben Ybarra) #4.doc

FILED DATE: 5/30/2019 4:11 PM    2010L050077

(Rev. 12/04/00)  CCG-0005 B

THE UNDERSIGNED, on oath, states:

I am over 18 years of age and not a party to this case.  I served the Citation to Discover Assets as follows:

on _____ by leaving a copy with him/her personally on _____,

_____, at the hour of _____.m. at _____, _____, Illinois.

OR

on _____ by leaving on _____, _____, at the hour of _____.m.;

at _____, _____, Illinois, his/her usual place of

abode with, _____, a person of his/her family of the age of 13 or

upwards informing that person of the contents of the Citation to Discover Assets, and also by sending on a true

and correct copy on _____, 2015, by prepaid Registered Mail, addressed to him/her;

Return Receipt Requested, delivery limited to addressee only.  The Registry Receipt signed by addressee on

_____, 2016, is attached.

(attached receipt here)

**SIGNED AND SWORN TO before me
this _____ day of _____, 2016.

_____
NOTARY PUBLIC

**If service is made by sheriff, return may be certificate rather than affidavit.

-2-

S:\G Drive (Client Files)\CNTRST\Ruben Ybarra Litigation\Higgins-AW\Alias Citation to Discover Assets (Ruben Ybarra) #4.doc



### EXHIBIT "A"

YOU ARE COMMANDED TO PRODUCE AT THE EXAMINATION (BRING WITH YOU) ALL BOOKS, PAPERS OR RECORDS IN YOUR POSSESSION OR OVER WHICH YOU HAVE CONTROL, WHICH MAY CONTAIN INFORMATION CONCERNING YOUR PROPERTY AND INCOME, INCLUDING:

1. In the event that the Judgment Debtor resides in a single-family dwelling, then a copy of all documents evidencing ownership or other right of possession of said realty, including the legal description of said realty.

2. In the event Judgment Debtor resides in a multi-family dwelling, then a copy of the documents evidencing the possessory interest of said dwelling.

3. In the event the Judgment Debtor is presently employed by a third-party or entity, then all documents concerning or affecting any contract of employment, the amount of salary, commissions, bonuses or other compensations receivable by the Judgment Debtor through employment.

4. In the event Judgment Debtor is self-employed, then all books, financial records, documents and papers concerning, affecting or pertaining to formation, ownership and operation of the business entity.

5. All documents indicating the sources and amounts of gross earnings and income of the Judgment Debtor from all sources (before taxes) from the date of the filing of the complaint in this cause to the date scheduled for hearing on this citation.

6. All documents concerning or affecting ownership by the Judgment Debtor and any business owned or operated by the Judgment Debtor from the date of the filing of the complaint in this cause to the date scheduled for hearing on this citation of any of the following:

    a. Real estate;
    b. Stocks, bonds or securities;
    c. Mortgages on real or personal property;
    d. Promissory notes, drafts, bills of exchange or other commercial paper;
    e. Judgments;
    f. Jewelry;
    g. Furniture;
    h. Collections (e.g., stamp, coin);
    i. Defense, war savings or savings bonds;
    j. Automobile(s) and/or truck(s);
    k. Recreational vehicles;
    l. Patents, inventions, trade names, trademarks or copyrights;
    m. Joint venture(s) or other business enterprises;
    n. Warehouse receipts, bills of lading or other document(s) of title.

7. All financial statements (whether signed or not) given by the Judgment Debtor and any business owned or operated by the Judgment Debtor, to any person or entity from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

8. All documents indicating or evidencing any interest (solely or jointly) in any bank account (commercial, savings or otherwise) for the period from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation, which shall include but not be limited to, the following information:

    a. The name and address of each institution holding any such account;
    b. The number or other identification of the account;
    c. An identification of the ownership interest of the Judgment Debtor in each such account;
    d. The account balance as of the date seven (7) days prior to service of the citation upon the Judgment Debtor and each day thereafter.

-3-

FILED DATE: 5/30/2019 4:11 PM    2010L050077

FILED DATE: 5/30/2019 4:11 PM    2010L050077

9.    All documents indicating or evidencing a power of attorney or other authority to sign checks or other instruments for the payment of money on any bank account.

10.    All documents indicating or evidencing any bank accounts in which the Judgment Debtor claims an interest although the account is not in the Judgment Debtor's name, for the period from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

11.    All documents indicating or evidencing any bank accounts (including checking and savings accounts, certificates of deposit and other accounts) on which the Judgment Debtor's name does not appear in which the Judgment Debtor during the period form the date of filing of the complaint in this cause to the date scheduled for hearing on this citation, deposited or withdrew any money or funds, which documents shall include:

    a.    The name and address of the depository institution;
    b.    Each name under which the account was listed;
    c.    Each account number or other identification;
    d.    The approximate date and amount of any such deposit(s) or withdrawal(s) made by the Judgment Debtor during said period; and
    e.    The source of the funds for each such deposit, or the use of each withdrawal.

12.    An itemization of and documents evidencing all obligations of the Judgment Debtor and any business owned or operated by the Judgment Debtor, including mortgages, conditional sales, contract obligations or promissory notes as of the date scheduled for hearing on this citation, which itemization and documentation shall include:

    a.    The name and address of each creditor;
    b.    The form of the obligation;
    c.    The date the obligation was incurred;
    d.    The consideration received for the obligation;
    e.    The description of any security connection with the obligation;
    f.    The amount of the original obligation;
    g.    The rate of interest on the obligation;
    h.    The present unpaid balance on the obligation; and
    i.    The date and amount of installment(s) or other payments on the obligation from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

13.    An itemization of and documents evidencing all obligations, including mortgages, articles of agreement for sale of real or personal property, contract obligations or promissory notes by third parties or entities to the Judgment Debtor and/or any business owned or operated by the Judgment Debtor as of the date scheduled for hearing on this citation, which itemization and documentation shall include:

    a.    The name and address of each debtor;
    b.    The original amount owed;
    c.    The unpaid balance on the obligation as of the date scheduled for hearing on this citation;
    d.    The form of the obligation;
    e.    The date the obligation was incurred;
    f.    The date the obligation became due and payable;
    g.    The conditions for payment;
    h.    The consideration given for the obligation;
    i.    The rate of interest of the obligation; and
    j.    The date and amount of installment(s) or other payments received by the Judgment Debtor on the obligation from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

-4-

FILED DATE: 5/30/2019 4:11 PM    2010L050077

14. In the event you are presently (or have been from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation) the holder of or have the right to access to any safety deposit box, then all documents, affecting or pertaining to the following:

    a.   The number of each such safety deposit box;
    b.   The name and address of the bank where any such safety deposit box is located;
    c.   The name and address of the owner and any joint or co-owners of any such safety deposit box, or any trustee holding such for your benefit;
    d.   The property contained in any such safety deposit box.

15. In the event that any person or entity is holding possession, control or title to any property, property interest or beneficial interest for your benefit, all documents indicating the following:

    a.   A description of each such property, property interest or beneficial interest;
    b.   The name and address of each such person or entity;
    c.   The date that such person or entity first acquired possession, control or title;
    d.   The value of each such property, property interest or beneficial interest;
    e.   The basis for any such person or entity having possession, control or title to any property.

16. An itemization of and documents evidencing all applications for loans from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

17. All documents indicating or evidencing any ownership interest by the Judgment Debtor in any stock in a business during the period from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

18. All documents indicating or evidencing that the Judgment Debtor during the period from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation, has been an officer or director of any corporation.

19. All documents evidencing or indicating an interest (ownership, beneficial or successor beneficial) in any policy of accident, health or life annuity or endowment insurance, including:

    a.   The name of each company;
    b.   Each policy number;
    c.   The amounts, types, and date of issuance of each policy;
    d.   The name and address of the owner(s) of each policy;
    e.   The name and address of each beneficiary of each policy;
    f.   The date of any changes in the beneficiary of any such policy from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.
    g.   The date of any assignment of beneficiary of insurance policies from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation;
    h.   The cash value of any such policies as of two (2) weeks prior to the dated scheduled for hearing on this citation;
    i.   The loan value of any such policies as of two (2) weeks prior to the dated scheduled for hearing on this citation;
    j.   The amount of any encumbrances, loans or liens against each policy, together with the date of any such encumbrances, loans or liens were created;
    k.   The date of acquisition of each of such policies;
    l.   The amount of the premium on each of such policies;
    m.   The date the last premium was paid.

20. All documents indicating or evidencing any purchase agreements entered into by the Judgment Debtor from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

21. All documents indicating or evidencing any beneficial interest of the Judgment Debtor of any trust, any interest in the estate of any deceased person, or any authority of the Judgment Debtor to act as executor, administrator, trustee, receiver, guardian or in any capacity under any will, agreement or court appointment acquired or begun by the Judgment Debtor from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

-5-

FILED DATE: 5/30/2019 4:11 PM    2010L050077

22. All original books, financial records and papers pertaining, showing or evidencing any income, receipts and disbursements made by the Judgment Debtor (including without limitation all original check book registers and evidence of deposits) encompassing the period from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

23. All documents indicating or evidencing the transfer by the Judgment Debtor by gift, sale or otherwise of any property to any person or entity from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

24. All documents evidencing or relating to any litigation either presently pending or which has been instituted from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation, in which the Judgment Debtor is a party.

25. All documents evidencing or relating to any judgments entered against the Judgment Debtor from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation, which documents shall include information relating to the following:

    a.   The date of entry of each such judgment;
    b.   The amount of each such judgment;
    c.   The court where each such judgment was entered;
    d.   The name of each such judgment creditor; and
    e.   An itemization of each payment on each such judgment from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

26. All documents indicating or evidencing any inheritances of money or property from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

27. All documents indicating or evidencing the filing by the Judgment Debtor of any trade name certificates or partnership certificates from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

28. The original check book registers of the Judgment Debtor and any business owned or operated by the Judgment Debtor encompassing the period from the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

29. Copies of Federal and State Income Tax records of the Judgment Debtor and any business owned or operated by the Judgment Debtor for a period of three (3) years prior the date of filing of the complaint in this cause to the date scheduled for hearing on this citation.

30. An itemization of all documents evidencing or relating to any payment of money received by the Judgment Debtor and any business owned or operated by the Judgment Debtor other than already described above.

31. An itemization of all documents evidencing the ownership of any other property by the Judgment Debtor and any business owned or operated by the Judgment Debtor other than already described above.

