## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION

CENTRUST BANK, N.A.,          )
                                    )
          Plaintiff,           )
                                    )
        v.                 )      Case No. 21-cv-2576
                                    )
RUBEN YBARRA, et al.,          )
                                    )
          Defendants.       )

## CENTRUST'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, Centrust Bank, N.A. ("Centrust" or the "Bank"), for its response to the motion to dismiss ("Motion") of Defendants Ruben Ybarra ("Ybarra"), YRY Holdings, LLC ("YRY"), and Boulder Hill Apartments, LLC ("BHA"), states as follows:

## I. PRELIMINARY STATEMENT

Centrust has adequately pled causes of action against Defendants for abuse of process and declaratory relief. Centrust alleges that Defendants colluded with PTCV Development, LLC ("PTCV") to perpetuate a fraud during a state court post-judgment proceeding before the Honorable Patrick Hennigan (the "Post-Judgment Proceedings"). Specifically, Ybarra had PTCV, YRY, and BHA pose as adversaries in the Post-Judgment Proceedings to: (1) prolong the proceedings; (2) use them as a discovery vehicle for an anticipated malicious-prosecution suit; and (3) engineer a resolution of the Post-Judgment Proceedings to bolster their anticipated suit.

The Ybarra Parties' efforts to defraud the court in the Post-Judgment Proceedings were only partially successful. (*Id.*) The Ybarra Parties managed to prolong the Post-Judgment Proceedings long enough to issue several abusive discovery requests to Centrust and others, but the bizarre, non-adversarial behavior of PTCV and the Ybarra Parties eventually aroused the court's suspicions, prompting it to authorize an investigation of their apparent collusion. (*Id.*)

Faced with the prospect of an investigation, PTCV and the Ybarra Parties simply dropped the Post-Judgment Proceedings and retreated. (*Id.*)

None of this should come as a surprise, since Ybarra, for the past 15 years, has been defrauding and harassing Centrust. While he was employed by Centrust as a loan officer, Ybarra used straw entities to make loans to himself and receive bribes. Since then, Ybarra has used straw entities to avoid paying his judgment debts to Centrust, direct abusive process towards Centrust, and threaten Centrust with frivolous litigation. Centrust commenced this action to: (1) obtain a declaration that the Ybarra Parties have no valid claims against the Bank; and (2) recover damages from the Ybarra Parties for their past abuses of process.

In their Motion, the Ybarra Parties assert this case is not ripe for adjudication because they have not filed their threatened lawsuit. The Ybarra Parties are wrong. They cannot prevent this case from becoming ripe by simply delaying their threatened lawsuit. While the Ybarra Parties dither and threaten, witness memories are fading and Centrust is being subjected to ongoing uncertainty and insecurity. The Court can easily adjudicate this case by applying the law to fully developed facts. As such, the case is ripe.

Furthermore, notwithstanding the Ybarra Parties' arguments to the contrary, there is nothing wrong with Centrust's allegations regarding YRY's citizenship or the alleged jurisdictional amount. Centrust alleges YRY is a limited liability company 100% beneficially owned – directly or indirectly – by a Texas citizen (Ybarra) with members that are all Texas citizens. Centrust further alleges the Bank is an Illinois citizen. As for the amount in controversy, Centrust alleges it has suffered more than $75,000 of damages, and that the Ybarra Parties claim to have suffered more than $1.5 million of damages. These allegations demonstrate diversity of citizenship between Centrust and YRY, and an amount in controversy exceeding $75,000.

Finally, despite the Ybarra Parties' arguments to the contrary, Centrust more than adequately states a claim for abuse of process. Centrust alleges Ybarra secretly used a straw entity to acquire the Bank's judgments against him and thereafter perpetuated sham post-judgment proceedings against himself in which he controlled all the parties, including the judgment creditor, judgment debtor, and third-party intervenors. In the sham post-judgment proceedings, the Ybarra Parties pretended they were adversaries litigating a controversy concerning Ybarra's fraudulent transfers when, in fact, they were co-conspirators that were merely perpetuating the post-judgment proceedings for the sole purpose of serving burdensome, irrelevant discovery on Centrust. These allegations plainly state a claim for abuse of process.

## II. SUMMARY OF ALLEGATIONS

From 2006 to 2008, Ybarra was employed by Centrust as a loan officer. (Dkt. 1 at ¶¶ 1, 19-27.) During his tenure, Ybarra repeatedly used straw entities to conceal his ownership and control over Centrust borrowers. (*Id.*) Ybarra received brides, made undisclosed personal loans to Centrust's borrowers, and released Centrust's collateral without the bank's knowledge or consent. (*Id.*) Eventually, the Office of the Comptroller of Currency (the "OCC") discovered Ybarra's illegal activities and commenced enforcement proceedings against him. (*Id.*) To avoid prosecution, Ybarra agreed to a consent order that barred him from the banking industry and required him to make restitution to Centrust. (*Id.*)

Ybarra and his companies also defaulted on the loans Centrust made to them. (*Id.* at ¶¶ 4-6, 28-44.) In 2010, Centrust sued Ybarra to collect the debts, and was awarded the Judgments, which total more than $2.6 million. (*Id.*) Ybarra never satisfied the Judgments. (*Id.*) Instead, Ybarra created an asset protection plan to shield his assets from Centrust. (*Id.*) Pursuant to his plan, Ybarra used straw companies (including Defendants YRY and BHA) to retain *de facto*

ownership and control over a wide variety of assets, including several apartments located in Montgomery, Illinois. (*Id.*) Centrust discovered: (1) the Montgomery apartments were transferred to BHA for less than $100; (2) BHA is 100% owned and controlled by YRY; and (3) YRY is managed by Ybarra, who owns (directly or indirectly) 100% of YRY. (*Id.*)

Based on this information, Centrust's attorneys' reasonably concluded Ybarra was using YRY and BHA as his alter egos to unjustly shield the Montgomery apartments from the Bank's collection efforts. (*Id.* at ¶¶ 7-8, 45-54.) As a result, in 2019, Centrust filed a Motion for Judicial Determination (the "Sale Motion") (¶52) to liquidate the Boulder Hill Apartments in Montgomery, Illinois (the "Apartments"). The Sale Motion argued Ybarra was the true owner of the Apartments and that he put ownership in the name of an entity he controlled to protect the asset from his creditors. That entity, Defendant YRY, ostensibly was owned by Ybarra's wife and children (or trusts for their benefit), but Ybarra held sufficient incidents of ownership to make the Apartments subject to the claims of his creditors. (¶7). In December of 2019, Defendants YRY and BHA as adverse claimants sought and were granted the right to an evidentiary hearing and to conduct discovery regarding the merits of the Sale Motion (¶57).

In the summer of 2020, Centrust decided it no longer wanted to pursue the Sale Motion or even to pursue collection from Ybarra. Centrust Bank sold the Judgment to an entity known as ABS Lincolnwood. (¶8). Ybarra, or entities he controlled, was able to acquire the Judgment through PTCV. (¶¶9-10, Ex. 8).[1] That should have ended the dispute and any litigation between

---

[1] In ruling on a motion to dismiss, the Court may consider the allegations in the complaint. Further, "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice" may also be considered by the Court in deciding a motion to dismiss without converting it into a motion for summary judgment." *Scott v. Bender*, 893 F. Supp. 2d 963, 971 (N.D. Ill. 2012) (citing *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n. 1 (7th Cir.2012) (citing Fed. R. Civ. Pro. 10(c))). A court may also "tak[e] judicial notice of state court decisions." *Id.* (citing *520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1138 n. 14 (7th Cir.2008) (citing *In re Salem*, 465 F.3d 767, 771 (7th Cir.2006))).

Centrust, Plaintiffs, and Defendants. After all, the Judgments were satisfied or at least controlled by a "friendly creditor" who would not pursue collection. However, the Ybarra Parties instead decided to pretend that PTCV was an unaffiliated third party and to conceal from the state court their acquisition of the Judgments. They reasoned the state court would then continue to indulge their requests for discovery. This fraud on the Circuit Court worked, at least for a while.

After 9 months of extensive discovery, including third-party subpoenas, a motion to quash, and a Sanction Motion,[2] Judge Heneghan ultimately concluded that something was wrong in the alignment of the adverse parties and that Defendants might be misleading him. (¶¶59-60, Ex. 8). Judge Heneghan then issued the opinion attached as Exhibit 8 to the Complaint, authorizing Centrust, and others, to serve discovery to ferret out collusion involving Defendants and PTCV. (¶59, Ex. 8). Shortly after Judge Heneghan empowered Centrust to issue discovery, Defendants abandoned their scheme and terminated the Post-Judgment Proceedings (¶60).

## III. ARGUMENT

### A. COUNTS I AND II ALLEGE A CASE RIPE FOR ADJUDICATION

Centrust alleges declaratory judgment claims that are ripe for adjudication. A case is ripe under Article III of the Constitution and the Declaratory Judgment Act[3] whenever "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

---

[2] A copy of the Motion for Sanctions Plaintiffs filed in the Post-Judgment Proceedings before Judge Heneghan is attached as **Exhibit A** to this Motion. The Court can consider this filing in ruling on Defendants' MTD. *See Miszczyszyn v. JPMorgan Chase Bank, N.A.*, 2019 WL 1254912, at *6 (N.D. Ill. Mar. 19, 2019) (Court considered document filed in state court action in ruling on motion to dismiss, reasoning that the Court could take judicial notice of the filing based upon *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012)); *Balogh v. Deutsche Bank Nat'l Tr. Co.*, 2017 WL 5890878, at *1 (N.D. Ill. Nov. 28, 2017) ("Although the state-court foreclosure filings are outside the pleadings in this case, this Court may take judicial notice of matters of public record without converting the motion to dismiss into a motion for summary judgment, particularly where the facts are not subject to reasonable dispute. [ ] This Court takes judicial notice of the underlying foreclosure documents, as they are state court filings and orders as a matter of public record, which is appropriate on a motion to dismiss.") (citations omitted)).

[3] The ripeness "requirements of the [Declaratory Judgment] Act and those of Article III are … coextensive." *See, e.g., Amling v. Harrow Indus. LLC,* 943 F.3d 373, 377–78 (7th Cir. 2019).

declaratory judgment." *Cent. States, Se. & Sw. Areas Health & Welfare Fund by Bunte v. Am. Int'l Grp., Inc.,* 840 F.3d 448, 451 (7th Cir. 2016). Whether a case is ripe turns on two factors: (1) "the fitness of the issues for judicial decision;" and (2) "the hardship to the parties of withholding court consideration." *Metro. Milwaukee Ass'n of Com. v. Milwaukee Cty.,* 325 F.3d 879, 882 (7th Cir. 2003). Here, both factors demonstrate Centrust's declaratory judgment claims are ripe.

### i.   CENTRUST'S CLAIMS ARE FIT FOR JUDICIAL DETERMINATION

Centrust's declaratory judgment claims are fit for judicial determination because they involve purely legal questions arising out of fully developed facts. Cases that "present purely legal issues are normally fit for judicial decision." *Wisconsin Right to Life State Pol. Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011). So are cases where the issues "will not be clarified by further factual development." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). In such cases, a controversy has generally ripened to a point where a party could invoke a coercive remedy (*i.e.*, a suit for damages or an injunction), but has not done so for some reason. *See, e.g., NUCOR Corp.,* 28 F.3d 572, 578 (7th Cir. 1994) (affirming declaratory judgment award where the claim of the defendant (the natural plaintiff) had "ripened to a point where it could invoke a coercive remedy, but it ha[d] not done so"). In other words, cases become ripe when a court can determine the parties' rights and liabilities by applying the law to fully developed facts – not when the natural plaintiff chooses to file suit. *See, e.g., id.*

In Counts I and II, Centrust merely asks the Court to determine whether it committed a tort by prosecuting the Sale Motion in the Post-Judgment Proceedings. (Dkt. 1 at ¶¶ 65-84.) To make this determination, the Court simply needs to apply the law to the facts surrounding the Post-Judgment Proceedings. The Court does not need to worry about the facts changing because the Post-Judgment Proceedings are finished. (*Id.* at ¶ 60.) If Centrust truly committed a tort by prosecuting the Sale Motion (which it did not), and if Defendants truly suffered damages because

of the Bank's conduct (which they did not), then Defendants would be entitled to sue for a coercive remedy. Therefore, the case regarding is fit for judicial determination, whether Defendants wish to litigate the case now, later, or never.

### ii. CENTRUST WILL SUFFER HARDSHIP

Centrust will also suffer hardship if the Court withholds consideration of the Bank's declaratory judgment claims. Courts have consistently recognized uncertainty and insecurity regarding potential liability is a hardship which the Declaratory Judgment Act is designed to address. *See, e.g., NUCOR Corp.,* 28 F.3d at 579 (affirming declaratory judgment award because it "relieved [plaintiff's] uncertainty and insecurity concerning its legal relationship with [defendant]"); *Sears, Roebuck & Co.,* 372 F.2d 435, 438 (7th Cir. 1967) (holding the Declaratory Judgment Act "should be construed to effectuate the purpose of the Act to afford relief from uncertainty and insecurity with respect to legal relations"*); Cont'l Assur. Co.,* 694 F. Supp. 449, 466 (N.D. Ill. 1988) (granting declaratory judgment that "contribute[d] to resolving the uncertainty, insecurity, and controversy involved in [the] case"). Courts have also recognized that delaying litigation works a hardship on the accused party because exculpatory evidence can be lost as witness memories fade. *NUCOR Corp.,* 28 F.3d at 578 (affirming declaratory judgment plaintiff "would be prejudiced by any delay" in litigation because, "[a]s memories fade, the facts become more difficult to determine").

### iii. CENTRUST HAS A REASONABLE APPREHENSION OF BEING SUED

The Complaint alleges objective facts establishing that Centrust has a reasonable apprehension of being sued by Defendants. Nothing further is needed to satisfy the plausibility pleading standard under Rule 8.[4] *GNB Battery Techs. Inc. v. Gould, Inc.,* 65 F.3d 615, 620 (7th

---

[4] To survive a Rule 12(b)(6) motion, a complaint "must contain allegations that state a claim to relief that is plausible on its face." *Lavalais v. Vill. of Melrose Park,* 734 F.3d 629, 632–33 (7th Cir. 2013). A claim has facial plausibility

Cir. 1995), offers guidance on pleading requirements in similar situations.  In that case, the Seventh

Circuit, *sua sponte*, analyzed the district court's jurisdiction to hear a declaratory judgment action

by GNB Battery against Gould, Inc. and concluded that GNB sufficiently pled a claim under *28

U.S.C. § 2201*.  The crux of the dispute was GNB's duty to reimburse Gould for environmental

contamination at plants Gould once owned.  Although neither Gould nor the EPA had yet sued

GNB for clean-up costs, GNB had a strong belief suit was a real and immediate "possibility."  *Id.*

at 621.  The Court concluded this was sufficient to establish justiciability under the Declaratory

Judgment Act, and observed:

> [I]n this case, in which a declaratory judgment plaintiff files an action in anticipation of a
> threatened action by the declaratory judgment defendant, the real and immediate possibility
> of such litigation is sufficient to create a justiciable controversy. *See Cardinal Chem. Co.
> v. Morton Int'l, Inc.*, 508 U.S. 83, [], 113 S.Ct. 1967, 1974–75, 124 L.Ed.2d 1 (1993).
> Looking only to the complaint, we must assure ourselves that the possibility of suit under
> CERCLA is sufficiently real and immediate. In making this judgment, we must evaluate
> the complaint as a whole and assess the totality of the circumstances. *See Trippe Mfg. Co.
> v. American Power Conservation Corp.*, 46 F.3d 624, 627 (7th Cir.1995). *Id.* at 620.

Similarly, *Norfolk S. Ry. Co. v. Guthrie*, 233 F.3d 532, 534–35 (7th Cir. 2000), directs courts

to consider the prior litigation conduct of the defendant when analyzing whether there is a

reasonable apprehension of suit, including actions taken in other litigation.  *See Id.*  In *Guthrie*, the

Norfolk and Southern Railway ("NS") sued two of its employees and their lawyer, seeking a

declaration that (a) it could discipline the employees for failing to report work injuries and (b) any

attempt by the law firm to prevent disciplinary investigations was preempted by federal law.  NS

knew the law firm recently filed 8 other suits in state court to prevent Union Pacific from

conducting disciplinary investigations for other clients.

The district court concluded there was no case or controversy because the law firm "had

---

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009).  The plausibility
standard does not allow a court to question or otherwise disregard nonconclusory factual allegations simply because
they may seem unlikely. *Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826-827 (7th Cir. 2015).

not taken any actions against NS and NS was not in immediate danger of sustaining direct injury caused" the law firm.  *Id.*, at 534.  The Seventh Circuit reversed this finding,[5] reasoning that "[w]here a declaratory plaintiff files a complaint in anticipation of litigation by the declaratory defendant, a case or controversy exists if the threat of such litigation is real and immediate."  *Id.* It recognized that the law firm's propensity to sue for similar conduct "is sufficient to demonstrate a real and immediate threat of litigation. Thus, the district court had the constitutional subject-matter jurisdiction necessary to proceed with [the railroad's] declaratory action."  *Id.*

Similarly, Centrust holds the firm belief it will be sued by Defendants for participating in the Post-Judgment Proceedings and the filing of the Sale Motion.  Centrust's knowledge and apprehension is not speculative or hypothetical.  The conduct and threats Defendants have directed at Centrust is more "real and immediate" than those directed at NS in *Guthrie*.  The Court need look no further than Judge Heneghan's opinion and the Sanctions Motion.  (*See,* Ex. A).

### B.    CENTRUST PROPERLY ALLEGES DIVERSITY JURISDICTION

#### i.    CENTRUST ALLEGES DIVERSITY BETWEEN THE BANK AND YRY

Centrust alleges it is a citizen of Illinois, whereas YRY is a citizen of Texas.  Therefore, Centrust properly alleges diversity of citizenship between the Bank and YRY.  Contrary to the Ybarra Parties' Motion, Centrust's allegations regarding YRY's citizenship are legally sufficient because they demonstrate YRY likely has one member, Ybarra, who is a citizen of Texas. Moreover, if YRY has other members, Centrust alleges they are citizens of Texas too.

It is axiomatic that "[t]he citizenship of a limited liability company is that of its members." *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 347 (7th Cir. 2006).  If an LLC has one individual member, and if the citizenship of that member is known, determining the LLC's citizenship is

---

[5] The Seventh Circuit concluded there was no independent basis for federal jurisdiction – i.e., no federal question jurisdiction -- and thus affirmed the dismissal on that basis.

simple.  However, analyzing the citizenship of an LLC can become more difficult if the LLC has a complicated structure.  *See, e.g., id.* (recognizing an LLC's citizenship "posed complex legal issues" where it had a "more complicated structure").  Worse, the details regarding an LLC's members are often unavailable from public records.  *Lincoln Ben. Life Co. v. AEI Life, LLC,* 800 F.3d 99, 108–09 (3d Cir. 2015) (recognizing that pleading the citizenship of an adverse LLC may be difficult because "[t]he membership of an LLC is often not a matter of public record").

Given the practical problems associated with analyzing an LLC's citizenship prior to discovery, a plaintiff does *not* need to allege every detail of the analysis.  *See, e.g., Emps. Preferred Ins. Co. v. C&K Hotel Grp., LLC,* No. 15-CV-1500, 2016 WL 755600, at *2-3 (C.D. Ill. 2016) (holding an allegation that "[a]ll members of [the defendant LLC were] citizens of the State of Illinois" was "sufficient to survive … and satisfy th[e] [c]ourt that jurisdiction over the matter [was] proper"); *see also Med. Assur. Co. v. Hellman,* 610 F.3d 371, 376 (7th Cir. 2010) (affirming the plaintiff properly alleged the citizenship of the defendants where it "alleged a particular state of citizenship of each [defendant]").  If a plaintiff's citizenship allegation demonstrates a good faith basis for concluding the citizenship of an LLC is the jurisdiction identified, a defendant cannot overcome the allegation with a mere facial attack.  *See, e.g., Emps. Preferred Ins. Co.*, 2016 WL 755600, at *2-3 (C.D. Ill. 2016) (rejecting a "facial attack" on plaintiff's allegation that an LLC was a citizen of Illinois where defendant failed to "assert [] any factual basis for her innuendo that [the LLC's] members … may not [have been] citizens of Illinois").

Instead, a plaintiff's good faith allegation regarding an LLC's citizenship must be accepted as true at the pleadings stage where "the defendants – who are in the best position to furnish evidence of their citizenship – have declined the opportunity to challenge the factual basis of [the plaintiff's] allegation."  *Med. Assur. Co.*, 610 F.3d at 376; *accord Griffin v. Werner Enterprises,*

*Inc.,* No. 14 C 9995, 2016 WL 792311, at *6 (N.D. Ill. 2016) (holding "[w]here there are some

facts … supporting the allegation of citizenship and the party who [is] in the best position to furnish

evidence of [its] citizenship … [has] declined the opportunity to challenge the factual basis of [the]

allegation, the court may proceed"). If courts required adverse parties to allege all the details of

an LLC's citizenship before discovery, many LLCs would effectively be immune from diversity

jurisdiction. *See, e.g., Lincoln Ben. Life Co.,* 800 F.3d at 108–09 (holding "a rule requiring the

citizenship of each member of each LLC to be alleged affirmatively before jurisdictional discovery

would effectively shield many LLCs from being sued in federal court without their consent");

*accord Carolina Cas. Ins. Co. v. Team Equip., Inc.,* 741 F.3d 1082, 1087 (9th Cir. 2014)

("adopt[ing] the sensible principle that, at this early stage in the proceedings, a [plaintiff] should

not be required to plead jurisdiction [over an LLC] affirmatively based on actual knowledge"

where "the facts supporting jurisdiction are not reasonably ascertainable by the plaintiff").

In this case, Centrust has alleged a basis for plausibly concluding YRY is a citizen of Texas

– not Illinois (where the Bank is a citizen). Centrust alleges Ybarra – who is domiciled in Texas

– "owns, directly or indirectly, an interest of 100% in YRY's profits, losses, or capital." (Dkt. 1

at ¶ 47.) The allegation is based on YRY's own tax return, which is attached to the Complaint.

(*Id.*) Centrust also alleges YRY's members are all citizens of Texas. (*Id.* at ¶ 15.) Centrust's

allegations are more than sufficient to survive the Ybarra Parties' facial attacks upon diversity

jurisdiction. The Ybarra Parties make no attempt to provide the Court with any factual basis for

concluding Centrust's allegations are wrong. Nor do they assert YRY has members that are

citizens of Illinois. Instead, the Ybarra Parties merely insinuate YRY may have members that are

not citizens of Texas. That is not enough to overcome the well-pleaded allegations of Centrust's

Complaint, especially when the Ybarra Parties undoubtedly know the identity and citizenship of

YRY's members but have chosen to conceal that information from the Court.

C.    CENTRUST PROPERLY ALLEGES THE AMOUNT IN CONTROVERSY

Centrust alleges the Ybarra Parties' abuse of process has cost it more than $75,000. (Dkt. 1 at ¶¶ 17, 90.) Centrust also alleges the Ybarra Parties have asserted claims against the Bank for more than $1.5 million that should be declared invalid. (*Id.* at ¶¶ 61-64 & ex. 9.) These allegations plainly demonstrate the amount in controversy exceeds $75,000.

At the pleadings stage, "[w]hether damages will exceed $75,000 is not a fact but a prediction" because the merits of the case have not yet been adjudicated. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 541 (7th Cir. 2006). As a result, courts defer to a plaintiff's allegation that the amount in controversy exceeds the jurisdictional amount. *See, e.g., id.* According to the Seventh Circuit, a trial court should only reject a plaintiff's allegations regarding the jurisdictional amount if it appears to be "a legal certainty" from the face of the complaint that "the claim is really for less than the jurisdictional amount." *Id.*.

The Ybarra Parties offer no reason to conclude it is a legal certainty that the amount in controversy falls short of $75,000. Although they argue Centrust could not have suffered $75,000 of damages, the Ybarra Parties do not demonstrate the Bank's allegations are legally impossible. Moreover, the Ybarra Parties do not deny they have claimed more than $1.5 million of damages.

D.    CENTRUST STATES A CLAIM FOR ABUSE OF PROCESS

In Court III, Centrust states a claim for abuse of process. Abuse of process under Illinois law[6] requires a plaintiff merely to allege the defendant: (1) had an ulterior motive; and (2) committed some act in the use of legal process not proper in the regular prosecution of the proceedings. Centrust alleges both these elements.

---

[6] Illinois law applies because Illinois has the most significant relationship with Centrust's tort claim. *See, e.g., Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F. Supp. 2d 857, 864 (N.D. Ill. 2002).

### i. THE YBARRA PARTIES HAD AN ULTERIOR MOTIVE

Centrust properly alleges Defendants had an ulterior motive. Specifically, Centrust alleges the Ybarra Parties served discovery requests[7] in the Post-Judgment Proceedings to develop evidence concerning the Sale Motion when, in fact, the Ybarra Parties' true purpose was to develop evidence unrelated to the Post-Judgment Proceedings.

A party has an ulterior motive if he intends to accomplish some collateral goal that is outside the regular scope of the litigation. As the Court of Appeals explained in *Shatz v. Paul*, the test is "whether the process has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be compelled to do." 7 Ill. App. 2d 223, 237 (1955); *accord Kurek v. Kavanagh, Scully, Sudow, White & Frederick*, 50 Ill. App. 3d 1033, 1038 (1997) (holding a party acts with an ulterior motive if he attempts "to accomplish some result which could not be accomplished through the suit itself"). A party's ulterior motive need not involve an arrest or seizure of property. *See, e.g., Kumar v. Bornstein*, 354 Ill. App. 3d 159, 166 (2004) (holding "an actual arrest or seizure of property … is not a necessary element").

In discovery, a party acts with an ulterior motive if he issues requests with the goal of achieving some objective unrelated to the current litigation. *See, e.g., Nienstedt v. Wetzel*, 133 Ariz. 348, 354 (1982) (holding a party issued discovery with an ulterior motive where his discovery requests were "not justified or used for legitimate or reasonably justifiable purposes of advancing [the party's] interests in the ongoing litigation"); *Ginsberg v. Ginsberg*, 84 A.D.2d 573 (1981) (holding a husband's use of discovery "for the unjustified purpose of harassing … and exhausting

---

[7] On March 12, 2021, Centrust was dismissed as a party Plaintiff in the Post-Judgment Proceedings. As such, even if Defendants' argument is correct (which it is not) all discovery sought by the Defendants were "process" at the direction of the Circuit Court against a non-party. A copy of the March 12, 2021 order is attached hereto as **Ex. B**.

