IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRUST BANK, N.A. | ) | |
| | ) | Case No. 21-cv-02576 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Judge Sara L. Ellis |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, LLC | ) | Hon. Magistrate Judge Maria Valdez |
| and BOULDER HILL APARTMENTS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWER TO COMPLAINT

NOW COME Defendants, Ruben Ybarra ("Ybarra"), YRY Holdings, LLC ("YRY") and
Boulder Hill Apartments, LLC ("Boulder Hill") (collectively, "Defendants"), by their attorneys,
Ariel Weissberg and Rakesh Khanna of the law office of Weissberg and Associates, Ltd, and
Christopher V. Langone of Langone Law LLC, and as *Defendants' Answer to Complaint*, state as
follows:

1.      Ybarra is an individual with a long history of using straw companies to defraud
and harass Centrust. Ybarra has used straw companies to fraudulently obtain loans from
Centrust; he has used straw companies to avoid repaying his debts to Centrust; and he has used
straw companies to harass and threaten Centrust with frivolous litigation. Centrust commenced
this case to: (a) protect itself from the frivolous threats of Ybarra's straw companies; and (b)
recover damages from Ybarra and his straw companies for their past litigation abuses.

**ANSWER:      Defendants deny the allegations contained in this paragraph.**

2.      From 2006 to 2008, Ybarra was employed by Centrust as a Vice President and
loan officer. During his tenure, Ybarra repeatedly used straw entities to conceal his ownership
and control over Centrust borrowers. Ybarra even acted as Centrust's loan officer for such loans

without revealing his control over the borrowers. In addition, Ybarra received bribes, made undisclosed personal loans to Centrust's borrowers, and released Centrust's collateral without the bank's knowledge or consent.

**ANSWER:** **Defendants admit that Ybarra was employed by Centrust and entered a consent decree relating to alleged misconduct related to loans, but Defendants deny the balance of the allegations in this paragraph.**

3. Eventually, the Office of the Comptroller of Currency (the "OCC") discovered Ybarra's illegal activities and commenced enforcement proceedings against him pursuant to 12 U.S.C. § 1818. To avoid prosecution by the OCC, Ybarra agreed to a consent order that barred him from the banking industry and required him to make restitution to Centrust.

4. Predictably, Ybarra and his companies also defaulted on the loans Centrust made to them. In 2010, Centrust sued Ybarra to collect the debts. In that litigation, Centrust was awarded judgments totaling more than $2.6 million. Ybarra has never satisfied the judgments.

**ANSWER:** **Defendants admit that the OCC commenced enforcement proceedings, Ybarra agreed to a consent order, and judgments were entered against him but Defendants deny the balance of the allegations in this paragraph.**

5. Instead, Ybarra created an asset protection plan to shield his assets from Centrust. The plan was apparently implemented in 2011 – shortly after Centrust's judgments were entered against Ybarra. Pursuant to his asset protection plan, Ybarra uses straw companies to retain de facto ownership and control over a wide variety of assets, including several apartments located in Montgomery, Illinois. Centrust was informed of Ybarra's asset protection plan by one of Ybarra's former business associates. Centrust also obtained confirmation of Ybarra's asset protection plan through post-judgment discovery proceedings.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

2

6.      Among other things, Centrust discovered:

    a.      The Montgomery apartments were transferred to BHA for less than $100;

    b.      BHA is 100% owned and controlled by YRY;

    c.      YRY is managed by Ybarra; and

    d.      Ybarra owns, directly or indirectly, an interest of 100% in YRY's profits, losses, or capital.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to what Centrust claims to have "discovered."**

7.      Based on the information it discovered, Centrust's attorneys reasonably concluded Ybarra was using YRY and BHA as his alter egos to unjustly shield the Montgomery apartments from Centrust's collection efforts. Centrust's attorneys also reasonably concluded the Montgomery apartments were transferred to BHA with the intent to hinder, delay, or defraud Centrust.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

8.      As a result, Centrust's attorneys tried to attach the Montgomery apartments in post judgment proceedings before the state court. Centrust believes the attachment proceedings would have been successful if they had been completed, but unfortunately, the attachment proceedings were never completed. Before it could complete the attachment proceedings, Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"). Shortly thereafter, ABS sold the judgments to PTCV Development, LLC ("PTCV") and PTCV eventually withdrew the attachment proceedings.