32. All documents relating to YRY Holdings, LLC, including but not limited to the operating agreement and all amendments, annual reports, loan documents, income tax returns and title documents.

**YOU ARE PROHIBITED** from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the Judgment Debtor or to which he may be entitled or which may be acquired by or become due to him and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to him, until further order of court or termination of the proceedings. You are not required to withhold the payment of any money beyond double the amount of judgment.

– END –

 

## CITATION TO DISCOVER ASSETS – INCOME AND ASSET FORM

**TO JUDGMENT DEBTOR:** Please complete this form and bring it with you to the hearing referenced in the enclosed citation notice. You should also bring to the hearing any documents you have to support the information you provide in this form, such as pay stubs and account statements. The information you provide will help the court determine whether you have any property or income that can be used to satisfy the judgment entered against you in this matter. The information you provide must be accurate to the best of your knowledge.

**IF YOU FAIL TO APPEAR AT THIS HEARING, YOU COULD BE HELD IN CONTEMPT OF COURT AND POSSIBLY ARRESTED.**

In answer to the citation and supplemental proceedings served upon the judgment debtor, he or she answers as follows:

Name: _____

Home Address: _____ Home Phone Number: _____

Date of Birth: _____

Do you have a job? ☐ YES ☐ NO     Marital Status: _____ I have _____ dependents.

Company's name I work for: _____

Company's address: _____

**JOB:**

I earn $_____ per _____

If self-employed, list here your business name and address: _____

Income from self-employment is $_____ per year.

I have the following benefits with my employer: _____

I do not have a job, but support myself through:

Government Assistance $_____

Unemployment $_____ per month          SSI $_____ per month

Social Security $_____ per month          Pension $_____ per month

**REAL ESTATE:**                                              Other $_____ per month

Do you own any real estate? ☐ YES ☐ NO

I own real estate at _____

With names of other owners _____

Additional real estate I own _____

I have a beneficial interest in a land trust. _____

-The name and address of the trustee is _____

-The beneficial interest is listed in my name and _____

There is a mortgage on my real estate. State the mortgage company's name and address for each parcel of real estate owned:

_____

An assignment of beneficial interest in the land trust was signed to secure a loan from _____

I have the following accounts:

Checking account at _____

Savings account at _____          Checking account balance $_____

Money market or certificate of deposit at _____          Savings account balance $_____

Other accounts (please identify) _____          Safe deposit box at _____

**I OWN:**

A vehicle (state year, make, model and VIN) _____

Jewelry (please specify) _____

Stocks/Bonds _____          Other property described as _____

DVD player _____          Personal computer _____

Stove _____          Television _____

Work tools _____          Microwave _____

Farm equipment _____          Business Equipment _____

Other property (please specify): _____

_____

_____

The undersigned certifies, under penalties provided by law pursuant to 735 ILCS 5/1-109, that the information contained herein is true and correct.

Signature: _____ Date: _____

-7-

FILED DATE: 5/30/2019 4:11 PM     2010L050077

FILED DATE: 5/30/2019 4:11 PM   2010L050077

FILED DATE: 5/30/2019 4:11 PM   2010L050077

# EXHIBIT "C"

FILED DATE: 5/30/2019 4:11 PM   2010L050077

Exhibit 20

OPERATING AGREEMENT

OF

## BOULDER HILL APARTMENTS

An Illinois Limited Liability Company

## ARTICLE I

## FORMATION

**1.1**     **Formation**.     BOULDER HILL APARTMENTS, LLC, an Illinois limited liability company (the "Company"), was formed by filing its Articles of Organization (the "Articles") with the Illinois Secretary of State on May 20th, 2015, pursuant to and in accordance with the Illinois Limited Liability Company Act, as amended (the "Act"). The sole member of the Company shall be YRY Holdings, LLC, ("Sole Member"), a Delaware limited liability company.  In the event of any conflict between the provisions of this Agreement and the provisions of the Articles, the provisions of the Articles shall govern.

**1.2**     **Name**.  The name of the Company is Boulder Hill Apartments, LLC.  All business of the Company shall be conducted in the name the Company and the Company shall hold all of its assets in its own name.  The Sole Member may change the name of the Company.

**1.3**     **Principal Place of Business**.   The principal place of business of the Company shall be 4 Rocky Way, Unit #13, Montgomery, IL 60538.  The Sole Member may change the principal place of business of the Company, and may establish additional places of business of the Company both within and without the State of Illinois.

**1.4**     **Registered Agent and Registered Office**.   The registered agent and registered office of the Company in Illinois shall be Ruben Ybarra, 4 Rocky Way, Unit #13, Montgomery, IL 60538.  The Sole Member may change the registered agent and/or registered office of the Company at any time.

**1.5**     **Purpose**.   The Company is formed for the purpose of engaging in any business for which a limited liability company may be formed pursuant to the Act.

**1.6**     **Term**.  The term of the Company shall commence on the date the Articles was filed with the Illinois Secretary of State and shall continue until the Company is dissolved and liquidated pursuant to the terms of this Agreement or of the Act.

FILED DATE: 5/30/2019 4:11 PM   2010L050077

## ARTICLE II

## TAX TREATMENT

The Company shall be treated as a sole proprietorship for tax purposes unless and until at least one additional Member is added in which event the Company shall thereafter be treated as a partnership for tax purposes.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

Upon execution of this Agreement the Sole Member contributed One Hundred and No/100 Dollars ($100.00) in exchange for one hundred percent (100%) of the membership interests in the Company and was admitted as the sole member (the "Sole Member") of the Company. The Sole Member may, from time to time, make additional capital contributions to the Company or the Company may borrow such capital from any person or persons, including the Sole Member, but in no event shall the Sole Member be required to make additional capital contributions to the Company, to loan money to the Company, or to cause the Company to borrow money from any other person.

## ARTICLE IV

## DISTRIBUTIONS

Interim distributions from the Company shall be payable at the times and in the amounts determined by the Sole Member in its sole discretion.

## ARTICLE V

## ALLOCATIONS

Except as may be required by the Internal Revenue Code of 1986, as amended, or the provisions of any successor statute (the "Code"), all items of income, gain, loss, deduction and credit of the Company shall be allocated to the Sole Member.

FILED DATE: 5/30/2019 4:11 PM   2010L050077

## ARTICLE VI

## MANAGEMENT

**6.1** **Management**. The business of the Company shall be managed by the Sole Member. The Sole Member shall have full authority to bind the Company and to enter into and execute any contract, agreement or other document on behalf of the Company.

**6.2** **No Required Meetings**. The Sole Member shall not be required to hold or conduct any meetings at any time.

**6.3** **Liability of Sole Member**. Unless otherwise provided by law or expressly assumed, the Sole Member shall not be liable for the acts, debts or liabilities of the Company.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS

The Sole Member may transfer all or any part of its membership interest in the Company to any person at any time. The membership interest of the Sole Member in the Company shall be freely transferable.

## ARTICLE VIII

## BOOKS, RECORDS, TAX MATTERS

**8.1** **Required Books and Records**. The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act and such books and records shall be kept at the Company's principal place of business and shall in all respects be independent of the books, records and transactions of the Sole Member. The calendar year shall be the fiscal year of the Company for tax and accounting purposes.

**8.2** **Inspection**. The Sole Member shall have the right to inspect the books and records of the Company at any time.

**8.3** **Tax Matters Partner**. The Sole Member shall be the Tax Matters Partner of the Company within the meaning of Section 6223 of the Internal Revenue Code of 1986, as amended.

**8.4** **Other Matters**. On or before the 90th day following the end of each fiscal year during the term of the Company, the Company shall furnish to the Sole

Member a federal (and, where applicable, state) income tax reporting Form K-1 or its equivalent.

## ARTICLE IX

## DISSOLUTION

**9.1** **Events of Dissolution**. The Company shall dissolve (i) upon the bankruptcy or dissolution of the Sole Member; (ii) upon the written election of the Sole Member; or (iii) upon the entry of a decree of judicial dissolution of the Company.

**9.2** **Winding Up**. In the event of the dissolution of the Company for any reason, the Sole Member shall commence to wind up the affairs of the Company and to liquidate its investments in an orderly manner. The Sole Member shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions.

**9.3** **Allocation and Distribution of Proceeds**. Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Sole Member to set up such cash reserves as it may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds or assets of the Company shall be distributed to the Sole Member.

**9.4** **Articles of Dissolution**. On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Sole Member (or such other person or persons as the Act may require or permit) shall file an Articles of Dissolution with the Secretary of State of Illinois and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE X

## MISCELLANEOUS

**10.1** **Amendment**. This Agreement may be amended at any time by a written document executed by the Sole Member.

**10.2** **Governing Law; Severability**. This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Illinois excluding any conflict of laws rule or principle that might refer to the governance or the construction of this Agreement to the law of another jurisdiction.

FILED DATE: 5/30/2019 4:11 PM   2010L050077

FILED DATE: 5/30/2019 4:11 PM    2010L050077

**10.3    Liability of the Sole Member**.    Except as otherwise provided by applicable law or expressly agreed to in writing by any the Sole Member, the Sole Member shall not have any personal liability whatsoever, whether to the Company or to the creditors of the Company, for the actions, debts or liabilities of the Company or any of its losses beyond the amount committed by such the Sole Member to the capital of the Company.

**10.4    Third Party Beneficiaries**.    The provisions of this Agreement are not intended to be for the benefit of any creditor or any other person (other than the Sole Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has a claim against), the Company or the Sole Member, and no such creditor or other person shall obtain any rights under such provisions or shall by reason of such provisions make any claim in respect of any of the aforesaid debts, liabilities or obligations (or otherwise) against the Company or the Sole Member.

**10.5    Binding Effect**. Except as herein otherwise specifically provided, the Agreement shall be binding upon and inure to the benefit of the Sole Member and its legal representatives, heirs, administrators, executors, successors and assigns.

**10.6    Entire Agreement**.  This Agreement constitutes the entire agreement with respect to the subject matter hereof. It supersedes any prior agreement or understandings, and it may not be modified or amended in any manner other than as set forth herein.