[his wife's] financial resources, in order to win a collateral advantage in the legal struggle over custody of [a] child" was an abuse of process). Although a party may lawfully seek the discovery of information that may be "admissible at trial [or] lead to admissible evidence," a party may not seek "discovery of information that does not meet the threshold requirement of relevance to matters actually at issue in the case." *Manns v. Briell,* 349 Ill. App. 3d 358, 361 (2004). Thus, a party clearly abuses process if he issues requests regarding irrelevant matters to achieve goals unrelated to the pending case. *Id.; Nienstedt,* 651 P.2d at 882; *Ginsberg*, 84 A.D.2d at 573.

Here, Centrust unambiguously alleges the Ybarra Parties issued discovery requests in the Post-Judgment Proceedings with an ulterior motive. Centrust alleges the Ybarra Parties' discovery requests were intended to fish for evidence that might support future claims against the Bank rather than achieving success in the Post-Judgment Proceedings. (Dkt. 1 at ¶ 57.) Centrust's allegations also establish PTCV and the Ybarra Parties were merely posing as adversaries in the Post-Judgment Proceedings to dupe the Circuit Court into believing discovery was necessary when, in fact, no discovery was necessary because Ybarra secretly controlled all the parties to the Post-Judgment Proceedings, including the judgment creditor (PTCV), judgment debtor (Ybarra), and third-party intervenors (YRY and BHA). (*Id.*) Thus, the Post-Judgment Proceedings were nothing more than a sham, evidenced by the fact the Ybarra Parties and PTCV promptly withdrew the Post-Judgment Proceedings once the Circuit Court grew suspicious of their collusion. (*Id.* at ¶¶ 58-59.)

The Ybarra Parties' abuse of discovery process was so outrageous that it appears to be unprecedented in Illinois. Certainly, none of the cases cited by the Ybarra Parties involved similar misconduct. *See, e.g., Dixon v. Smith-Wallace Shoe Co.,* 283 Ill. 234, 242 (1918) (holding "allowing process to issue regularly for the collection of such debt, after judgment, in the usual and ordinary manner, is not a malicious abuse of process"); *McGrew v. Heinold Commodities,*

14

*Inc.,* 147 Ill. App. 3d 104, (1986) (holding the use of "garnishment summonses … to collect money, the very purpose for which the process was created" was not an abuse of process). Contrary to the Ybarra Parties' Motion, this is not a situation where a party merely issued "proper" discovery to an opposing party. Nor is it merely a case involving aggressive discovery tactics. This case involves a fraud upon the Circuit Court, the collusive perpetuation of the Post-Judgment Proceedings by parties that were merely posing as adversaries, and the issuance of burdensome discovery by the Ybarra Parties for ulterior purposes unrelated to the Post-Judgment Proceedings. This is a clear case of parties with an ulterior motive.

### ii. THE YBARRA PARTIES COMMITTED AN IMPROPER ACT

In Count III, Centrust also alleges the Ybarra Parties committed an act in the use of process not proper in the regular prosecution of the Post-Judgment Proceedings. As explained previously, Centrust alleges the Ybarra Parties perpetuated the Post-Judgment Proceedings as a sham vehicle to direct abusive discovery requests to the Bank, and to seek information that had no relevance to any contested issue in the Post-Judgment Proceedings. (Dkt. 1 at ¶¶ 10, 55-60); (*Id.*) *See, e.g., Shatz,* 7 Ill. App. 2d at 238 (holding the repeated pre-judgment use of writs *capias ad respondendum* during litigation to imprison a party and thereby coerce him to borrow funds from his relatives to satisfy contested debts was an act not proper in the regular course of such litigation); *Nienstedt,* 133 Ariz. at 354 (holding the issuance of discovery in litigation to achieve ends unrelated to the litigation is an act that is not proper in the course of such proceedings); *Ginsberg,* 84 A.D.2d at 573 (same). No Illinois court has ever held the act of issuing discovery is immune from scrutiny as an abuse of process. Moreover, many courts have specifically held an abuse of process claim may be predicated on abusive discovery. *See, Nienstedt v. Wetzel,* 133 Ariz. at 354 (holding issuance of abusive discovery is an abuse of process); *Ginsberg,* 84 A.D.2d at 573, 573.

15

## IV.  CONCLUSION

For the reasons set forth above, Centrust respectfully requests that this Court deny the

Defendants' Motion to Dismiss.

Dated:  September 3, 2021                                   Respectfully submitted,

                                                                             **CENTRUST BANK, N.A**.


                                                                             _/s/  Adam B. Rome_
                                                                             By:  One of its Attorneys



Adam B. Rome (ARDC 62784341)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois  60606
arome@grglegal.com
Telephone: (312) 428-2750

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2021, I electronically filed the foregoing ***Centrust's***

***Response to Defendants' Motion to Dismiss***, with the Clerk of the Court via the CM/ECF System,

which will send notification of such filing to those registered to receive electronic notices via email

transmission at the email addresses provided by them including:

Christopher V. Langone
PO Box 5084
Skokie, IL 60077
LangoneLaw@gmail.com

Rakesh Khanna
Weissberg & Associates
564 W. Randolph St., 2nd Floor
Chicago, IL 60661
rakesh@weissberglaw.com


            /s/   Adam B. Rome
Adam B. Rome (ARDC 62784341)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois  60606
arome@grglegal.com
Telephone: (312) 428-2750

# EXHIBIT A

FILED
4/2/2021 3:23 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2010L050077

12817263

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| PTCV DEVELOPMENT, LLC, as assignee of ABS LINCOLNWOOD LLC, as assignee of CENTRUST, N.A., a national banking association, | |
| Judgment Creditor, | Case No. 10 L 050077 |
| vs. | Hon. Patrick J. Heneghan |
| RUBEN YBARRA, | |
| Judgment Debtor. | |

## MOTION FOR RULE 219 SANCTIONS
## FOR ABUSIVE SUBPOENAS

Pursuant to Supreme Court Rules 219(c) and (d), CNTRST Debt Recovery and Bruce Teitelbaum ("Subpoena Respondents") request the entry of an order requiring YRY Holdings LLC, Boulder Hill Apartments, LLC, Ruben Ybarra and PTCV Development (collectively, the "Conspirators") to pay the fees and expenses, including legal fees and expenses, Subpoena Respondents incurred and will continue to incur as a result of the subpoenas that YRY Holdings LLC and Boulder Hill Apartments, LLC ("Adverse Claimants") served upon Subpoena Respondents (the "Subpoenas").

Put simply, Subpoena Respondents believe discovery sanctions are warranted against the Conspirators because:

- Adverse Claimants did not serve the Subpoenas to obtain materials relevant to their defense of the Motion for Judicial Determination (as

{00193113 3}                                    1

FILED DATE: 4/2/2021 3:23 PM   2010L050077

they were granted leave to do originally),[1] but for improper and abusive purposes. Given the alignment of the Conspirators even before service of the Subpoenas, this discovery was tendered when there was no risk that the asset in question, the Boulder Hills Apartment, might be sold by a judgment creditor. Instead, the Subpoenas were tendered solely to obtain materials that Adverse Claimants and Ruben Ybarra intend to use to manufacture claims in a subsequent suit they acknowledge they will be filing against Subpoena Respondents and others.

- The Subpoenas are key components of the fraud upon the Court that Subpoena Respondents believe the Conspirators are perpetrating and that is explained in more detail in the Reply Brief Subpoena Respondents filed, which is attached as Exhibit 2. Adverse Claimants have represented that they need responses to the Subpoenas to defend against PTCV's efforts to sell the Boulder Hill Apartments, but the available evidence indicates PTCV is a shill created to acquire the judgment against Ruben Ybarra and to do the bidding of Adverse Claimants and Ruben Ybarra in this proceeding. As such, Subpoena Respondents believe PTCV has no intention of collecting a nickel from

---

[1] On May 13, 2020, the Court entered the attached order (Exhibit 1) that authorized Adverse Claimants to conduct discovery "relevant to adjudicate their notice of adverse claims in opposition to Plaintiff's motion for judicial determination for an order to forcibly sell the Boulder Hill Apartments per Section 2-1402."

Ruben Ybarra or trying to sell the Boulder Hill Apartments and Conspirators are concealing PTCV's true role from the Court because the Conspirators fear the Court will shut down their abuse of the Subpoena power if the Court fully understands the connection between Conspirators. Shutting down this scheme would then compromise their end-game in this case, which is to use this proceeding to develop facts for the separate action which they admit they plan to bring against Subpoena Respondents, the original Judgment Creditor Centrust Bank, and certain lawyers.

Because Conspirators are using the Subpoenas for improper and fraudulent purposes, they should be sanctioned accordingly.

## **<u>BACKGROUND</u>**

This request for sanctions under Rule 219(d) arises in the context of the captioned post-judgment collection action and is predicated upon the abuse of the subpoena power by Adverse Claimants and those who are participating in the abuse, including Ruben Ybarra and PTCV. The judgment debtor's family members have substantial ownership interests in the Adverse Claimants.

In May of 2019, the judgment creditor at the time, Centrust Bank, N.A., filed its motion for a judicial determination that the Boulder Hill Apartments were owned by Ruben Ybarra and for entry of an order authorizing the sale of this asset (the "Motion for Judicial Determination").

In December 2019, entities in which Ruben Ybarra's wife and children have an interest filed adverse claims in this proceeding and in February 2021, filed

amended adverse claims.  The adverse claims responded to the Motion for Judicial Determination.  In May of 2020, the Court ruled that Adverse Claimants could conduct discovery to defend against the Motion for Judicial Determination.  *See* Note 1, *supra.*

In or about July or August of 2020, Centrust Bank fully assigned the debt of more than $5 million it held against Ruben Ybarra to an entity known as ABS Lincolnwood LLC.  There is no known connection between Centrust Bank and ABS Lincolnwood.  Shortly thereafter and for reasons not known by Subpoena Respondents, ABS assigned the subject debt to a newly formed entity known as PTCV Development, LLC.  The Illinois Secretary of State indicates that PTCV was formed about 2-3 weeks after ABS filed its motion to intervene as the holder of the judgment.

In or about October or November of 2020, PTCV filed a motion to intervene as the plaintiff/judgment creditor and Centrust Bank filed a motion to dismiss this post-judgment proceeding or to withdraw as the plaintiff.  Curiously, Adverse Claimants objected to the dismissal of this citation proceeding – the same proceeding to which they claim an objection -- which is further evidence of the connection between Adverse Claimants and PTCV.  The Court recently granted PTCV's motion to intervene as the plaintiff, denied Centrust Bank's motion to dismiss this proceeding, and granted Centrust Bank's motion to withdraw as the plaintiff.

In or about October 2020, Adverse Claimants served very broad Subpoenas

FILED DATE: 4/2/2021 3:23 PM  2010L050077

upon Bruce Teitelbaum, CNTRST Debt Recovery and Joyce Vojcak. Adverse Claimants say they served the subpoenas to obtain information that is relevant to defending the Motion for Judicial Determination. Adverse Claimants thus contend they need this very broad and extensive discovery to prove that ***they*** own the Boulder Hill Apartments and to disprove the contention that Ruben Ybarra owns this asset. Adverse Claimants do not explain why they cannot establish these elements based solely upon documents and evidence in their possession and in the possession of their related party, Ruben Ybarra.

In response to the Subpoenas, in December of 2020, Bruce Teitelbaum, CNTRST Debt Recovery and Joyce Vojcak filed a motion to quash and/or for a protective order (the "Motion to Quash") and on March 22, 2020 filed their Reply Brief in further support of the Motion to Quash (the "Reply Brief"). Adverse Claimants filed a response to the Motion Quash. A copy of the Reply Brief is appended as Exhibit 2 and incorporated herein. The Reply Brief explains and discusses the fraudulent conduct that Subpoena Respondents believe has been occurring at the hand and pen of Adverse Claimants and Ruben Ybarra.

After the Court made clear that it would not permit Adverse Claimants to use the Subpoenas to conduct discovery in the service of bringing new claims, Adverse Claimants partially came clean on their scheme. In their response to the Motion to Quash, Adverse Claimants acknowledged they were using the Subpoenas to develop their alleged claims against third-parties, but equated quashing the Subpoenas with "throwing out the baby with the bathwater." In their view, the

FILED DATE: 4/2/2021 3:23 PM   2010L050077

FILED DATE: 4/2/2021 3:23 PM    2010L050077

Subpoenas served an improper purpose (developing facts for their new proceeding), but also served a proper purpose (developing facts to prove they owned the Boulder Hill Apartments).

Adverse Claimants did not come completely clean, however, and in fact have aggravated the misconduct that Subpoena Respondents believe constitutes a fraud upon the Court. By continuing to cling to the false narrative that they need responses to the Subpoenas to litigate the Motion for Judicial Determination, Subpoena Respondents believe Adverse Claimants are falsely representing that PTCV is an adverse party that intends to pursue the Motion for Judicial Determination. Worse yet, Subpoena Respondents believe Conspirators are concealing the fact that this proceeding is now a sham that exists solely to enable Adverse Claimants to enforce the Subpoenas and obtain materials they believe will aid them when they bring the suit they concede they are bringing. It is difficult to envision a more pernicious use of the subpoena power.

## **ARGUMENT**

Supreme Court Rule 219(d) provides that:

> The court may order that information obtained through abuse of discovery procedures be suppressed. If a party wilfully obtains or attempts to obtain information by an improper discovery method, wilfully obtains or attempts to obtain information to which that party is not entitled, or otherwise abuses these discovery rules, the court may enter any order provided for in paragraph (c) of this rule.

Rule 219(d) authorizes sanctions against a party that serves a subpoena for an improper purpose. *In re Marriage of Baumgartner*, 890 N.E.2d 1256, 1281 (Ill. App. 1st Dist. 2008) (reviewing court recognized that using the legal process to

accomplish some improper ulterior purpose was "an abuse of process of the court" and that the discovery rules permitted sanctions to be imposed on parties who abused or disregarded discovery rules."). Supreme Court Rule 219(c) provides that the remedy for serving an improper subpoena includes the payment of the fees and expenses the subpoena respondent incurs to defend itself.

In this case, the Subpoenas are improper for three reasons: (a) the Subpoenas are part of what Subpoena Respondents believe is a fraudulent scheme to deceive the Court into believing that Adverse Claimants are in jeopardy of losing the Boulder Hill Apartments and need discovery to prevent that from happening, (b) the Subpoenas serve no legitimate or proper purpose and (c) the Subpoenas are designed solely to cause undue burden and prejudice and are not geared to obtaining information relevant to the ownership of the Boulder Hill Apartments.

### A.  **The Subpoenas are part of the scheme to defraud the Court.**

As explained in more detail in the Reply Brief incorporated herein by reference, Subpoena Respondents believe the Conspirators are perpetrating a fraud upon the Court by propagating the false narrative that the putative judgment creditor, PTCV Development, is an independent third-party seeking to obtain a recovery from Ruben Ybarra, the judgment debtor.

The evidence shows thus far, however, that PTCV was created after Centrust Bank assigned the judgment against Ruben Ybarra to ABS. Subpoena Respondents further believe PTCV is controlled in some meaningful fashion by Adverse Claimants and/or Ruben Ybarra and is acting at their behest and as their shill so

FILED DATE: 4/2/2021 3:23 PM    2010L050077

FILED DATE: 4/2/2021 3:23 PM   2010L050077

that Adverse Claimants and Ruben Ybarra do not lose the jurisdictional foot-hold they have been exploiting to persuade the Court they are entitled to discovery in furtherance of their ultimate goal, which is to acquire evidence for the suit they now acknowledge they will be filing against Subpoena Respondents and others.

Subpoena Respondents identified in the Reply Brief the close working relationship between the attorneys for Ruben Ybarra and his family (Weisberg & Associates) and the attorneys for PTCV (Gregory Stern & Associates) and the custom each firm has of collaborating when separate counsel is needed to represent a friendly party in a matter. The appearance of Gregory Stern & Associates on behalf of PTCV is a strong indication that PTCV is the so-called friendly creditor in this situation and that it was recruited to play that role by counsel for Ruben Ybarra and his family. Consistent with the role of a "friendly creditor," Subpoena Respondents believe PTCV would not dare do anything to injure the interests of Adverse Claimants or Ruben Ybarra.

Also indicative of PTCV's role as the friendly creditor in this scheme is the fact that it has not taken any steps in this case to advance collection of the more than $5 million judgment it holds. It has not examined Ruben Ybarra to ascertain if he has any assets that can be liquidated to satisfy the judgment and it has not asked Centrust Bank or Subpoena Respondents for any information or documents related to Ruben Ybarra. It also has not indicated whether it intends to pursue the Motion for Judicial Determination, even though its alleged indecisiveness is causing extreme prejudice to the multiple parties who are spending significant sums to

FILED DATE: 4/2/2021 3:23 PM   2010L050077

address the multiple subpoenas.  To employ a well-known idiom: "If it walks like a duck and looks like a duck, it is a duck."  PTCV is thus a friendly creditor installed by Adverse Claimants and Ruben Ybarra to deceive the Court.

In sum, Subpoena Respondents believe the Subpoenas are an important element in the Conspirators' scheme to use these proceedings to garner evidence they believe will support the litigation they intend to pursue and the Subpoenas serve no other purpose.  The Subpoenas are thus improper and Conspirators should be directed to pay the fees and expenses Subpoena Respondents have incurred and will continue to incur.

> **B.  The alleged proper purpose for the Subpoenas is a pre-text that Conspirators have advanced to further their abusive discovery.**

Adverse Claimants do not deny they served the Subpoenas to accomplish an "ulterior purpose."  They acknowledge the Subpoenas seek information they intend to use in the next round of litigation they are bringing against Subpoena Respondents and others.  This alone warrants sanctions against Conspirators. *People v. McWhorter*, 498 N.E.2d 1154, 1157 (Ill. 1986) ("it is well established that legal process may not be used to compel a party to do some collateral thing or to accomplish some improper ulterior purpose").

Adverse Claimants allege, however, that the Subpoenas are otherwise proper and not abusive because they also are relevant to their "primary purpose" of defending against the Motion for Judicial Determination.  But this is nonsense. There no longer is any case or controversy regarding the Motion for Judicial Determination. Centrust Bank, the original proponent of the Motion, is no longer a

party in this proceeding and PTCV is not pursuing the Motion for Judicial Determination. The close association between PTCV, the Adverse Claimants, and Ruben Ybarra indicates that PTCV will not want to see the Boulder Hill Apartments sold.

Absent PTCV's declaration that it is wholly independent and separate from Adverse Claimants and Ruben Ybarra, and concrete actions showing it intends to affirmatively collect the judgment it now holds, there is no reasonable or rational basis for Adverse Claimants to contend they need the requested discovery to defend their interests in the Boulder Hill Apartments. Those interests are not under attack any longer.

And even if PTCV were a *bona fide* debt buyer, Adverse Claimants do not need the subject discovery to defend against the Motion for Judicial Determination. The Motion for Judicial Determination raises a limited set of issues related to Adverse Claimant's titular ownership of the asset and Ruben Ybarra's real ownership interest based upon his exercise of control and decision-making authority, as well as his efforts to defraud creditors. Although Adverse Claimants believe they have free reign to challenge the underlying debt as part of the Motion for Judicial Determination, the judgment debtor is the true party that has standing to do so and he has not done so and is not doing so (at least directly).

It also bears noting that Adverse Claimants and PTCV do not need any discovery from Subpoena Respondents to prove their ownership, or disprove Ruben Ybarra's ownership, of the Boulder Hill Apartments. That information is solely

within the custody and control of Adverse Claimants and Ruben Ybarra.

C. **The Subpoenas are designed to cause undue burden and prejudice.**

As noted previously in the Reply Brief, the Subpoenas span 38 pages, request depositions and just about every scrap of paper that Subpoena Respondents ever exchanged with Centrust Bank and that Centrust Bank ever exchanged with its attorneys regarding Ruben Ybarra and the Adverse Claimants. It is accurate to use the term "fishing expeditions" to describe the breadth of these Subpoenas, which are improper when directed to non-parties to supplementary proceedings. Similar documents have been served upon the attorneys that represented Centrust Bank.

In view of the breadth of the Subpoenas and the lack of a legitimate basis for serving them, the Subpoenas were served to harass Subpoena Respondents an improper purpose and Conspirators should be required to pay the fees and expenses of Subpoena Respondents.

## SUBPPOENA RESPONDENTS ARE ENTITLED TO A HEARING AND DISCOVERY ON THIS MOTION

If any of the Conspirators dispute the basis for the relief requested in this Motion (i.e., they deny that PTCV is associated with the Adverse Claimants and Ruben Ybarra), Subpoena Respondents request that the Court schedule a hearing on such matters and authorize Subpoena Respondents to serve subpoenas upon Adverse Claimants, PTCV, Ruben Ybarra and others to further establish the fraud upon the Court and Subpoenas Respondents' entitlement to recover their fees and expenses, including attorneys' fees and expenses. *See People v. Latin Kings Street*

*Gang*, 2019 IL App (2d) 180610-U, 2019 WL 2150804, at *21 (Ill. App. Ct. 2d Dist. 2019) ("We conclude that the trial court erred in denying defendants' request for Rule 219 discovery sanctions without first holding a hearing on whether or not there was a Rule 213 violation.").

WHEREFORE, for all of the reasons set forth herein CNTRST Debt Recovery Corp. requests the entry of an order (a) directing Conspirators, jointly and severally, to pay the fees and expenses, including legal fees and expenses, Subpoena Respondents have incurred and will incur in defense of the Subpoenas, (b) setting this matter for a hearing on the entitlement to the requested relief and the amount owed and authorizing Subpoena Respondents to conduct any necessary discovery, and (c) providing for such other and further relief as is proper and warranted.

Dated: April 2, 2021

**Third Party Subpoena Respondent CNTRST Debt Recovery Corp.**

*/s/ William J. Factor*
One of Its Attorneys

William J. Factor
Isaiah Fishman
**THE LAW OFFICE OF**
   **WILLIAM J. FACTOR, LTD.**
**Firm No. 45665**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel:    (312) 878-6976
Fax:   (847) 574-8233
Email:  wfactor@wfactorlaw.com
           ifishman@wfactorlaw.com

{00193113 3}                                      12

FILED DATE: 4/2/2021 3:23 PM    2010L050077

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on April 2, 2021, he caused a copy of the foregoing *motion* to be served on all parties of record in this case by electronic mail, namely:

| | | |
|---|---|---|
| Edward Malone<br>Barack Ferrazzano Kirshbaum<br>& Nagelberg, LLP<br>200 W. Madison Street, Suite 3900<br>Chicago, Illinois 60606<br>Edward.malone@bfkn.com | Michael S. Gotkin<br>Pullmam & Gotkin<br>3047 Pawtucket Road<br>Northbrook, Illinois 60062<br>mgotkin@flash.net | Michael Tannen<br>Timothy Meloy<br>Tannen Law Group, P.C.<br>77 W. Washington Street,<br>Suite 500<br>Chicago, Illinois 60602<br>mtannen@tannenlaw.com<br>tmeloy@tannenlaw.com |
| Ruben Ybarra<br>516 Byron Nelson Blvd., #945<br>Roanoke, TX 76262<br>Ybarrafamily5@outlook.com | Adam B. Rome<br>Greiman, Rome &<br>Greismeyer, LLC<br>205 W. Randolph St., Ste 2300<br>Chicago, IL 60606<br>arome@grglegal.com | Monica O'Brien<br>Gregory K. Stern, P.C.<br>53 W. Jackson Blvd., Ste. 1442<br>Chicago, IL 60604<br>monica@gregstern.com |

*/s/ William J. Factor* _____

FILED DATE: 4/2/2021 3:23 PM   2010L050077

# Exhibit 1

{00014788}

FILED DATE: 4/2/2021 3:23 PM 2010L050077

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| CENTRUST, N.A., A NATIONAL | ) | |
| BANKING ASSOCIATION | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 10 L 050077 |
| | ) | |
| RUBEN YBARRA, *et al.*, | ) | |
| Defendants. | ) | |

### ORDER

This matter, coming to be heard for telephonic hearing on May 8, 2020 on the submissions of Plaintiff Centrust Bank, NA ("Plaintiff" or "the Bank") and Intervenors/Adverse Claimants YRY Holdings LLC ("YRY") and Boulder Hill Apartments LLC ("BHA")(collectively "Intervenors") regarding the discovery pertinent to adjudicate Plaintiff's motion for judicial determination for an order to forcibly sell the Boulder Hill Apartments per Section 2-1402 of the Illinois Code of Civil Procedure and to adjudicate Intervenors' notice of adverse claims, due notice given, the Court being fully advised in the premises, with counsel for Plaintiff, Intervenors, and Adverse Claimant Real Realty, Inc. present, with briefs and supporting materials filed, and argument heard before a certified court reporter, and with counsel for Intervenors, after being so ordered by the Court on May 8, having supplied counsel for the parties on May 11 with the contact information for Defendant Ruben Ybarra as per the Illinois Supreme Court Rules,

**IT IS ORDERED**:

1. For the reasons stated by the Court on the record, Intervenors' submission to conduct written and oral discovery relevant to adjudicate their notice of adverse claims in opposition to Plaintiff's motion for judicial determination for an order to forcibly sell the Boulder Hill Apartments per Section 2-1402 is granted;

FILED DATE: 4/2/2021 3:23 PM   2010L050077

2. For the reasons stated by the Court on the record, on or before May 22, 2020, at the Court's request, Plaintiff, on the one hand and on the other hand, Intervenors YRY and BHA and Adverse Claimant T2 Montgomery LLC ("T2") shall for the Court's guidance supply the Court with their respective proposed draft, non-final timelines of operative events, subject to future revision, which they each deem relevant to adjudicate Plaintiff's motion for judicial determination for an order to forcibly sell the Boulder Hill Apartments per Section 2-1402 of the Illinois Code of Civil Procedure and to adjudicate Intervenors' and T2's notices of adverse claims. To the extent feasible, Intervenors YRY and BHA and Adverse Claimant T2 shall strive to submit a joint timeline of operative events. Defendant Ybarra can formally participate in the preparation of Intervenors' and Adverse Claimant T'2's timeline, but is not required to do so.



3. On or before June 12, 2020, Judgment Debtor Ruben Ybarra shall file his appearance of record, either *pro se* or through counsel;

4. Intervenors YRY and BHA are granted leave to join T2's Notice of Adverse Claim and T2 is granted leave to join Intervenors Notice of Adverse Claims; and,

5. Counsel for Intervenors shall serve a copy of this Order to all Parties, including Defendant Ruben Ybarra.

Entered: _____

The Honorable Judge Patrick J. Heneghan

Date: _____

Associate Judge Patrick J. Heneghan

MAY 13 2020

Circuit Court - 2155

Michael Murphy Tannen, Esq.
*mtannen@tannenlaw.com*
Tannen Law Group, P.C.
77 West Washington Street, Suite 500
Chicago, IL 60602
312.641.6650
Atty. No. 38447

2

FILED DATE: 4/2/2021 3:23 PM 2010L050077

# Exhibit 2

FILED
3/22/2021 5:13 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2010L050077

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

PTCV DEVELOPMENT, LLC, as
assignee of ABS LINCOLNWOOD
LLC, as assignee of CENTRUST, N.A., a
national banking association,

   Judgment Creditor,

vs.