**ANSWER:    Defendants admit attachment proceedings were initiated, but deny Plaintiff's speculation about whether they "would have been successful," or what Centrust**

**otherwise believes. Defendants admit Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"). Shortly thereafter, ABS sold the judgments to PTCV Development, LLC ("PTCV") and PTCV eventually withdrew the attachment proceedings.**

9.     So, in the end, Ybarra's asset protection plan worked, but Ybarra is still not satisfied. Now he wants to use his straw companies to punish Centrust for having the audacity to challenge his plan. For the better part of a year, Ybarra has been using YRY and BHA to threaten Centrust with a malicious prosecution suit regarding the state-court attachment proceedings. The constant threats from Ybarra's straw companies have forced Centrust to notify its insurer of a potential claim. They have also caused Centrust to incur substantial attorneys' fees and costs.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to who Centrust notified, or why, or the amount of any fees incurred, and on that basis denies same. Defendants deny the remaining allegations contained in this paragraph.**

10.     To add insult to injury, Ybarra also used his straw companies to extend the state court attachment proceedings for his own ulterior motives. Specifically, upon information and belief, Ybarra secretly created PTCV to acquire the judgments Centrust sold to ABS. Then, upon information and belief, Ybarra had PTCV, YRY, and BHA pose as adversaries in the state-court proceedings to: (a) prolong the proceedings; (b) use the proceedings as a discovery vehicle for his anticipated malicious-prosecution suit; and (c) engineer a resolution of the state-court proceedings that would bolster his anticipated malicious-prosecution suit.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

11.     In the end, Ybarra's efforts to defraud the state court were only partially successful.  He did manage to prolong the state-court proceedings long enough to issue several

4

abusive discovery requests to Centrust and others, but the bizarre, non-adversarial behavior of Ybarra's straw companies eventually aroused the state court's suspicions, prompting the state court to authorize an investigation of their apparent collusion. The prospect of an investigation promptly ended the attachment proceedings. Faced with an investigation, Ybarra's straw companies simply sought leave to drop the attachment proceedings and retreated from the state court.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

12.     In this case, Centrust is seeking to end Ybarra's machinations once and for all. Centrust is seeking a declaration that neither Ybarra nor his straw companies have any legitimate claim against the bank for malicious prosecution or abuse of process. Centrust is also seeking to recover damages from Ybarra and his straw companies for their own abuse of process in connection with the state-court proceedings.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

PARTIES

13.     Centrust is a national banking association. Centrust's main office is located at 385 Waukegan Rd, Northbrook, Illinois 60062.

**ANSWER:     Defendants admit the allegations contained in this paragraph.**

14.     Ybarra is an individual that, upon information and belief, is domiciled in Texas. Ybarra resides in Texas, and upon information and belief, intends to remain in Texas.

**ANSWER:     Defendants admit the allegations contained in this paragraph.**

15.     YRY is a Delaware limited liability company. Upon information and belief, YRY's members are all citizens of Texas either because they are individuals that resides in Texas with the intent to remain, or because they are trusts with trustees that reside in Texas with the intent to remain.

**ANSWER:    Admit that YRY is a Delaware limited liability company; deny the balance of the allegations**.

16.    BHA is an Illinois limited liability company with only one member: YRY.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

JURISDICTION

17.    The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the controversy is between citizens of different states.

**ANSWER:    Defendants deny the allegations contained in this paragraph.**

18.    This Court has personal jurisdiction over Defendants because they have each regularly conducted business in Illinois, they have each owned property in Illinois (either directly or indirectly), and they were each involved in the transactions and events described below (which occurred in Illinois).

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

FACTUAL BACKGROUND

A.    YBARRA'S MISCONDUCT AS A CENTRUST LOAN OFFICER

19.    From 2006 to 2008, Ybarra was employed as a loan officer and Vice President by Centrust.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

20.    In his capacity as a loan officer, Ybarra was required to evaluate, authorize, and/or recommend the approval of loans that would be in Centrust's best interests to make.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

21.    As a loan officer, Ybarra was also responsible for monitoring a portfolio of existing Centrust loans for the purpose of making, authorizing, and/or recommending any

necessary actions or adjustments by the bank, such as loan extensions, modifications, or collection activities.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

22.    As a loan officer, Ybarra was prohibited from receiving any undisclosed personal benefits from Centrust customers, such as bribes or kickbacks. He was also prohibited from having any undisclosed personal business dealings with Centrust customers.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

23.    As a loan officer, Ybarra was required to disclose any material ownership interest he held in Centrust's customers or prospective customers.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

24.    As a loan officer, Ybarra was required to place Centrust's interests ahead of his own when dealing with Centrust's customers. He was certainly prohibited from releasing Centrust's collateral without its knowledge or consent.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

25.    Unfortunately, Ybarra did not faithfully discharge his duties as a Centrust loan officer. According to the OCC, Ybarra engaged in a pattern and practice of misconduct during his tenure at Centrust which included personal dishonesty, breaches of fiduciary duties, unjust enrichment, and flagrant disregard for banking laws. Ybarra's misconduct caused Centrust to suffer substantial losses.