**10.7    Captions**.  Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope of any provision hereof.

**10.8    Gender and Number**.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine line, feminine and neuter.

**10.9    Severance**.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

**10.10    Other Activities**.  The Sole Member may have other business interests and may engage in other activities in addition to those relating to the Company, including, without limitation, acting as a manager for other limited liability companies, or as a general partner for partnerships.  The Company shall not have any right by virtue of this Agreement or otherwise in or to such other ventures or activities of any the Sole Member or to the income or proceeds derived therefrom, and the pursuit of such ventures shall not be deemed wrongful or improper.

**10.11    Transactions with Affiliates**.  The validity of any transaction, agreement or payment involving the Company and the Sole Member and any affiliate of the Sole Member, otherwise permitted by the terms of this Agreement, shall not be affected by

FILED DATE: 5/30/2019 4:11 PM   2010L050077

reason of the relationship between the Company and the Sole Member and/or the affiliate of the Sole Member, as the case may be.

**THIS AGREEMENT** is executed as of May 20th, 2015.


_____
Ruben Ybarra

Manager

YRY Holdings, LLC

FILED DATE: 5/30/2019 4:11 PM 2010L050077

# EXHIBIT "D"

FILED DATE: 5/30/2019 4:11 PM    2010L050077

OPERATING AGREEMENT

OF

## BOULDER HILL CONDOS

An Illinois Limited Liability Company

## ARTICLE I

## FORMATION

1.1    **Formation**. BOULDER HILL CONDOS, LLC, an Illinois limited liability company (the "Company"), was formed by filing its Articles of Organization (the "Articles") with the Illinois Secretary of State on May 20th, 2015, pursuant to and in accordance with the Illinois Limited Liability Company Act, as amended (the "Act"). The sole member of the Company shall be YRY Holdings, LLC, ("Sole Member"), a Delaware limited liability company. In the event of any conflict between the provisions of this Agreement and the provisions of the Articles, the provisions of the Articles shall govern.

1.2    **Name**. The name of the Company is Boulder Hill Condos, LLC. All business of the Company shall be conducted in the name the Company and the Company shall hold all of its assets in its own name. The Sole Member may change the name of the Company.

1.3    **Principal Place of Business**. The principal place of business of the Company shall be 4 Rocky Way, Unit #13, Montgomery, IL 60538. The Sole Member may change the principal place of business of the Company, and may establish additional places of business of the Company both within and without the State of Illinois.

1.4    **Registered Agent and Registered Office**. The registered agent and registered office of the Company in Illinois shall be Ruben Ybarra, 4 Rocky Way, Unit #13, Montgomery, IL 60538. The Sole Member may change the registered agent and/or registered office of the Company at any time.

1.5    **Purpose**. The Company is formed for the purpose of engaging in any business for which a limited liability company may be formed pursuant to the Act.

1.6    **Term**. The term of the Company shall commence on the date the Articles was filed with the Illinois Secretary of State and shall continue until the Company is dissolved and liquidated pursuant to the terms of this Agreement or of the Act.

## ARTICLE II

### TAX TREATMENT

The Company shall be treated as a sole proprietorship for tax purposes unless and until at least one additional Member is added in which event the Company shall thereafter be treated as a partnership for tax purposes.

## ARTICLE III

### CAPITAL CONTRIBUTIONS

Upon execution of this Agreement the Sole Member contributed One Hundred and No/100 Dollars ($100.00) in exchange for one hundred percent (100%) of the membership interests in the Company and was admitted as the sole member (the "Sole Member") of the Company. The Sole Member may, from time to time, make additional capital contributions to the Company or the Company may borrow such capital from any person or persons, including the Sole Member, but in no event shall the Sole Member be required to make additional capital contributions to the Company, to loan money to the Company, or to cause the Company to borrow money from any other person.

## ARTICLE IV

### DISTRIBUTIONS

Interim distributions from the Company shall be payable at the times and in the amounts determined by the Sole Member in its sole discretion.

## ARTICLE V

### ALLOCATIONS

Except as may be required by the Internal Revenue Code of 1986, as amended, or the provisions of any successor statute (the "Code"), all items of income, gain, loss, deduction and credit of the Company shall be allocated to the Sole Member.

## ARTICLE VI

## MANAGEMENT

**6.1** <u>Management</u>. The business of the Company shall be managed by the Sole Member. The Sole Member shall have full authority to bind the Company and to enter into and execute any contract, agreement or other document on behalf of the Company.

**6.2** <u>No Required Meetings</u>. The Sole Member shall not be required to hold or conduct any meetings at any time.

**6.3** <u>Liability of Sole Member</u>. Unless otherwise provided by law or expressly assumed, the Sole Member shall not be liable for the acts, debts or liabilities of the Company.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS

The Sole Member may transfer all or any part of its membership interest in the Company to any person at any time. The membership interest of the Sole Member in the Company shall be freely transferable.

## ARTICLE VIII

## BOOKS, RECORDS, TAX MATTERS

**8.1** <u>Required Books and Records</u>. The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act and such books and records shall be kept at the Company's principal place of business and shall in all respects be independent of the books, records and transactions of the Sole Member. The calendar year shall be the fiscal year of the Company for tax and accounting purposes.

**8.2** <u>Inspection</u>. The Sole Member shall have the right to inspect the books and records of the Company at any time.

**8.3** <u>Tax Matters Partner</u>. The Sole Member shall be the Tax Matters Partner of the Company within the meaning of Section 6223 of the Internal Revenue Code of 1986, as amended.

**8.4** <u>Other Matters</u>. On or before the 90th day following the end of each fiscal year during the term of the Company, the Company shall furnish to the Sole

FILED DATE: 5/30/2019 4:11 PM    2010L050077

Member a federal (and, where applicable, state) income tax reporting Form K-1 or its equivalent.

## ARTICLE IX

## DISSOLUTION

**9.1    Events of Dissolution.**    The Company shall dissolve (i) upon the bankruptcy or dissolution of the Sole Member; (ii) upon the written election of the Sole Member; or (iii) upon the entry of a decree of judicial dissolution of the Company.

**9.2    Winding Up.**  In the event of the dissolution of the Company for any reason, the Sole Member shall commence to wind up the affairs of the Company and to liquidate its investments in an orderly manner.  The Sole Member shall have full right and unlimited discretion to determine the time, manner and terms of any sale or sales of Company assets pursuant to such liquidation having due regard to the activity and condition of the relevant market and general financial and economic conditions.

**9.3    Allocation and Distribution of Proceeds.** Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Sole Member to set up such cash reserves as it may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds or assets of the Company shall be distributed to the Sole Member.

**9.4    Articles of Dissolution.**  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Sole Member (or such other person or persons as the Act may require or permit) shall file an Articles of Dissolution with the Secretary of State of Illinois and shall take such other actions as may be necessary to terminate the Company.

## ARTICLE X

## MISCELLANEOUS

**10.1    Amendment.**  This Agreement may be amended at any time by a written document executed by the Sole Member.

**10.2    Governing Law; Severability.**  This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Illinois excluding any conflict of laws rule or principle that might refer to the governance or the construction of this Agreement to the law of another jurisdiction.

FILED DATE: 5/30/2019 4:11 PM   2010L050077

**10.3    Liability of the Sole Member**.   Except as otherwise provided by applicable law or expressly agreed to in writing by any the Sole Member, the Sole Member shall not have any personal liability whatsoever, whether to the Company or to the creditors of the Company, for the actions, debts or liabilities of the Company or any of its losses beyond the amount committed by such the Sole Member to the capital of the Company.

**10.4    Third Party Beneficiaries**.   The provisions of this Agreement are not intended to be for the benefit of any creditor or any other person (other than the Sole Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has a claim against), the Company or the Sole Member, and no such creditor or other person shall obtain any rights under such provisions or shall by reason of such provisions make any claim in respect of any of the aforesaid debts, liabilities or obligations (or otherwise) against the Company or the Sole Member.

**10.5    Binding Effect**. Except as herein otherwise specifically provided, the Agreement shall be binding upon and inure to the benefit of the Sole Member and its legal representatives, heirs, administrators, executors, successors and assigns.

**10.6    Entire Agreement**. This Agreement constitutes the entire agreement with respect to the subject matter hereof. It supersedes any prior agreement or understandings, and it may not be modified or amended in any manner other than as set forth herein.

**10.7    Captions**. Captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope of any provision hereof.

**10.8    Gender and Number**. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in either the masculine, the feminine or the neuter gender shall include the masculine line, feminine and neuter.

**10.9    Severance**. If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provisions to persons or circumstances other than those to which it is held invalid, shall not be affected thereby.

**10.10    Other Activities**.   The Sole Member may have other business interests and may engage in other activities in addition to those relating to the Company, including, without limitation, acting as a manager for other limited liability companies, or as a general partner for partnerships.  The Company shall not have any right by virtue of this Agreement or otherwise in or to such other ventures or activities of any the Sole Member or to the income or proceeds derived therefrom, and the pursuit of such ventures shall not be deemed wrongful or improper.

**10.11    Transactions with Affiliates**. The validity of any transaction, agreement or payment involving the Company and the Sole Member and any affiliate of the Sole Member, otherwise permitted by the terms of this Agreement, shall not be affected by

reason of the relationship between the Company and the Sole Member and/or the affiliate of the Sole Member, as the case may be.