RUBEN YBARRA,

   Judgment Debtor.

Case No. 10 L 050077

Hon. Patrick J. Heneghan

## SUBPOENA RESPONDENTS' REPLY BRIEF
## IN FURTHER SUPPORT OF MOTION FOR
## PROTECTIVE ORDER AND/OR TO QUASH SUBPOENAS

1. In their mission to highjack the post-judgment proceeding that Centrust Bank originally filed, Adverse Claimants and the judgment debtor Ruben Ybarra (collectively, the "Ybarra Entities") appear to be perpetrating a fraud upon the Court. The evidence strongly points in this direction and Movant[1] believes it will conclusively be proven if the evidence is developed through discovery, including discovery on whether the Court has jurisdiction over this matter in view of the current alignment of the parties.

2. It is now very plausible that PTCV, an entity with connections to the Ybarra Entities, is keeping the $5 million judgment against Ruben Ybarra alive solely out of concern the Court would otherwise shut down this ongoing discovery fishing expedition if the Court discovered that this judgment had been, for all

---

[1] Movant is seeking to Quash the October 27, 2020 Subpoena to Debt Recovery issued by YRY Holdings, LLC and Boulder Hill Apartments, LLC; (2) the November 2, 2020 Notice of Rule 206(1)(1) Deposition of Debt Recovery as amended on November 20, 2020; and (3) the Subpoena to Joyce Vojcak to Appear for a deposition on November 12, 2020.

intents and purposes, released or satisfied through PTCV's acquisition of it.

3.       By all accounts, PTCV has no bona fide intention of collecting a nickel from Ruben Ybarra or of using § 2-1402 to discover his assets or to proceed with the "pending" motion to sell the Boulder Hill Apartments.  On information and belief, PTCV, which was formed by those with close connections to counsel for one or more of the Ybarra Entities, is feigning adversity so that the Ybarra Entities do not lose the jurisdictional foothold they have been exploiting to persuade the Court they are entitled to discovery from Centrust Bank and to serve intrusive, irrelevant, and improper subpoenas upon a multitude of entities.

4.       As the Court was advised previously, counsel for Adverse Claimants prepared and delivered to Centrust Bank a lengthy list of grievances regarding its treatment of the Ybarra Entities.  That diatribe culminated in a warning that Centrust Bank would be well-advised to alert its insurance carrier about such matters because a day of reckoning would soon be upon it.  *See* Ex. 1.

5.       The pending discovery Adverse Claimants served is of no utility to prosecuting their adverse claims, and instead relates solely to the grievances of the Ybarra Entities.  But a post-judgment proceeding to decide adverse claims, like this one, is by no means the proper environment to investigate grievances or to decide them.  If the Ybarra Entities believe they hold claims against Centrust Bank and others on account of activities spanning 10 years, they should have to file and conduct discovery on those claims in a separate action.  Enough is enough and it is time to stop this charade and this invasion of the due process and other rights of the targets of this discovery.  *See generally Carlson v. Jerousek*, 2016 IL App (2d) 151248, ¶ 37, 409 Ill. Dec. 667, 678, 68 N.E.3d 520, 531 (2ⁿᵈ Dist. 2016) (discussing how broad discovery can trespass into invasions of privacy rights under Illinois Constitution).[2]

---

[2] *See also Cleveland v. Chamberlain*, 66 U.S. 419, 423, 1 Black 419, 17 L.Ed.

FILED DATE: 3/42/2021 5:23 PM   2010L050077

6.     It may be a crafty use of this post-judgment proceeding to conduct pre-suit discovery on the judgment debtor's alleged grievances, but it is not a proper use of Illinois law or an Illinois tribunal and it violates basic rights of those served with the subpoenas.  This is particularly true when the fulcrum for this discovery is a lie. *See generally U.S. v. Johnson,* 319 U.S. 302, 305 (1943) (finding suit collusive and improper where "plaintiff has had no active participation, over which he has exercised no control, and the expense of which he has not borne" and where plaintiff "has been only nominally represented by counsel who was selected by appellee's counsel and whom he has never seen").

7.     CNTRST Debt Recovery and Bruce Teitelbaum thus believe the Ybarra Entities and PTCV are perpetrating a fraud upon the Cook County Court System. In a nutshell, the fraud stems from the ruse that judgment creditor PTCV Development is an independent third-party pondering if it wants to collect the judgment that Centrust Bank originally held against Ruben Ybarra.

8.     Each document, each argument, and each court appearance the Ybarra Entities and PTCV advance in furtherance of their fake cause constitutes a false representation to the Court. They are falsely representing that there is an actual case and controversy before the Court when there is no such thing.

## BACKGROUND OF PTCV'S INVOLVEMENT

9.     In July of 2020, Centrust Bank assigned the more than $5 million judgment it held against Ruben Ybarra to an unaffiliated third-party known as ABS Lincolnwood LLC.  Within a month or so of that transaction, ABS Lincolnwood transferred the judgment to a newly created entity known as PTCV.  In September of 2020, PTCV moved to substitute as plaintiff in this case.  Recently, the Court

---

93 (1861) ("Where there is a pretended dispute between parties merely nominal, it is a fraud upon the court, even where the object is to get an opinion for the benefit of the parties themselves; but if the purpose be to injure third parties by collusion between those who are named in the record, it would be scandal to the administration of justice to let it go on.").

granted PTCV's motion to substitute and PTCV now wears the judgment creditor cloak.

10. After PTCV moved to assume the mantle of the judgment creditor, on November 2, 2020, Centrust moved, under Illinois Supreme Court Rule 277 and 735 ILCS 5/2-1402, to terminate this proceeding or, in the alternative, to dismiss Centrust Bank as a party Plaintiff.

11. Adverse Claimants objected to Centrust Bank's motion to terminate these proceedings. On its face, that objection made no sense. Ending these proceedings would terminate the motion for judicial determination and give Adverse Claimants a victory. It is now apparent they objected to Centrust Bank's request to terminate the proceedings because they did not want to lose the jurisdictional toe-hold they had obtained to serve discovery in furtherance of the claims that counsel for the Adverse Claimants has indicated he intends to file against Centrust Bank and others.

12. PTCV did not object to Centrust Bank's motion to withdraw as Plaintiff, but did object to the termination of these proceedings. Dutifully playing its role, PTCV advised the Court that it had "the right to decide whether to continue to prosecute the Motion for Judicial Determination." In other words, absent PTCV's contention that it was mulling whether to prosecute the Motion for Judicial Determination, this proceeding would have ended. In this way, PTCV and the Ybarra Entities have highjacked this action to advance their discovery fishing expedition.

13. The Court ultimately denied Centrust Bank's motion to terminate these proceeding and instead entered an Order substituting PTCV as the judgment creditor in place of Centrust Bank.

14. Notably, PTCV has not adopted the discovery Adverse Claimants served upon Movant, Centrust Bank and the law firms of Markoff Law, Kluever & Platt, and Richard Jones & Associates. PTCV also has not indicated such discovery

is needed so it can evaluate if it wants to proceed with the motion for judicial sale that has been set for hearing in late June.

15.     More importantly, PTCV has not responded to the Amended Adverse Claims that were filed almost 60 days ago. PTCV has not rebutted the adverse claims or indicated if and how it will proceed in the face of those claims. Thus, even if all concerned play along with the charade that PTCV is an adverse party, there is no indication that the putative judgment creditor and the Adverse Claimants are at issue.

## PTCV IS PART OF THE CONSPIRACY

16.     Given the opaqueness of the public records for PTCV, discovery tools would be useful to precisely identify the real parties in interest controlling this entity. Movants reserve the right to seek such discovery, particularly if an abuse of process continues.

17.     Short of formal discovery against PTCV and the Ybarra Entities, however, there still is reliable and useful circumstantial evidence indicating that PTCV is not an independent third-party seeking to collect a judgment against Ruben Ybarra, but that it is a shill for the Ybarra Entities.

18.     The circumstantial evidence arises, in part, from the strong connection between the lawyers for PTCV (Gregory Stern & Assocs. "GSA") and the lawyers for Ruben Ybarra (Weissberg and Assocs. "WA"). Those lawyers have a custom of working in tandem in situations like the present and one does not need a rocket scientist IQ to surmise that PTCV's lawyer was recruited by Ruben Ybarra's lawyer to form PTCV to acquire the judgment from ABS Lincolnwood and to then represent PTCV in this case under the pretense that PTCV is an unaffiliated third-party with an interest in collecting the judgment against Ruben Ybarra.

19.     The chart appended as Exhibit 2 hereto shows at least ten (10) cases over the past 5-6 years in which the lawyers currently representing PTCV (GSA) worked collectively on behalf of the same client or related clients with Ruben

FILED DATE: 3/22/2021 5:23 PM    2010L050077

Ybarra's attorney (WA). This case thus seems to be at least the eleventh (11th) instance in which GSA and WA have worked in tandem in a case where one firm lodges an appearance on behalf of an entity (i.e., PTCV) and that entity acts to further the interests of the other firm's client (i.e., the Ybarra Entities).

20.     It is thus not a coincidence that GSA surfaced as counsel for PTCV in this case in September of 2020. GSA and WA declined to identify the real parties behind PTCV.

21.     It also merits highlighting that the Court disqualified Mr. Weissberg from representing Ruben Ybarra in this case in November of 2018, on account of Mr. Weissberg's prior representation of Mr. Teitelbaum. Mr. Weissberg's role in recruiting PTCV's involvement in this case offers evidence that PTCV is not adverse to Ruben Ybarra. The Rules of Professional Responsibility prohibit a lawyer from acting adversely to their client. Soliciting a debt buyer (PTCV) to pursue his own client (Ruben Ybarra) would be acting adversely to Ruben Ybarra and thus that is another basis to believe PTCV is not adverse to Ruben Ybarra.

22.     Also noteworthy is that PTCV was formed by the Illinois Secretary of State three-weeks after ABS Lincolnwood LLC filed its Motion to Substitute Plaintiff and for Leave to Appear. PTCV did not exist until after ABS Lincolnwood acquired the judgment. PTCV is not regularly engaged in the business of acquiring judgments at a discount and striving to collect funds to earn a profit. PTCV was formed for the sole purpose of owning and controlling the judgment against Ruben Ybarra.[3] The lawyer for ABS Lincolnwood would not identify who he spoke to regarding the assignment of the judgment to PTCV.

23.     PTCV's role as a shill for Adverse Claimants and Ruben Ybarra also is

_____

[3] PTCV Development was formed in late August of 2020 by its current attorney, who is its registered agent. PTCV Development's manager is PTCV Development Manager. Inc. and the agent for this entity is the same attorney. Other than their attorney, the Secretary of State does not identify any of the individuals associated with PTCV or PTCV Manager.

evident from its inactive posture in this case. The Court authorized PTCV to issue discovery on or about January 21, 2021. PTCV has done nothing to advance its own interests. It has passively stayed on the sidelines while the lawyer representing entities owned by Ruben Ybarra's wife and children (i.e., Adverse Claimants) is taking the reins of the litigation and using it to conduct the discovery geared towards the claims that he has threatened to file against Centrust Bank and others.

24.     PTCV also has been in this case for about six months and still is undecided about whether it intends to pursue the motion for judicial sale or any other collection action against Ruben Ybarra. Given the amount of time and money at issue, PTCV should be required to decide right away. PTCV also has not even responded to the Amended Adverse Claims that Adverse Claimants have filed, so nobody is cognizant of PTCV's position.

25.     Adverse Claimants cannot represent in good faith that they have a legitimate need for discovery that is likely to cost hundreds of thousands of dollars and hundreds of hours of attorney time when they do not yet have a firm decision that PTCV intends to pursue collection or whether it agrees with, or disagrees with, the Adverse Claims.

26.     If this charade continues, Movant believes PTCV eventually will contend after extensive discovery has been served and extensive discovery disputes have been decided by the Court that PTCV does not want to pursue the motion for judicial determination. PTCV will then represent that it believes the motion for judicial determination is not well-founded and should never have been filed. Undoubtedly, the Ybarra Entities will then use this admission by their co-conspirator in some other forum or for some other purpose.

## THE MOTION TO QUASH SHOULD BE GRANTED BECAUSE THE REQUESTED DISCOVERY HAS NO BEARING ON THE LIMITED <u>MATTERS CURRENTLY BEFORE THE COURT</u>

27.     The core of the discovery Adverse Parties served upon Movant is an

almost incomprehensible rider that spans 38-pages and requests just about every scrap of paper that Movant ever exchanged with Centrust Bank and that Centrust Bank exchanged with its attorneys regarding the Ybarra Entities. Adverse Parties served similar subpoenas upon the law firms.

28. The Court made clear at a hearing on February 18, 2021, that it will not tolerate Adverse Claimants' use of this proceeding to gather evidence for the next round of litigation:

> I can totally understand why you would want to use what
> we're doing here to collect a whole lot of information about
> the anticipated, the threatened other litigation. I
> understand that, but it's not going to happen here.

Ex. 3 at 20:10-14.

29. But rather than heeding the Court's admonition and either modifying the subpoenas or withdrawing them entirely, the Ybarra Entities have double-downed their position and have, again, deceived the Court. They now assert that although the discovery will help them pursue their claims against Centrust Bank, CNTRST Debt Recovery, and the law firms, it also is needed because it helps Adverse Claimants defend against the claim PTCV now controls. They also proclaim the discovery is narrowly tailored to aid them in their defense against any claim that PTCV might bring. According to Adverse Claimants, they have:

> [T]ailored its [sic] subpoena [sic] CNTRST to elicit the
> information and documents for legitimate purposes
> related to the amended adverse claims and the motion to
> forcibly sell the Boulder Hill Apartments."

(Resp., p. 5)

30. But this is nonsense. Claimants do not need the extensive discovery they have served to defend themselves against the motion for judicial sale and to prosecute their so-called adverse claims, even if, for the sake of argument, PTCV did decide to pursue such claims. Any suggestion by Adverse Claimants to the contrary is specious. Given that Centrust Bank is not the judgment creditor any longer, any

FILED DATE: 3/2/2021 5:23 PM   2010L050077

attenuated connection arising from the communications between Centrust Bank, Movant, and the law firms is simply not relevant to any issue that might arise if PTCV decides to pursue the judicial sale of the Boulder Hill Apartments. "Although relevant (discoverable) information is defined broadly to encompass not only admissible information but also information calculated to lead to the discovery of admissible information (*In re Estate of O'Hare*, 2015 IL App (2d) 140073), this definition is not intended as an invitation to invent attenuated chains of possible relevancy." *Carlson v. Jerousek,* 2016 IL App (2d) 151248, ¶ 37.

31. And even if there is some narrow relevance for the subject discovery, the subpoenas should be quashed solely on the basis that they violate the balancing test required by Supreme Court Rule 201(c)(3). "The proportionality balancing test requires a court to consider both monetary and nonmonetary factors in determining" whether the anticipated burden of the proposed discovery outweighs the anticipated benefit. *Burdess v. Cottrell*, Inc., 2020 IL App (5th) 190279, ¶ 78 (quoting *Carlson v. Jerousek*, 2016 IL App (2d) 151248, ¶ 40. Courts also should consider additional factors such as "whether the discovery is sought from a nonparty without any direct stake in the outcome of the litigation." *Carlson,* ¶ 41.

32. Movant firmly believes the requested discovery is exceedingly burdensome, will cost hundreds of thousands of dollars to generate and will serve no purpose in this case. Quite simply, Adverse Claimants' defenses to the motion for judicial sale are largely legal issues or limited fact issues that do not require any information from third-parties.

33. For example, Adverse Claimants argue in their Amended Adverse claims that Delaware law forbids an action against YRY. They contend charging orders must go against a membership interest, not a property, and that Delaware does not recognize a reverse veil-piercing action. They also allege the statute of limitations has run. (Intervenor's Amend. Notice of Adv. Claim ("Amend. Adv. Clm.") ¶¶ 27-29). These defenses raise purely legal issues that do not require any

discovery. In fact, when the issue of discovery was broached by Adverse Claimants in May of 2020, the Court indicated its view that the issues in the adverse claims were legal in nature, advising:

> 15 THE COURT … What are your potential
> 17 defenses as you see them now, and I'm not trying
> 18 to box you in on that, for which you need
> 19 discovery? Because it does occur to me that the
> 20 last defense that you just identified is a
> 21 construction of Delaware law.
> 22      I don't know that there is
> 23 discovery that you necessarily need with respect
> 24 to the last event and with respect to the one before
> 1 before that your position is Ruben is not an owner
> 2 or member of YRY or Boulder Hill?
> 3      MR. TANNEN: That's correct.
> 4      THE COURT: That will be
> 5 determined -- you have -- I assume you have
> 6 whatever discovery you -- you already need, you
> 7 have control of those witnesses, Ruben and his
> 8 wife.
> 9      So you don't need discovery with
> 10 respect to these last two potential or actual
> 11 defenses, do you?
> 12      MR. TANNEN: I don't think I do, but
> 13 the bank in its response to our notice of adverse
> 14 claim is now asserting that the entire trust
> 15 relationship that was setup, these family trusts,
> 16 are invalid because they -- these trusts were
> 17 established after the judgment. So –

Ex. 4 at 13:15-14:17.

34.      Similarly, Adverse Claimants do not need discovery to establish that the release that Bruce Teitelbaum executed in early 2015, should be imputed to Centrust Bank. Centrust Bank is not the holder of the judgment any longer and there is no suggestion that the release Mr. Teitelbaum executed in 2015 precludes PTCV from enforcing the judgment (assuming PTCV was a bona fide third-party seeking to do so). Furthermore, even if the earlier release could impact the judgment, the issue involves the construction of the release agreement that Adverse

FILED DATE: 3/2/2021 5:23 PM    2010L050077

Claimants have, and the construction of an agreement is a legal issue. (Amend. Adv. Clm. ¶¶ 31-32)

35.     Adverse Claimants also do not need discovery for their spurious claim that Eric Ferleger acted as an attorney in fact for Centrust Bank and, because of that, the motion for judicial determination and the entire post-judgment actions are a nullity. (Amend. Adv. Claim. ¶ 35)  Even assuming the truth of these factual allegations regarding Mr. Ferleger, Adverse Claimants have not explained, nor can they, how a judgment for $5 million becomes void because the judgment creditor may have obtained advice by a disbarred attorney.

36.     Unlike cases that have applied the nullity rule when a non-attorney appears in a case on behalf of a party, licensed attorneys appeared on behalf Centrust Bank in this case.  The Ybarra Entities are griping over the conduct of Kluever & Platt and Markoff Law and there is no allegation the attorneys in those firms were not authorized to practice law.  Thus, even if, for the sake of argument, Mr. Ferleger did provide legal advice behind the scenes, there is no allegation that he appeared in this case for any party and thus there is no basis to go down that rabbit hole merely to indulge the Ybarra Entities' pursuit of the claims they are preparing.

### ADVERSE CLAIMANTS' RESPONSIVE BRIEF BACKFIRES AND SUPPORTS THE ENTRY OF A PROTECTIVE ORDER

37.     Adverse Claimants' responsive brief does not explain why Adverse Claimants need extensive discovery to defend their property interests.  It also does not deny the connections that exist between Ruben Ybarra and the Boulder Hill Apartments, or the prior proceedings that found him in contempt and rejected the contention that his liability on separate judgment was not affected by the settlement agreement with Mr. Teitelbaum and Sharayim

38.     Instead, Adverse Claimants recite some of the grievances they intend to pursue in separate litigation and argue the discovery materials are proper

FILED DATE: 3/22/2021 5:23 PM    2010L050077

because they can serve a dual purpose. But this strategy elides the main issue, which is whether the discovery does serve any legitimate purpose in this case or is merely another ruse to gain pre-suit information to support the aggressive claims that the Ybarra Entities are trying to develop against Movant and others. This strategy also backfires because it shows that the Ybarra Entities already have the information they believe supports their grievances.

39.     And considering the limited (and actually non-existent) issues and matters that bear on the motion for judicial sale, the subject discovery has no relevance to any of the matters under consideration in connection with the motion for judicial sale.

WHEREFORE, for all of the reasons set forth herein and in the Subpoena Respondents' Motion for Protective Order and/or to Quash Subpoenas, CNTRST Debt Recovery Corp. requests the entry of an order quashing (1) the October 27, 2020 Subpoena to Debt Recovery issued by Adverse Claimants, (2) Adverse Claimants' Notice of Rule 206 Deposition of Debt Recovery and (3) Adverse Claimants' Subpoena to Joyce Vojcak, and for such other and further relief as is proper and warranted.

Dated:  March 22, 2021

**Third Party Subpoena Respondent CNTRST Debt Recovery Corp.**

*/s/ William J. Factor*
One of Its Attorneys

William J. Factor
Isaiah Fishman
**THE LAW OFFICE OF**
    **WILLIAM J. FACTOR, LTD.**
**Firm No. 45665**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
Tel:   (312) 878-6976
Fax:   (847) 574-8233
Email:  wfactor@wfactorlaw.com
          ifishman@wfactorlaw.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on March 22, 2021, he caused a copy of the foregoing *motion* to be served on all parties of record in this case by electronic mail, namely:

| | | |
|---|---|---|
| Edward Malone<br>Barack Ferrazzano Kirshbaum & Nagelberg, LLP<br>200 W. Madison Street, Suite 3900<br>Chicago, Illinois 60606<br>Edward.malone@bfkn.com | Michael S. Gotkin<br>Pullmam & Gotkin<br>3047 Pawtucket Road<br>Northbrook, Illinois 60062<br>mgotkin@flash.net | Michael Tannen<br>Timothy Meloy<br>Tannen Law Group, P.C.<br>77 W. Washington Street, Suite 500<br>Chicago, Illinois 60602<br>mtannen@tannenlaw.com<br>tmeloy@tannenlaw.com |
| Ruben Ybarra<br>516 Byron Nelson Blvd., #945<br>Roanoke, TX 76262<br>Ybarrafamily5@outlook.com | Adam B. Rome<br>Greiman, Rome & Greismeyer, LLC<br>205 W. Randolph St., Ste 2300<br>Chicago, IL 60606<br>arome@grglegal.com | Monica O'Brien<br>Gregory K. Stern, P.C.<br>53 W. Jackson Blvd., Ste. 1442<br>Chicago, IL 60604<br>monica@gregstern.com |

*/s/ William J. Factor*

FILED DATE: 3/22/2021 5:23 PM     2010L050077

# TANNEN
## LAW GROUP, P.C.

ATTORNEYS AND COUNSELORS AT LAW
77 West Washington Street, Suite 500
Chicago, Illinois 60602
Tel: (312) 641-6650     Fax (312) 641-6656
Email: mtannen@tannenlaw.com

October 8, 2020

***Via Electronic Mail Delivery***

Mr. James McMahon, President and CEO
Centrust Bank, NA
 c/o  Steve Rappin, Esq.
Hauselman & Rappin, Ltd.
29 E. Madison Street, Suite 950
Chicago, Illinois 60602

> **Re:** ***Notice of Claim***
> ***Centrust Bank NA v. Ruben Ybarra//10 L 50077***

Dear Mr. McMahon:

Our firm represents YRY Holdings LLC ("YRY") and Boulder Hill Apartments LLC ("BHA") in the above captioned case. As will be discussed below, BHA and YRY own and control a large apartment complex in Montgomery, Illinois known as the Boulder Hill Apartments. The Bank and its lawyers, agents, and collection partners have engaged in an unrelenting, abusive, and frivolous litigation campaign to obtain ownership and control of this apartment complex to satisfy the Bank's judgment against the judgment debtor Ruben Ybarra ("Ruben"). The Boulder Hill Apartments are not, and never have been, Ruben's property. The Bank knows this.

We are directing this letter to you as President and CEO of Centrust Bank NA ("the Bank") through the Bank's counsel of record, Steve Rappin. This letter should be considered as a notice of a claim under any policies of insurance issued to the Bank and its officers and directors. Accordingly, please make sure that this letter and attached supporting materials are tendered immediately to your insurers and to the Bank's officers and directors.

The Bank's insurance policies will likely require the Bank to tender a detailed proof of loss. Since you are new to this case, I have enclosed for your reference our fourth amended timeline of operative events filed in late August of this year. The Court in our case had ordered the parties to prepare timelines so the court could have a context for ruling on the Bank's baseless motion to forcibly sell the Boulder Hill Apartments. Moreover, the judge told your lawyer on October 2, there is no evidence that Ruben was a member of YRY or BHA, and thus, there is no basis for the Bank to force a sale of an apartment complex that Ruben does not own.

In seeking to enforce a judgment against Ruben Ybarra, the Bank has damaged YRY and BHA. Among other things, we point to the following acts and omissions:

- The Bank entered into a cooperation agreement with CNTRST Debt Recovery Corporation ("CNTRST"), an entity owned and controlled by Bruce Teitelbaum ("Teitelbaum"), a disgruntled business partner of YRY.[1] Shortly before the secret cooperation agreement was executed, Teitelbaum settled a separate lawsuit involving the Boulder Hill Apartments. He sold his membership interest in the Boulder Hill Apartments, and agreed to walk away from the apartment complex forever.

---

[1] It bears noting that CNTRST was incorporated by the Bank's outside general counsel.

FILED DATE: 3/2/2021 5:23 PM    2010L050077

- This cooperation agreement was concealed from the Court, YRY, and BHA for more than four years. The Bank has been the named plaintiff in this case for a decade. The Bank and Teitelbaum--or Teitelbaum in the name of the Bank--have waged a scorched earth litigation campaign against YRY and BHA where there is no basis in fact or in law to have done so.

- Under the guise of enforcing the Bank's judgments against Ruben, the Bank and Teitelbaum have sought to wrest ownership and control of the Boulder Hill Apartments from YRY and BHA event though Teitelbaum settled his lawsuit against YRY, and agreed to have nothing to do with the Boulder Hill Apartments.

- The Bank permitted itself to be the strawman plaintiff in this case, with Teitelbaum directing the Bank's lawyers to seize ownership and control of the Boulder Hill Apartments, an objective he was barred from pursuing per the settlement in his prior lawsuit against YRY.

- The Bank and Teitelbaum have abused the enforcement process. Among other things, the Bank, Teitelbaum, CNTRST, and the Bank's lawyers have violated the rules for notice to parties to obtain conditional judgments against YRY and BHA; have sought charging orders against Ruben's non-existent membership interest in YRY and BHA; had Ruben arrested during the middle of his citation exam when he had agreed to appear at this citation exam; filed fraudulent notices of motion to incorrectly revive the lapsed judgment; filed an emergency motion to appoint a receiver for the Boulder Hill Apartments and let it lay fallow for a year before inexplicably abandoning it; and filed a bogus motion to appoint Ferleger—an interested party and a disbarred lawyer—to act as receiver over Ruben's non-existent membership interest in YRY and BHA. On information and belief, CNTRST—the Bank's collection agent and partner—knowingly used the services of a disbarred lawyer to enforce the judgment against Ruben and harass YRY and BHA. Teitelbaum and CNTRST could not have engaged in these efforts without the knowing or unwitting participation of the Bank as named plaintiff.