**ANSWER:    Defendants deny the allegations contained in this paragraph.**

26.    In 2012, the OCC initiated an enforcement proceeding against Ybarra based on his fraudulent activities (the "OCC Case"). The OCC Case culminated in the entry of a consent order against Ybarra (the "Consent Order") on January 22, 2013 which barred him from any future involvement with an insured depository institution and required him to reimburse

Centrust for some of its losses. A true and correct copy of the Consent Order is attached hereto as **Exhibit 1**.

**ANSWER:** **Defendants admit the allegations contained in this paragraph.**

27.     According to the Consent Order, Ybarra's misconduct as a Centrust loan officer included:

>   a.     Receiving a bribe from a Centrust borrower in exchange for inducing the bank to make an uncollectable loan to the borrower;
>
>   b.     Receiving a bribe from a property seller in exchange for inducing Centrust to finance the purchase of the seller's property with an uncollectable loan;
>
>   c.     Making several undisclosed high-interest, short-term loans to a Centrust borrower with his own personal funds;
>
>   d.     Employing a straw borrower to conceal from Centrust that he owned a controlling interest in an entity that received a $1.4 million loan from the bank;
>
>   e.     Purchasing an undisclosed controlling interest in a company that had received several loans from Centrust and acting as the loan officer for the company both before and after his acquisition of the undisclosed controlling interest;
>
>   f.     Purchasing an undisclosed controlling interest in a Centrust borrower and thereafter acting as the bank's loan officer with respect to several additional loans the bank made to the borrower;
>
>   g.     Recording a personal mortgage against a property that was already security for a Centrust loan; and

8

      h.     Releasing Centrust's mortgage in a property without its knowledge or consent.

**ANSWER:** **The Consent Order speaks for itself, and thus no response is required.**

    **B.** **CENTRUST'S JUDGMENTS AGAINST YBARRA**

28.    During his tenure at Centrust, Ybarra also obtained loans (collectively, the "Loans") totaling more than $2.5 million from the bank for entities that he owned and controlled, including:

    a.     <u>Loan 427</u>. Loan number *****427 ("Loan 427") was made to Fox Valley II, a Series of Develco Investments, LLC, an Illinois limited liability company ("Fox Valley II"). The loan was memorialized by a promissory note dated August 31, 2009 for the principal amount of $659,652.63. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Fox Valley II.

    b.     <u>Loan 763</u>. Loan number *****763 ("Loan 763") was made to Higgins-G&W, a Series of Develco Investments, LLC, an Illinois limited liability company ("Higgins-G&W"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $380,000. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-G&W.

    c.     <u>Loan 766</u>. Loan number *****766 ("Loan 766") was made to Higgins-AW, a Series of Develco Investments, LLC, an Illinois limited liability company ("Higgins-AW"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $1,130,000.

Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-AW.

    d.    <u>Loan 769</u>. Loan number *****769 ("Loan 769") was made to Higgins-NP, a Series of Develco Investments, LLC, an Illinois limited liability company ("Higgins-NP"). The loan was memorialized by a promissory note dated October 25, 2007 for the principal amount of $152,000. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Higgins-NP.

    e.    <u>Loan 826</u>. Loan number *****826 ("Loan 826") was made to Fox Valley II. The loan was memorialized by a promissory note dated August 31, 2009 for the principal amount of $199,998.97. Ybarra personally guaranteed the loan. Ybarra was the sole member and manager of Fox Valley II.

**ANSWER:**    **Defendants admit the allegations contained in this paragraph.**

    29.    Ybarra and his companies eventually defaulted on the Loans. As a result, Centrust initiated several lawsuits (collectively, the "Collection Lawsuits") against Ybarra in the Circuit Court of Cook County, Illinois (the "Circuit Court"). In the Collection Lawsuits, the Circuit Court entered judgments in favor of Centrust against Ybarra for more than $2.6 million (collectively, the "Judgments") as follows:

    a.    Case No. 50077. In Circuit Court case number 10-L-50077 ("Case Number 50077"), Centrust obtained a money judgment concerning Loan 766 against Ybarra on January 28, 2010 for $1,142,414.88, plus costs.

    b.    Case No. 50078. In Circuit Court case number 10-L-50078 ("Case Number 50078"), Centrust obtained a money judgment concerning Loan 763 against

Ybarra on January 28, 2010 for $384,565.22, plus costs.

    c.    Case No. 50079. In Circuit Court case number 10-L-50079 ("Case Number 50079"), Centrust obtained a money judgment concerning Loan 769 against Ybarra on January 28, 2010 for $154,275.77, plus costs.

    d.    Case No. 50286. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 427 against Ybarra on February 26, 2010 for $710,583.95, plus costs.

    e.    Case No. 50287. In Circuit Court case number 10-L-50287 ("Case Number 50287"), Centrust obtained a money judgment concerning Loan 826 against Ybarra on February 26, 2010 for $216,135.04, plus costs.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

    **C.    CENTRUST'S AGREEMENT WITH CDR**

30.    In February 2012, the current management group, including, but not limited to, James McMahon, were retained by Centrust.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to who as retained by Centrust and when, and on that basis, Defendants deny the allegations in this paragraph.**

31.    After Centrust's new management team took over, the Judgments remained dormant and substantively unknown to them.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to who what was known or unknown to Centrust and when, and on that basis denies the allegation.**

32.    By the summer of 2015, the amount Ybarra owed to Centrust based on the Judgments had increased to more than $3.3 million.