**THIS AGREEMENT** is executed as of May 20th, 2015.

_____
Ruben Ybarra

Manager

YRY Holdings, LLC

FILED DATE: 5/30/2019 4:11 PM   2010L050077

# EXHIBIT "E"

5/6/2019                                                    LLC - File Detail Report

FILED DATE: 5/30/2019 4:11 PM   2010L050077



**OFFICE OF THE ILLINOIS SECRETARY OF STATE**

**JESSE WHITE**
**SECRETARY OF STATE**

## LLC FILE DETAIL REPORT

| | | | | | |
|---|---|---|---|---|---|
| **File Number** | 03661121 | | | | |
| **Entity Name** | YRY HOLDINGS, LLC | | | | |
| **Status** | ACTIVE | **On** | | 02/05/2019 | |
| **Entity Type** | LLC | **Type of LLC** | | Foreign | |
| **File Date** | 10/11/2011 | **Jurisdiction** | | DE | |
| **Agent Name** | ARIEL WEISSBERG | **Agent Change Date** | | 02/05/2019 | |
| **Agent Street Address** | 401 S. LASALLE ST., STE 403 | **Principal Office** | | 24 HILLSTONE ROAD #8 MONTGOMERY, IL 605380000 | |
| **Agent City** | CHICAGO | **Managers** | | View | |
| **Agent Zip** | 60605 | **Duration** | | PERPETUAL | |
| **Annual Report Filing Date** | 02/05/2019 | **For Year** | | 2018 | |
| **Series Name** | NOT AUTHORIZED TO ESTABLISH SERIES | | | | |

Return to the Search Screen

Purchase Certificate of Good Standing
**(One Certificate per Transaction)**

**OTHER SERVICES**

File Annual Report

Adopting Assumed Name

Articles of Amendment Effecting A Name Change

Change of Registered Agent and/or Registered Office Address

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

5/6/2019

LLC - MANAGERS

FILED DATE: 5/30/2019 4:11 PM 2010L050077



## LLC MANAGERS

| Entity Name | YRY HOLDINGS, LLC | File Number | 03661121 |
| --- | --- | --- | --- |
| Name | Address | | |
| YBARRA JR., RUBEN | 24 HILLSTONE ROAD #8, MONTGOMERY, IL - 605380000 | | |

Close

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

FILED DATE: 5/30/2019 4:11 PM   2010L050077

# EXHIBIT "F"

FILED DATE: 5/30/2019 4:11 PM   2010L050077

**SCHEDULE B-1**
**(Form 1065)**
(Rev. December 2011)
Department of the Treasury
Internal Revenue Service

## Information on Partners Owning 50% or More of the Partnership
▶ Attach to Form 1065. See instructions on back.

OMB No. 1545-0099

Name of partnership
YRY HOLDINGS, LLC

Employer identification number (EIN)

**Part I**    Entities Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3a)

Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, tax-exempt organization, or any foreign government that owns, directly or indirectly, an interest of 50% or more of the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| YBARRA CHILDREN INVESTMENT | | TRUST | US | 50.000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Part II**    Individuals or Estates Owning 50% or More of the Partnership (Form 1065, Schedule B, Question 3b)

Complete columns (i) through (iv) below for any individual or estate that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| RUBEN YBARRA | Redacted - Personally Identifiable Information | US | 100.000 |
| YOLANDA YBARRA | | US | 100.000 |
| | | | |
| | | | |
| | | | |
| | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 1065.

Schedule B-1 (Form 1065) (Rev. 12-2011)

JSA
6P1038 1.000

0194NQ 701Y

V16-7.14F

CONFIDENTIAL

BDO-Ybarra 000436

FILED DATE: 5/30/2019 4:11 PM   2010L050077

# EXHIBIT "G"

368313

FILED DATE: 5/30/2019 4:11 PM   2010L050077

EXHIBIT A

LEGAL DESCRIPTION

Apartments:

PARCEL 1:

LOTS 1 AND 5 OF BOULDER HILL, UNIT 9, IN THE TOWNSHIP OF OSWEGO, KENDALL COUNTY, ILLINOIS.

PARCEL 2:

LOT 1 OF RESUBDIVISION OF LOTS 2, 3, AND 4 IN BOULDER HILL, UNIT 9, IN THE TOWNSHIP OF OSWEGO, (EXCEPT FOR THAT PORTION THEREOF DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID LOT 1, THENCE NORTH 82 DEGREES 35 MINUTES 53 SECONDS EAST ALONG THE SOUTH LINE THEREOF, 64.09 FEET TO THE PLACE OF BEGINNING; THENCE NORTH 07 DEGREES 09 MINUTES 34 SECONDS WEST, 80.54 FEET; THENCE NORTH 82 DEGREES 50 MINUTES 26 SECONDS EAST, 132.07 FEET TO THE EAST LINE OF SAID LOT 1; THENCE SOUTHEASTERLY 53.40 FEET ALONG SAID EAST LINE, BEING ALONG A NON-TANGENT CURVE TO THE LEFT WITH A RADIUS OF 2617.37 FEET, A CHORD LENGTH OF 53.40 FEET AND BEARS SOUTH 10 DEGREES 38 MINUTES 46 SECONDS EAST; THENCE SOUTHWESTERLY 40.94 FEET ALONG SAID EAST LINE BEING A CURVE TO THE RIGHT WITH A RADIUS OF 25.00 FEET, CHORD LENGTH OF 38.02 FEET AND BEARS SOUTH 35 DEGREES 41 MINUTES 01 SECONDS EAST TO THE SOUTH LINE OF LOT 1; THENCE SOUTH 82 DEGREES 35 MINUTES 53 SECONDS WEST ALONG SAID SOUTH LINE 110.48 FEET TO THE POINT OF BEGINNING), IN KENDALL COUNTY, ILLINOIS.

PARCEL 3:

LOTS 3 AND 4 OF RESUBDIVISION OF LOTS 2, 3, AND 4 IN BOULDER HILL UNIT 9, IN THE TOWNSHIP OF OSWEGO, KENDALL COUNTY, ILLINOIS.

PARCEL 4:

THAT PART OF THE SOUTHEAST 1/4 OF SECTION 5, TOWNSHIP 37 NORTH, RANGE 8, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHWESTERLY CORNER OF BOULDER HILL, KENDALL COUNTY, ILLINOIS, UNIT 9; THENCE SOUTHWESTERLY ALONG THE WESTERLY LINE OF HILLSTONE ROAD, ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1217.25 FEET, AN ARC DISTANCE OF 310.69 FEET TO A POINT OF TANGENCY; THENCE SOUTH 19 DEGREES, 45 MINUTES, 26 SECONDS WEST ALONG SAID WESTERLY LINE, 127.55 FEET TO A POINT OF CURVATURE; THENCE SOUTHERLY ALONG SAID WESTERLY LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1678.50 FEET, AN ARC DISTANCE OF 142.20 FEET TO THE SOUTHWESTERLY CORNER OF SAID UNIT 9, SAID POINT BEING ALSO A NORTHERLY CORNER OF THE GARDENS OF BOULDER HILL, KENDALL COUNTY, ILLINOIS; THENCE SOUTHERLY ALONG A WESTERLY LINE OF SAID GARDENS OF BOULDER HILL, BEING ALONG A CURVE TO THE LEFT HAVING A

RADIUS OF 1741.09 FEET, AN ARC DISTANCE OF 17.61 FEET TO A NORTHERLY CORNER OF SAID GARDENS OF BOULDER HILL; THENCE NORTH 75 DEGREES, 37 MINUTES, 04 SECONDS WEST ALONG A NORTHERLY LINE OF SAID GARDENS OF BOULDER HILL 120.73 FEET TO THE EASTERLY LINE OF THE CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY; THENCE NORTHEASTERLY ALONG SAID EASTERLY LINE, BEING ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 1882.30 FEET, AN ARC DISTANCE OF 172.86 FEET TO A POINT OF TANGENCY; THENCE NORTH 20 DEGREES, 00 MINUTES, 55 SECONDS EAST ALONG SAID EASTERLY LINE, 126.44 FEET TO A POINT OF CURVATURE; THENCE NORTHERLY ALONG SAID EASTERLY LINE, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1050.48 FEET, AN ARC DISTANCE OF 279.46 FEET; THENCE SOUTH 84 DEGREES, 57 MINUTES, 25 SECONDS EAST 119.46 FEET TO THE POINT OF BEGINNING; IN THE TOWNSHIP OF OSWEGO, (EXCEPTING THEREFROM THAT PORTION DESCRIBED AS FOLLOWS:

THAT PART OF THE SOUTHEAST QUARTER OF SECTION 5, TOWNSHIP 37 NORTH, RANGE 8, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWESTERN CORNER OF BOULDER HILL UNIT 9, BEING A SUBDIVISION OF PART OF THE SAID SOUTHEAST QUARTER;

A-1

KINGSTON_001056

FILED DATE: 5/30/2019 4:11 PM    2010L050077

ACCORDING TO THE PLAT THEREOF RECORDED NOVEMBER 4, 1959 IN BOOK 10 OF PLATS, PAGE 20 AS DOCUMENT NO. 127365, SAID POINT BEING ALSO A NORTHERLY CORNER OF THE GARDENS OF BOULDER HILL BEING A SUBDIVISION OF PART OF THE SAID SOUTHEAST QUARTER, ACCORDING TO THE PLAT THEREOF RECORDED AUGUST 24, 1971 IN BOOK 13 OF PLATS, PAGES 65 AND 66 AS DOCUMENT NO. 71-3071; THENCE SOUTHERLY 17.61 FEET ALONG A WESTERLY LINE OF SAID GARDENS OF BOULDER HILL, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1741.09 FEET, THE CHORD OF WHICH BEARS SOUTH 14 DEGREES 36 MINUTES 48 SECONDS WEST, FOR A DISTANCE OF 17.61 FEET TO A NORTHERLY CORNER OF SAID GARDENS OF BOULDER HILL; THENCE NORTH 75 DEGREES 37 MINUTES 04 SECONDS WEST ALONG A NORTHERLY LINE OF SAID GARDENS OF BOULDER HILL 120.73 FEET TO THE EASTERLY LINE OF THE CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY; THENCE NORTHEASTERLY 172.86 FEET ALONG SAID EASTERLY LINE, BEING ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 1862.30 FEET, THE CHORD OF WHICH BEARS NORTH 17 DEGREES 21 MINUTES 22 SECONDS EAST, FOR A DISTANCE OF 172.80 FEET; THENCE NORTH 20 DEGREES 00 MINUTES 55 SECONDS EAST ALONG SAID EASTERLY LINE, 56.25 FEET; THENCE SOUTH 70 DEGREES 14 MINUTES 34 SECONDS EAST, 119.59 FEET TO THE WEST RIGHT-OF-WAY LINE OF HILLSTONE ROAD; THENCE SOUTH 19 DEGREES 45 MINUTES 26 SECONDS WEST ALONG SAID WEST RIGHT-OF-WAY LINE, 58.01 FEET; THENCE SOUTHERLY 142.20 FEET, ALONG SAID WEST RIGHT-OF-WAY LINE, BEING ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 1678.50 FEET, THE CHORD OF WHICH BEARS SOUTH 17 DEGREES 19 MINUTES 49 SECONDS WEST, FOR A DISTANCE OF 142.16 FEET TO THE PLACE OF BEGINNING) IN KENDALL COUNTY, ILLINOIS.