- The Bank persisted for years in seeking to encumber, control through the appointment of a receiver, and to forcibly sell the Boulder Hill Apartments when it knew or should have known and attached that Ruben has no membership or ownership interest in the Boulder Hill Apartments.

- The Bank failed to investigate the qualifications and background of CNTRST, its agents, and its employees. At the time that the secret cooperation agreement was executed, Teitelbaum was in Chapter 7 bankruptcy and Ferleger had been disbarred. (Illinois law holds that proceedings may be voided if a litigant knew or should have known that a knowingly permitted the unauthorized practice of law.)

- The Bank, on information and belief, failed to seek committee approval before entering into the secret cooperation agreement.

- The Bank negligently failed to monitor and supervise CNTRST and CNTRST's agents and employees with respect to enforcement proceedings in this case and in other cases in which the Bank had obtained judgments against Ruben.

 

**Exhibit 1**

FILED DATE: 3/2/2021 5:23 PM    2010L050077

**Letter to James McMahon**
**October 8, 2020**
**Page 3**

- The Bank negligently failed to monitor and supervise the Bank's lawyers in the above captioned case. Indeed, the Bank's lawyers, Markoff Law, in open court told the court that Markoff took 100% of his marching orders from Teitelbaum, not the Bank.

- The Bank negligently permitted its rogue agent and partner CNTRST and the Bank's lawyers to file false, abusive, and frivolous motions against YRY and BHA.

Typically, a bank's insurance policies construe as a "claim" a letter or notice which seeks monetary damages. YRY and BHA, and its member and manager, have suffered damages as a result of the Bank's acts and omissions, both intentional and negligent. The Bank is liable for the negligent, intentional, abusive, and malicious acts of CNTRST since (i) CNTRST is the Bank's agent, and (ii) the Bank and CNTRST are partners. Indeed, as CNTRST's partner, CNTRST's knowledge and conduct is imputed to the Bank.

YRY's and BHA's damages include attorneys' fees and costs incurred in this case and damages for tortious interference with existing contract and prospective economic advantage. In addition, the Bank's acts and omissions caused BHA and YRY to refinance their loan at a significantly higher interest rate. These damages are in excess of $1.5 million. And, when a jury hears the about the outrageous conduct of CNTRST and the Bank's lawyers, we think they will readily award punitive damages.

In addition to putting the Bank's insurers, officers, and directors on notice, we renew our request that the Bank preserve and not modify every shred of paper related to this case and its relationship with CNTRST, Ruben, YRY, and BHA. Doug Giese told us in writing in 2019 that he had instructed you to preserve and not alter any materials related to this case. We filed a motion for preservation order in June of this year. A copy of this motion is attached for your convenience so that you are aware of the depth and breadth of what needs to be preserved. The files held by the Bank's lawyers are the Bank's files, so you can readily request those files and demand that they be preserved.

Thank you for your attention to this matter. Should you have any questions or comments, please have Mr. Rappin and/or the lawyer who your insurers assign to handle this claim.

Sincerely,

TANNEN LAW GROUP, P.C.

*Michael M. Tannen*

Michael M. Tannen
MMT



| Cases Chart | |
|---|---|
| 1. In re Walter Posner | Chapter 11 case in which WA represented the debtor and GSA appointed as liquidation trustee |
| 2. Posner 523 litigation | Nondischargeability case in which WA withdrew due to conflict and GSA appeared to represent plaintiffs |
| 3. In re 2738 Fulton, LLC | Bankruptcy Case in which WA represented debtor and GSA appeared to represent related party |
| 4. In re Marisa Garcia | GSA represented the debtor in the underlying case and then WA represented the debtor in a denial of discharge action in which GSA was a witness. |
| 5. George Haldes and Sharon Haldes | Bankruptcy case in which WA represented husband and GSA represented wife. |
| 6. Bottom Fish Inc. v. Gregory Stern | State court case in which WA was counsel for G. Stern |
| 7. Danny's Liquors Lincolnwood | GAS firm withdrew and replaced by WA. Withdrawal occurs because GSA firm is representing the debtor's sole member in his own bankruptcy case. |
| 8. In re Joseph DiMaria (19-33823) | WA filed individual chapter 7 case for debtor and GSA filed limited objection to motion of chapter 7 trustee to sell assets in which debtor had an interest. |
| 9. In re Bryce Stirlen (17-06666) | GSA filed case for individual debtor and WA firm files appearance on behalf of debtor's wholly owned company |
| 10. In re Lift Off Chicago (19-11408) | WS withdraws from representing party in case (potentially because of issues raised by attorney for adverse party) and GSA then files appearance on behalf of party that WA represented. |

**Exhibit 2**

FILED DATE: 3/2/2021 5:23 PM 2010L050077

Page 1

```
 1        IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

 2             COUNTY DEPARTMENT, LAW DIVISION

 3

 4    CENTRUST BANK,                        )

 5                    Plaintiff,            )

 6        vs.                               )

 7    YRY HOLDINGS, LLC; BOULDER HILL       )  No. 10 L 050077

 8    APARTMENTS, LLC; ET AL.,              )

 9                    Defendants.           )

10

11

12                    REPORT OF REMOTE PROCEEDINGS at

13    the hearing of the above-entitled cause before

14    the Honorable PATRICK J. HENEGHAN, Judge of said

15    Court, on the 18th day of February, 2021.

16

17

18

19

20

21

22    Reported By:  Julie Walsh, CSR

23    License No.:  084-004032

24
```

Page 2

1    APPEARANCES VIA VIDEOCONFERENCE:

2

3         GREIMAN ROME & GRIESMEYER, LLC

4         BY:  MR. ADAM B. ROME

5              205 West Randolph Street

6              Suite 2300

7              Chicago, Illinois, 60606

8              312-428-2750

9              Arome@grglegal.com

10

11                 on behalf of Centrust Bank;

12

13        THE LAW OFFICES OF WILLIAM J. FACTOR, LTD.

14        BY:  MR. ISAIAH A. FISHMAN

15              105 West Madison Street

16              Suite 1500

17              Chicago, Illinois, 60602

18              312-470-1282

19              Ifishman@wfactorlaw.com

20

21                 on behalf of Cntrst Debt

22                 Recovery, Joyce Vojac and Bruce

23                 Titlebaum;

24

FILED DATE: 3/2/2021 5:23 PM   2010L050077

Page 3

```
 1    APPEARANCES VIA VIDEOCONFERENCE (Cont'd):

 2

 3           TANNEN LAW GROUP, PC

 4         BY:  MR. MICHAEL TANNEN

 5              77 West Washington Street

 6              Suite 500

 7              Chicago, Illinois, 60602

 8              312-641-6650

 9              Mtannen@tannenlaw.com

10

11                 On behalf of YRY Holdings, LLC,

12                 and Boulder Hill Apartments,

13                 LLC;

14

15           PULLMAN & GOTKIN

16         BY:  MR. MICHAEL S. GOTKIN

17              3047 Pawtucket Road

18              Northbrook, Illinois, 60062

19              847-564-2395

20              Mgotkin@flahs.net

21

22                 on behalf of Real Realty, Inc.;

23

24
```

Page 4

1    APPEARANCES VIA VIDEOCONFERENCE (Cont'd):

2

3         GREGORY K. STERN, PC

4        BY:  MS. MONICA O'BRIEN

5             53 West Jackson Boulevard

6             Suite 1442

7             Chicago, Illinois, 60604

8             312-427-1558

9             Monica@gregstern.com

10

11                on behalf of PTCV Development,

12                LLC;

13

14        BARACK FERRAZZANO KIRSHBAUM & NAGELBERG,

15        LLP

16        BY:  MR. EDWARD MALONE

17             200 West Madison Street

18             Suite 3900

19             Chicago, Illinois, 60606

20             312-984-3100

21             Edward.malone@bfkn.com

22

23                on behalf of T2 Boulder Hill

24                Montgomery, LLC;

Page 5

1   APPEARANCES VIA VIDEOCONFERENCE (Cont'd):

2

3          MR. RUBEN YBARRA

4             516 Byron Nelson Boulevard

5             Suite 945

6             Roanoke, Texas, 76262

7             ybarrafamily5@outlook.com

8

9                   on behalf of himself.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1      MR. TANNEN:  My name is Michael Tannen.  I

2 represent adverse claimants, YRY Holdings, LLC,

3 and Boulder Hill Apartments, LLC.

4      MR. ROME:  Adam Rome on behalf of Centrust

5 Bank.

6      MS. O'BRIEN:  Monica O'Brien on behalf of

7 the PTCV Development, LLC, assignee.

8      MR. GOTKIN:  Michael Gotkin on behalf of the

9 adverse claimant, Real Realty, Inc.

10      MR. FISHMAN:  Isaiah Fishman on behalf of

11 Cntrst, C-n-t-r-s-t, debt recovery; Joyce Vojac

12 and Bruce Titlebaum.

13      MR. MALONE:  Edward Malone on behalf of

14 adverse claimant, T2 Boulder Hill Montgomery,

15 LLC.

16      MR. YBARRA:  Ruben Ybarra, Y-b-a-r-r-a,

17 appearing pro se.

18      THE COURT:  Okay.  I think that does it,

19 right?  That's everyone.  Okay.  So who can

20 update me on the latest with the protective order

21 or preservation order?

22      MR. TANNEN:  I can, your Honor.

23      THE COURT:  And subpoenas.

24      MR. TANNEN:  Last week we tendered

FILED DATE: 8/2/2021 5:23 PM  2010L050077

Page 7

1    subpoenas, document subpoenas, upon Richard Jones

2    and Associates, Kluever and Platt and the lawyers

3    who handled the matter as well as Markoff Law.

4    The subpoenas had been preceded by letters, a

5    smattering of documents to acclimate them to what

6    the subpoenas were about, and meet and confers to

7    see if we could hammer out something before the

8    subpoenas were issued.  We were not able to.  So

9    those three subpoenas have gone out.

10              I found out today that Kluever and

11   Platt has engaged outside counsel to respond to

12   the subpoena.  I found that out about an hour

13   ago.  Markoff Law is being represented by

14   attorneys from that firm.  Richard Jones is

15   assembling documents to respond, but all those

16   subpoenas have gone out as promised.

17       THE COURT:  Okay.  So, Mr. Rome, you now

18   have the subpoena.  That should equip you with

19   more information that was previously unknown to

20   enable you to pass on the draft of the

21   preservation order that was circulating.

22       MR. ROME:  Judge, I believe the parties have

23   come to an agreement or I should say counsel for

24   the adverse claimants and I on the language.  He

FILED DATE: 3/2/2021 5:23 PM   2010L050077

Page 8

1   sent me over a draft that included the sentence

2   that we were looking for and that included the

3   sentence that your Honor had suggested that no

4   one objected to.  I think that the order is

5   agreeable to all parties at this point.

6       MR. TANNEN:  I'm sorry, Mr. Rome, the order

7   that was sent out included the language about the

8   obligations arising under the preservation order

9   shall survive the dismissal and any party like

10  the Judge had suggested.  The redline did not

11  pick up.  That one line that you wanted entered

12  in paragraph four is still at issue.  I apologize

13  that it didn't show up in the redline I sent.

14          So, your Honor, I fixed the order as

15  you want it and that line that Mr. Rome objected

16  to is still at issue.  I apologize, Mr. Rome.

17      MR. ROME:  Okay.  I wasn't aware of that,

18  Judge.  He sent it around.  It was in there and

19  it showed up as it looked like he added it.  So

20  this is the first I'm hearing, Judge, that there

21  was an issue on it.

22      THE COURT:  Okay.  Well, that's

23  disappointing that it was -- by that I mean that

24  it wasn't ironed out before we have 11 of us

Page 9

1   chatting about this today.

2       MR. ROME:  Yes, I agree.  It went out to the

3   whole group, Judge.  It was a redline that showed

4   what was acceptable to the adverse claimants and

5   that line was in there and the line that we had.

6   So I thought we all came to an agreement.

7       MR. TANNEN:  Your Honor, it was a Scribner's

8   error on my part.  I was working from home.  That

9   line was not redlined.

10          I have always had a problem with it

11  for the reasons that I stated last time that I

12  think that Mr. Rome and his clients are fully

13  protected by the subpoenas and the language of

14  the preservation order that waive any privilege

15  whatsoever.  And this line that he wants included

16  gives them carte blanche to withhold documents

17  for reasons that they determine are not

18  discoverable.

19      MR. ROME:  I don't think that's what it

20  reads.  It's just, Judge, the first part as we've

21  always said with the releases he wants us to

22  sign --

23      THE COURT:  Can you speak up, Mr. Rome?

24      MR. ROME:  Sure.  The first part of the

FILED DATE: 8/2/2021 5:23 PM   2010L050077

Page 10

1   paragraph preserves had to do with the releases
2   that they want us to sign.  The second part comes
3   to notwithstanding.  We're just reserving all the
4   rights that we would have under applicable law.
5   And honestly I looked at the subpoenas.  I have
6   talked to a lot of counsel on the phone here and
7   they're very broad, Judge.  I mean, they are -- I
8   don't want to get into it now, but they didn't
9   give us any more peace of mind.

10           They go far beyond what is needed to
11  defend these adverse claims or I guess -- I don't
12  even know if the adverse claim is still being
13  brought by PTCV, but if it is maybe in the motion
14  for judicial determination the discovery needed
15  goes far beyond that and that's the only reason
16  it's in there, Judge.

17           I mean, we are agreeing to preserve
18  documents.  We're just not agreeing to waive any
19  of our objections.

20      THE COURT:  Well, I'll tell you what I'm
21  inclined to do.  I'm inclined to enter an order
22  that reflects everyone's agreement.  And I gather
23  that the inclusion of this disputed sentence does
24  not reflect Mr. Rome's agreement.

Page 11

1          Well, I have two options.  That's

2    option one.  Option two is to include the

3    language that Mr. Tannen wants to include.

4          MR. ROME:  Well, I'm the one who --

5          THE COURT:  I'm sorry, include the language

6    you want to include, Mr. Rome, and simply keep

7    your client in the case until we sort out all

8    discovery and I can have a much higher degree of

9    confidence that the responses to outstanding

10   discovery will be dealt with adequately, fairly

11   and that I will have continuing jurisdiction over

12   everyone to resolve those issues.

13          So those are the two options before

14   me.  And I am indifferent to which of those two

15   options I pursue.  So I will leave it to you, Mr.

16   Rome, to tell me which option you want.  Either

17   it's going to be an agreed order that everyone

18   agrees to all of the terms or it won't be in

19   which case Centrust Bank stays in the case.

20          MR. ROME:  Well, can I have a ten-minute

21   break, Judge, because I need to make a phone call

22   if it's agreed.

23          THE COURT:  Sure.

24          MR. ROME:  Okay.

Page 12

1              (Whereupon a recess was taken
2                   at 2:17 p.m. and the hearing
3                   resumed at 2:33 p.m.)
4      THE COURT:  Okay.  I'm turning it over to
5  you, Mr. Rome.
6      MR. ROME:  Thanks, Judge.  I spoke to the
7  client.  I explained to them your reading of it.
8  That your concern is that it wouldn't be --
9  production of the documents wouldn't be
10  forthcoming.  And they wanted me to tell you that
11  absolutely that that's not what they thought and
12  if that's what your reading of it is, then we
13  will agree to take that language out.
14          By no means are we trying to stop any
15  production of documents.  We just kind of read it
16  as a preservation; but if everybody has already
17  stated that, we understand that we're not waiving
18  any attorney/client privilege or work product and
19  everybody believes it's okay and it's all taken
20  care of in the first sentence, we will agree to
21  take it out.
22      THE COURT:  Okay.  It sounds like then that
23  was the only sticking point as I read it, right?
24      MR. ROME:  That's right.

Page 13

1      THE COURT:  Okay.  So it sounds like
2  everybody is now in a position to enter into what
3  is going to be styled as and signed by everyone
4  as an agreed order, right?
5      MR. ROME:  That's right.
6      MR. TANNEN:  Yes.
7      THE COURT:  Okay.  So, Mr. Tannen, why don't
8  you make a final cleanup edit of the order if you
9  have not done so already and then circulate a
10  clean copy for signature.
11      MR. TANNEN:  I shall do so as soon as we are
12  done with the call.
13      THE COURT:  Okay.  And what upcoming dates
14  do we have?  I'm sure we have some, but I just
15  can't recall what they are off the top of my
16  head.
17      MR. TANNEN:  Your Honor, we have no specific
18  outstanding dates for us to appear before you.
19  There is a return date on the subpoenas to the
20  lawyers of March 4th and the briefing on our
21  motion to compel against the bank, Cntrst Debt
22  Recovery's motion to quash, the briefing on that
23  shall be done on March 9th.
24          Editorializing a little bit.  We have

Page 14

1    vast disagreements about the tenor and quality

2    and extent of the bank's production and we think

3    that once that hearing is held and you make some

4    rulings that we'll be able to move forward on

5    with the ongoing discovery.

6             But as of now I have about 191 pages

7    of documents from the bank, protestations of

8    ignorance, no privilege log, no affidavit of

9    completeness and no -- what I had to do to get

10   documents from former counsel.  So I just think

11   unfortunately that we may be engaged in motion

12   practice on this for a while.

13       THE COURT:  Okay.  So just everyone knows we

14   are not moving the date.  We are going to have

15   the hearing on those days.

16       MR. TANNEN:  Wait, your Honor.

17       MR. ROME:  I don't think the hearing has

18   been set, has it?

19       THE COURT:  The hearing that we set in June.

20       MR. ROME:  Oh, yes.

21       MR. TANNEN:  Well, your Honor, we understand

22   that and, again, we feel since last April when

23   Mr. Gesee (sic) and I approached the Court and

24   said we were ready to proceed with discovery, we

Page 15

1  have surmounted every hurdle and jumped through

2  every hoop that you want and that we have tried

3  and complied with every order.  That we only have

4  191 pages.  I am moving with all deliberate speed

5  and I hope we can get everything that we need to

6  proceed to hearing, but there is no delay on our

7  end whatsoever.

8      THE COURT:  I'm not assuming that there is

9  or postulating that there has been any delay on

10 your part, Mr. Tannen.  I'm just stating as a

11 fact we're not changing that date.  That is a

12 real date.  That's the date that we are going to

13 have the hearing.  Whatever the parties need to

14 do to get prepared it really is -- this is down

15 to Miss O'Brien at this point, her client.  So I

16 would imagine I will see one or more motions from

17 her as well.

18     MR. TANNEN:  So, your Honor, with a return

19 date of March 4th for the attorneys to respond to

20 the subpoenas and a March 9th date for the

21 completion of the briefs on motions to compel and

22 motions to quash, we would need a date from you

23 thereafter for the hearing on the motion to quash

24 and our motion to compel some time later in

FILED DATE: 3/2/2021 5:23 PM  2010L050077

Page 16

1   March.

2        THE COURT:  Okay.  So what I can do is today

3   set a status date and we'll just see what the

4   compliance looks like.  And I'm assuming the

5   briefing is going to be done consistent with the

6   prior schedule, but I will give you a -- if I can

7   find my calendar here.  I will give you a date

8   today for when we can hold a status.  March 9th

9   is the date that briefing is completed, right?

10       MR. TANNEN:  Yes.  On those two motions,

11  yes.

12       THE COURT:  March 11th at 11:00.

13       MR. TANNEN:  That's fine with me, your

14  Honor.

15       THE COURT:  Does that work for everybody?

16       MR. ROME:  It does, Judge.  So the motion

17  for PTCV to substitute, is that all being

18  continued also to March 11th?

19       THE COURT:  Yes, I intend to enter an order

20  with respect to those two motions within the next

21  week or so.

22       MR. ROME:  Thank you, Judge.

23       MR. TANNEN:  The two motions being the

24  motions to substitute --

Page 17

1      THE COURT:  Right.

2      MR. TANNEN:  By the two assignees?

3      THE COURT:  Right.

4      MR. TANNEN:  And may I ask will that order

5  address the status of the bank as a party?

6      THE COURT:  Very likely it will.  Okay.

7  Anything else today?

8      MR. TANNEN:  Your Honor, one thing that we

9  are concerned about on our side of the V is the

10  bank being -- if the bank is going to be formally

11  dismissed with discovery outstanding, we're going

12  to be --

13      MR. ROME:  Judge, the bank as we know was

14  served with discovery on October 14th and I have

15  held my tongue about this and Mr. Tannen has

16  talked about that he has been moving this along

17  since April and well before I have been in the

18  case.

19          We were served with requests to admit

20  on October 14th, 2020.  We timely responded to

21  them.  We were served with interrogatories and

22  production requests on October 22nd, 2020.  We

23  timely responded to them.  We didn't file a

24  motion for extension of time or anything else.

Page 18

1          We were served with a dep notice for

2     November 24th.  We were willing, able to appear.

3     Mr. Tannen canceled it.  We are not doing

4     anything to obstruct anything here.  So with that

5     being said all the concerns that Mr. Tannen

6     continues to state, we have done -- we have

7     complied -- all I can tell you is since I have

8     been involved in this case, we have complied with

9     every order your Honor as entered.  We have

10    complied timely with discovery requests.  There

11    has been no delay.  We have not sat on discovery

12    requests for months and months.  And that's just

13    the reality of what has occurred with respect to

14    discovery.

15         MR. TANNEN:  Your Honor, when you see how

16    they answered the discovery --

17         MR. ROME:  That's all we have, Mr. Tannen,

18    and that's --

19         MR. TANNEN:  Please don't interrupt me.

20    There are e-mails --

21         MR. ROME:  This isn't a motion to compel

22    today, your Honor.

23         THE COURT:  Hold on, Mr. Rome.  Mr. Rome,

24    he's now talking.

Page 19

1       MR. TANNEN:  Your Honor, Mr. Gotkin and I

2  are the only ones and Mr. Malone are the ones who

3  have been living and breathing this case since

4  the agreement of creditors came to light and

5  everything that has flowed since then.

6            I'm telling you right now we have 191

7  pages of documents most of which deal with the

8  circulation of an order on July 10th and copies

9  of pleadings.  There are inflammatory e-mails

10  that run counter to their indications of

11  ignorance that they didn't know what was going

12  on.  There are reams and reams and reams of

13  documents in the possession of attorneys who they

14  haven't even talked to yet.

15            We are extremely concerned that they

16  think that they can disappear into the night if

17  they are formally dismissed.  You had previously

18  said you were going to keep them in the case

19  until they complied with discovery.  Miss O'Brien

20  wants to see what they produce --

21       THE COURT:  So, Mr. Tannen, I can just stop

22  you right here.  What this will not become --

23  what is going to happen over the next several

24  months particularly with respect to discovery,

FILED DATE: 3/2/2021 5:23 PM   2010L050077

Page 20

1    what this is not going to become is the seeding

2    ground for your next lawsuit against the bank or

3    whomever.  That is not what this discovery is

4    about.

5              This discovery is about the claim, the

6    bank's claim.  Which relates back in time to

7    what, 2010 or '11?  I mean, it's a significant

8    period of time ago.  So that's the way I am

9    looking at this.

10             I can totally understand why you would

11   want to use what we're doing here to collect a

12   whole lot of information about the anticipated,

13   the threatened other litigation.  I understand

14   that, but it's not going to happen here.

15             What is going to happen here is the

16   bank and all of these other responsible parties

17   are going to be called to produce documents,

18   information, witnesses about the bank's original

19   claim.  That's what it relates to.

20        MR. TANNEN:  And our discovery I believe

21   skews very closely to the defenses we articulated

22   to you back in May and, again, in our amended

23   adverse claims.  We were very careful not to go

24   beyond those parameters.  For example, how it was

Page 21

1   that Ruben Ybarra was arrested in the middle of

2   his deposition.  That's neither here nor there.

3   Now, discovery can serve two purposes

4   essentially, but this discovery that we issued

5   skews very closely to the defenses we've raised

6   and we don't stray from that.

7       THE COURT:  So I will take up discovery

8   disputes as they arise, one at a time, when both

9   sides have had an opportunity to articulate their

10  positions.  I am not going to prejudge this at

11  this point.

12          But I want you all to appreciate two

13  important things.  We have a hearing in June and

14  that date is not going to change.  And number two

15  is, what we address between now and that hearing

16  date and what we address at that hearing date are

17  limited in terms of what the bank's claim is

18  against Ybarra, against your client, etcetera.