11

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

33.    Given Ybarra's prior history of employing straw entities and concealing his assets, Centrust's attorneys reasonably suspected Ybarra might be employing similar tactics to protect his assets from Centrust.

**ANSWER:    Defendants deny the allegations contained in this paragraph.**

34.    In or about the summer of 2015, Centrust was approached by Bruce Teitelbaum ("Teitelbaum"). Teitelbaum informed Centrust that: (a) Ybarra was his former business associate; (b) Ybarra owed him money too; and (c) Ybarra was concealing his assets from his creditors. Teitelbaum also indicated he was willing to retain an attorney at his own expense to represent Centrust and himself in collection proceedings against Ybarra if Centrust would agree to share the recovery with Teitelbaum.

**ANSWER:    Defendants lack knowledge or information sufficient to form a belief as to who if and when Teitelbaum met with Centrust or what was discussed, and on that basis, Defendants deny the allegations in this paragraph.**

35.    Eventually, on or about August 18, 2015, Centrust and a corporation Teitelbaum formed known as Cntrst Debt Recovery Corporation ("CDR") entered into an Agreement of Creditors (the "Agreement") that gave CDR the authority to collect the Judgments on the bank's behalf. A true and correct copy of the Agreement is attached hereto as **Exhibit 2**.

**ANSWER:    Defendants admit the allegations contained in this paragraph.**

36.    Under the terms of the Agreement, CDR promised to openly share with Centrust whatever information CDR possessed or acquired regarding the location of Ybarra's assets. CDR also agreed to retain and pay for lead counsel to jointly represent Centrust and CDR in all post judgment collection actions.

**ANSWER:     Defendants do not dispute the terms as set forth in the agreement.**

37.     In exchange for CDR's engagement of joint counsel for the parties, as well as CDR's agreement to openly share information with Centrust regarding Ybarra's assets, Centrust granted CDR the right to receive 70% of any amount recovered with respect to the Judgments after it was reimbursed for legal expenses. Thus, Centrust retained only a minority stake (30%) in the net amount, if any, recovered from Ybarra after CDR was reimbursed for legal expenses. Centrust also forfeited the right to select its own counsel.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

### D.     YBARRA'S ASSET PROTECTION PLAN

38.     Shortly after Centrust obtained the Judgments – in or about 2011 – Ybarra surreptitiously created an elaborate asset protection plan designed to conceal and shield his assets from creditors.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

39.     In connection with his plan, Ybarra created YRY to act as a holding company for many (probably most) of his assets. YRY operated as a central vehicle in Ybarra's asset protection scheme. It was apparently designed to own and control most (perhaps all) of Ybarra's business ventures and investments.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

40.     Ybarra of course made himself manager of YRY, thereby vesting himself with complete control over the management of YRY's affairs. Ybarra also gave himself and his wife 100% beneficial ownership of YRY. Thus, YRY was 100% owned (directly or indirectly) and controlled by Ybarra.

13

**ANSWER: Defendants admit Ybarra was manager, Defendants deny the allegations in this paragraph**

41.     To further shield his assets, Ybarra also created several subsidiary entities that were owned and controlled by him (indirectly through YRY).

**ANSWER: Defendants deny the allegations contained in this paragraph.**

     E.      BHA AND THE BOULDER HILL APARTMENTS

42.     BHA is one of YRY's subsidiaries that Ybarra created to shield his assets from his creditors. BHA is the record owner of several units in an apartment complex located in Montgomery, Illinois commonly known as the Boulder Hill Apartments (the "Apartments"). Through YRY and BHA, Ybarra indirectly owns and controls the Apartments.

**ANSWER: Defendants admit that "BHA is one of YRY's subsidiaries," and "BHA is the record owner of several units in an apartment complex located in Montgomery, Illinois commonly known as the Boulder Hill Apartments," Defendants deny the allegations in this paragraph.**

43.     YRY is the sole manager of BHA, thereby vesting Ybarra with complete de facto control over the management of BHA's affairs. YRY is also the sole member of BHA, which means Ybarra and his wife beneficially own 100% of BHA.

**ANSWER: Defendants admit that "YRY is the sole manager of BHA" and "YRY is also the sole member of BHA." Defendants deny the remaining allegations in this paragraph.**

44.     Upon information and belief, Teitelbaum also owned (directly or indirectly) some membership interest in BHA which he transferred to YRY prior to entering into the Agreement with Centrust. Teitelbaum's former affiliation with BHA presumably afforded him inside information regarding how Ybarra uses BHA and YRY to conceal his assets.