<u>Condominiums</u>

PARCEL 1:

UNITS 1, 2, 3, 4, 5, 6, 7, 8 AND 9 IN BUILDING "M" IN BOULDER HILL CONDOMINIUM, AS DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND:

THAT PART OF THE SOUTHEAST QUARTER OF SECTION 6, TOWNSHIP 37 NORTH, RANGE 8, EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS: BEGINNING AT THE SOUTHWESTERLY CORNER OF BOULDER HILL UNIT 9, BEING A SUBDIVISION OF PART OF THE SAID SOUTHEAST QUARTER; ACCORDING TO THE PLAT THEREOF RECORDED NOVEMBER 4, 1959 IN BOOK 10 OF PLATS, PAGE 20 AS DOCUMENT NO. 127365, SAID POINT BEING ALSO A NORTHERLY CORNER OF THE GARDENS OF BOULDER HILL BEING A SUBDIVISION OF PART OF THE SAID SOUTHEAST QUARTER, ACCORDING TO THE PLAT THEREOF RECORDED AUGUST 24, 1971 IN BOOK 13 OF PLATS, PAGES 65 AND 66 AS DOCUMENT NO. 71-3071; THENCE SOUTHERLY 17.61 FEET ALONG A WESTERLY LINE OF SAID GARDENS OF BOULDER HILL, BEING ALONG A CURVE TO THE LEFT HAVING A RADIUS OF 1741.09 FEET, THE CHORD OF WHICH BEARS SOUTH 14 DEGREES 36 MINUTES 48 SECONDS WEST, FOR A DISTANCE OF 17.61 FEET TO A NORTHERLY CORNER OF SAID GARDENS OF BOULDER HILL; THENCE NORTH 75 DEGREES 37 MINUTES 04 SECONDS WEST ALONG A NORTHERLY LINE OF SAID GARDENS OF BOULDER HILL 120.73 FEET TO THE EASTERLY LINE OF THE CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY; THENCE NORTHEASTERLY 172.86 FEET ALONG SAID EASTERLY LINE, BEING ALONG A CURVE TO THE RIGHT, HAVING A RADIUS OF 1862.30 FEET, THE CHORD OF WHICH BEARS NORTH 17 DEGREES 21 MINUTES 22 SECONDS EAST, FOR A DISTANCE OF 172.80 FEET; THENCE NORTH 20 DEGREES 00 MINUTES 55 SECONDS EAST ALONG SAID EASTERLY LINE, 56.25 FEET; THENCE SOUTH 70 DEGREES 14 MINUTES 34 SECONDS EAST, 119.59 FEET TO THE WEST RIGHT-OF-WAY LINE OF HILLSTONE ROAD; THENCE SOUTH 19 DEGREES 45 MINUTES 26 SECONDS WEST ALONG SAID WEST RIGHT-OF-WAY LINE, 58.01 FEET; THENCE SOUTHERLY 142.20 FEET, ALONG SAID WEST RIGHT-OF-WAY LINE, BEING ALONG A CURVE TO THE LEFT, HAVING A RADIUS OF 1678.50 FEET, THE CHORD OF WHICH BEARS SOUTH 17 DEGREES 19 MINUTES 49 SECONDS WEST, FOR A DISTANCE OF 142.16 FEET TO THE PLACE OF BEGINNING) IN KENDALL COUNTY, ILLINOIS.

WHICH PLAT OF SURVEY IS ATTACHED AS EXHIBIT "C" TO THE DECLARATION OF CONDOMINIUM RECORDED FEBRUARY 7, 2008, AS DOCUMENT NUMBER 200800003287 AND AMENDED FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS, IN KENDALL COUNTY, ILLINOIS.

PARCEL 2:

UNITS 1, 2, 5, 6, 7 AND 8 IN BUILDING J IN BOULDER HILL CONDOMINIUM, AS DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND:

KINGSTON_001057

FILED DATE: 5/30/2019 4:11 PM   2010L050077

LOT 6 OF BOULDER HILL, UNIT 9, IN THE TOWNSHIP OF OSWEGO, KENDALL COUNTY, ILLINOIS;

WHICH PLAT OF SURVEY IS ATTACHED AS EXHIBIT "C" TO THE DECLARATION OF CONDOMINIUM RECORDED FEBRUARY 7, 2008 AS DOCUMENT NUMBER 200800003287 AND AMENDED FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS, IN KENDALL COUNTY, ILLINOIS.

PARCEL 3:

UNITS 5, 6, 9, 10, 11, 12, 13, 14 IN BUILDING "E" IN BOULDER HILL CONDOMINIUM, AS DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND:
LOT 2 OF RESUBDIVISION OF LOTS 2, 3, AND 4, BOULDER HILL, UNIT 9, IN THE TOWNSHIP OF OSWEGO, KENDALL COUNTY, ILLINOIS;

WHICH PLAT OF SURVEY IS ATTACHED AS EXHIBIT "C" TO THE DECLARATION OF CONDOMINIUM RECORDED FEBRUARY 7, 2008 AS DOCUMENT NUMBER 200800003287 AND AMENDED FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS.

PARCEL 4:

UNITS 13, 14, 15 AND 16 IN BUILDING "C" IN BOULDER HILL CONDOMINIUM, AS DELINEATED ON A PLAT OF SURVEY OF THE FOLLOWING DESCRIBED TRACT OF LAND:

PART OF LOT 1 OF RESUBDIVISION OF LOTS 2, 3, AND 4, BOULDER HILL, UNIT 9, IN THE TOWNSHIP OF OSWEGO, KENDALL COUNTY, ILLINOIS;

WHICH PLAT OF SURVEY IS ATTACHED AS EXHIBIT "C" TO THE DECLARATION OF CONDOMINIUM RECORDED FEBRUARY 7, 2008 AS DOCUMENT NUMBER 200800003287 AND AMENDED FROM TIME TO TIME; TOGETHER WITH ITS UNDIVIDED PERCENTAGE INTEREST IN THE COMMON ELEMENTS.

A-3

FILED DATE: 5/30/2019 4:11 PM   2010L050077

| |
|---|
| Unit 1, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 2, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 3, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 4, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 5, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 6, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 7, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 8, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 5, Building M in Common Area Boulder Hill Condominium Phase 2 of Parcel 1 |
| Unit 1, Building J in Common Area Boulder Hill Condominium Parcel 2 |
| Unit 2, Building J in Common Area Boulder Hill Condominium Parcel 2 |
| Unit 5, Building M in Common Area Boulder Hill Condominium Parcel |
| Unit 6, Building J in Common Area Boulder Hill Condominium 2 of Parcel 2 |
| Unit 7, Building J in Common Area Boulder Hill Condominium 2 of Parcel 2 |
| Unit 8, Building J in Common Area Boulder Hill Condominium 2 of Parcel 2 |
| Unit 5, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 6, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 9, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 10, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 11, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 12, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 13, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 14, Building E in Common Area Boulder Hill Condominium Parcel 3 |
| Unit 13, Building E in Common Area Boulder Hill Condominium Parcel 4 |
| Unit 14, Building E in Common Area Boulder Hill Condominium Parcel 4 |
| Unit 15, Building E in Common Area Boulder Hill Condominium Parcel 4 |
| Unit 16, Building E in Common Area Boulder Hill Condominium Parcel 4 |
| Lot 5 in Boulder Hill Subdivision of Parcel 5 |
| Lot 1 in Boulder Hill Subdivision of Parcel 5 |
| Lot 1 in Boulder Hill Subdivision of Parcel 6 |
| Lot 4 in Boulder Hill Subdivision Unit 9 of Parcel 7 |
| Lot 3 in Boulder Hill Subdivision Unit 9 of Parcel 7 |
| Parcel 8 |

# EXHIBIT 8

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION
TAX AND MISCELLANEOUS REMEDIES SECTION

PTCV DEVELOPMENT, LLC as Assignee of ABS )
LINCOLNWOOD, LLC, as Assignee of CENTRUST )
BANK N.A., A NATIONAL BANKING ASSOCIATION, )
                                     )
           Plaintiff, )      No. 10 L 50077
                                     )
      v. )      Calendar 5
                                     )
                                     )      Associate Judge Patrick J. Heneghan
RUBEN YBARRA, )
                                     )
          Defendant. )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Subpoena Respondents CNTRST Debt Recovery LLC ("CNTRST"), Bruce Teitelbaum ("Teitelbaum"), and Markoff Law LLC's ("Markoff") (collectively, "Subpoena Respondents") Motion for Leave to Issue Subpoenas ("Discovery Motion") relating to CNTRST and Teitelbaum's Motion for Sanctions.  Subpoena Respondents seek sanctions against Plaintiff PTCV Development LLC ("PTCV"), Ruben Ybarra ("Ybarra"), and Adverse Claimants YRY Holdings LLC ("YRY"), Boulder Hill Apartments, LLC ("Boulder Hill"), and Real Realty, Inc. ("Real Realty") (collectively, "Adverse Claimants") for PTCV's, Ybarra's and Adverse Claimants' alleged collusion and fraud upon the Court in this litigation.

This Court entered a *sua sponte* order on April 19, 2021 reconsidering its prior order denying CNTRST and Teitelbaum's oral motion for leave to issue subpoenas, and directing any party to file memoranda in support or opposition of the Discovery Motion.  Collectively, Subpoena Respondents, Ybarra, and Adverse Claimants (YRY, Boulder Hill, and Real Realty) submitted three memoranda, addressing the Court's questions.  The Court heard oral argument on the *sua sponte* order on April 27, 2021.  During the oral argument, former plaintiff Centrust Bank, N.A. ("Centrust Bank") expressly joined in Subpoena Respondents' Discovery Motion as well as in Subpoena Respondents' memoranda filed in response to the Court's April 19, 2021 *sua sponte* order.

After reviewing all submitted memoranda, exhibits, and cited legal authority, as well as hearing oral argument from all interested parties and non-parties, this Court GRANTS Subpoena Respondents' and Centrust Bank's motion for leave to issue subpoenas.

## I. BACKGROUND

Former plaintiff Centrust Bank had judgments totaling over $5 million against Defendant Ybarra in this matter. In or around July 2020, it assigned the judgments to ABS Lincolnwood, LLC ("ABS"). A few months thereafter, ABS assigned the judgments to PTCV, which was formed in September 2020, approximately half a month after ABS filed its motion to intervene following its assignment from Centrust Bank.

PTCV filed a motion to intervene as the plaintiff and judgment creditor in this matter in October 2020, and Centrust Bank correspondingly filed a motion to dismiss the post-judgment proceedings or withdraw as plaintiff. This Court granted PTCV's motion to intervene, denied Centrust Bank's motion to dismiss, and granted Centrust Bank's motion to withdraw.