19  It is not about what the bank has done as far as

20  I see it with Cntrst, C-n-t-r-s-t, in the

21  intervening several years which I gather is going

22  to be or very likely will be the subject of

23  separate litigation that you intend.  And I'm not

24  weighing in on the merits of that litigation or

Page 22

1   the merits of any defense.  That is what it is.
2   But what I do in supplementary proceedings is
3   limited.
4        MR. TANNEN:  I -- we recognize that, your
5   Honor.  We have talked about that and we
6   understand that.
7        THE COURT:  Okay.  All right.  Who is
8   preparing today's order?
9        MR. TANNEN:  I'll prepare it.
10       THE COURT:  We have the preservation order
11  which I gather is largely done, needs to be tuned
12  up a bit.  And then just probably a one or
13  two-line order setting our next date, right?
14       MR. TANNEN:  Yes, I will prepare those
15  orders immediately right after we get off the
16  phone.
17       THE COURT:  Okay.  Anything else today?
18       MR. ROME:  No, Judge.
19       THE COURT:  All right.  Thank you.
20                      (Whereupon the hearing
21                       concluded at 2:46 p.m.)
22
23
24

Page 23

```
1   STATE OF ILLINOIS )
2                     ) SS.
3   COUNTY OF L A K E )
4
5           JULIE WALSH, being first duly sworn
6   on oath says that she is a court reporter doing
7   business in the City of Chicago; that she
8   reported in shorthand the remote proceedings
9   given at the taking of said hearing and that the
10  foregoing is a true and correct transcript of her
11  shorthand notes so taken as aforesaid and
12  contains all the proceedings given at said
13  hearing.
14
15
16
            Julie Walsh, CSR
17          Illinois CSR No. 084-004032
18
19
20  My Commission Expires
21  August 5, 2024
22
23
24
```

**[& - call]**

FILED DATE: 9/2/2021 5:23 PM 2010L050077

**&**

**&** 2:3 3:15 4:14

**0**

**050077** 1:7
**084-004032** 1:23
23:17

**1**

**10** 1:7
**105** 2:15
**10th** 19:8
**11** 8:24 20:7
**11:00** 16:12
**11th** 16:12,18
**1442** 4:6
**14th** 17:14,20
**1500** 2:16
**18947** 23:16
**18th** 1:15
**191** 14:6 15:4 19:6

**2**

**200** 4:17
**2010** 20:7
**2020** 17:20,22
**2021** 1:15
**2024** 23:21
**205** 2:5
**22nd** 17:22
**2300** 2:6
**24th** 18:2
**2:17** 12:2
**2:33** 12:3
**2:46** 22:21

**3**

**3047** 3:17
**312-427-1558** 4:8
**312-428-2750** 2:8
**312-470-1282** 2:18
**312-641-6650** 3:8

**312-984-3100** 4:20
**3900** 4:18

**4**

**4th** 13:20 15:19

**5**

**5** 23:21
**500** 3:6
**516** 5:4
**53** 4:5

**6**

**60062** 3:18
**60602** 2:17 3:7
**60604** 4:7
**60606** 2:7 4:19

**7**

**76262** 5:6
**77** 3:5

**8**

**847-564-2395** 3:19

**9**

**945** 5:5
**9th** 13:23 15:20
16:8

**a**

**able** 7:8 14:4 18:2
**absolutely** 12:11
**acceptable** 9:4
**acclimate** 7:5
**adam** 2:4 6:4
**added** 8:19
**address** 17:5
21:15,16
**adequately** 11:10
**admit** 17:19
**adverse** 6:2,9,14
7:24 9:4 10:11,12
20:23

**affidavit** 14:8
**aforesaid** 23:11
**ago** 7:13 20:8
**agree** 9:2 12:13,20
**agreeable** 8:5
**agreed** 11:17,22
13:4
**agreeing** 10:17,18
**agreement** 7:23
9:6 10:22,24 19:4
**agrees** 11:18
**al** 1:8
**amended** 20:22
**answered** 18:16
**anticipated** 20:12
**apartments** 1:8
3:12 6:3
**apologize** 8:12,16
**appear** 13:18 18:2
**appearances** 2:1
3:1 4:1 5:1
**appearing** 6:17
**applicable** 10:4
**appreciate** 21:12
**approached** 14:23
**april** 14:22 17:17
**arising** 8:8
**arome** 2:9
**arrested** 21:1
**articulate** 21:9
**articulated** 20:21
**assembling** 7:15
**assignee** 6:7
**assignees** 17:2
**associates** 7:2
**assuming** 15:8
16:4
**attorney** 12:18
**attorneys** 7:14
15:19 19:13

**august** 23:21
**aware** 8:17

**b**

**b** 2:4 6:16
**back** 20:6,22
**bank** 1:4 2:11 6:5
11:19 13:21 14:7
17:5,10,10,13 20:2
20:16 21:19
**bank's** 14:2 20:6
20:18 21:17
**barack** 4:14
**behalf** 2:11,21
3:11,22 4:11,23
5:9 6:4,6,8,10,13
**believe** 7:22 20:20
**believes** 12:19
**beyond** 10:10,15
20:24
**bfkn.com** 4:21
**bit** 13:24 22:12
**blanche** 9:16
**boulder** 1:7 3:12
4:23 6:3,14
**boulevard** 4:5 5:4
**break** 11:21
**breathing** 19:3
**briefing** 13:20,22
16:5,9
**briefs** 15:21
**broad** 10:7
**brought** 10:13
**bruce** 2:22 6:12
**business** 23:7
**byron** 5:4

**c**

**c** 6:11 21:20
**calendar** 16:7
**call** 11:21 13:12

FILED DATE: 9/2/2021 5:23 PM    2010L050077

**called**  20:17
**canceled**  18:3
**care**  12:20
**careful**  20:23
**carte**  9:16
**case**  11:7,19,19
  17:18  18:8  19:3
  19:18
**cause**  1:13
**centrust**  1:4 2:11
  6:4 11:19
**change**  21:14
**changing**  15:11
**chatting**  9:1
**chicago**  2:7,17 3:7
  4:7,19 23:7
**circuit**  1:1
**circulate**  13:9
**circulating**  7:21
**circulation**  19:8
**city**  23:7
**claim**  10:12 20:5,6
  20:19 21:17
**claimant**  6:9,14
**claimants**  6:2 7:24
  9:4
**claims**  10:11 20:23
**clean**  13:10
**cleanup**  13:8
**client**  11:7 12:7,18
  15:15 21:18
**clients**  9:12
**closely**  20:21 21:5
**cntrst**  2:21 6:11
  13:21 21:20
**collect**  20:11
**come**  7:23
**comes**  10:2
**commission**  23:20
**compel**  13:21
  15:21,24 18:21

**completed**  16:9
**completeness**  14:9
**completion**  15:21
**compliance**  16:4
**complied**  15:3
  18:7,8,10 19:19
**concern**  12:8
**concerned**  17:9
  19:15
**concerns**  18:5
**concluded**  22:21
**confers**  7:6
**confidence**  11:9
**consistent**  16:5
**cont'd**  3:1 4:1 5:1
**contains**  23:12
**continued**  16:18
**continues**  18:6
**continuing**  11:11
**cook**  1:1
**copies**  19:8
**copy**  13:10
**correct**  23:10
**counsel**  7:11,23
  10:6 14:10
**counter**  19:10
**county**  1:1,2 23:3
**court**  1:1,15 6:18
  6:23 7:17 8:22
  9:23 10:20 11:5
  11:23 12:4,22
  13:1,7,13 14:13,19
  14:23 15:8 16:2
  16:12,15,19 17:1,3
  17:6 18:23 19:21
  21:7 22:7,10,17,19
  23:6
**creditors**  19:4
**csr**  1:22 23:16,17

## d

**date**  13:19 14:14
  15:11,12,12,19,20
  15:22 16:3,7,9
  21:14,16,16 22:13
**dates**  13:13,18
**day**  1:15
**days**  14:15
**deal**  19:7
**dealt**  11:10
**debt**  2:21 6:11
  13:21
**defend**  10:11
**defendants**  1:9
**defense**  22:1
**defenses**  20:21
  21:5
**degree**  11:8
**delay**  15:6,9 18:11
**deliberate**  15:4
**dep**  18:1
**department**  1:2
**deposition**  21:2
**determination**
  10:14
**determine**  9:17
**development**  4:11
  6:7
**disagreements**
  14:1
**disappear**  19:16
**disappointing**
  8:23
**discoverable**  9:18
**discovery**  10:14
  11:8,10 14:5,24
  17:11,14 18:10,11
  18:14,16 19:19,24
  20:3,5,20 21:3,4,7
**dismissal**  8:9

**dismissed**  17:11
  19:17
**disputed**  10:23
**disputes**  21:8
**division**  1:2
**document**  7:1
**documents**  7:5,15
  9:16 10:18 12:9
  12:15 14:7,10
  19:7,13 20:17
**doing**  18:3 20:11
  23:6
**draft**  7:20 8:1
**duly**  23:5

## e

**e**  18:20 19:9 23:3
**edit**  13:8
**editorializing**
  13:24
**edward**  4:16 6:13
**edward.malone**
  4:21
**either**  11:16
**enable**  7:20
**engaged**  7:11
  14:11
**enter**  10:21 13:2
  16:19
**entered**  8:11 18:9
**entitled**  1:13
**equip**  7:18
**error**  9:8
**essentially**  21:4
**et**  1:8
**etcetera**  21:18
**everybody**  12:16
  12:19 13:2 16:15
**everyone's**  10:22
**example**  20:24
**expires**  23:20

FILED DATE: 3/2/2021 5:23 PM    2010L050077

**explained** 12:7
**extension** 17:24
**extent** 14:2
**extremely** 19:15

**f**

**fact** 15:11
**factor** 2:13
**fairly** 11:10
**far** 10:10,15 21:19
**february** 1:15
**feel** 14:22
**ferrazzano** 4:14
**file** 17:23
**final** 13:8
**find** 16:7
**fine** 16:13
**firm** 7:14
**first** 8:20 9:20,24
 12:20 23:5
**fishman** 2:14 6:10
 6:10
**fixed** 8:14
**flahs.net** 3:20
**flowed** 19:5
**foregoing** 23:10
**formally** 17:10
 19:17
**former** 14:10
**forthcoming** 12:10
**forward** 14:4
**found** 7:10,12
**four** 8:12
**fully** 9:12

**g**

**gather** 10:22
 21:21 22:11
**gesee** 14:23
**give** 10:9 16:6,7
**given** 23:9,12

**gives** 9:16
**go** 10:10 20:23
**goes** 10:15
**going** 11:17 13:3
 14:14 15:12 16:5
 17:10,11 19:11,18
 19:23 20:1,14,15
 20:17 21:10,14,21
**gotkin** 3:15,16 6:8
 6:8 19:1
**gregory** 4:3
**gregstern.com** 4:9
**greiman** 2:3
**grglegal.com** 2:9
**griesmeyer** 2:3
**ground** 20:2
**group** 3:3 9:3
**guess** 10:11

**h**

**hammer** 7:7
**handled** 7:3
**happen** 19:23
 20:14,15
**head** 13:16
**hearing** 1:13 8:20
 12:2 14:3,15,17,19
 15:6,13,23 21:13
 21:15,16 22:20
 23:9,13
**held** 14:3 17:15
**heneghan** 1:14
**higher** 11:8
**hill** 1:7 3:12 4:23
 6:3,14
**hold** 16:8 18:23
**holdings** 1:7 3:11
 6:2
**home** 9:8
**honestly** 10:5
**honor** 6:22 8:3,14
 9:7 13:17 14:16

 14:21 15:18 16:14
 17:8 18:9,15,22
 19:1 22:5
**honorable** 1:14
**hoop** 15:2
**hope** 15:5
**hour** 7:12
**hurdle** 15:1

**i**

**ifishman** 2:19
**ignorance** 14:8
 19:11
**illinois** 1:1 2:7,17
 3:7,18 4:7,19 23:1
 23:17
**imagine** 15:16
**immediately** 22:15
**important** 21:13
**inclined** 10:21,21
**include** 11:2,3,5,6
**included** 8:1,2,7
 9:15
**inclusion** 10:23
**indications** 19:10
**indifferent** 11:14
**inflammatory**
 19:9
**information** 7:19
 20:12,18
**intend** 16:19 21:23
**interrogatories**
 17:21
**interrupt** 18:19
**intervening** 21:21
**involved** 18:8
**ironed** 8:24
**isaiah** 2:14 6:10
**issue** 8:12,16,21
**issued** 7:8 21:4
**issues** 11:12

**j**

**j** 1:14 2:13
**jackson** 4:5
**jones** 7:1,14
**joyce** 2:22 6:11
**judge** 1:14 7:22
 8:10,18,20 9:3,20
 10:7,16 11:21
 12:6 16:16,22
 17:13 22:18
**judicial** 10:14
**julie** 1:22 23:5,16
**july** 19:8
**jumped** 15:1
**june** 14:19 21:13
**jurisdiction** 11:11

**k**

**k** 4:3 23:3
**keep** 11:6 19:18
**kind** 12:15
**kirshbaum** 4:14
**kluever** 7:2,10
**know** 10:12 17:13
 19:11
**knows** 14:13

**l**

**l** 1:7 23:3
**language** 7:24 8:7
 9:13 11:3,5 12:13
**largely** 22:11
**latest** 6:20
**law** 1:2 2:13 3:3
 7:3,13 10:4
**lawsuit** 20:2
**lawyers** 7:2 13:20
**leave** 11:15
**letters** 7:4
**license** 1:23
**light** 19:4

**limited** 21:17 22:3
**line** 8:11,15 9:5,5
  9:9,15 22:13
**litigation** 20:13
  21:23,24
**little** 13:24
**living** 19:3
**llc** 1:7,8 2:3 3:11
  3:13 4:12,24 6:2,3
  6:7,15
**llp** 4:15
**log** 14:8
**looked** 8:19 10:5
**looking** 8:2 20:9
**looks** 16:4
**lot** 10:6 20:12

**m**

**madison** 2:15 4:17
**mails** 18:20 19:9
**malone** 4:16 6:13
  6:13 19:2
**march** 13:20,23
  15:19,20 16:1,8,12
  16:18
**markoff** 7:3,13
**matter** 7:3
**mean** 8:23 10:7,17
  20:7
**means** 12:14
**meet** 7:6
**merits** 21:24 22:1
**mgotkin** 3:20
**michael** 3:4,16 6:1
  6:8
**middle** 21:1
**mind** 10:9
**minute** 11:20
**monica** 4:4,9 6:6
**montgomery** 4:24
  6:14

**months** 18:12,12
  19:24
**motion** 10:13
  13:21,22 14:11
  15:23,24 16:16
  17:24 18:21
**motions** 15:16,21
  15:22 16:10,20,23
  16:24
**move** 14:4
**moving** 14:14 15:4
  17:16
**mtannen** 3:9

**n**

**n** 6:11 21:20
**nagelberg** 4:14
**name** 6:1
**need** 11:21 15:5,13
  15:22
**needed** 10:10,14
**needs** 22:11
**neither** 21:2
**nelson** 5:4
**night** 19:16
**northbrook** 3:18
**notes** 23:11
**notice** 18:1
**notwithstanding**
  10:3
**november** 18:2
**number** 21:14

**o**

**o'brien** 4:4 6:6,6
  15:15 19:19
**oath** 23:6
**objected** 8:4,15
**objections** 10:19
**obligations** 8:8
**obstruct** 18:4

**occurred** 18:13
**october** 17:14,20
  17:22
**offices** 2:13
**oh** 14:20
**okay** 6:18,19 7:17
  8:17,22 11:24
  12:4,19,22 13:1,7
  13:13 14:13 16:2
  17:6 22:7,17
**once** 14:3
**ones** 19:2,2
**ongoing** 14:5
**opportunity** 21:9
**option** 11:2,2,16
**options** 11:1,13,15
**order** 6:20,21 7:21
  8:4,6,8,14 9:14
  10:21 11:17 13:4
  13:8 15:3 16:19
  17:4 18:9 19:8
  22:8,10,13
**orders** 22:15
**original** 20:18
**outlook.com** 5:7
**outside** 7:11
**outstanding** 11:9
  13:18 17:11

**p**

**p.m.** 12:2,3 22:21
**pages** 14:6 15:4
  19:7
**paragraph** 8:12
  10:1
**parameters** 20:24
**part** 9:8,20,24
  10:2 15:10
**particularly** 19:24
**parties** 7:22 8:5
  15:13 20:16

**party** 8:9 17:5
**pass** 7:20
**patrick** 1:14
**pawtucket** 3:17
**pc** 3:3 4:3
**peace** 10:9
**period** 20:8
**phone** 10:6 11:21
  22:16
**pick** 8:11
**plaintiff** 1:5
**platt** 7:2,11
**pleadings** 19:9
**please** 18:19
**point** 8:5 12:23
  15:15 21:11
**position** 13:2
**positions** 21:10
**possession** 19:13
**postulating** 15:9
**practice** 14:12
**preceded** 7:4
**prejudge** 21:10
**prepare** 22:9,14
**prepared** 15:14
**preparing** 22:8
**preservation** 6:21
  7:21 8:8 9:14
  12:16 22:10
**preserve** 10:17
**preserves** 10:1
**previously** 7:19
  19:17
**prior** 16:6
**privilege** 9:14
  12:18 14:8
**pro** 6:17
**probably** 22:12
**problem** 9:10
**proceed** 14:24
  15:6

FILED DATE: 8/2/2021 5:23 PM   2010L050077

**proceedings** 1:12 22:2 23:8,12
**produce** 19:20 20:17
**product** 12:18
**production** 12:9 12:15 14:2 17:22
**promised** 7:16
**protected** 9:13
**protective** 6:20
**protestations** 14:7
**ptcv** 4:11 6:7 10:13 16:17
**pullman** 3:15
**purposes** 21:3
**pursue** 11:15

**q**

**quality** 14:1
**quash** 13:22 15:22 15:23

**r**

**r** 6:11,16,16 21:20
**raised** 21:5
**randolph** 2:5
**read** 12:15,23
**reading** 12:7,12
**reads** 9:20
**ready** 14:24
**real** 3:22 6:9 15:12
**reality** 18:13
**really** 15:14
**realty** 3:22 6:9
**reams** 19:12,12,12
**reason** 10:15
**reasons** 9:11,17
**recall** 13:15
**recess** 12:1
**recognize** 22:4
**recovery** 2:22 6:11

**recovery's** 13:22
**redline** 8:10,13 9:3
**redlined** 9:9
**reflect** 10:24
**reflects** 10:22
**relates** 20:6,19
**releases** 9:21 10:1
**remote** 1:12 23:8
**report** 1:12
**reported** 1:22 23:8
**reporter** 23:6
**represent** 6:2
**represented** 7:13
**requests** 17:19,22 18:10,12
**reserving** 10:3
**resolve** 11:12
**respect** 16:20 18:13 19:24
**respond** 7:11,15 15:19
**responded** 17:20 17:23
**responses** 11:9
**responsible** 20:16
**resumed** 12:3
**return** 13:19 15:18
**richard** 7:1,14
**right** 6:19 12:23 12:24 13:4,5 16:9 17:1,3 19:6,22 22:7,13,15,19
**rights** 10:4
**road** 3:17
**roanoke** 5:6
**rome** 2:3,4 6:4,4 7:17,22 8:6,15,16 8:17 9:2,12,19,23 9:24 11:4,6,16,20 11:24 12:5,6,24

13:5 14:17,20 16:16,22 17:13 18:17,21,23,23 22:18
**rome's** 10:24
**ruben** 5:3 6:16 21:1
**rulings** 14:4
**run** 19:10

**s**

**s** 3:16 6:11 21:20
**sat** 18:11
**says** 23:6
**schedule** 16:6
**scribner's** 9:7
**se** 6:17
**second** 10:2
**see** 7:7 15:16 16:3 18:15 19:20 21:20
**seeding** 20:1
**sent** 8:1,7,13,18
**sentence** 8:1,3 10:23 12:20
**separate** 21:23
**serve** 21:3
**served** 17:14,19,21 18:1
**set** 14:18,19 16:3
**setting** 22:13
**shorthand** 23:8,11
**show** 8:13
**showed** 8:19 9:3
**sic** 14:23
**side** 17:9
**sides** 21:9
**sign** 9:22 10:2
**signature** 13:10 23:16
**signed** 13:3
**significant** 20:7

**simply** 11:6
**skews** 20:21 21:5
**smattering** 7:5
**soon** 13:11
**sorry** 8:6 11:5
**sort** 11:7
**sounds** 12:22 13:1
**speak** 9:23
**specific** 13:17
**speed** 15:4
**spoke** 12:6
**ss** 23:2
**state** 18:6 23:1
**stated** 9:11 12:17
**stating** 15:10
**status** 16:3,8 17:5
**stays** 11:19
**stern** 4:3
**sticking** 12:23
**stop** 12:14 19:21
**stray** 21:6
**street** 2:5,15 3:5 4:17
**styled** 13:3
**subject** 21:22
**subpoena** 7:12,18
**subpoenas** 6:23 7:1,1,4,6,8,9,16 9:13 10:5 13:19 15:20
**substitute** 16:17 16:24
**suggested** 8:3,10
**suite** 2:6,16 3:6 4:6,18 5:5
**supplementary** 22:2
**sure** 9:24 11:23 13:14
**surmounted** 15:1

FILED DATE: 3/2/2021 5:23 PM    2010L050077

FILED DATE: 3/2/2021 5:23 PM   2010L050077

survive  8:9
sworn  23:5

**t**

t  6:11,11 21:20,20
t2  4:23 6:14
take  12:13,21 21:7
taken  12:1,19
  23:11
talked  10:6 17:16
  19:14 22:5
talking  18:24
tannen  3:3,4 6:1,1
  6:22,24 8:6 9:7
  11:3 13:6,7,11,17
  14:16,21 15:10,18
  16:10,13,23 17:2,4
  17:8,15 18:3,5,15
  18:17,19 19:1,21
  20:20 22:4,9,14
tannenlaw.com
  3:9
tell  10:20 11:16
  12:10 18:7
telling  19:6
ten  11:20
tendered  6:24
tenor  14:1
terms  11:18 21:17
texas  5:6
thank  16:22 22:19
thanks  12:6
thing  17:8
things  21:13
think  6:18 8:4
  9:12,19 14:2,10,17
  19:16
thought  9:6 12:11
threatened  20:13
three  7:9
time  9:11 15:24
  17:24 20:6,8 21:8

timely  17:20,23
  18:10
titlebaum  2:23
  6:12
today  7:10 9:1
  16:2,8 17:7 18:22
  22:17
today's  22:8
tongue  17:15
top  13:15
totally  20:10
transcript  23:10
tried  15:2
true  23:10
trying  12:14
tuned  22:11
turning  12:4
two  11:1,2,13,14
  16:10,20,23 17:2
  21:3,12,14 22:13

**u**

understand  12:17
  14:21 20:10,13
  22:6
unfortunately
  14:11
unknown  7:19
upcoming  13:13
update  6:20
use  20:11

**v**

v  17:9
vast  14:1
videoconference
  2:1 3:1 4:1 5:1
vojac  2:22 6:11
vs  1:6

**w**

wait  14:16
waive  9:14 10:18
waiving  12:17
walsh  1:22 23:5,16
want  8:15 10:2,8
  11:6,16 15:2
  20:11 21:12
wanted  8:11 12:10
wants  9:15,21
  11:3 19:20
washington  3:5
way  20:8
we've  9:20 21:5
week  6:24 16:21
weighing  21:24
went  9:2
west  2:5,15 3:5 4:5
  4:17
wfactorlaw.com
  2:19
whatsoever  9:15
  15:7
william  2:13
willing  18:2
withhold  9:16
witnesses  20:18
work  12:18 16:15
working  9:8

**y**

y  6:16
ybarra  5:3 6:16,16
  21:1,18
ybarrafamily5  5:7
years  21:21
yry  1:7 3:11 6:2

1

```
STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF C O O K    )


    IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT, LAW DIVISION


CENTRUST, N.A., A NATIONAL    )
BANKING ASSOCIATION,          )
                              )
            Plaintiff,        )
                              ) No. 10 L 050077
      vs                      )
                              )
RUBEN YBARRA, et al,          )
                              )
            Defendants.       )
```

TELEPHONIC REPORT OF THE PROCEEDINGS

had at the hearing on a motion of the

above-entitled cause before the Honorable PATRICK

J. HENEGHAN, Judge of said Court, Room 2503, The

Daley Center, Chicago, Illinois, on the 8th day of

May, 2020, at the hour of 10:30 a.m.

**Exhibit 4**

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM    2010L050077

2

```
1 A P P E A R A N C E S:
2    MARKOFF LAW, LLC
     BY:  MR. DOUGLAS C. GIESE
3    29 North Wacker Drive
     Suite 1010
4    Chicago, Illinois 60606
     (312) 698-7355,
5    doug@markofflaw.com
6         Appeared on behalf of the Plaintiff;
7    PULLMAN & COTKIN
     BY:  MR. MICHAEL S. GOTKIN
8    3047 Pawtucket Road
     Northbrook, Illinois 60062
9    (847) 564-2395,
     mgotkin@flash.net
10
          Appeared on behalf of the third-party
11        Adverse Claimant Real Realty;
12   TANNEN LAW GROUP
     BY:  MR. MICHAEL TANNEN
13   77 West Washington Street
     Suite 500
14   Chicago, Illinois 60602
     (312) 641-6650,
15   mtannen@tannenlaw.com
16        Appeared on behalf of the intervenors
          YRY Holdings, LLC, and Boulder Hill
17        Apartments, LLC;
18
     REPORTED BY:
19
          Steven J. Brickey, CSR, RMR
20        CSR License No. 084-004675
21
22
23
24
```

3

```
1         THE COURT:  Let's get appearances on
2  the record for the court reporter.
3         MR. GIESE:  Douglas Giese for the
4  plaintiff.  G-I-E-S-E.
5         MR. TANNEN:  My name is Michael
6  Tannen.  I represent the intervenors and adverse
7  claimants YRY Holdings, LLC, and Boulder Hill
8  Apartments, LLC.
9         MR. GOTKIN:  Michael Gotkin,
10 G-O-T-K-I-N, attorney for adverse party claimant
11 Real Realty, Inc.
12        THE COURT:  Okay.  This is Judge
13 Heneghan.  Can I impose on the court reporter to
14 have him or her tell us his or her name.
15        THE COURT REPORTER:  Steven Brickey.
16 LA Court Reporters.
17        THE COURT:  Thank you.  The one
18 request I'll make to you again if you cannot
19 understand us somehow, get partially disconnected
20 or the reception is somewhat spotty, please alert
21 us right away and we'll try to repeat what we are
22 saying so you catch every word.
23        THE COURT REPORTER:  Okay.
24        THE COURT:  Okay.  Are we ready to
```

4

```
1  begin?
2         MR. TANNEN:  Yes, your Honor.
3         MR. GIESE:  Yes, your Honor.
4         THE COURT:  Okay.  So, Mr. Tannen,
5  this is your -- we'll address your motion
6  regarding discovery.
7         MR. TANNEN:  Yes.
8         THE COURT:  I think that's the only
9  matter technically up today, right?
10        MR. TANNEN:  That's correct.
11        THE COURT:  Okay.  Go ahead.
12        MR. TANNEN:  So thank you for
13 hearing us in this time and in this manner.  We
14 appreciate it.  The threshold issue in this matter
15 is whether the intervenors can conduct discovery
16 to oppose a very heavy-handed motion to sell their
17 property, property which is not owned by the
18 judgment debtor.
19        We have set forth in all our
20 papers the legal and factual reasons why we think
21 we are entitled to discovery.  The bank doesn't
22 really address the threshold issue about whether
23 discovery is permitted in a postjudgment
24 proceeding like this, but in our briefs we pointed
```

5

```
1  the court to Section 2-1402, which essentially
2  says that notice of adverse claims are to be
3  handled as garnishment proceedings are and then
4  the garnishment statute, which is 12-710 and
5  following, says that all claims in B will be tried
6  together and Section C says the trial shall be
7  conducted as in all other cases.
8         And the Illinois Supreme Court
9  has already determined that the garnishment
10 statute, because it provides notice, doesn't
11 deprive somebody of due process because they have
12 the right to appear and defend and I see no
13 argument raised by the bank that would prevent us
14 from opposing what I think may be the most
15 aggressive, heavy-handed provision in the entire
16 enforcement provision, which is to seize and
17 forcibly sell the property.  Layered on top --
18        THE COURT:  So, Mr. Tannen --
19        MR. TANNEN:  Yes?
20        THE COURT:  As I see it, you have
21 framed two issues in your opening paper.  The
22 first is entitlement to discovery and the second
23 is the scope of the discovery, is that a fair
24 analysis?
```

2 (Pages 2 to 5)