14

**ANSWER:** **Defendants admit that. Teitelbaum also owned (directly or indirectly) some membership interest in BHA which he transferred to YRY prior to entering into the Agreement with Centrust but lack knowledge or information sufficient to form a belief as to the remaining allegations, and on that basis deny same.**

F. **MARKOFF'S POST-JUDGMENT PURSUIT OF THE APARTMENTS**

45. Following Centrust's execution of the Agreement, CDR engaged Markoff Law, LLC ("Markoff") to collect the Judgments and generally pursue collection activities against Ybarra. In connection with its engagement, Markoff took a variety of steps to discover Ybarra's assets and collect the Judgments.

**ANSWER:** **Defendants admit that Markoff took a variety of steps to discover Ybarra's assets and collect the Judgments yet deny the Defendants deny the remaining allegations in this paragraph.**

46. Among other things, Markoff instituted post-judgment proceedings against Ybarra in the Collection Lawsuits by serving citations to discover assets upon Ybarra and others.  Eventually, Markoff was able to confirm Ybarra is the beneficial owner of the Apartments through YRY and BHA.

**ANSWER:** **Admit Markoff initiated post judgment proceedings against Ybarra in the Collection Lawsuits by serving citations to discover assets upon Ybarra and others, deny what Markoff was (or was not) able to confirm.**

47. For example, Markoff discovered YRY filed a tax return in which it indicated Ybarra owns, directly or indirectly, an interest of 100% in YRY's profits, losses, or capital. A true and correct copy of the relevant excerpt from the tax return Markoff discovered is attached hereto as **Exhibit 3**.

15

**ANSWER:      Defendants admit Exhibit 3 is an excerpt from a tax return filed by YRY, Defendants deny the characterizations and legal conclusions in this paragraph and lacks knowledge or information sufficient to form a belief as to what Markoff discovered, and on that basis denies same.**

48.      Markoff also discovered BHA's Operating Agreement, which indicates YRY is BHA's sole member and manager. A true and correct copy of BHA's Operating Agreement is attached hereto as **Exhibit 4**.

**ANSWER:      Defendants admit Exhibit 4 is a genuine copy of BHA's Operating Agreement. Defendants deny the characterizations and legal conclusions in this paragraph.**

49.      Markoff also discovered BHA received a quit claim deed (the "Deed") for most of the Apartments from an Illinois limited liability company named Boulder Hill Condominiums, LLC ("BHC") in or about 2018. A true and correct copy of the Deed is attached hereto as **Exhibit 5**. According to the Deed, BHC's manager was YRY, YRY's manager was Ybarra, and BHC received less than $100 from BHA in exchange for the Deed.

**ANSWER:      Defendants admit Exhibit 5 is a genuine copy of the Deed. Defendants deny the characterizations and legal conclusions in this paragraph**

50.      In discovery, Markoff was also able to obtain a copy of BHC's Operating Agreement. Predictably, BHC's Operating Agreement indicated YRY was BHC's sole member and manager. A true and correct copy of BHC's Operating Agreement is attached hereto as **Exhibit 6**.

**ANSWER:      Defendants admit Exhibit 6 is a genuine copy of the Deed. Defendants deny the characterizations and legal conclusions in this paragraph.**

51.      Based on the information Markoff was able to develop through discovery, as well

as Ybarra's history of employing straw companies to conceal his assets, Markoff reasonably concluded Ybarra was using YRY and BHA as his alter egos or instrumentalities to unjustly shield the Apartments from his creditors. Markoff also reasonably believed it could develop facts establishing the Apartments were transferred to BHA to hinder, delay, or defraud Ybarra's creditors. As a result, Markoff ultimately recommended to institute proceedings in the Collection Lawsuits to attach the Apartments.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the allegations in this paragraph.**

52.     As a result, Markoff filed a Motion for Judicial Determination and Other Relief Pursuant to 735 ILCS 5/2-1401 (the "Motion for Judicial Determination") on its behalf in Case 50077. A true and correct coy of the Motion for Judicial Determination – which was filed on May 30, 2019 – is attached hereto as **Exhibit 7**. In the Motion for Judicial Determination, Centrust sought to attach the Apartments and have them sold to satisfy its Judgments.

**ANSWER:     Admit a Motion for Judicial Determination was filed, a genuine copy of which is attached as Exhibit 7, Defendants lack information to form a belief as to what, if anything, this was a "result" of.**

53.     The parties never completed discovery regarding the Motion for Judicial Determination, nor did the Circuit Court ever conduct a final evidentiary hearing regarding the motion, or rule on the motion.