CNTRST never was a plaintiff in this matter, and is involved as a subpoena respondent through its connection to Centrust Bank. CNTRST and Centrust Bank had executed an "Agreement of Creditors" relating to the prosecution of claims against Ybarra. According to the Adverse Claimants and Ybarra, CNTRST allegedly drove the litigation on Centrust Bank's behalf when the latter was the plaintiff in the litigation. Adverse Claimants YRY and Boulder Hill filed a motion in June 2020 to join CNTRST as a necessary party, which CNTRST opposed. Centrust Bank assigned the judgments to ABS shortly thereafter.

The present issue before this Court is Subpoena Respondents' and Centrust Bank's claim that now-Plaintiff PTCV, Defendant Ybarra, and certain Adverse Claimants may bv colluding to create a sham proceeding before this Court. Subpoena Respondents and Centrust Bank assert that there may exist no justiciable controversy because PTCV's, Ybarra's, and Adverse Claimants' interests may be aligned. Subpoena Respondents further assert that the prosecution of any remaining matters before this Court likely is designed to enable Ybarra and Adverse Claimants to develop evidence to use in collateral litigation against the Subpoena Respondents, Centrust Bank, and Centrust Bank's current and former lawyers.[1] Adverse Claimants have conceded that, at least in part, they intend to use materials discovered through supplementary proceedings pending before this Court to develop claims against third parties.

For its part, CNTRST seeks sanctions against, and to issue subpoenas on PTCV, Ybarra, and Adverse Claimants and others on the asserted collusion matter. In entering this order, the Court addresses the Discovery Motion.

---

[1] On October 8, 2020, Adverse Claimants YRY and Boulder Hills sent correspondence to Centrust Bank threatening litigation for the latter's alleged abusive and contumacious conduct during the course of these judgment enforcement proceedings. *See* "Subpoena Respondents' Reply Brief in Further Support of Motion for Protective Order and/or to Quash Subpoenas," Exhibit 1 (filed 3/22/21)(attaching 10/8/20 correspondence).

## II.   ANALYSIS

The Court starts with the premise that, for litigation to commence or continue, the parties must (1) be adverse and (2) be seeking redress in the courts in order to resolve a justiciable case or controversy. *See Schell v. Albrecht*, 65 Ill. App. 3d 989, (Ill. 1978) (noting that in reviewing agreements between plaintiffs and defendants, the court must look to whether the adversarial relationship between the parties has been preserved); *Banovz v. Rantanen*, 271 Ill. App. 3d 910, 915 (5th Dist. 1995) (same); *Carlson v. City Constr. Co.*, 239 Ill. App. 3d 211, 244-45 (1st Dist. 1992) ("[W]here such [a cooperation and indemnification] agreement exists, the adversarial relationship of the parties is altered.  Parties who initially were at odds become aligned. Without disclosure of the agreement to the jury, they remain unaware of the realignment, and the integrity of the trial is at risk."); *Sturgeon v. Powell*, 118 Ill. App. 2d 382, 385 (1st Dist. 1969).

Relatedly, if for whatever reason, the plaintiff and the defendant are aligned together to achieve the same goal, to the possible detriment of another (former party, party, third-party, or non-party), the Court itself has a preeminent interest in learning this fact.[2]  And, quite expectedly, if such a circumstance exists, it is very possible that no justiciable controversy exists.  *See Gatto v. Walgreen Drug Co.*, 61 Ill. 2d 513, 523 (1975)("No 'justiciable matter' exists where two former adversary parties have settled their differences as to all the issues they are purportedly litigating before the trial court."); *see also Sturgeon*, 118 Ill. App. 2d at 385 ("[The court] must refrain from making decisions upon moot questions which do not involve actual controversies.")

### A.  Subpoena Respondents' (and Centrust Bank's) Argument in Support of the Motion for Leave to Issue Subpoenas

In their motion for sanctions as well as in their memoranda responding to the Court's *sua sponte* order, Subpoena Respondents point to a number of circumstances that, they claim, evidence *possible* collusion between PTCV, on the one hand, and Ybarra and the Adverse Claimants, on the other.  They initially remark that Ybarra's and the Adverse Claimants interest are aligned because Ybarra's wife is the sole member of the LLCs that control Adverse Claimants.  With respect to PTCV and its possible "friendly" relationship with Ybarra and Adverse Claimants, Subpoena Respondents offer the following facts and circumstances that they assert justify the issuance of subpoenas to verify or learn of more underlying facts:

---

[2]  Though uncommon, the plaintiff and the defendant in a case might such a have a unity of interest in the prosecution and defense of litigation in some circumstances where collusion between the two might be tempted.  At oral argument, the Court speculated that such circumstances might include cases where the following types of non-parties might exist: (a) an insurer that might ultimately be responsible for paying any judgment, (b) an indemnitee that might be responsible for paying any judgment, costs or litigation expenses, or (c) where the conduct of some professional—an architect, an engineer, an accountant or a lawyer, etc.—might later be challenged as deficient and/or failing to satisfy minimal professional standards and whose conduct assertedly was responsible for the loss sustained by the "losing" party at an earlier trial where collusion may have occurred.

3

1. PTCV was formed in the fall of 2020, right around the time that Centrust Bank assigned its judgments to ABS.

2. Counsel representing PTCV here, Monica O'Brien, Esq., formed the corporate entity PTCV Development, LLC and its Manager, PTCV Development Manager, Inc., and serves as the Registered Agent for both entities. Further, the Court takes judicial notice that the "Principal Office" for PTCV Development Manager, Inc. listed with the Illinois Secretary of State is the address of the law firm "Gregory K. Stern, PC," the firm with which Ms. O'Brien is affiliated.

3. From the corporate documents alone, one cannot tell the identity of the actual or beneficial owners of PTCV or PTCV Development, Inc.

4. Lead counsel representing PTCV, Gregory Stern, has a long-time, close working relationship with Ybarra's former counsel, Ariel Weissberg.

5. Mr. Weissberg appears to have a continuing role, at least in part, behind the scenes in these post-judgment proceedings.

6. On February 3, 2021, the Court set the evidentiary hearing on the Adverse Claims and the Motion for Judicial Determination to commence on June 25, 2021.

7. On January 27, 2021 this Court granted PTCV leave to issue subpoenas to defend against the adverse claims.

8. Despite having over three months to issue such subpoenas and otherwise commence third-party discovery, PTCV has issued no subpoenas. PTCV also has not joined in the subpoenas, discovery motions, or other proceedings initiated by its adversaries—the Adverse Claimants. Stated simply, much is at stake for PTCV in the contemplated and scheduled evidentiary hearing on Adverse Claimants' claims and on the Motion for Judicial Determination, but PTCV apparently has taken no overt, affirmative steps to prosecute its interests in the litigation.

9. In preparation for its defense of the Adverse Claims, PTCV is instead relying on its adversaries' discovery efforts.

10. As adversaries to PTCV, the Adverse Claimants are showing a great degree of cooperation with their adversary.

11. PTCV is exhibiting enormous passivity, if not indifference, towards both the Adverse Claims and the pending Motion for Judicial Determination.

12. Subpoena Respondents made efforts to learn from attorneys for ABS (the assignee of Centrust Bank and the assignor to PTCV) the identities of the people behind PTCV

4

and the relationship, if any, between PTCV, Ybarra, and the Adverse Claimants. According to Subpoena Respondents, counsel for ABS declined to communicate with Subpoena Respondents on these subjects.

13. After the Subpoena Respondents filed their Motion for Sanctions, one of the counsel for PTCV (Ms. O'Brien) never appeared again in the case. Ms. Stern, Ms. O'Brien co-counsel, volunteered in open court that Ms. O'Brien was not likely to appear further because of the filed Motion for Sanctions.

14. In none of the papers PTCV or Adverse Claimants filed in connection with the Court's *sua sponte* order, did those entities deny a that a "friendly creditor" relationship existed between PTCV, on the one hand, and Ybarra and the Adverse Claimants, on the other.

During oral argument on the *sua sponte* order, the Court asked a number of questions about how, if at all, would a court discover if the real parties in interest might be colluding to achieve a predetermined, nefarious result, or otherwise abuse the litigation process to advance some other, undisclosed interest. Particularly where, as here, there exists a single plaintiff (PTCV) and a single defendant (Ybarra), it would be exceptionally difficult for the Court itself to discover the actual facts.

### i. Subpoena Respondents' cited case authority supporting their request to issue subpoenas

In support of Subpoena Respondents' request for leave to issue subpoenas, Subpoena Respondents primarily rely on the following three cases in their memorandum.

In *Gatto v. Walgreen Drug Co.*, the plaintiffs sued the lessor of a Walgreens store after the store roof feil on one of them. 61 Ill.2d 513 (Ill. 1975) (superseded by statute on an unrelated issue). The lessor pursued a successful contribution claim against the roofer who had worked on the roof, and who the plaintiffs failed to timely add as a defendant in their suit. After the plaintiffs were awarded a judgment against the lessor, the roofer learned of possible collusion between the plaintiffs and lessor. The court granted the roofer's motion for discovery on whether there was a fraudulently concealed settlement agreement between the plaintiffs and defendant/lessor. The court reversed the judgments of the circuit court, stating, "While our constitution provides that "Circuit Courts shall have original jurisdiction of all justiciable matters" (Ill. Const. 1970, art. VI, sec. 9), it does not confer jurisdiction to decide sham controversies. No 'justiciable matter' exists where two former adversary parties have settled their differences as to all the issues they are purportedly litigating before the trial court." *Id.* at 522-23.

In *People v. B.R. MacKay & Sons, Inc.*, the court granted the State's motion to conduct discovery on whether a settlement agreement was a sham because it relied on the defendant's allegedly false sworn statements that it did not conduct business in Illinois. 141 Ill.App.3d 137 (1st Dist.

5

1986). On a motion to vacate the settlement and order dismissing the case, the court granted the State leave to file a request for production of documents to explore this fraud question, finding that "the unusual facts present here, establishing a prima facie case of fraud, permit limited discovery in relation to the 2-1401 petition." *Id.* at 140.