May 8, 2020

---

**6**

1    MR. TANNEN: That is a very fair
2  analysis and --
3    THE COURT: Okay.
4    MR. TANNEN: -- I would argue that
5  we are also entitled to discovery to establish
6  what we believe to be valid defenses to the whole
7  effort by the bank to forcibly sell the Boulder
8  Hill Apartments. One of which, of course, is that
9  Mr. Teitelbaum and Centrust Debt Recovery are
10  behind the scenes trying to seize control of an
11  apartment complex that is the subject of prior
12  litigation and shortly before this agreement among
13  creditors was entered into Centrust Debt Recovery
14  got more than a million dollars to walk away from
15  the Boulder Hill Apartments forever.
16    So we -- I don't know if this
17  issue goes into the entitlement to discovery or
18  the scope of discovery. I think the argument I'm
19  about to make goes to the entitlement. Centrust
20  Bank makes an argument that YRY and Boulder Hill
21  cannot contest or get into the negotiation and
22  performance of the agreement among creditors
23  because we were not parties to the agreement.
24    We cited throughout our reply

---

**7**

1  brief a plethora of Illinois cases which say that
2  strangers to contracts have the standing, quote,
3  unquote, to argue that parol evidence is
4  admissible to flush out the meaning and intent of
5  ambiguous provisions and we attached the
6  transcript when the agreement of creditors first
7  came to light and the court itself pointed out a
8  number of ambiguities, not the least of which is
9  that Centrust Debt Recovery had no respective
10  claims itemized in the agreement, that YRY and
11  Boulder Hill aren't even mentioned in the
12  agreement as debtors, other issue which I think
13  goes more to scope about whether a joint venture
14  exists.
15    But the threshold issue about
16  whether we have the right to pierce behind --
17  pierce the ambiguous language of an agreement that
18  we're not a party to I think is not supported by
19  the law. It would be incredibly unfair because
20  even though we're not parties to the agreement we
21  certainly are the victims of the agreement and an
22  analogy that I think I could make is that an
23  injured party in a personal injury suit is a party
24  to an insurance coverage dispute because they have

---

**8**

1  rights to the policy proceeds and they may have
2  the right to argue for coverage where the insured
3  for some reason does not and, here, where Centrust
4  Bank is trying to sell property, we think we have
5  the right to engage in discovery to defeat that
6  right. I think it's codified --
7    THE COURT: So --
8    MR. TANNEN: Nevermind. I'm done.
9    THE COURT: Go ahead.
10    MR. TANNEN: No, I'll wait.
11    THE COURT: So I'm focusing on --
12  both your papers articulate this, but you also
13  mentioned it a moment ago that the intervenors
14  have certain -- or may have certain defenses to
15  Centrust, that is to say the plaintiff's, motion
16  here.
17    Can you identify what those
18  potential or actual defenses are?
19    MR. TANNEN: I will --
20    THE COURT: In discovery, it might
21  be relevant.
22    MR. TANNEN: Yes, I can and I will
23  preface this by saying that most often the
24  document which provides the framework for

---

**9**

1  discovery is a complaint and in a postjudgment
2  world I think the documents that frame the
3  inquiries are the bank's motion for judicial
4  determination as well as our notice of adverse
5  claim.
6    The one defense that we
7  certainly have been mentioning throughout is the
8  concept of release, that Centrust Debt Recovery
9  is -- behind the scenes is going to share in the
10  spoils, may or may not be a necessary party and
11  the timeline that we've established so far just
12  based on the timing of the settlement of the
13  Sharayin litigation, that's S-H-A-R-A-Y-I-N, where
14  Bruce Teitelbaum and his affiliates and related
15  parties agreed to walk away from Boulder Hill
16  forever.
17    THE COURT: That was April of 2015?
18    MR. TANNEN: Correct. Followed by
19  the recommencement with vigor of the bank's
20  enforcement proceedings and then the entry and
21  execution of --
22    THE COURT: When was that? When was
23  that, Mr. Tannen?
24    MR. TANNEN: Well, I believe -- I

3 (Pages 6 to 9)

FILED DATE: 3/2/2021 5:23 PM    2010L050077

May 8, 2020

**10**

1  believe that Centrust Bank started to initiate
2  enforcement proceedings against the Ybarra's in
3  2016 and 2017, but the -- but the key point is in
4  August of 2015 the agreement of creditors is
5  entered into between Centrust Debt Recovery and --
6  which is Teitelbaum's company and Centrust Bank.
7          According to its provisions,
8  Centrust Debt Recovery is taking a laboring oar
9  and funding entirely the efforts to recover monies
10  owed pursuant to their, quote, unquote, respective
11  claims and I think that the timing of what we've
12  uncovered to date strongly supports a release,
13  affirmative defense.  In addition --
14          THE COURT:  Okay.
15          MR. TANNEN:  -- and I don't know
16  this yet, but we'll find out, we don't know
17  whether the agreement of creditors by and between
18  Centrust Bank and Centrust Debt Recovery is a
19  valid agreement or not.  I don't know yet.  I
20  don't know if this is a participation agreement.
21  Typically, participation agreements need to be
22  between banks.  I don't know.  We don't know if
23  this agreement --
24          THE COURT:  So you flagged that on

**11**

1  January 2nd.  That is in Footnote 4 of your brief.
2          MR. TANNEN:  Correct.
3          THE COURT:  So as I read your
4  briefs, I have identified those two potential
5  affirmative defenses, release and possible
6  illegality or unenforceability.  I'm not sure how
7  to phrase it.
8          And I have several questions
9  about both of those.  Are there others?
10          MR. TANNEN:  Well, I think that
11  while it's not necessarily a defense, maybe.  If
12  the bank and Centrust Debt Recovery are joint
13  ventures, their conduct -- each others' conduct
14  and knowledge is imputed to the other and I don't
15  think Centrust Bank can claim with a straight face
16  that they don't -- let me -- I'm using too many
17  negatives.  Let me strike that.
18          The whole premise of the bank's
19  motion for judicial determination is based on an
20  allegation that Reuben is an owner of YRY and I
21  think if discovery unfolds we are going to
22  discover that the bank and/or Centrust Debt
23  Recovery knew or should have known that Ruben is
24  not an owner or a member of the LLC that the bank

**12**

1  is seeking to sell.
2          Another defense that we have is
3  that YRY --
4          THE COURT:  Before you -- before you
5  move on, Mr. Tannen, isn't that something that I
6  ultimately will be asked to decide in any event?
7  So whether or not the bank is -- acknowledges it
8  is imputed to the bank based on its relationship
9  with Teitelbaum arising from the August of 2015
10  cooperation agreement, while that is an
11  interesting subject, I ultimately at some point
12  will have to determine whether Ruben is an owner
13  and member of YRY and, if so, whether his position
14  changed at some point, won't I?
15          MR. TANNEN:  I think you will.
16          THE COURT:  Okay.
17          MR. TANNEN:  And we -- we don't --
18  Centrust, other than wanting to take the citation
19  exam of Ruben again after they hauled him off to
20  jail in the middle of the first citation exam, I
21  think we are -- I think the structure of YRY and
22  Boulder Hill is relevant.  It is a decision that
23  you're going to have to make and it leads to
24  another defense that we mentioned in a -- in a

**13**

1  footnote in our reply is that YRY is a member
2  managed Delaware LLC and according to
3  well-established case law in Delaware, which
4  happens to be the cradle of civilization for
5  LLC's, the only remedy available against a
6  Delaware LLC is a charging order, not an order to
7  sell the property they own and so that's another
8  defense and so I agree with you if and when it's
9  determined that Ruben is not a member of YRY or
10  Boulder Hill Apartments, I think their entire
11  motion to sell falls.  So that's another defense
12  that we have.
13          THE COURT:  And, you know what, I
14  was probably not as precise as I could have been
15  when I asked you what your defenses are.  Let me
16  put a finer point on it.  What are your potential
17  defenses as you see them now, and I'm not trying
18  to box you in on that, for which you need
19  discovery?  Because it does occur to me that the
20  last defense that you just identified is a
21  construction of Delaware law.
22          I don't know that there is
23  discovery that you necessarily need with respect
24  to the last event and with respect to the one

4  (Pages 10 to 13)

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM    2010L050077

---

**14**

1 before that your position is Ruben is not an owner
2 or member of YRY or Boulder Hill?
3          MR. TANNEN:  That's correct.
4          THE COURT:  That will be
5 determined -- you have -- I assume you have
6 whatever discovery you -- you already need, you
7 have control of those witnesses, Ruben and his
8 wife.
9               So you don't need discovery with
10 respect to these last two potential or actual
11 defenses, do you?
12         MR. TANNEN:  I don't think I do, but
13 the bank in its response to our notice of adverse
14 claim is now asserting that the entire trust
15 relationship that was setup, these family trusts,
16 are invalid because they -- these trusts were
17 established after the judgment.  So --
18         THE COURT:  Right.  The year after
19 the judgment, right?
20         MR. TANNEN:  Yes.  And I believe --
21 the bank suggests in its response that this is an
22 issue that they are going to want to get into
23 about the formation of the trust in the first
24 instance and Judge McGing has commented that he

---

**15**

1 was troubled that it appears that Teitelbaum
2 brought the Ybarra's to the estate planning
3 lawyers to setup the estate and now the bank with
4 Teitelbaum in the background is trying to pierce
5 the trusts.  I don't think I need discovery to
6 establish that Ruben is not a member of either
7 LLC.  It could be probably established through the
8 filing of certified documents of incorporation and
9 perhaps the affidavit of Ruben Ybarra or his wife,
10 but it's the bank that wants to blow the whole
11 thing up and I don't think I necessarily need it
12 to answer your question.  I have it.
13         THE COURT:  Okay.  All right.  So
14 any others?
15         MR. TANNEN:  Other than the ones
16 that I've mentioned, no.  I don't -- I may -- I
17 may discover other things later on, but I think
18 I've highlighted the main ones.
19         THE COURT:  Okay.  So just for me to
20 recap, correct me if I'm misstating this, you've identified four
21 or misunderstanding this, you've identified four
22 potential affirmative defenses, one of which is
23 the scope of the release that was executed in
24 April of 2015; number two is the potential

---

**16**

1 illegality around the arrangement between Centrust
2 with Teitelbaum as -- as its -- that is
3 C-N-T-R-S-T and Centrust NA, the plaintiff here,
4 the potential illegality of that arrangement;
5 three, that Ruben is not an owner or member of YRY
6 and Boulder Hill; and then four is the limitation
7 under -- a creditor's limitation under Delaware
8 law that even if Ruben is determined to be an
9 owner/member of YRY and/or Boulder Hill the most
10 that a creditor can seek is a charging order for
11 the member's interest?
12         MR. TANNEN:  Yes, and there is one
13 more, your Honor, which relates to a conversation
14 we had earlier this week.  T2 is taking the
15 laboring oar on this, but I think there's some
16 threshold issues and problems with the way this
17 judgment was revived and if there is not proper
18 revival and recording of certain things, I don't
19 think they can proceed on their motion which is
20 why we wanted to join our motion to T2 and they to
21 ours and we can address that through consolidated
22 discovery and briefing schedules and that can also
23 be established one way or the other through
24 recorded documents and court orders.

---

**17**

1         THE COURT:  Okay.  So has that
2 motion been teed up yet?
3         MR. TANNEN:  T2 filed that motion
4 when -- when we did and we referred to it in our
5 notice of adverse claim and we'd like to formally
6 adopt it through a motion to join.
7         THE COURT:  Okay.  And what is the
8 status of the briefing on that motion?
9         MR. TANNEN:  It has been -- it has
10 been entered and continued to today's date and
11 Mr. Malone, the lawyer for T2, has said he is
12 perfectly happy with bootstrapping any briefing
13 and discovery schedule on his notice of adverse
14 claim to whatever we're doing here and I think
15 that makes sense.
16         THE COURT:  Okay.  Let me put a
17 finer point on this.  Is T2's challenge to the
18 manner in which the judgment was revived embodied
19 in a separate motion challenging the revival or
20 instead is it part of T2's adverse claim?
21         MR. TANNEN:  It is part of T2's
22 adverse claim.
23         THE COURT:  Okay.  For which there
24 is not reply briefing by the plaintiff, correct?

---

L.A. Court Reporters, L.L.C.
312-419-9292

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM   2010L050077

**18**

1    MR. TANNEN: T2, to my knowledge --
2  excuse me. The bank, to my knowledge, has not
3  responded to T2's notice of adverse claim and I
4  think it was contemplated that at some point,
5  either today or soon thereafter, there will be
6  some sort of consolidated order which sets forth
7  the order of proceedings going forward.
8    THE COURT: Okay. That might have
9  been your contemplation, but that is news to me.
10    MR. TANNEN: Well, all I can say is
11 that T2, through one of the lawyers that stood up
12 before you, wanted an accelerated briefing
13 schedule to get in and out of dodge and you said
14 no and everything has been entered and continued
15 generally.
16    I apologize if I'm making an
17 assumption that is not correct.
18    THE COURT: Okay. So without me --
19 I don't have T2's adverse claim here, but -- and I
20 realize you cannot speak for T2, but you've
21 indicated that you're prepared to adopt the T2
22 position, at least as it relates to this. Let me
23 just ask you a very basic question.
24    With respect to revival, could

**19**

1  whatever claimed deficiencies that exist be
2  remedied if the creditor simply purports to revive
3  the judgment again, would that cure any claimed
4  defect?
5    MR. TANNEN: I do not think so. I
6  don't think the judgment was timely revived and
7  there has been no recording of a memorandum of
8  judgment in Kendall County where the real
9  property, the Boulder Hill Apartments, exists and
10 the first issue about the timely revival of the
11 judgment, the judgment was originally entered in
12 January of 2010 and it wasn't revived until April
13 of 2017 and I don't think there is any relation
14 back or anything like that which would cure that
15 problem that is the essence of T2's notice of
16 adverse claim.
17    THE COURT: Okay. So it's a timing
18 issue, not a -- well, the judgment can be revived
19 up to 20 years. It's whether other liens attached
20 by the timely revival of the judgment, correct?
21 What liens, if any, attach?
22    MR. TANNEN: I don't understand the
23 court's question. I think our position, meaning
24 our, T2's and YRY's and Boulder Hill's, is that

**20**

1  Centrust Bank cannot forcibly sell property in
2  Kendall County because they did not timely revive
3  the judgment and they did not properly record a
4  memorandum of judgment in Kendall County.
5    THE COURT: Okay. All right. Do
6  you know if any discovery is needed by T2 or
7  Boulder Hill relating to the revival issue?
8    MR. TANNEN: I don't think so. I
9  believe that issue is probably amendable to
10 request to admit genuineness of public documents
11 or the court taking judicial notice of its own
12 docket. I don't necessarily contemplate
13 depositions on the point. There may be a few
14 written discovery questions about it, but I don't
15 think it's something that's a big factual dispute
16 between the parties.
17    THE COURT: Okay. Anything else to
18 add?
19    MR. TANNEN: I don't -- no on the
20 defenses. And then I don't know if you want me to
21 address the scope of discovery, but we laid that
22 out in our papers.
23    THE COURT: All right. I do have
24 questions about the first two affirmative defenses

**21**

1  and the scope of discovery, but at this point I'm
2  going to hear from Mr. Giese and I'm going to
3  return to you, Mr. Tannen, after Mr. Giese
4  responds to your opening and ask you some specific
5  questions.
6    MR. TANNEN: Okay. Thank you, your
7  Honor.
8    THE COURT: Okay. Mr. Giese.
9    MR. GIESE: Thank you, your Honor.
10 First, there are several items that have been
11 raised, but I think you nailed this down. We have
12 the scope of the release, whether the claim that
13 their creditor cooperation agreement is illegal or
14 violates the joint venture issues, the fact that
15 they're arguing that Ruben is not an owner of any
16 of the intervenors and the Delaware limitation of
17 relief. I think we can address these first off.
18    Regarding the scope of the
19 release, there -- there was an affirmative
20 defense -- I'm sorry. Affirmative defense raised
21 in a parallel manner, counsel referenced Judge
22 McGing's ruling where they set this release --
23 release Ruben Ybarra from any cause of action
24 related to Mr. Teitelbaum, that release was

6 (Pages 18 to 21)

May 8, 2020

22

1 ignored by the court because they said it didn't
2 cover that. The release itself --
3          THE COURT: Was the -- was that the
4 7550 Kingston case?
5          MR. GIESE: Yes. It did not apply
6 there and it does not apply to Centrust. The
7 argument that this is a joint venture is also
8 specious. If we look at the Joint Venture Act, it
9 requires four things.
10          THE COURT REPORTER: I can't -- this
11 is kind of hard to hear.
12          MR. TANNEN: Mr. Giese, the court
13 reporter can't hear you. So you're fading in and
14 out. So please start over with respect to the
15 four elements of a joint venture because the court
16 reporter was --
17          THE COURT REPORTER: I can't hear.
18          MR. TANNEN: Couldn't hear you. So
19 please --
20          MR. GIESE: Okay. Okay. So the
21 issue on the joint venture there are four
22 elements. Community of interest, which I agree is
23 there; interest in the subject matter, which is
24 present; a right to direct or govern policy.

23

1 Centrust Bank has no right to direct or govern
2 policy and also a right to joint control. There
3 is no right to joint control. Because those two
4 elements are missing, this is not a joint venture.
5 So the release does not attach to Centrust Bank.
6          With regard to the illegality of
7 the cooperation agreement, there is no evidence,
8 there is no argument. The bank is allowed to
9 enter into this agreement to enforce it and
10 there's been argument raised about Mr. Ybarra
11 being hauled off to jail during an examination or
12 conduct that is heavy-handed against Mr. Ybarra.
13 I think we need to review this and look at this
14 and confirm that Mr. Ybarra is not the instant in
15 this matter.
16          We have attached a copy of the
17 consent order which shows Mr. Ybarra had wrongful
18 conduct against the bank. The bank obtained a
19 judgment, the bank is enforcing the judgment. How
20 it enforces it is within the rules of the law.
21          THE COURT: Let me go back.
22 Mr. Giese, let me take you back to the joint
23 venture.
24          So you contest the applicability

24

1 of two of the four elements of the joint venture?
2 The right to -- right to joint control and the
3 right to direct activities of the venture,
4 correct?
5          MR. GIESE: Yes. Yes.
6          THE COURT: And you're basing that
7 on the language in the cooperation agreement?
8          MR. GIESE: Yes.
9          THE COURT: Okay. What if, in fact,
10 the manner in which this enterprise, I'll use that
11 word, is operated and controlled shows -- if
12 discovery shows this -- quite a bit of
13 cooperation, knowledge and assent between
14 Teitelbaum on the one hand or C-N-T-R-S-T Debt
15 Recovery or Asset Recovery on the one hand and
16 Centrust Bank on the other notwithstanding the
17 language in the cooperation agreement?
18          MR. GIESE: You're asking me a
19 hypothetical which I can tell you I am not taking
20 direction or control from the bank. I'm advising
21 the court that all my direction is coming from
22 Centrust Debt Recovery Corporation.
23          THE COURT: What if you're unaware
24 of the communications between Centrust Debt

25

1 Recovery and Centrust Bank and there is a close
2 alliance? We know there's a community of
3 interest. What if discovery revealed that that is
4 the way this, in fact, is operated? Wouldn't that
5 be relevant to one or both of these remaining two
6 points?
7          MR. GIESE: I agree with you it
8 would be relevant, but I know for a fact it is not
9 happening that way. I'm representing to the court
10 and I'm representing the agreement to the
11 creditors this is how it is working.
12          THE COURT: Well, it's one thing for
13 you to make that representation. Right now
14 they're talking about entitling or authorizing the
15 intervenors to conduct their own discovery related
16 to that. Okay. Please go on.
17          MR. GIESE: If you look at -- the
18 requirements are a right to direct/govern policy.
19 They do not have the right under this agreement
20 and they do not have the right to joint control
21 under the agreement. The agreement itself cannot
22 be read as a joint venture. On its plain face,
23 they do not have this right.
24          To open the door to discovery on

7 (Pages 22 to 25)

FILED DATE: 3/2/2021 5:23 PM  2010L050077

May 8, 2020

26

1  this issue would open the door to anyone coming in
2  and making these arguments at any time. It's not
3  the purpose of a postjudgment proceeding. The
4  discovery in a postjudgment proceeding relates to
5  assets of the judgment debtor. Mr. Ybarra has not
6  completed his citation examination. That is what
7  we're entitled to do. Because Mr. Ybarra is not
8  coming forward and giving his assets, we do know
9  there is certain assets he owned at the time of
10 the judgment, we do know he transferred those
11 assets to other parties after the judgment was
12 entered and all --
13         THE COURT REPORTER: Mr. Giese, I
14 can't hear you.
15         MR. GIESE: So the issue of
16 discovery in a postjudgment proceeding is
17 discovery of assets. We know Mr. Ybarra has
18 assets at the time the judgment was entered, we
19 know he transferred those assets to other parties
20 after the judgment was entered and we do not know
21 if valid consideration was paid for those.
22         If they weren't, it is just a
23 transfer to someone else where our lien would
24 attach. That is the issue to try and --

27

1          THE COURT: Okay. Let me just stop
2  you here. And we're probably -- out of curiosity
3  I have this question for you.
4          So the judgment is entered ten
5  years ago, right?
6          MR. GIESE: Yes.
7          THE COURT: And at sometime I
8  believe I read somewhere that the bank served
9  citations on Mr. Ybarra soon after the judgment
10 was entered, right?
11         MR. GIESE: Yes.
12         THE COURT: Okay. And did the bank
13 conduct a citation examination of Mr. Ybarra at
14 that time?
15         MR. GIESE: I believe so, yes.
16         THE COURT: Okay. So did the bank
17 seek turnover of any of Mr. Ybarra's assets at
18 that time?
19         MR. GIESE: I do not believe so. My
20 understanding is that during the examination
21 Mr. Ybarra was picked up on a warrant.
22         THE COURT: That was more recent, I
23 believe, right, Mr. Tannen?
24         MR. TANNEN: That is correct, your

28

1  Honor. I wasn't -- Mr. Ybarra -- well, Yolanda
2  Ybarra --
3          THE COURT: That was 2017. As I
4  recall the papers, and I did not write this one
5  down, I thought it was 2017 when Mr. Ybarra sat
6  for a citation examination more recently and he
7  was picked up at counsel's office, presumably the
8  creditor's counsel's office, by the sheriff on an
9  outstanding warrant.
10         MR. TANNEN: That's correct.
11         THE COURT: And, Mr. Giese, I'm
12 referring to conduct that occurred maybe six or
13 seven years earlier soon after the judgment
14 originally was entered and that conduct relates to
15 a citation on Mr. Ybarra, citation examination on
16 Mr. Ybarra and what transpired after that, you
17 know, in the one or two years after that, do you
18 know?
19         MR. GIESE: I do not know. I was
20 not involved in the case.
21         MR. TANNEN: Your Honor, this is
22 Michael Tannen. I believe, and I can confirm
23 this, that Mr. Ybarra was the subject of a number
24 of judgments by a number of lenders and I believe

29

1  sometime after 2010 and before, let's say, 2014 I
2  believe that Mr. Ybarra underwent a consolidated
3  citation exam, I think, and I can confirm that one
4  way or the other.
5          THE COURT: I'm trying to put this
6  in context with what Mr. Giese is arguing and I've
7  seen this in Centrust's papers as well. Centrust,
8  I gather, is challenging transfer or it wants to
9  at some point challenge transfers that Mr. Ybarra
10 made of some or all interest that he may have had
11 in entities that control, at least in part, the
12 Boulder Hill Apartment complex, is that a fair
13 statement, Mr. Giese?
14         MR. GIESE: Yes.
15         THE COURT: Okay. And those
16 transfers occurred likely in 2010, '11 or '12,
17 right, Mr. Giese?
18         MR. GIESE: I believe so, yes.
19         THE COURT: Okay. And by what
20 vehicle does -- does Centrust want to challenge or
21 intend to challenge of any alleged transfer?
22         MR. GIESE: We will need to make
23 that determination once we see a response to our
24 motion.

8 (Pages 26 to 29)

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM    2010L050077

---

30

1      THE COURT: Okay. Does Centrust
2  need discovery beyond the continued examination of
3  Ruben Ybarra relating to those transactions that
4  occurred, or may have occurred, in 2010, '11, '12?
5      MR. GIESE: Again, we may, but that
6  will be determined once we see their response to
7  our motion for turnover. We -- we do not have
8  anyone on record saying who has what and when it
9  was transferred. That's what we're trying to
10 determine. If it's fleshed out enough in their
11 response, we will not need discovery.
12     THE COURT: When you say turnover,
13 are you referring to your motion for judicial
14 determination and other relief?
15     MR. GIESE: Yes.
16     THE COURT: Okay.
17     MR. GIESE: Yes.
18     MR. TANNEN: Your Honor --
19     THE COURT: What we're contemplating
20 now -- hold on. What we're contemplating now is
21 to the extent discovery is allowed, is it
22 occurring before there is a briefing schedule?
23 That's what I understood the parties having
24 postured this, is that incorrect, Mr. Giese?

---

31

1      MR. GIESE: I believe it is
2  incorrect because right now the intervenors are
3  seeking discovery related to the creditor
4  agreements exclusively. We don't believe that's
5  proper. We believe what should have --
6      THE COURT: The cooperation
7  agreement, right?
8      MR. GIESE: The cooperation
9  agreement, yes. What should happen is their
10 request for discovery be denied, they file a
11 response to our motion which has been pending for
12 close to a year and if discovery is necessary on
13 their statement of facts, we will get into that,
14 but, if not, we can respond on paper.
15     MR. TANNEN: Your Honor, this was
16 not at all what I thought the parties were
17 contemplating. I think you're exactly right that
18 we were going to -- we took this intermediate step
19 about the scope of discovery that is contemplated
20 by the party's, quote, unquote, pleadings. That
21 is why I filed a petition to intervene in the
22 first place and then filed, according to statute,
23 a notice of adverse claim and now these issues are
24 to be resolved as if there is to be a trial.