**ANSWER:     Defendants admit the allegations contained in this paragraph.**

54.     Before any of that could happen, Centrust assigned the Judgments to ABS, ABS assigned the Judgments to PTCV, and PTCV eventually withdrew the Motion for Judicial Determination.

**ANSWER:     Defendants admit the allegations contained in this paragraph.**

### G.     YBARRA'S CONTINUED USE OF STRAW ENTITIES

55.     Although the parties never completed discovery regarding the Motion for Judicial Determination, further evidence did emerge in the Collection Actions of Ybarra's use of straw entities to conceal his assets and implement his hidden agendas.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

56.     Specifically, upon information and belief, it appears Ybarra established PTCV to acquire the Judgments from Centrust's successor, ABS. Upon information and belief, Ybarra then had PTCV, YRY, and BHA pose as adverse parties to keep the post-judgment proceedings in Case 50077 alive, not for the purpose of satisfying the Judgments, but rather for the surreptitious purpose of conducting discovery regarding a potential malicious-prosecution suit Ybarra planned to have YRY and BHA bring against Centrust for having attempted to attach the Apartments.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

57.     In connection with his scheme, upon information and belief, Ybarra had YRY and BHA issue burdensome discovery requests to Centrust, CDR, Teitelbaum, and Markoff that primarily focused on their past efforts to collect the Judgments, rather than the merits of the pending Motion for Judicial Determination. Meanwhile, upon information and belief, Ybarra had PTCV keep the Motion for Judicial Determination pending for the sole purpose of giving the Circuit Court the false impression that there was some pending adverse claim among YRY, BHA, and PTCV regarding the Apartments that would someday require adjudication.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

58.     Eventually, the Circuit Court grew suspicious that Ybarra, YRY, BHA, and PTCV might not truly be adverse parties when CDR and Teitelbaum pointed out:

            a.     PTCV never took any concrete steps to prosecute the Motion for Judicial

18

Determination;

b.　　PTCV never conducted any discovery to support the pending Motion for Judicial Determination or defend against the adverse claims of YRY and BHA concerning the Apartments;

c.　　PTCV relied on the discovery of YRY and BHA, which were supposedly PTCV's adversaries;

d.　　PTCV exhibited tremendous passivity, if not indifference, towards YRY, BHA, and the outcome of proceedings concerning the Motion for Judicial Determination;

e.　　Ybarra's former counsel appeared to have some continuing, behind-the-scenes role in orchestrating the litigation strategies of YRY, BHA, and PTCV;

f.　　PTCV's lead attorney in Case 50077 had a long-time, close working relationship with Ybarra's former counsel;

g.　　PTCV's principal office is located at the law firm that represented PTCV in Case 50077;

h.　　The individuals behind the ownership and management of PTCV could not be determined from its filings with the Illinois Secretary of State.

i.　　PTCV was formed in the fall of 2020 by the law firm that represented it in Case 50077;

j.　　CDR and Teitelbaum tried to determine who owned PTCV from ABS, but ABS refused to disclose that information;

k.　　One of PTCV's attorneys never appeared in Case 50077 after CDR and Teitelbaum filed a motion for sanction against her; and

l.      Ybarra, PTCV, YRY, and BHA never denied they have a friendly

relationship.

**ANSWER:      Defendants deny the allegations contained in this paragraph.**

59.      Due to its suspicions, the Circuit Court entered an order on May 3, 2021 granting

Centrust, CDR, Teitelbaum, and Markoff leave to conduct discovery regarding potential

collusion among Ybarra, PTCV, YRY, and BHA. A true and correct copy of the Circuit Court's

May 3, 2021 order is attached hereto as **Exhibit 8**.

ANSWER:      **Admit that Exhibit 8 is a genuine copy of the Court's order dated May 3,**

**2021**, **Defendants deny the characterizations and legal conclusions in this paragraph**

60.      Almost immediately after the Circuit Court entered its May 3, 2021 order,

Ybarra, PTCV, YRY, and BHA suddenly submitted a joint proposed agreed order to the Circuit

Court that would withdraw the Motion for Judicial Determination and withdraw the adverse

claims of YRY and BHA. Upon information and belief, Ybarra caused PTCV, YRY, and BHA

to submit the above-referenced agreed order to the Circuit Court because he wanted to terminate

the post judgment proceedings in Case 50077 before Centrust, CDR, Teitelbaum, and Markoff

could conduct discovery regarding Ybarra's secret control over PTCV, YRY, and BHA, as well

as the collusion among PTCV, YRY, BHA, and Ybarra.

**ANSWER:       Defendants deny the allegations contained in this paragraph.**

**H.      YRY AND BHA'S THREATS AGAINST CENTRUST**

61.      To make matters worse, YRY and BHA have also repeatedly threatened Centrust

with legal action.