Lastly, in *Hursey v. Calhoun*, former defendants who the plaintiff had dismissed from the case filed a post-judgment motion for sanctions, asserting that they never should have been sued. 2020 IL App (5th) 190276. The court allowed them limited discovery, stating, "As Ill. Sup. Ct. R. 201(b)(1) allows for broad discovery regarding any matter relevant to the pending action, a circuit court has discretion to allow post-judgment discovery in connection with motions for sanctions." *Id* at *61.

   ii.  **Law-of-the-Case Doctrine**

Subpoena Respondents next note that this Court granted PTCV leave to issue document subpoenas in its January 21, 2021 order, before PTCV formally was substituted as the party Plaintiff. Subpoena Respondents assert that pursuant to the law-of-the-case doctrine, because the Court allowed a non-party to issue subpoenas before it became a party, that ruling should control the disposition of the Subpoena Respondents' motion here.

Under the law-of-the-case doctrine, a rule that has been established as controlling in a particular case continues to be the law of the case if the facts remain the same. *See Continental Ins. Co. v. Skidmore, Owings & Merrill*, 271 Ill. App. 3d 692, 966-67 (1st Dist. 1995) (Because all issues relating to the insurer's duty to defend the insured were resolved in the appellate court's first opinion, the trial court had no authority to act beyond the dictates of the appellate court's mandate upon remand, and the law of the case required the appellate and trial courts to find that the insurer had a duty to defend.)

> Under [the law of the case] doctrine, a court is bound by its prior rulings of law in opinions or orders in the same case unless the facts require a different interpretation. The rule of the law of the case is a rule of practice, based on sound policy that, where an issue is once litigated and decided, that should be the end of the matter and the unreserved decision of a question of law or fact made during the course of litigation settles that question for all subsequent stages of the suit.

*Id.* (internal citations omitted). In this matter, the Court has already permitted then non-party PTCV (later, Plaintiff PTCV) to issue subpoenas, and it might be inconsistent with that prior order to prevent the third-party Subpoena Respondents from issuing subpoenas on the collusion issue.

6

iii. **Subpoena Respondents' reliance on Section 1101 of the Illinois Code of Civil Procedure**

Section 1101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-1101 covers the issuance of subpoenas, and states in relevant part that, "An attorney admitted to practice in the State of Illinois, as an officer of the court, may also issue subpoenas on behalf of the court for witnesses." Subpoena Respondents urge that section 1101 may be used to allow them to serve as "friends of the court" and seek the requested information through subpoenas, particularly where the Court's jurisdiction may be in question. The Court observes that section 1101 neither explicitly permits nor denies a third party subpoena respondent the right to itself serve subpoenas in such a circumstance.

iv. **The Court's supervisory authority to control its own docket**

Subpoena Respondents also refer to the Court's inherent discretion to address the whether circumstances in this case reveal that there no longer is a justiciable case or controversy or whether a potential fraud is being perpetrated on the Court. It would be absurd for the Court to be aware that there may not be a true conflict before it but be powerless to order discovery into the matter by the parties with an interest in rooting out the fraud. As the Court explains later in this order, Subpoena Respondents are correct in noting that it would undermine the integrity of the courts if the only entities in this matter that are empowered to investigate the possibility of collusion are either this Court itself, or the parties that are being accused of this collusion. *See Nicholson v. The Chicago Bar Ass'n*, 233 Ill. App. 3d 1040, 1045 (1st Dist. 1992) (Courts are vested with the power to manage their own dockets so as to achieve the orderly and expeditious disposition of their cases.)

v. **Subpoena Respondents' right to conduct discovery in support of their Motion for Sanctions**

Subpoena Respondents additionally contend that they are seeking sanctions against Adverse Claimants for the latters' alleged abuses of the subpoena power against Subpoena Respondents. No party argues that Subpoena Respondents do not have a right to pursue their sanctions motion. However, as Subpoena Respondents argue, without the authority to issue subpoenas in furtherance of exploring and supporting their arguments for sanctions, the right to pursue sanctions would be largely toothless under the circumstances presented in this case.

This Court undoubtedly has authority, under its own initiative or upon motion, to sanction a party that abuses discovery procedures to gain information through improper discovery methods. *See* Ill. Sup. Ct. R 219(c)-(d). In this case, Subpoena Respondents filed a motion before this Court seeking relief from Adverse Claimants' alleged abuses in issuing subpoenas. While the Court does not make any findings or rulings on the sanctions motion itself, the Court recognizes that a subpoena respondent would be substantially handicapped in assembling all of the objective facts supporting its discovery sanctions claim unless it has itself the right to issue subpoenas under certain circumstances. This Court can hardly conclude that the law does not

provide a subpoena recipient with the means to support a motion for relief that the movant is otherwise unquestionably entitled to seek.

          vi.     **Centrust Bank's joinder in Subpoena Respondents' motion**

With the joinder of Centrust Bank in Subpoena Respondents' motion, all of those entities also urge that the motion carries even greater force because there exist several cases, identified above, where a former party was allowed to itself commence discovery to detect whether collusion had occurred.

    B.  **PTCV's and Adverse Claimants' Response**

PTCV's primary argument in its opposition memorandum, which is echoed by Adverse Claimants, is that none of CNTRST's proffered cases involve a court permitting a non-party third-party subpoena recipient to issue subpoenas. PTCV argues that civil discovery pursuant to the Illinois Supreme Court Rules solely permits parties to the litigation—referring to the plaintiffs or defendants, and not entities or individuals who are involved in any other capacity, such as a third-party subpoena respondent like CNTRST—to issue subpoenas or otherwise engage in discovery.

PTCV cites to Illinois Supreme Court Rule 201, governing general discovery, which states, "[A] party may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking disclosure or of any other party…" Ill. Sup. Ct. R. 201(b)(1). PTCV and Adverse Claimants argue that the use of the term "party" throughout Illinois Supreme Court Rules 201 through 224 pertaining to discovery, should be read strictly to refer to only an actual party in the litigation. Based on the appellate court's interpretation of the predecessor to Ill. Sup. Ct. R. 213, Adverse Claimants state that a "party" that may conduct discovery is narrowly defined as one of the opposing litigants to the judicial proceedings. *See Neuswanger v. Ikegai America Corp.*, 221 Ill. App. 3d 280 (3d Dist. 1991).

In *Neuswanger*, the court ruled that the work-product privilege did not shield from discovery a videotape made by a consulting expert, because the discovery rules applied only to "parties," defined as the opposing litigants in a judicial proceeding. *Id* at 283.[3] *Neuswanger's* discussion of who qualified as a "party" under an older version of the discovery rules related to the question of expert work product and was later found to have relied on an improper analysis. The opinion does not develop any basis for concluding that an interested non-litigant third-party cannot be granted leave to conduct discovery on a matter that affects its rights and position in the litigation, as here.

---

[3] *Neuswanger* later was overruled in *Dameron v. Mercy Hosp. & Med. Ctr.*, holding that Ill. Sup. Ct. R. 201(b)(3)'s provision on the consultant's privilege protects such work product and a showing of exceptional circumstance was required by defendants seeking discovery of an expert's report. 2020 IL 125219, *45 (Ill. Nov. 19, 2020).

Plaintiff and Adverse Claimants have not presented any controlling authority for their proposition that this Court cannot permit an interested third-party subpoena respondent to itself issue subpoenas, or that the discovery is limited to litigants on either side of the case caption. The entire point of the relief sought by Subpoena Respondents is that they are requesting discovery outside of the usual discovery timelines and processes, as the matter is now in the post-judgment phase. Moreover, Subpoena Respondents attack the very premise that there remains a justiciable controversy before the Court at all, at least once the judgment was assigned to PTCV and PTCV became the plaintiff. The cases cited by Subpoena Respondents are on point regarding precisely this kind of limited, special discovery, and no authority presented to this Court indicates that such discovery is only available to certain classes of parties as narrowly defined by Ybarra and Adverse Claimants.

Additionally, Plaintiff's and Adverse Claimants' position that an Illinois court lacks authority to grant an interested party other than a plaintiff or defendant leave to conduct discovery would create an overly restrictive, unreasonable result under the circumstances of this case. Indeed, such a rule could functionally deprive a court of the ability to properly address whether either a justiciable controversy exists or a fraud was committed upon the court. Additionally, by including in their definition of proper "parties" that may conduct discovery, certain categories of non-plaintiffs and non-defendants (such as the dismissed former defendants in *Hursey* or the third-party indemnitor in *Gatto*), but not other interested entities or individuals—such as third-party subpoena respondents like CNTRST, Teitelbaum, or Markoff Law LLC—Ybarra and Adverse Claimants create an arbitrary, illogical divide between who is and who is not considered a litigant in the matter.

During the April 21, 2021 hearing before this Court, PTCV's counsel acknowledged that if there was collusion, and if that collusion occurred between all of the parties before the Court as plaintiffs or defendants in the matter, then there would be no viable method of protecting the integrity of the courts, as no other entity or individual involved in the matter could bring this fraud to the Court's attention and allow the Court to address the matter. The vast majority of suits are between genuinely adverse parties and therefore the chances of such collusion are quite low. But is it incumbent upon the courts to proactively screen every case that comes before them for such fraud? Mechanically as well as procedurally, how would that occur? Such an absurd requirement would put an undue burden upon the courts and hinder the resolution of cases.

In the present matter, there are non-party third-parties who are subpoena respondents, and who make a claim of potential collusion based on the information they have available about this matter. The fourteen separate observations the Subpoena Respondents assert to support their suspicions are catalogued earlier in this Opinion. This Court mentions the above factual contentions merely to note *the allegations presented before it*, and does not weigh in on the accuracy or veracity of those statements. However, these details underscore how the Court would be frustrated from fully apprising itself of any fraud and collusion occurring before it if it had to divert time and resources towards conducting its own investigation, rather than

9

spending its valuable time and resources otherwise handling actual matters in controversy. Rather, a court is authorized to empower the entities and individuals with a vested interest in assessing whether a real case or controversy exists, as well as those entities and individuals more intimately familiar with the facts of this case. Moreover, if only the plaintiff or defendant could conduct discovery on the matter of collusion, it would lead to the incongruous result wherein only those parties complicit in the alleged collusion could bring proof of it to the Court's attention.

Plaintiff and Adverse Claimants also make numerous allegations about CNTRST's (through Bruce Teitelbaum) alleged behind-the-scenes involvement in this case while Centrust Bank was the plaintiff, through CNTRST's control of the prosecution of claims involving Centrust Bank's judgments against Ybarra. PTCV further accuses CNTRST of using the threat of a sanctions motion in order to pressure PTCV to decline proceeding on Plaintiff's (now PTCV's) Motion for Judicial Determination.