---

32

1          I am not focusing solely on the
2  creditor's agreement. I am going to the heart of
3  our adverse claims and the heart of their motion
4  for judicial determination and, before I forget,
5  another potential affirmative defense is the
6  statute of limitations on their ability to unwind
7  a trust agreement which they've known about for
8  many, many, many years.
9          So I thought we were here today
10 to talk about the discovery relative to their
11 motion for judicial determination, our notice of
12 adverse claim. After discovery is completed, we
13 will file a response, they will file a reply and
14 then we're going to have a hearing. That's what I
15 thought we were going to be doing.
16     THE COURT: Okay. So, Mr. Tannen,
17 I'm going to come back to you in a moment with
18 some questions. I'm going to return to Mr. Giese.
19 I interrupted him on my rabbit trail question
20 about the -- two of the elements of the joint
21 venture.
22          Mr. Giese, before I return to
23 you, I just want to make sure I have Mr. Tannen's
24 now sixth potential affirmative defense and I

---

33

1  gather it to be a potential statute of limitations
2  defense on the potential Centrust fraudulent
3  transfer claim against Ruben Ybarra for the
4  transfer, if at all, if any, of an interest that
5  he may have had in an LLC that controls the
6  Boulder Hill Apartment complex sometime in the
7  early 2010's. I mean, is that a fair summary of
8  your potential defense?
9      MR. TANNEN: Yes.
10     MR. GIESE: I would -- I'm sorry. I
11 thought you were asking me.
12     THE COURT: Okay. Mr. Giese, I'm
13 just writing it down. Mr. Giese, I'm not -- I
14 have a running checklist of that matter -- on that
15 matter, but I'm going to return to you so you can
16 continue.
17     MR. GIESE: Thank you, your Honor.
18 So the submission that was presented by counsel
19 sought discovery related to the cooperation
20 agreement. That is what we were going after. If
21 I need discovery as a result of a response filed
22 by Mr. Ybarra or any of the intervenors to our
23 motion, we would request that at that time, but
24 it's apparent from the briefs itself that we do

---

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM    2010L050077

34

1  not need discovery and the facts are there that is
2  where we were going forward.  So I was not
3  intending this to be a complete discovery of
4  everything because until I get Mr. Ybarra on
5  record to my motion I don't know where this is
6  leading.
7          THE COURT:  So let me just share
8  with you this thought, Mr. Giese.  I'm looking at
9  your April 30th, 2019, motion styled for the court
10  reporter Motion for Judicial Determination and
11  Other Relief Pursuant to 735 ILCS 5/2-1402.
12          MR. GIESE:  Yes.
13          THE COURT:  It has less than two,
14  T-W-O, pages of text.  It sort of throws out
15  against the wall an argument that we're entitled
16  to a superior position in this property.  It does
17  so in conclusory fashion.  If the intervenors or
18  Mr. Ybarra moved to strike this motion based on
19  any number of bases, number one basis being the
20  absence of specificity, or move to dismiss it I
21  very likely would grant that motion because
22  this -- I have never seen a thinner motion than
23  this one that is presented.
24          One cannot fairly defend against

35

1  this motion and so I throw that out to you,
2  Mr. Giese, because your contemplated procedure
3  whereby you sort of tee up in the loosest fashion
4  possible in a two-page motion what you would like
5  the court -- how you would like the court to rule
6  in your client's favor is -- and then you expect a
7  robust response by the -- by the defendant, three
8  different groups of adverse claimants is not going
9  to happen and so if we were -- if today's hearing
10  was about your motion for judicial determination
11  and other relief, I would have a lot more to say
12  about that, but I say this to you, Mr. Giese, to
13  enlighten you about where this likely will go
14  based on your incredibly thin two-page motion that
15  I view to be woefully incomplete.  So, with that
16  said, we're back to discovery.  Please continue
17  your argument.
18          MR. GIESE:  If your Honor was
19  contemplating discovery, we will issue discovery
20  that is necessary, but I do not believe
21  intervenors are entitled to go beyond the face of
22  the cooperation agreement.
23          THE COURT:  Okay.  Anything else?
24          MR. GIESE:  No.

36

1          THE COURT:  All right.  Mr. Tannen,
2  I have questions about the two bases for
3  discovery, the two potential affirmative defenses.
4  Let's start with the relief.
5          If you all have it handy, it's
6  probably helpful to have it because I'm going to
7  refer you to the specific section and I'm going to
8  try to understand how discovery might relate to
9  ferreting out the impact of that section.
10          MR. TANNEN:  I have the release from
11  the Sharayin case in front of me, your Honor.
12          MR. GIESE:  I have it, your Honor.
13          THE COURT:  Okay.  Do you have it,
14  Mr. Giese?
15          MR. GIESE:  Yes.
16          THE COURT:  Okay.  Mr. Tannen, do
17  you have it?
18          MR. TANNEN:  I do, your Honor.
19          THE COURT:  Hello, Mr. Tannen?
20          MR. TANNEN:  I'm sorry.  I had you
21  on mute.  I do have the settlement agreement in
22  hand.  I apologize.  Yes, I do.
23          THE COURT:  Yeah, the mutual general
24  release.

37

1          MR. TANNEN:  I'm looking at
2  something that's called Settlement Agreement and
3  Purchase and Sale of Limited Liability Company and
4  Membership Interest to which I think the release
5  was attached.
6          THE COURT:  Right.
7          MR. TANNEN:  Yes.  It was -- for the
8  record, it was -- it was Exhibit B of our notice
9  of adverse claim.
10          THE COURT:  Okay.  So the provision
11  in the release that I have concerns about relate
12  to the phrase -- it's about one, two, three, four,
13  five, six, seven lines from the bottom of the
14  first page of mutual general release and
15  indemnification.
16          MR. TANNEN:  On Page 1?
17          THE COURT:  Are you there?
18          MR. TANNEN:  Yes, I'm here.  On Page
19  1 of the release?
20          THE COURT:  Mr. Giese, are you
21  there?
22          MR. GIESE:  Yes, your Honor.
23  Paragraph 1.
24          THE COURT:  Okay.  So the seventh

10  (Pages 34 to 37)

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM   2010L050077

---

**38**

1  line starts with limited complaints that were
2  asserted or could have been asserted in the
3  litigation, do you see that?
4         MR. GIESE:  Yes.
5         THE COURT:  And then there are, you
6  know, the next four or five lines talk about
7  whether arising in law and equity, whether
8  possessed -- presently possessed or possessed in
9  the future a lot of whethers.  Okay?  As I read
10  it, the whether, W-H-E-T-H-E-R, clauses merely
11  modify the operative term, quote, that were
12  asserted or could have been asserted in the
13  litigation, close quote.
14         Now, neither side puts cases in
15  their briefs relating to the scope of the release
16  and I am deciding the scope of the release.  I am
17  deciding the question of scope of discovery at
18  this point and I am trying to determine,
19  Mr. Tannen, how an agreement that was executed
20  four months after this mutual general release
21  which was executed coincident with the settlement
22  agreement for which Teitelbaum was paid over a
23  million bucks, but the release, if it was executed
24  in April of 2015, how this release would apply to

---

**39**

1  claims that might arise four months, 12 months,
2  four years after the execution of this release.
3         MR. TANNEN:  Is that -- is that --
4         THE COURT:  Can you enlighten me?
5         MR. TANNEN:  I think I will -- I
6  will certainly try because I was not involved in
7  the Sharayin litigation and I did not draft this
8  release.
9         However, I can say that in
10  his -- in Sharayin's complaint, which is the
11  subject matter of this release, he sought to
12  control the Boulder Hill Apartments which is the
13  real estate that they're trying to sell in this
14  case.  The cooperation agreement was entered into
15  quietly between Centrust and Centrust Bank after
16  this release and it could very well be, I don't
17  know, that the -- that the bank knew about this
18  and that's why the agreement was concealed from
19  everybody and why Centrust Debt Recovery, per
20  Mr. Giese's admission, is the --
21         THE COURT:  Let me stop you here.
22  Let me stop you here.
23         You used the phrase that the
24  bank knew about this.  What are you referring to?

---

**40**

1         MR. TANNEN:  I'm sorry.  I always
2  yell at my kids to not use pronouns.  So I
3  apologize.  I don't know what occurred between the
4  time this release was executed and the time that
5  the agreement among creditors was executed.  I do
6  believe that the intent of the release was to have
7  Teitelbaum walk away from the Boulder Hill
8  Apartments forever and if you look at the
9  settlement agreement I think that's clear.
10         So I don't know if I'm answering
11  your question, but I believe that the timeline is
12  such that the validity of this agreement, the
13  strength of this agreement being the cooperation
14  agreement and whether the mutual release intended
15  what it intended, which was to end all disputes
16  between the parties over the ownership and control
17  of the Boulder Hill Apartments are at issue.
18         THE COURT:  Let me just -- I'm going
19  to ask you a hypothetical and then -- and then try
20  to key in this phrase mutual general release and
21  indemnification.
22         Forget about the cooperation
23  agreement.  Let's pretend it does not exist.
24  Let's assume that four months after this is

---

**41**

1  executed Teitelbaum goes to Centrust Bank and says
2  that you have a loan on Boulder Hill, the borrower
3  is Boulder Hill, LLC, and I'm prepared to buy the
4  loan for 95 cents on the dollar and Centrust says,
5  "That is the best deal on the planet.  We will
6  happily sell it to you for 95 cents on the dollar"
7  and Teitelbaum buys the loan and buys the right to
8  receive payments under the loan or the right to
9  enforce the terms of the loan and all of that
10  transpires four months or let's say a year after
11  the April 2015 settlement.
12         Now, it would seem to me when
13  you look at the phrase that I've highlighted that
14  Teitelbaum -- it could not reasonably be said that
15  Teitelbaum could have asserted in the litigation,
16  capital L litigation, any time before he had
17  purchased the loan the right to collect on that
18  loan.
19         So how, if at all, could it be
20  said that Teitelbaum's purchase of the loan,
21  including the right to enforce or foreclose on the
22  loan, have been a claim that he could have
23  asserted in the litigation that predated by
24  several years his purchase of the loan and the

---

11 (Pages 38 to 41)

May 8, 2020

---

42

1  settlement of which, and the release of which,
2  predated by a year in my hypothetical the purchase
3  of the loan?
4          MR. TANNEN: I'm having difficulty,
5  your Honor, with the concept of Teitelbaum
6  purchasing the loan. I'm not sure what loan you
7  are referring to. I think to -- as best as I can
8  to compare apples to apples, the subject matter of
9  the Sharayin litigation through Teitelbaum was his
10 efforts to seek control of the Boulder Hill
11 Apartments. It settled for $1.16 million.
12         THE COURT: You know what, I
13 misspoke. It's not a loan. He purchases the
14 judgment which is a judgment on a loan, on a
15 foreclosed loan, right?
16         MR. TANNEN: That's correct.
17         THE COURT: So with my modification
18 is not purchasing the loan, he buys the judgment
19 and the right to enforce the judgment and he buys
20 it a year after he settles in April of 2015.
21         MR. TANNEN: And you're asking me
22 whether such an effort would be barred by the
23 mutual general release because of subsequent
24 conduct?

---

43

1          THE COURT: Correct.
2          MR. TANNEN: I'm not able to answer
3  that question right now. I'm sorry. I just don't
4  know.
5          THE COURT: Because, to me, that
6  is -- my example is the simplest way to
7  crystallize this issue about the scope of the
8  release. To me, all that went into the
9  cooperation agreement, the crafting of it, the
10 negotiation leading up to it, the intent behind
11 it. While interesting perhaps, it has to relate
12 to a material issue that I'm going to have to
13 decide and you've articulated two such issues that
14 it might have been released, it might be included
15 within the scope of the release, and derivatively
16 Centrust, through its relationship with
17 Teitelbaum, might now lack the right to enforce
18 the judgment because of the release between the
19 parties, including Teitelbaum, in April of 2015.
20 So those are two subsidiary questions.
21         MR. TANNEN: And I think --
22         THE COURT: The other issue -- the
23 other issue is potential illegality, that the
24 arrangement might relate to the defense that

---

44

1  the -- it is now illegal to try to enforce the
2  judgment because of the nefarious or -- or
3  proscribed cooperation agreement between a bank
4  and a non-bank player, Teitelbaum, or Centrust
5  Debt Recovery.
6          So I'll put the second one
7  aside. What I'm trying to do in my own mind is
8  crystallize the simplest example to get to what --
9  what limitations were imposed on Teitelbaum as a
10 result of the release, what could he not do in the
11 future? Because if he could purchase the judgment
12 a year after the April settlement and then enforce
13 the judgment, what he is doing in the cooperation
14 agreement is merely a variance of that.
15         And I realize the cooperation
16 agreement was executed not a year later, but four
17 months later, there may be some timing issue about
18 that, and it's not as clean of an example as
19 Teitelbaum personally purchasing the judgment, but
20 help me understand how, if at all, this release
21 which uses the phrase asserted or could have been
22 asserted in the litigation how that phrase would
23 apply to a right that Teitelbaum did not have in
24 April of 2015 and he only gained by presumably

---

45

1  paying good consideration a year later for the
2  acquisition of a judgment that he intended to
3  enforce.
4          MR. TANNEN: I don't know what --
5          THE COURT: How is that -- go ahead.
6          MR. TANNEN: I'm sorry. I
7  interrupted you. How would -- you were going to
8  say what is the relationship between the two
9  documents that would allow us to get discovery
10 about it?
11         THE COURT: Well, discovery will
12 come in a minute. This relates to the scope of
13 the release, right? That's how you phrased it in
14 your papers. That's how you articulated your
15 number one argument about the relevance was to the
16 relief in our argument today and with my example
17 I'm trying to understand how a year after he signs
18 this release -- his release does not say he will
19 never take any adverse action against Boulder
20 Hill.
21         This release says that "You are
22 forfeiting claims that were asserted or could have
23 been asserted in the litigation." He could not
24 have -- he did not assert a right to collect on a

---

May 8, 2020

46

1 judgment that he bought from a bank in litigation
2 because he hadn't bought the right at the time the
3 litigation was pending, nor could he have asserted
4 the right to collect on the judgment during the
5 course of the litigation because he did not -- he
6 had not acquired that right.
7           So how then in my example could
8 Teitelbaum's right to enforce a judgment that he
9 bought from Centrust in April of 2016 in my
10 example, how could that be covered by the release?
11 Because we are talking about a discovery issue,
12 but central to that discovery issue is what
13 relevance does it have to any issue that at some
14 point I'm going to be asked to decide and I need
15 some help understanding that.
16           MR. TANNEN:  I will try to answer
17 your question.  There was a dispute between YRY
18 and Sharayin in which Teitelbaum had an interest.
19 They had a lawsuit over the control and ownership
20 of the Boulder Hill Apartments.  They entered into
21 a settlement agreement and purchase of sale of
22 limited liability company membership interest
23 where Bruce got $1.16 million in exchange for him
24 selling his membership interest and walking away

47

1 from the Boulder Hill Apartments.  Four months
2 later, he enters into an agreement with Centrust
3 Bank to --
4           THE COURT:  Okay.  So let me stop
5 you here.  I'm not interested in the Centrust Bank
6 agreement at this point.  I'm interested in my
7 hypothetical because that's going to help me
8 better understand where we are today with the
9 Centrust Bank agreement.  I'm asking you to
10 address my hypothetical, which is a year after
11 this settlement Teitelbaum buys a judgment owned
12 by Centrust and seeks to enforce it.
13           How is this -- how would this
14 mutual general release preclude that activity by
15 Teitelbaum in view of my hypothetical facts?
16           MR. TANNEN:  Let me look at the
17 release again, your Honor.  I nonetheless have a
18 problem with Bruce Teitelbaum in any capacity as a
19 member of any company seeking to buy the very
20 thing that he received $1.16 million not to buy or
21 control and that is the best I can do.  I'm not
22 saying that's the best I can do.  That's what I
23 know or that's what it appears to me as of now.
24           THE COURT:  So it looked like he

48

1 received $1.13 million for the revolution of
2 litigation and the forfeiture of his ownership
3 interest, right?
4           MR. TANNEN:  Yes, I think that's
5 true.
6           THE COURT:  Okay.  But at least in a
7 mutual general release and indemnification I don't
8 see any -- certainly not express prohibition on
9 him serving in or taking some other role related
10 to the -- the corpus of the LLC, right, the
11 property itself or loans that might be outstanding
12 owed by the LLC.
13           In fact, the limitation appears
14 to be were asserted or could have been asserted in
15 the litigation and in my hypothetical I don't see
16 how Teitelbaum's later act in acquiring a judgment
17 and then seeking to enforce the judgment could
18 reasonably get shoehorned into the phrase were
19 asserted or could have been asserted in the
20 litigation.  And so when we talk about, well, we
21 want -- we want to have some discovery about, you
22 know, what inspired Teitelbaum in my hypothetical
23 to go out and buy the -- acquire the note and then
24 seek to enforce it and squeeze further the Boulder

49

1 Hill operation, you might be interested in that,
2 but at the end of the day you have to demonstrate
3 that that has some legal relevance to matters
4 before me.
5           MR. TANNEN:  Well, here is
6 something, your Honor, and this was news to me.
7 It seems based on what Mr. Giese just said that
8 the bank is essentially a potted plant, a straw
9 man plaintiff, and that Centrust Debt Recovery is
10 the plaintiff in this matter seeking the remedy of
11 a sale of property which he agreed to walk away
12 from.
13           I've got to tell you when the
14 Ybarra's -- when Yolanda Ybarra found out about
15 this cooperation agreement six years after the
16 fact and it wasn't even brought to light when
17 Centrust Bank tried to disqualify Ariel Weissberg
18 from being the lawyer for the Ybarra's because of
19 his supposed concurrent and past representation of
20 Teitelbaum, it would have seen that this agreement
21 of creditors would have come to light, but I -- I
22 do believe that there is a -- a relevance to the
23 agreement of creditors for the reasons I just
24 stated and all the other reasons I've stated.

13  (Pages 46 to 49)

FILED DATE: 3/22/2021 5:23 PM   2010L050077

May 8, 2020

50

1 There is something -- there is something not right
2 going on here and --
3          MR. GIESE:  Your Honor, this is
4 Attorney Giese.  I just have to object to him
5 re-characterizing --
6          THE COURT:  You'll get your chance,
7 Mr. Giese.  Rest-assured, I'm going to get to your
8 chance to respond.
9          MR. GIESE:  Okay.
10          THE COURT:  Continue, Mr. Tannen.
11          MR. TANNEN:  I think -- I think
12 I'm -- I think I'm done with my -- my argument.
13 You are --
14          THE COURT:  Okay.
15          MR. TANNEN:  Excuse me.
16          THE COURT:  I have another question
17 for you.
18          MR. TANNEN:  Okay.
19          THE COURT:  Let me just make an
20 observation.  First, back to my hypothetical.  I
21 realize my hypothetical is not this case.  What we
22 have in this case is something that is less clear
23 and closer in time to the execution of the
24 settlement agreement and the release in that the

51

1 cooperation agreement bears a date, and I don't
2 have the exact date, but it's August of 2015, and
3 the settlement agreement is April 24th, 2015.
4          So a three to four-month period
5 between the execution of the settlement agreement
6 and companion release and then the agreement of
7 creditors.  If it were the case that there was
8 ongoing negotiations related to the cooperation
9 agreement coincident with the settlement of the
10 litigation, what do you see relevant there,
11 Mr. Tannen?
12          MR. TANNEN:  You're asking me --
13          THE COURT:  The cooperation
14 agreement is not concluded until August of 2015,
15 but let's say I grant you some limited discovery
16 and you learn that contact over discussions about
17 negotiations over the terms of a cooperation
18 agreement incurred -- commenced in early 2015, I
19 assume your position it would be highly relevant?
20          MR. TANNEN:  Yes, I think it would
21 be highly relevant, but let's assume for the sake
22 of argument that negotiations about the concept of
23 some sort of agreement of creditors between the
24 bank and Centrust Debt Recovery didn't occur until

52

1 the ink on the settlement agreement and release
2 was dry and what if we learned that the agreement
3 of creditors was crafted in such a way to do an
4 end-around to the release and indemnification
5 agreement that you've been pointing to.
6          I mean, the parties did agree
7 that it was to be kept confidential.  Mr. Giese
8 tried to bar us from pre-agreement negotiations.
9 When we had the agreement on August 28th, you --
10 you preliminarily said that pre-cooperation
11 agreement negotiations were fair game and that if
12 there was privilege to be asserted they would
13 assert privilege.  I don't think, and I'm
14 operating blindly here because we weren't parties
15 to any of this, of course, but I don't think the
16 bright line date for discovery of negotiations
17 relating to the cooperation agreement have to
18 start before the Sharayin agreement was executed.
19          I think this intervening time
20 between April and August is highly relevant,
21 particularly since Centrust Debt Recovery did not
22 define or itemize any of its, quote, unquote,
23 respective claims.  Because if he -- he'd have to
24 admit, I think, that he had no claim against YRY

53

1 or Boulder Hill Apartments or Ruben Ybarra in
2 August 2015 when this agreement was entered into,
3 that being the cooperation agreement, he had no
4 respective claims.
5          So I think it's very possible
6 that he walked into the bank and he says, "Listen.
7 We have this cooperation agreement, you can be the
8 named plaintiff, I'll do all the work and I'll get
9 70 percent of the proceeds."  What a great deal
10 for the bank.  And if it's true, that's troubling
11 and I think Centrust Debt Recovery may be the real
12 party in interest, may be the plaintiff and all of
13 this I think is barred.  But we don't know yet.
14 I'm operating in the dark.
15          THE COURT:  Mr. Tannen, barred by
16 what?
17          MR. TANNEN:  Barred by the release.
18 Barred by the release.  How can Centrust Debt
19 Recovery under the guise of Centrust Bank between
20 the nominal plaintiff now forcibly -- get an order
21 to forcibly sell property that he agreed he would
22 sell his membership interest in and walk away
23 from?
24          THE COURT:  So, again, this --

14  (Pages 50 to 53)

FILED DATE: 3/2/2021 3:23 PM   2010L050077

May 8, 2020

FILED DATE: 8/2/2021 3:23 PM    2010L050077

54

1  this -- I'm troubled by this -- this line because
2  we get back to my hypothetical.  Had he done
3  directly -- so -- so part of what troubled me back
4  when we were discussing this in 2019 and we were
5  all learning in realtime the construct of this
6  agreement, it was not an assignment, it was an
7  agreement of -- cooperation agreement and really
8  it may not be a cooperation agreement, it may, in
9  fact, be a litigation funding agreement if -- if
10  Teitelbaum does not have any claims or Centrust
11  Debt Recovery does not have any claims, it could
12  very well be a litigation funding agreement, but
13  those are all variances to me to the purest
14  example, which is the one I gave in my
15  hypothetical and to put it in the simplest terms
16  what about the release would prevent Teitelbaum
17  from acquiring the judgment that Centrust Bank is
18  seeking to enforce here and Teitelbaum, in turn,
19  enforcing that judgment?
20            It all comes back to the scope
21  of that release and I'm not making any decision
22  about the release.  I'm looking at the language
23  that they tell you and I will need some convincing
24  at the appropriate point that the cooperation

55

1  agreement somehow is violative of that release
2  through Teitelbaum's direct or indirect connection
3  to the parties.  You know, Teitelbaum through
4  Centrust Debt Recovery and then to, under your
5  view, Mr. Tannen, to Centrust Bank and Centrust
6  Bank's participation in that cooperation agreement
7  operate to forfeit or to extinguish its -- its
8  claim to a judgment, its enforcement rights.
9            And all of those are links in
10  the chain, but in my hypothetical I try to
11  eliminate -- I try to present as simple of an
12  example without those links in the chain to better
13  understand your argument about the scope of the
14  release.  So what I'd like to do now is turn to
15  the other affirmative defense for which you,
16  Mr. Tannen, may need or do need discovery and that
17  is the illegality issue which you've identified a
18  couple of times and it's in Footnote 4 of your
19  opening brief here.
20            You've now had four months or so
21  since you filed that brief to investigate the
22  illegality of the arrangement.  Where are you on
23  that?
24            So your Footnote 4 reads "So is

56

1  illegality if it turns out that the Bank cannot
2  validly enter into a secret participation
3  agreement with a nonbank to fully fund a
4  collection war against one of its customers."
5            But where are you on the
6  research regarding that, presumably legal issues?
7            MR. TANNEN:  You're asking me
8  where -- you're asking me if I've conducted
9  research on the issue about whether a private
10  citizen and a bank can enter into an agreement of
11  this sort?  I --
12            THE COURT:  In a roundabout way,
13  that's a fairly accurate statement.  I can put a
14  finer point on it, but can you answer that
15  question that you just posed?
16            MR. TANNEN:  I haven't exhaustively
17  researched that issue yet because I feel I need
18  some more underlying facts to get my arms around
19  what this cooperation agreement is.  I believe,
20  generally speaking, participation agreements need
21  to be by and between banks and Centrust Debt
22  Recovery is not a -- is not a bank and I also
23  don't know whether Centrust Debt Recovery is
24  licensed to collect a debt and engage in

57

1  litigation enforcement as you referenced that this
2  might be what the agreement is.  I am really
3  troubled that had it not been for the inadvertent
4  disclosure of an e-mail that we would have never
5  ever, ever known about Mr. Teitelbaum's work
6  behind the scenes, I find it to be deeply
7  troubling and if Centrust Debt Recovery is
8  required to be -- have some sort of license to do
9  what it is doing -- and, by the way, this does
10  dovetail into my joint venture agreement.
11            Mr. Giese did mention one of the
12  most important factors which is the sharing of
13  profits and losses which is clearly in the
14  agreement and you mentioned it before Centrust
15  Bank had the right to veto any settlement.  This
16  all goes back to the -- the cooperation agreement
17  standing all by itself and let's pretend that the
18  Sharayin release doesn't exist, this agreement,
19  this concealed, undisclosed agreement is very, to
20  me, problematic and I don't know yet what Centrust
21  Debt Recovery is, whether they had a license,
22  whether they can validly do what they're doing.
23            We had this argument before that
24  it had been -- the cooperation agreement had been

15  (Pages 54 to 57)

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM    2010L050077

---

**58**

1  characterized as an assignment.  If it had been an
2  assignment, then Centrust Debt Recovery would have
3  had to come out of the shadows and attach the
4  documents that give us the rights that it is now
5  asserting and they didn't do it that way.  They're
6  doing it in the way in which we found out all of
7  us, you and I late in the game, that Bruce
8  Teitelbaum is behind the scenes orchestrating
9  everything.
10         I think it's problematic, but to
11 answer your question I've not completed my
12 research and I, frankly, have not done a
13 tremendous amount of research on what is or is not
14 an illegal or legal participation agreement.
15 That's why I put it in a footnote.  I wasn't
16 exactly sure.  I just don't know yet, but I think
17 I'm entitled to find out.
18         THE COURT:  Okay.  Anything else?
19         MR. TANNEN:  No.
20         THE COURT:  Okay.  Mr. Giese, any --
21 you had a couple of additional comments I believe
22 you wanted to offer?
23         MR. GIESE:  I did, your Honor.
24 First off, when I originally brought my motion for

---

**59**

1  protective order on the cooperation agreement, I
2  did not call it an assignment.  I said there was
3  assignment language as I read it in the light most
4  favorable to intervenors and least favorable to
5  me.  You eventually called it a cooperation
6  agreement.  I'll abide by that determination
7  because I saw there was an assignment of an
8  obligation which the discovery asked for.  So we
9  did present this.
10         Regarding the concealed or
11 undisclosed, it's not necessary that it be advised
12 this is what is happening.  There is statements of
13 concealing nefarious issues.  You know, that's
14 just luster, but, again, your Honor asked a very
15 simple hypothetical question and I believe the
16 answer to that could this affect Mr. Teitelbaum's
17 actions in any other case was answered by Judge
18 Cleary on April 20th, 2017, when he entered an
19 order of summary judgment on defendants' amended
20 counterclaims and affirmative defenses, entered
21 summary judgment in favor of plaintiff on each of
22 the defendants' affirmative defenses and
23 counterclaims.  That's Exhibit 4 to my response.
24         It relates to Exhibit 3 where