**ANSWER:      Defendants deny the allegations contained in this paragraph.**

62.      According to YRY and BHA, they intend to sue Centrust for "abusive" and

"frivolous" prosecution of the Motion for Judicial Determination and certain related matters. A

true and correct copy of a notice of claim (the "Notice of Claim") YRY and BHA's attorneys served on Centrust regarding their alleged claims is attached hereto as **Exhibit 9**.

**ANSWER:    Admit that Exhibit 9 is genuine and was delivered to Centrust through an attorney.**

63.     YRY and BHA served the Notice of Claim on Centrust more than seven months ago. In the Notice of Claim, YRY and BHA expressly demanded that Centrust notify its insurers of their claims. Since they served their Notice of Claim on Centrust, YRY and BHA have repeated their threats of litigation on numerous occasions, but they have never actually filed a lawsuit.

**ANSWER:    Defendants admit that YRY and BHA served the Notice of Claim on Centrust more than seven months ago, and in the Notice of Claim, YRY and BHA expressly demanded that Centrust notify its insurers of their claims. Defendants deny that "threats" were repeated on "numerous occasions." Admit no lawsuit has been filed.**

64.     Upon information and belief, Ybarra is the party responsible for causing YRY and BHA to threaten Centrust with litigation.

**ANSWER:    Defendants deny the allegations contained in this paragraph.**

### COUNT I – DECLARATORY JUDGMENT (NO MALICIOUS PROSECUTION)

65.     Centrust incorporates by reference Paragraphs 1 through 64 of its Complaint.

**ANSWER:    This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

66.     As alleged above, there is a substantial controversy between Centrust and Defendants regarding the issue of whether Centrust maliciously prosecuted claims in the Circuit Court concerning the Apartments. Defendants assert Centrust maliciously prosecuted the Motion for Judicial Determination and certain related matters in the Circuit Court; whereas

Centrust denies it maliciously prosecuted the Motion for Judicial Determination or any other matter in the Circuit Court.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required**

67.　　As alleged above, the parties have adverse legal interests in the resolution of the controversy between them. Defendants are seeking to recover damages from Centrust; whereas Centrust is seeking to avoid paying any damages to Defendants.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

68.　　As alleged above, the controversy between Centrust and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court. Defendants have served the Notice of Claim on Centrust and repeatedly threatened to file a lawsuit against Centrust. Due to Defendants' threats, Centrust has been forced to notify its insurer of a potential claim.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

69.　　Under the Declaratory Judgment Act, this Court may resolve the controversy between Centrust and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of malicious prosecution.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

70.　　In this regard, Centrust respectfully submits that it did not maliciously prosecute any claims against Defendants in the Collection Lawsuits.

**ANSWER:**    **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

71.    As alleged above, Centrust did not commence or continue any cause of action against Defendants in the Collection Lawsuits that was terminated in Defendants' favor.

**ANSWER:**    **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

72.    Nor did Centrust commence or continue any cause of action against Defendants in the Collection Lawsuits with malice or without probable cause.

**ANSWER:**    **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

73.    Instead, Centrust merely attempted to attach the Apartments because its attorneys reasonably suspected Ybarra was using YRY and BHA as his alter egos or instrumentalities to unjustly shield his assets from his creditors. As alleged above, there is an abundance of documentary proof that readily reveals Ybarra directly or indirectly owns and controls YRY and BHA. Moreover, Ybarra has a long history of employing straw companies to shield his assets and implement his hidden agendas.

**ANSWER:**    **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

74.    In addition, as alleged above, BHA received the Apartments for less than $100 from another company (BHC) directly or indirectly owned and controlled by Ybarra. As result, Centrust's attorneys also reasonably suspected the Apartments were transferred to BHA with the intent to hinder, delay, or defraud Ybarra's creditors.

**ANSWER:**    **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

23

75.     Given these facts and circumstances, Defendants do not have any valid claim against Centrust for malicious prosecution.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

WHEREFORE, Defendants, Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC, pray that this Court dismiss the instant action against them; and for such other and further relief as this Court deems just and proper.

### COUNT II – DECLARATORY JUDGMENT (NO ABUSE OF PROCESS)

76.     Centrust incorporates by reference Paragraphs 1 through 75 of its Complaint.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required**

77.     As alleged above, there is a substantial controversy between Centrust and Defendants regarding the issue of whether Centrust committed an abuse of process in connection with the Collection Lawsuits. Defendants assert the Motion for Judicial Determination and certain related matters pursued by Centrust in the Circuit Court were an abuse of process; whereas Centrust denies any such abuse of process ever occurred.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

78.     As alleged above, the parties have adverse legal interests in the resolution of the controversy between them. Defendants are seeking to recover damages from Centrust; whereas Centrust is seeking to avoid paying any damages to Defendants.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