The Court, having presided over these post-judgment proceedings for over two years, has a working knowledge of some of the past disputes involving Teitelbaum and Ybarra. But the Court does not see how the threat of sanctions related to the asserted collusion issue could derail the prosecution of an otherwise meritorious Motion for Judicial Determination (or meritorious Adverse Claim, for that matter).

Moreover, as this Court was apprised during the hearing on this matter, former plaintiff Centrust has now joined the Subpoena Respondents in the latters' motion for leave to issue subpoenas on the issue of whether a justiciable controversy exists. Nothing in either PTCV's or Adverse Claimants' memoranda support an objection to a former plaintiff being granted leave to conduct limited post-judgment discovery on this question. *See Hursey*, 2020 IL App (5th) 190276 (dismissed former defendants allowed to conduct discovery on their post-judgment motion for sanctions).

   C. **Scope of the Discovery Allowed**

The Court now turns to the scope of the discovery allowed. The Court has reviewed the Exhibit attached to Subpoena Respondents' memoranda. The Exhibit identifies both the identity of the persons and entities on which Subpoena Respondents seek to issue subpoenas as well as a short narrative description of the information sought.

Subpoena Respondents seek to issue subpoenas on four corporate entities (PTCV, Adverse Claimants YRY Holdings and Boulder Hill, and ABS Lincolnwood); two individuals (Ybarra and his wife); and three lawyers or law firms (PTCV's counsel, Adverse Claimants' counsel, and attorney Ariel Weissberg). The Court is familiar generally with most of these entities and people, and their respective involvement in the post-judgment proceedings. The Court of course has no knowledge about whether any of them engaged in conduct that might defeat this Court's jurisdiction in the event there no longer is a justiciable case or controversy. But that, of course,

10

is the point of the sought-after information. The Court will authorize the issuance of the subpoenas to those nine identified entities and individuals.

III.    CONCLUSION

For the foregoing reasons, the Court GRANTS Subpoena Respondents' and Centrust Bank's Discovery Motion. Subpoena Respondents and Centrust Bank are granted leave to issue subpoenas relating to the exploring the dual issues about whether a justiciable case or controversy still exists or whether, instead, PTCV and Ybarra and the Adverse Claimants are engaging in a cooperative, non-adversarial enterprise that operates to defeat this Court's jurisdiction over this case.

Dated:    May 3, 2021

Patrick J. Heneghan, Associate Judge
Associate Judge Patrick J. Heneghan

MAY 03 2021

Circuit Court - 2155

11

# EXHIBIT 9

# TANNEN
## LAW GROUP, P.C.

ATTORNEYS AND COUNSELORS AT LAW
77 West Washington Street, Suite 500
Chicago, Illinois 60602
Tel: (312) 641-6650     Fax (312) 641-6656
Email:  mtannen@tannenlaw.com

October 8, 2020

***Via Electronic Mail Delivery***

Mr. James McMahon, President and CEO
Centrust Bank, NA
 c/o  Steve Rappin, Esq.
Hauselman & Rappin, Ltd.
29 E.  Madison Street, Suite 950
Chicago, Illinois 60602

> **Re:     *Notice of Claim***
> ***Centrust Bank NA v. Ruben Ybarra//10 L 50077***

Dear Mr. McMahon:

Our firm represents YRY Holdings LLC ("YRY") and Boulder Hill Apartments LLC ("BHA") in the above captioned case.  As will be discussed below, BHA and YRY own and control a large apartment complex in Montgomery, Illinois known as the Boulder Hill Apartments. The Bank and its lawyers, agents, and collection partners have engaged in an unrelenting, abusive, and frivolous litigation campaign to obtain ownership and control of this apartment complex to satisfy the Bank's judgment against the judgment debtor Ruben Ybarra ("Ruben").  The Boulder Hill Apartments are not, and never have been, Ruben's property.  The Bank knows this.

We are directing this letter to you as President and CEO of Centrust Bank NA ("the Bank") through the Bank's counsel of record, Steve Rappin. This letter should be considered as a notice of a claim under any policies of insurance issued to the Bank and its officers and directors.  Accordingly, please make sure that this letter and attached supporting materials are tendered immediately to your insurers and to the Bank's officers and directors.

The Bank's insurance policies will likely require the Bank to tender a detailed proof of loss.  Since you are new to this case, I have enclosed for your reference our fourth amended timeline of operative events filed in late August of this year.  The Court in our case had ordered the parties to prepare timelines so the court could have a context for ruling on the Bank's baseless motion to forcibly sell the Boulder Hill Apartments.  Moreover, the judge told your lawyer on October 2, there is no evidence that Ruben was a member of YRY or BHA, and thus, there is no basis for the Bank to force a sale of an apartment complex that Ruben does not own.

In seeking to enforce a judgment against Ruben Ybarra, the Bank has damaged YRY and BHA. Among other things, we point to the following acts and omissions:

- The Bank entered into a cooperation agreement with CNTRST Debt Recovery Corporation ("CNTRST"), an entity owned and controlled by Bruce Teitelbaum ("Teitelbaum"), a disgruntled business partner of YRY.[1] Shortly before the secret cooperation agreement was executed, Teitelbaum settled a separate lawsuit involving the Boulder Hill Apartments.  He sold his membership interest in the Boulder Hill Apartments, and agreed to walk away from the apartment complex forever.

---

[1] It bears noting that CNTRST was incorporated by the Bank's outside general counsel.

**Letter to James McMahon**
**October 8, 2020**
**Page 2**

- This cooperation agreement was concealed from the Court, YRY, and BHA for more than four years. The Bank has been the named plaintiff in this case for a decade. The Bank and Teitelbaum--or Teitelbaum in the name of the Bank--have waged a scorched earth litigation campaign against YRY and BHA where there is no basis in fact or in law to have done so.

- Under the guise of enforcing the Bank's judgments against Ruben, the Bank and Teitelbaum have sought to wrest ownership and control of the Boulder Hill Apartments from YRY and BHA event though Teitelbaum settled his lawsuit against YRY, and agreed to have nothing to do with the Boulder Hill Apartments.

- The Bank permitted itself to be the strawman plaintiff in this case, with Teitelbaum directing the Bank's lawyers to seize ownership and control of the Boulder Hill Apartments, an objective he was barred from pursuing per the settlement in his prior lawsuit against YRY.

- The Bank and Teitelbaum have abused the enforcement process. Among other things, the Bank, Teitelbaum, CNTRST, and the Bank's lawyers have violated the rules for notice to parties to obtain conditional judgments against YRY and BHA; have sought charging orders against Ruben's non-existent membership interest in YRY and BHA; had Ruben arrested during the middle of his citation exam when he had agreed to appear at this citation exam; filed fraudulent notices of motion to incorrectly revive the lapsed judgment; filed an emergency motion to appoint a receiver for the Boulder Hill Apartments and let it lay fallow for a year before inexplicably abandoning it; and filed a bogus motion to appoint Ferleger—an interested party and a disbarred lawyer—to act as receiver over Ruben's non-existent membership interest in YRY and BHA. On information and belief, CNTRST—the Bank's collection agent and partner—knowingly used the services of a disbarred lawyer to enforce the judgment against Ruben and harass YRY and BHA. Teitelbaum and CNTRST could not have engaged in these efforts without the knowing or unwitting participation of the Bank as named plaintiff.

- The Bank persisted for years in seeking to encumber, control through the appointment of a receiver, and to forcibly sell the Boulder Hill Apartments when it knew or should have known and attached that Ruben has no membership or ownership interest in the Boulder Hill Apartments.

- The Bank failed to investigate the qualifications and background of CNTRST, its agents, and its employees. At the time that the secret cooperation agreement was executed, Teitelbaum was in Chapter 7 bankruptcy and Ferleger had been disbarred. (Illinois law holds that proceedings may be voided if a litigant knew or should have known that a knowingly permitted the unauthorized practice of law.)

- The Bank, on information and belief, failed to seek committee approval before entering into the secret cooperation agreement.

- The Bank negligently failed to monitor and supervise CNTRST and CNTRST's agents and employees with respect to enforcement proceedings in this case and in other cases in which the Bank had obtained judgments against Ruben.



**Letter to James McMahon**
**October 8, 2020**
**Page 3**

- The Bank negligently failed to monitor and supervise the Bank's lawyers in the above captioned case. Indeed, the Bank's lawyers, Markoff Law, in open court told the court that Markoff took 100% of his marching orders from Teitelbaum, not the Bank.

- The Bank negligently permitted its rogue agent and partner CNTRST and the Bank's lawyers to file false, abusive, and frivolous motions against YRY and BHA.

Typically, a bank's insurance policies construe as a "claim" a letter or notice which seeks monetary damages. YRY and BHA, and its member and manager, have suffered damages as a result of the Bank's acts and omissions, both intentional and negligent. The Bank is liable for the negligent, intentional, abusive, and malicious acts of CNTRST since (i) CNTRST is the Bank's agent, and (ii) the Bank and CNTRST are partners. Indeed, as CNTRST's partner, CNTRST's knowledge and conduct is imputed to the Bank.

YRY's and BHA's damages include attorneys' fees and costs incurred in this case and damages for tortious interference with existing contract and prospective economic advantage. In addition, the Bank's acts and omissions caused BHA and YRY to refinance their loan at a significantly higher interest rate. These damages are in excess of $1.5 million. And, when a jury hears the about the outrageous conduct of CNTRST and the Bank's lawyers, we think they will readily award punitive damages.

In addition to putting the Bank's insurers, officers, and directors on notice, we renew our request that the Bank preserve and not modify every shred of paper related to this case and its relationship with CNTRST, Ruben, YRY, and BHA. Doug Giese told us in writing in 2019 that he had instructed you to preserve and not alter any materials related to this case. We filed a motion for preservation order in June of this year. A copy of this motion is attached for your convenience so that you are aware of the depth and breadth of what needs to be preserved. The files held by the Bank's lawyers are the Bank's files, so you can readily request those files and demand that they be preserved.

Thank you for your attention to this matter. Should you have any questions or comments, please have Mr. Rappin and/or the lawyer who your insurers assign to handle this claim.

Sincerely,

TANNEN LAW GROUP, P.C.

*Michael M. Tannen*

Michael M. Tannen
MMT