---

**60**

1  defendants' response and opposition to plaintiff's
2  amended motion for summary judgment raised the
3  same release issue and Judge Cleary found that the
4  release in the Sharayin litigation did not release
5  the Centrust action against 7550 South Kingston,
6  15 CH 07695, a claim of Centrust which existed at
7  the time of the cooperation agreement.  So we do
8  have a --
9          THE COURT:  Mr. Giese, quick
10 question.  A factual question, Mr. Giese, and you
11 may not know the answer to this.  You may.  In the
12 Centrust versus 7550 South Kingston, LLC,
13 litigation, the chancery case --
14         MR. GIESE:  Yes.
15         THE COURT:  -- I don't know if it
16 was -- was it always before Judge Cleary?
17         MR. GIESE:  I know -- I know it
18 eventually went before Judge McGing.
19         THE COURT:  Okay.  Was the
20 cooperation agreement discovered and revealed in
21 that case?
22         MR. GIESE:  I do not know.
23         MR. TANNEN:  Your Honor, I can say
24 for whatever it's worth, even though I've only

---

**61**

1  been representing YRY and Boulder Hill for ten
2  months or so, the cooperation agreement or the
3  agreement of creditors was absolutely news to them
4  and I don't think it was disclosed, and I take it
5  I will have an opportunity to respond to Mr.
6  Giese's arguments about the impact or effect of
7  that release on this case.
8          THE COURT:  Okay.  Mr. Giese --
9  thank you, Mr. Tannen.  Mr. Giese, sorry for the
10 interruption.  Please continue.
11         MR. GIESE:  That's fine.  I believe
12 Judge Cleary's order of April 20th, 2017, answered
13 your hypothetical.  If Centrust was allowed to
14 enforce its actions against 7550 South Kingston as
15 well as Ms. Ybarra and Mr. Ybarra and others, the
16 release was not -- is not as broad as Mr. Tannen
17 would like it to be.
18         THE COURT:  Okay.  Anything else?
19         MR. GIESE:  At this point, my
20 argument mainly is there is no need for discovery
21 related to the cooperation agreement and unless
22 and until Mr. Tannen can come up with legal
23 arguments to show why this agreement may be
24 illegal other than just claiming to be illegal and

---

FILED DATE: 3/2/2021 5:23 PM 2010L050077

May 8, 2020

62

1  saying he needs discovery to find it to be
2  illegal, I think we need to find out if the law
3  substantiates a claim.
4          THE COURT:  Okay.  Any final
5  remarks, Mr. Tannen?
6          MR. TANNEN:  Just a few, your Honor.
7  I want to say globally that I am -- I am troubled
8  that a two-page motion, which is a motion and not
9  a complaint under the Illinois code, is so
10  threadbare and what is alleged is not true and
11  that all of this has been spawned by this motion
12  for judicial determination and in one breath
13  Centrust Bank -- well, actually, Mr. Teitelbaum
14  now wants to pierce the very estate planning
15  construct that he directed the Ybarra's to the
16  attorneys to setup on the one hand, but on the
17  other we can't get into the terms of an agreement
18  that is ambiguous on its face and temporally
19  raises a lot of questions.
20          The definition of discovery is
21  relevant in what may be calculated to lead to the
22  discovery of relevant information and I throw out
23  another issue that is out there.  I haven't
24  mentioned -- I did not mention it in my brief

63

1  because you said we'll get to it later, but we do
2  have knowledge of Centrust Debt Recovery using an
3  unlicensed lawyer to potentially engage in the
4  practice of law and if that occurs and there is a
5  joint venture the plaintiff, the bank, has some
6  problems.
7          I haven't mentioned it because
8  you said we would get to it later, but if we have
9  a situation where Eric Ferleger is advising the
10  bank, giving legal advice to Centrust Debt
11  Recovery and they are joint venturers, that raises
12  a whole 'nother can of worms, but it's out there
13  and I think we're going to find out perhaps when
14  they produce their privilege log that an
15  unlicensed lawyer was essentially practicing law,
16  using the court system, drafting documents,
17  seeking agreements and all of this would have
18  never been known -- excuse me.
19          None of this would have ever
20  been known by any of us had not that e-mail been
21  produced.  I'm very troubled by all of this, your
22  Honor, particularly given the very, very, very
23  skimpy motion to sell the property.  I say it's
24  innocuously named, it is, but the relief it seeks

64

1  is quite draconian.
2          THE COURT:  Okay.  I'm ready to rule
3  on the discovery issue, but I will say I will put
4  a marker on this, there's another issue I want to
5  talk about at the conclusion of my ruling to
6  better frame the issues that we will be
7  confronting in the months ahead.  So my view of
8  discovery is that it is fairly broad and need not
9  be confined to simply admissible evidence because
10  you don't know what is admissible or not when you
11  embark on your discovery efforts.
12          I continue to have concerns
13  about the relevance of the materials sought, but,
14  frankly, given the close timing between the
15  execution of the settlement agreement and release
16  and the conclusion of the execution of the
17  cooperation agreement I do see it as potentially
18  leading to the discovery of admissible evidence on
19  a relevant subject.
20          So I am going to authorize and
21  permit the discovery, that provision.  That is
22  really the second of the two issues that were teed
23  up for today.  The first is entitlement to
24  discovery.  I do share the view that, you know, an

65

1  adverse claim situation such as this we will deal
2  with this under 12-710 which contemplates
3  ambitions and authorizes discovery.  So in terms
4  of entitlement to discovery, yes, the parties, not
5  just the adverse claimant, both sides are entitled
6  to conduct discovery and that will be allowed and
7  with respect to the scope of the discovery here,
8  under the circumstances here with the arguments
9  presented, I will allow it.
10          Okay.  So, Mr. Tannen, I will
11  need you to, as the prevailing party, prepare an
12  order to that effect.  It need not be extensive,
13  but it will need to be prepared.  A related point,
14  do we have an order circulated from our hearing on
15  Tuesday?
16          MR. TANNEN:  I got tied up
17  yesterday, your Honor, and I apologize for not
18  getting it from Tuesday, but I'll submit a
19  separate order along with this order today.
20          THE COURT:  Okay.  Now, here is the
21  other point that is -- would be enormously helpful
22  to me.  There are a lot of relevant facts here.
23  What I would really appreciate from both sides --
24  I'm saying both sides.  There is more than two

17 (Pages 62 to 65)

May 8, 2020

FILED DATE: 3/42/2021 5:23 PM    2010L050077

66

1  sides here.  There are intervenors, there's
2  defendants, three intervenors, a defendant and a
3  plaintiff, I would appreciate the development of
4  timelines by the relevant parties and if the
5  intervenors want to work with the defendant and
6  develop a unified timeline, that would be fine.
7  If not, everybody can develop their own because
8  what I'm looking for is each side and, to me,
9  let's assume there is generally two communities of
10  interest or sides.  So I know that is not
11  technically true for all issues.
12          Each side has a number of facts
13  that they will rely on to advocate for the release
14  that they're ultimately going to be requesting.  I
15  would like to know what those facts are and how
16  they fit into a timeline.  So, Mr. Giese, for
17  example, your timeline probably would start with
18  Centrust complaint filed on X date, judgment
19  entered on Y date in the amount, judgment entered
20  in favor of Centrust in the amount of X, again
21  defendant Ruben Ybarra and maybe others, probably
22  just Ruben, on date Y, Centrust serves citation on
23  Yolanda Ybarra on X date, Centrust serves citation
24  on Ruben Ybarra on Y date, order continuing

67

1  citation is entered on ABC date, turnover order
2  entered on Y date, second citation served on -- ad
3  anything else in between plus intervening events
4  that you know will be relevant to the ultimate
5  disposition and along with recent activities in
6  discovery.
7          Second citation served on Ybarra
8  on Y date, Ybarra sits for citation examination,
9  et cetera.  Because I want to understand the
10  timeline in order to better appreciate how the
11  different arguments, that is to say affirmative
12  arguments and potential defenses, dovetail into
13  the timeline.  It's going to be -- it's going to
14  give me a much better idea of how we're going to
15  manage these arguments going forward.
16          MR. GIESE:  I will do my best, your
17  Honor.
18          THE COURT:  Because I think it would
19  be worthwhile after the parties develop those
20  timelines, file them and exchange them that we
21  have a status conference so that I can understand
22  maybe there is missing pieces in one or more of
23  the timelines, I want to understand how the legal
24  arguments are going to fit into those timelines

68

1  and, for me, that's going to be a much more
2  productive initial activity than reviewing when
3  discovery is over briefs responding to Centrust's
4  motion for judicial determination.
5          I think it will help shape how
6  we deal with Centrust's motion.
7          MR. GIESE:  Do you --
8          MR. TANNEN:  So do you want us to
9  each -- do you want us each to create a timeline?
10          THE COURT:  Let's start with
11  Mr. Giese.  Mr. Giese, I'm sorry.  Go ahead.
12          MR. GIESE:  I do understand your
13  request.  I will make a diligent effort to do
14  that.  But I will advise your Honor, I have not
15  been involved in the enforcement of this judgment
16  since the initial citation.  I do not have all of
17  the documents since they were not provided to me
18  by prior counsel and most of my access is going to
19  be the online docket since we are not to be going
20  to court to review physical files and I don't have
21  access to the online documents themselves, but I
22  will make every effort to get that together.
23          THE COURT:  Thank you.  I appreciate
24  that and I recognize you were not involved in the

69

1  case since the inception and you can style these
2  as draft timelines.  I'm not -- the point of this
3  is not to stick anybody to a timeline that is
4  filed.  These can be working drafts that can be
5  modified in the future if we have access to other
6  information in the future and learn more, but as
7  complete a timeline as you can develop now, you
8  being all the parties, it would be helpful to me.
9          So you can drop footnote one on
10  the first page.  It's going to be this is a
11  working draft and subject to future possible
12  revisions, you can definitely put such a
13  placeholder in there, but I want to assure you I'm
14  not looking to -- to bar somebody from modifying
15  them down the road as you learn more information,
16  but as complete as you can make them would be
17  helpful to me.
18          MR. GIESE:  Your Honor, I just want
19  to make sure you understand where we're coming
20  from and I assume Attorney Tannen may have the
21  same issues.  So --
22          MR. TANNEN:  And you just used a
23  pronoun yourself, your Honor, them, which is
24  plural.  So are you contemplating us creating our

18  (Pages 66 to 69)

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM    2010L050077

70

1  own timeline of what we think is relevant?
2       THE COURT: Yes, exactly. All
3  parties creating a timeline.
4       MR. TANNEN: Each party creating its
5  own timeline?
6       THE COURT: Correct.
7       MR. TANNEN: Okay.
8       THE COURT: And the defendant
9  certainly -- if all adverse parties want to create
10  a timeline -- a unified timeline, if all adverse
11  parties, plus defendant Ruben Ybarra, wanted to
12  submit a joint timeline, that's fine.
13       MR. TANNEN: I think that may be --
14       THE COURT: I'm not looking to bar
15  anyone from --
16       MR. TANNEN: I think that may be
17  easier.
18       THE COURT: I'm not looking to bar
19  anyone from contributing to this at some point in
20  the future or adding additional detail as it gets
21  fleshed out and, frankly, a unified timeline from
22  all adverse parties would be really helpful. It
23  would even in my mind be more advantageous to have
24  a unified timeline from all adverse parties and

71

1  Ruben Ybarra if that can be accomplished, but I'm
2  not requiring it. This will really help me
3  understand what's transpired over the last ten
4  plus years in the case and more than that when I
5  look at what the legal arguments are given the
6  complexity of this case it will be -- it will be
7  helpful.
8       For example, so the -- the
9  adverse party and your client's timeline would
10  include things done and not done with respect to
11  the property. You know, no -- you might have a
12  footnote no memorandum of judgment ever filed,
13  which really is almost a negative item on the
14  timeline. But --
15       MR. TANNEN: I understand. I
16  understand what you are asking.
17       THE COURT: Okay. Anything else
18  today?
19       MR. TANNEN: I don't think so. I
20  don't think so, your Honor.
21       THE COURT: How about we do this.
22  If you would like collectively to have a status
23  conference in a week or so or mid next week after
24  you collectively contemplate the additional

72

1  discovery that you -- that you would envision.
2  I'm reluctant today to say discovery should be
3  completed in 45 days given where we are right now
4  with -- with limited access to court, stay-at-home
5  orders, et cetera.
6       If that's -- I'm not envisioning
7  discovery to go on indefinitely. So I'd like the
8  two of you to talk about that first or the sides
9  talk about that first. If you can come up with
10  some sort of a reasonable timeline agreement, that
11  would be great. If not, we can revisit about that
12  next week, but let me know what you think about
13  that.
14       MR. TANNEN: Okay. So are you --
15  are you thinking, your Honor, that by the time we
16  chat with you next week the parties will have made
17  substantial progress on their own respective
18  timelines?
19       THE COURT: So the timeline is -- so
20  the written timeline that I'm envisioning may take
21  more than a few days for you to develop. I
22  appreciate that. And I also appreciate you have
23  other things to deal with besides this case.
24       Do you think that is doable in,

73

1  say, two weeks a timeline filed within, say, two
2  weeks?
3       MR. TANNEN: Speaking for myself, I
4  think two weeks would be appropriate. I think I
5  can try and gather as many documents that exist on
6  our side to create our timeline and I think two
7  weeks is -- is good enough for us.
8       THE COURT: Okay.
9       MR. GIESE: I believe I can do that
10  as well, your Honor.
11       THE COURT: Great. Who represents
12  Ybarra?
13       MR. TANNEN: Nobody. Mr. -- Mr. --
14  Mr. Weissberg had to withdraw and I only represent
15  YRY and Boulder Hill. I do not formally represent
16  Mr. Ybarra.
17       THE COURT: Okay. All right. So we
18  need to make sure that today's order also gets to
19  Mr. Ybarra.
20       So he is representing himself, I
21  gather?
22       MR. TANNEN: For now, yes. I mean,
23  Yolanda and Ruben, you know, live in the same
24  house, of course, and, I mean, he is aware of what

19  (Pages 70 to 73)

May 8, 2020

FILED DATE: 3/2/2021 5:23 PM    2010L050077

74

1 is going on and I will ensure that he gets a copy
2 of the order.
3         THE COURT:  Okay.
4         MR. GIESE:  Your Honor, this is
5 Attorney Giese.  As of today, I don't believe he
6 has filed a substitute appearance to give us
7 contact information.  I don't have his phone
8 number.  I believe I have an address.
9         MR. TANNEN:  Mr. Giese, I will get
10 Mr. Ybarra the order.
11         MR. GIESE:  My understanding is he
12 will not be able to communicate with Mr. Ybarra
13 for discovery purposes.
14         THE COURT:  Okay.  So let's do this.
15 Are both of you fairly confident that Mr. Ybarra
16 does not have an appearance on file, a pro se
17 appearance on file?
18         MR. TANNEN:  I -- I am.
19         MR. GIESE:  I have not received one,
20 your Honor.
21         MR. TANNEN:  I don't think he has a
22 substitute appearance on file.  I know when I came
23 into the case I came into the case on behalf of
24 YRY and Boulder Hill only.

75

1         THE COURT:  Right.
2         MR. TANNEN:  I think Mr. Ybarra
3 would be open to filing a pro se appearance so
4 that he gets notice of things and I can ask him to
5 do that.
6         THE COURT:  Yeah.  So in today's
7 order, let's give him 28 days -- 35 days to file a
8 pro se appearance and in the meantime, Mr. Tannen,
9 can you please provide to Mr. Giese Mr. Ybarra's
10 contact information so that Mr. Giese, to the
11 extent he needs to contact Mr. Ybarra, can do so?
12         MR. TANNEN:  Yes, I can do that.
13         THE COURT:  Okay.  So you'll
14 formally direct Mr. Ybarra to file a substitute
15 appearance, pro se or otherwise, 35 days from
16 today.
17         MR. TANNEN:  And, your Honor, as I
18 understand your ruling, I take it we're going to
19 meet in two weeks and there is no -- the time to
20 start issuing discovery has not yet started, we'll
21 start that after we agree on a timeline of moving
22 forward?
23         THE COURT:  So this is what is going
24 on here.

76

1         So there are -- the timeline is
2 unrelated to the discovery issue --
3         MR. TANNEN:  Understood.
4         THE COURT:  -- my ruling on the
5 discovery.  The timeline is to give me, like, a
6 20,000 foot view of the underlying facts that are
7 relevant to either matters that are teed up now or
8 matters that likely will be in the pipeline soon.
9 That's how I'm looking at the timeline.  And I
10 would -- you know, as an aside, I would suggest
11 that with respect to the timeline be more
12 inclusive than less if there are important issues
13 or you're not quite sure how important they will
14 be, put them in.  Because I'm going to -- I will
15 take whatever timelines that are submitted and
16 develop my own.  I'm going to meld the two and
17 develop my own.  So that's not related to
18 discovery.
19         With respect to discovery, what
20 I encourage the two of you to do is talk over the
21 next few days about the envisioned discovery;
22 timeline, termination dates, et cetera.  I'm
23 not -- you can -- you can start discovery now.
24 You can send out interrogatories and document

77

1 requests each side now.  There is nothing that
2 prohibits you from doing that.  If you want my
3 involvement further in -- in picking discovery
4 off, I suppose I can be involved.  The most
5 important thing I'm looking from the two of you
6 I'm looking for some feedback about how long you
7 envision this discovery to last.  How much time do
8 you need?
9         MR. TANNEN:  We understand and I
10 apologize for using the word timelines in
11 referring to a discovery timeline and the
12 chronological timeline you wanted.  Before the
13 COVID pandemic had hit us, I suggested an
14 abbreviated schedule in my motion which I think is
15 completely out the door in light of the pandemic,
16 but Mr. Giese and I will figure it out and I
17 expect we'll be able to agree and if we can't,
18 we'll unfortunately have to come back to you for
19 guidance.
20         THE COURT:  Yeah, and the way you
21 can come back to keep this simple is one or the
22 other of you, sends an e-mail to Ann Ostrowski
23 sender, sends an e-mail to Ann Ostrowski asking
24 for time to have a status conference with me.  So

20  (Pages 74 to 77)

May 8, 2020

FILED DATE: 3/22/2021 5:23 PM   2010L050077

78

1  that's how we're going to handle this particular
2  issue in the near term.
3         MR. TANNEN:  Okay.  So as of --
4         THE COURT:  And then --
5         MR. TANNEN:  Sorry.
6         THE COURT:  And then once I get the
7  timeline I'm going to look at them and I, in turn,
8  may ask Ms. Ostrowski to reach out to the two of
9  you to have a follow-up conversation about the
10 timeline, but I'm -- I want to see the timeline
11 first.
12        So today's order with respect to
13 the timeline is file them two weeks from today and
14 then e-mail a copy of them to -- to Ann Ostrowski
15 and she will get them to me the same day.
16        MR. TANNEN:  Okay.  So you had
17 mentioned next Friday as a status, but we don't
18 need one right now, we will come back when we need
19 you or when you call us after reviewing the
20 timelines?
21        THE COURT:  Yeah, that seems to make
22 sense.
23        MR. TANNEN:  Okay.
24        THE COURT:  What do you think,

79

1  Mr. Giese?
2         MR. GIESE:  I agree with that.  My
3  question relates to will your Honor enter any
4  ruling on the scope of discovery, what they are
5  entitled to request or obtain or the issues to
6  address?
7         THE COURT:  So I am not going to
8  restrict their scope now.  I have reviewed those
9  six or seven bullet points that are presented in
10 the motion in terms of the envisioned discovery
11 and I am not limiting them at this point.
12        MR. GIESE:  Thank you.
13        THE COURT:  Okay.  Anything else
14 today?
15        MR. TANNEN:  No, your Honor.
16        THE COURT:  All right.  Thank you,
17 gentlemen.
18        MR. TANNEN:  Thank you very much for
19 hearing us today.
20        MR. GIESE:  Thank you, your Honor.
21        THE COURT:  You bet.  Bye.
22
23
24

80

1  STATE OF ILLINOIS   )
2                      )  SS.
3  COUNTY OF COOK      )
4
5      I, Steven Brickey, Certified Shorthand
6  Reporter, do hereby certify that I reported in
7  shorthand the proceedings had at the trial
8  aforesaid, and that the foregoing is a true,
9  complete and correct transcript of the proceedings
10 of said trial as appears from my stenographic
11 notes so taken and transcribed under my personal
12 direction.
13      Witness my official signature in and for
14 Cook County, Illinois, on this _____ day of
15 _____, A.D., 2020.
16
17
18
19
20
                     _____
21                    STEVEN BRICKEY, CSR
                     8 West Monroe Street
                     Suite 2007
22                   Chicago, Illinois 60603
                     Phone:  (312) 419-9292
23                   CSR No. 084-004675
24

21  (Pages 78 to 80)

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

PTCV DEVELOPMENT, LLC as assignee )
of ABS LINCOLNWOOD, LLC as assignee )
of CENTRUST, N.A., A NATIONAL )
BANKING ASSOCIATION )
                              Plaintiff, )
         v. )      No. 10 L 050077
                                    )
RUBEN YBARRA, )
                       Defendant. )

**ORDER**

THIS MATTER, coming before the Court on April 27, 2021 on the Court's *sua sponte* order of April 19, 2021 request that interested parties submit briefs on the issues set forth in the Court's order of April 19, and with Subpoena Recipients CNTRST Debt Recovery Corporation, Bruce Teitelbaum and Joyce Vojcak (collectively "CNTRST") and Markoff Law LLC ("Markoff") and Adverse Claimants YRY Holdings LLC ("YRY"), Boulder Hill Apartments LLC ("BHA") and Real Realty, Inc. having submitted said their respective briefs on April 21 and April 26, and with Centrust Bank, N.A. ("the Bank") joining at hearing, over YRY's and BHA's objection, CNTRST and Markoff Law's April 21 brief, and also coming to be heard for hearing on the fully briefed motion of YRY and BHA to compel compliance with discovery against Centrust Bank ("the Bank"), and coming to be heard for status on the motions to quash YRY and BHA's document subpoenas of Markoff Law and of Kluever Law Group (including former attorneys Andrew Platt and M. Reas Bowman and successor firms)(collectively "K&P"), and for case management, with the following parties present through counsel: the Bank, Adverse Claimants YRY, BHA, T2 Boulder Hill Montgomery LLC, and Real Realty, Inc. ("Real Realty"); Assignee PTCV Development LLC ("PTCV"), and Subpoena Recipient CNTRST, Subpoena Recipient Markoff Law; with counsel for K&P not present and with Reas Bowman (formerly of K&P) present; and Judgment Debtor Ruben Ybarra present *pro se*, with assignee ABS Lincolnwood LLC not present, the Court being fully advised in the premises, with a certified court reporter present,

**IT IS HEREBY ORDERED:**

1.     The Court takes under advisement its disposition of its *sua sponte* order of April 19, 2021.

2.     This matter is continued until May 3, 2021 at 4:00 p.m. for the entry of an order following the hearing on April 16 on CNTRST's motion to quash subpoenas tendered by YRY and BHA, with CNTRST, YRY, and BHA having not come to an agreement about certain portions of the Court's ruling. Zoom instructions to follow.

Page 1 of 2

*Zoom ID#:* ~~_____~~

*Zoom Passcode:* ~~891457~~

3. Hearing on YRY and BHA's fully briefed motion to compel against the Bank shall proceed on May 10, 2021 at 2:00 p.m. Zoom instructions to follow.

4. Markoff Law's and K&P's motion to quash YRY's and BHA's document subpoenas are entered and continued for status until May 3, 2021 at 4:00 p.m.

Entered:

Date: _____

_____

The Honorable Judge Patrick J. Heneghan

Michael Murphy Tannen/Timothy R. Meloy
Attorneys for Adverse Claimants YRY Holdings LLC
   and Boulder Hill Apartments LLC
Tannen Law Group, PC
77 West Washington Street, Suite 500
Chicago, Illinois 60602
(312) 641-6650
Attorney No. 38447

Associate Judge Patrick J. Heneghan

APR 3 0 2021

Circuit Court - 2155

Page 2 of 2

# EXHIBIT B

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION
TAX & MISCELLANEOUS REMEDIES SECTION

| | | |
|---|---|---|
| Centrust, N.A., a National Banking Association, | ) | |
| | ) | |
| | ) | No. 10 L 50077 |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Calendar 5 |
| | ) | |
| | ) | |
| Ruben Ybarra, | ) | |
| | ) | Associate Judge Patrick J. Heneghan |
| | ) | |
| Defendant. | ) | |

**ORDER**

This matter is before the Court on the following motions relating to the post-judgment supplementary proceedings pending before this Court under 735 ILCS 5/2-1402 and Supreme Court Rule 277:

1. ABS Lincolnwood, LLC's "Motion to Substitute Plaintiff and for Leave to Appear" ("ABS Lincolnwood's Motion to Substitute") (filed 8/14/20);

2. PTCV Development LLC's "Motion to Substitute Plaintiff, for Leave to Substitute Counsel and File Substitute Appearance" ("PTCV's Motion to Substitute")(filed 9/29/20); and

3. Centrust Bank's N.A.'s "Motion to Terminate Post-Judgment Proceedings or Alternatively to Dismiss Centrust as a Party Plaintiff" ("Centrust's Motion to Terminate")(filed 11/2/20).

The movants, parties, and adverse claimants have briefed these motions and the Court has entertained argument by the movants, parties, and adverse claimants related to these motions.

NOW, THEREFORE, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Court GRANTS ABS Lincolnwood's Motion to Substitute;

2. The Court GRANTS PTCV's Motion to Substitute and GRANTS Gregory K. Stern, P.C. and its attorneys leave to appear; and

3. The Court DENIES Centrust's Motion to Terminate insofar as the motion seeks to terminate the post-judgment proceedings against Centrust but GRANTS the alternative relief requested and substitutes ABS Lincolnwood for Centrust as the party plaintiff.

For all pleadings filed in this case in the future, the caption of this case shall read:

"PTCV Development, LLC, as assignee of ABS Lincolnwood, LLC, as assignee of Centrust, N.A., a National Banking Association, Plaintiff v. Ruben Ybarra, Defendant."

The Clerk of the Court is authorized and directed to change the name of the caption of this case on the docket system accordingly.

Nothing contained herein shall relieve Centrust, N.A. or any party or non-party of its responsibility and obligation to comply with any (1) citation, (2) subpoena, or (3) discovery request made in connection with the litigation of any adverse claim (i.e., interrogatories, document requests, deposition notices, requests to admit, etc.) served on Centrust, N.A., or such party or non-party.

Dated: March 12, 2021

_____
Patrick J. Heneghan, Associate Judge

Associate Judge Patrick J. Heneghan

MAR 12 2021

Circuit Court • 2155