79.     As alleged above, the controversy between Centrust and Defendants is sufficiently real and immediate to warrant the issuance of a declaratory judgment by this Court. Defendants have served the Notice of Claim on Centrust and repeatedly threatened to file a lawsuit against Centrust. Due to Defendants' threats, Centrust has been forced to notify its insurer of a potential claim.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

80.     Under the Declaratory Judgment Act, this Court may resolve the controversy between Centrust and Defendants by declaring their rights and other legal relations with respect to Defendants' allegations of abuse of process.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

81.     In this regard, Centrust respectfully submits that it did not commit any abuse of process in the Collection Lawsuits.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

82.     Centrust had no ulterior purpose or motive for pursuing the Motion for Judicial Determination, seeking attachment of the Apartments, or attempting to collect the Judgments. Centrust's sole objective was the satisfaction of the Judgments by proper legal means.

**ANSWER:     This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

83.     Furthermore, Centrust did not employ any legal process in the Collection Lawsuits that was not proper in the regular prosecution of those proceedings.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

84.     As a result, Defendants have no valid claim for abuse of process against Centrust.

**ANSWER:** **This Count was dismissed by the Court on December 16, 2021, and thus no answer is required.**

WHEREFORE, Defendants, Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC, pray that this Court dismiss the instant action against them; and for such other and further relief as this Court deems just and proper.

### COUNT III – ABUSE OF PROCESS (AGAINST DEFENDANTS)

85.     Centrust incorporates by reference Paragraphs 1 through 84 of its Complaint.

**ANSWER:** **Defendants restate their answers to paragraph 1 through 84 of the Complaint as their response to paragraph 85 of Count III of the Complaint as if fully stated herein.**

86.     As alleged above, Defendants caused YRY and BHA's counsel to serve discovery requests on Centrust in connection with the Collection Lawsuits.

**ANSWER:** **Defendants admit that discovery requests were served on Centrust in connection with the Collection Lawsuit, Defendants deny the remaining allegations contained in this paragraph.**

87.     Defendants pretended the discovery requests were served for the purpose of developing evidence to defeat the Motion for Judicial Determination and prevent PTCV from attaching the Apartments. However, Defendants' true purpose and motive for serving the discovery on Centrust was to develop evidence for a subsequent lawsuit against Centrust and others.

**ANSWER:** **Defendants deny the allegations contained in this paragraph.**

26

88.     As alleged above, Defendants also conspired to perpetuate the post-judgment proceedings in Case 50077 even though there was no legitimate adverse claim among PTCV, YRY, and BHA regarding the Motion for Judicial Determination or Apartments. Defendants perpetuated the state-court proceedings for the sole purpose of keeping those proceedings alive while they pursued unrelated discovery designed to develop evidence for subsequent litigation against Centrust and others.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

89.     It was not proper for Defendants to serve abusive discovery on Centrust in the Collection Lawsuits for information that was unrelated to the claims pending in those cases, nor was it proper for Defendants to perpetuate the post-judgment proceedings when there was no legitimate controversy among them regarding the Motion for Judicial Determination or Apartments.

**ANSWER:     Defendants deny the allegations contained in this paragraph.**

90.     Centrust has suffered significant damage because of Defendants' abuse of process in the Collection Lawsuits, including, without limitation, attorneys' fees and costs related to the Collection Lawsuits and above-referenced abusive discovery.

**ANSWER:     Defendants deny the allegations contained in this paragraph..**

WHEREFORE, Defendants, Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC, pray that this Court dismiss the instant action against them; and for such other and further relief as this Court deems just and proper.

**RUBEN YBARRA, YRY HOLDINGS, LLC AND BOULDER HILL APARTMENTS, LLC**, Defendants

By**:**      /s/ Ariel Weissberg
        One of their attorneys

27

Ariel Weissberg, Esq. (Attorney No. 03125591)
Rakesh Khanna, Esq. (Attorney No. 6243244)
564 W. Randolph St., 2nd Floor
Chicago, IL  60661
T. 312-663-0004
Email: ariel@weissberglaw.com
Email: rakesh@weissberglaw.com

Christopher V. Langone, Esq. (Attorney No. 6211105)
Langone Law LLC
2275 Half Day Road Suite 346
Bannockburn, IL, 60015
Tel. 312-720-9191
Email Chris@LangoneLaw.com

## CERTIFICATE OF SERVICE

I, Ariel Weissberg, certify that on January 28, 2022, I caused **DEFENDANTS'
ANSWER TO COMPLAINT** to be filed electronically.  Notice of these filings was sent to all
parties registered with the court's CM/ECF electronic transmission system, including to the
following parties:

Adam Brent Rome, Esq.
Zachary Mulcrone, Esq.
Greiman Rome & Griesmeyer LLC
205 West Randolph, Suite 2300
Chicago, IL 60606
Email: arome@grglegal.com; zmulcrone@grglegal.com


                        /s/ Ariel Weissberg
                        Ariel Weissberg