# IN THE UNITED STATES DISTRICT COURT
## THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CENTRUST BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-2576 |
| | ) | |
| RUBEN YBARRA, *et al.*, | ) | Judge Sara L. Ellis |
| | ) | |
| Defendants. | ) | |
| | ) | |

## CENTRUST'S OPPOSITION TO DEFENDANTS' MOTION FOR
## LEAVE TO FILE COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Plaintiff, Centrust Bank, N.A. ("Centrust" or the "Bank"), by and through its undersigned counsel, hereby opposes the Motion for Leave to File Counterclaims and Third-Party Claims (the "Motion for Leave," Dkt. 44) of Defendants, Ruben Ybarra ("Ybarra"), YRY Holdings, LLC ("YRY"), and Boulder Hill Apartments, LLC ("BHA").

Adam B. Rome (ARDC 62784341)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois 60606
arome@grglegal.com
Telephone: (312) 428-2750

*Attorney for Plaintiff, Centrust Bank, N.A.*

# **TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. FACTUAL BACKGROUND ................................................................................................. 2

III. PROCEDURAL HISTORY ................................................................................................... 4

    A.    Defendants Failed To Timely Respond To Their First Answer Deadline ...................... 4

    B.    Defendants Moved To Dismiss Arguing Their Claim Was Not Ripe............................. 5

    C.    Defendants' Discovery Schedule Failed To Expand The Case....................................... 5

    D.    This Court Granted Defendants' Dismissal Motion, In Part ........................................... 6

    E.    Defendants Hide Their Plan To Assert Counterclaims .................................................. 6

    F.    Defendants Failed To Timely Respond To Second Answer Deadline ............................. 6

    G.    Defendants Failed To Timely Assert Any Counterclaims ............................................. 7

    H.    Defendants Have Unilaterally Delayed Discovery ........................................................ 7

    I.    Defendants Moved For Leave To Amend ...................................................................... 8

IV. ARGUMENT ...................................................................................................................... 10

    A.    Defendants Caused Undue Delay and Acted in Bad Faith............................................ 10

        1.    Defendants provide no explanation for their delay ................................................. 11

        2.    No facts have changed since Centrust filed this action ............................................ 11

        3.    Granting leave to amend will require new discovery efforts..................................... 12

    B.    Granting Leave To Amend Would Cause Unfair Prejudice ......................................... 13

    C.    The Proposed Amendment Would Be Futile ................................................................ 14

        1.    The Proposed Third-Party Claim.............................................................................. 14

        2.    Champerty, Maintenance, and Barratry..................................................................... 16

        3.    Abuse of Process ...................................................................................................... 17

        4.    Consumer Fraud Act................................................................................................. 20

        5.    Tortious Interference ................................................................................................ 21

V. CONCLUSION ................................................................................................................... 22

# <u>TABLE OF AUTHORITIES</u>

**Statutes**
815 ILCS 121/1 ............................................................................................................ 20

**Rules**
Fed. R. Civ. P. 8(a) .................................................................................................... 15
Fed. R. Civ. P. 13(a)(1) .............................................................................................. 15
Fed. R. Civ. P. 14(a)(1) .............................................................................................. 15
Fed. R. Civ. P. 15(a)(1)(A) ........................................................................................ 10

**Secondary Sources**
14 C.J.S. Champerty and Maintenance § 4 ................................................................ 16
6 Charles Alan Wright, et al., Federal Practice & Procedure § 1446 (3d ed. 2010) ............ 15

**Cases**
*3Com Corp. v. Elecs. Recovery Specialists, Inc.*, 104 F. Supp. 2d 932 (N.D. Ill. 2000) .............. 20
*Berlin v. Nathan*, 64 Ill. App. 3d 940, 381 N.E.2d 1367 (1st Dist. 1978) ................................... 21
*Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482 (Ill. 1996) ............................................... 20, 21
*Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293 (7th Cir. 1993) ....................................................... 11
*Crete Carrier Corp. v. Sullivan & Sons, Inc.*, No. ELH-21-328, 2022 WL 313865
(D. Md. Feb. 1, 2022) ................................................................................................................ 15
*Dixon v. Smith-Wallace Shoe Co.*, 283 Ill. 234 (Ill. 1918) ..................................................... 19
*Doyle v. Shlensky*, 120 Ill. App. 3d 807 (1st Dist. 1983) .................................................... 17, 18
*Dunne v. Herrick*, 37 Ill. App. 180 (1st Dist. 1890) .............................................................. 21
*Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217 (7th Cir. 1988) .......................................... 12
*Galinski v. Kessler*, 134 Ill. App. 3d 602 (1st Dist. 1985) ................................................... 17
*HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145 (Ill. 1989) ............... 22
*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 393 F. Supp. 3d 745
(N.D. Ill. 2019) .......................................................................................................................... 12
*J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co., Inc.*, 265 F.R.D. 341
(N.D. Ind. 2010) ................................................................................................................... 11, 13
*Johnson v. Methodist Med. Ctr. of Illinois*, 10 F.3d 1300 (7th Cir. 1993) ................................. 13
*JS&A Group, Inc. v. Kruger*, 1985 WL 2916, (N.D. Ill. Sept. 26, 1985) ................................. 17
*King v. Cooke*, 26 F.3d 720 (7th Cir. 1994) ............................................................................ 13
*Kumar v. Bornstein*, 354 Ill. App. 3d 159 (2d Dist. 2004) ..................................................... 19
*Lake Cnty. Grading Co. of Libertyville, Inc. v. Advance Mech. Contractors, Inc.*,
275 Ill. App. 3d 452 (Ill. App. Ct. 1995) .................................................................................. 20
*Life Plans, Inc. v. Security Life of Denver Ins., Co.*, 800 F3d 343 (7th Cir. 2015) .................... 10
*McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674 (7th Cir. 2014) ....................................... 12
*McGrew v. Heinold Commodities, Inc.*, 147 Ill. App. 3d 104 (1st Dist. 1986) ..................... 18, 19
*Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711 (N.D. Ill. 2014) ............................. 17, 21
*Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849 (7th Cir. 2017) ................................. 12
*Murphy v. White Hen Pantry Co.*, 691 F.2d 350 (7th Cir. 1982) ............................................ 13
*Sanders v. Venture Stores, Inc.*, 56 F.3d 771 (7th Cir. 1995) ................................................. 11
*Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898 (N.D. Ill. 2014) ...................... 18
*Todd v. Societe Bic, S.A.*, 21 F.3d 1402 (7th Cir. 1994) ......................................................... 20
*Tribble v. Evangelides*, 670 F.3d 753 (7th Cir. 2012) ............................................................ 14
*U. S. Gen., Inc. v. City of Joliet*, 598 F.2d 1050 (7th Cir. 1979) ............................................ 15

# I. PRELIMINARY STATEMENT

More than a year into this lawsuit, and near the close of discovery, Defendants now seek leave to assert (a) omitted compulsory counterclaims against Centrust and (b) third-party claims against two non-parties. Each and every fact set forth in the proposed pleading is alleged to have occurred prior to the date Centrust filed this lawsuit. Accordingly, Defendants could and should have asserted their compulsory counterclaims in January 2022, when their answer was due.

Instead of timely filing their counterclaims, Defendants took the position that they would ***not*** be asserting any claims against Centrust. Based on that position, Defendants successfully obtained dismissal of Centrust's declaratory judgment claims as unripe. After the Court dismissed Centrust's declaratory judgment claims, this case proceeded on Centrust's narrow abuse of process claim. The abuse of process claims center around Defendants having improperly created a sham entity to control both sides of a state court post-judgment collection action. Throughout this proceeding, Defendants never suggested they might file any counterclaims. Accordingly, Centrust focused its entire discovery strategy over the past eight months solely on its abuse of process claim. Now, after lying in wait, Defendants now seek leave to assert ***the very same claims*** Defendants had argued they had no plans to file here. This Court should not countenance Defendants' bad faith litigation strategy.

Under Rule 15, this Court should deny leave to amend where—as here—the movant has caused undue delay, the amendment would cause prejudice, or the proposed claims are futile. It is particularly clear in this case that Defendants have caused undue delay, as failing to initially assert any counterclaims against Centrust was part of a well-documented litigation strategy, and Defendants have provided no other explanation for their delay.

It is also readily apparent that granting Defendants leave to amend would cause Centrust prejudice. The proposed counterclaims concern attempts to collect on judgments against Ybarra in several post-judgment collection actions, and sound in champerty, maintenance, abuse of process, the Consumer Fraud Act, and tortious interference with contract. Injecting these new legal theories (and the myriad new facts on which they are based) into this case would dwarf Centrust's narrow abuse of process claim, and would require the parties to start from square-one on discovery.

The Court should also deny leave to amend because each of the proposed claims are futile. The proposed third-party claims do not satisfy the requirements of Rule 14, as the proposed third-party defendants are not derivatively liable for Centrust's abuse of process claim. Each count of the proposed counterclaims is futile for the following reasons:

- The champerty and maintenance claims are futile because a party with an interest in the outcome of a lawsuit (like Centrust) cannot be held liable for champerty or maintenance.

- The abuse of process claim is futile because Defendants do not allege any ulterior motive or improper use of process—their claim boils down to the fact that Centrust was seeking to collect money on the judgments it owned, which is precisely the purpose of post-judgment collection proceedings.

- The Consumer Fraud Act claim is futile because post-judgment collection actions against a judgment debtor do not involve a consumer nexus or implicate any larger consumer protection concerns.

- The tortious interference with contract claim is futile because Defendants neither identify a valid contract, nor any breach of a contract.

As such, this Court should deny Defendants leave to amend.

## II. **FACTUAL BACKGROUND**

From 2006 to 2008, Ybarra was employed by Centrust as a Vice President and loan officer. (Dkt. 1 at ¶ 2). During his tenure, Ybarra used straw entities to conceal his ownership and control over Centrust borrowers—even acting as Centrust's loan officer for such loans without revealing

his control over the borrowers. (*Id.*). Ybarra also received bribes, made undisclosed personal loans to Centrust's borrowers, and released Centrust's collateral without the bank's knowledge or consent. (*Id.*). Eventually, the U.S. Department of the Treasury discovered Ybarra's illegal activities and commenced enforcement proceedings against him under 12 U.S.C. § 1818. (*Id.* at pp. 22-29). To avoid prosecution, Ybarra agreed to a consent order that barred him from the banking industry and required him to make restitution to Centrust. (*Id.*).

Ybarra also defaulted on Centrust's loans. (Dkt. 1 at ¶ 4). In 2010, Centrust sued Ybarra to collect the debts, and Centrust was awarded judgments totaling more than $2.6 million. (*Id.*). Instead of satisfying these judgments, Ybarra created an asset protection plan to shield his assets from Centrust. (*Id.* at ¶ 5). Centrust obtained information from one of Ybarra's former business associates that the asset protection plan included the use of straw companies to retain *de facto* control over a wide variety of assets, including several apartment buildings in Montgomery, Illinois. (*Id.*). Centrust's attorneys learned that Ybarra was using YRY and BHA as his alter egos to unjustly shield the Montgomery apartments from Centrust's collection efforts, and that the Montgomery apartments were transferred to BHA with the intent to hinder, delay, or defraud Centrust. (*Id.* at ¶ 7). Accordingly, Centrust attempted to attach the Montgomery apartments in post-judgment collection proceedings before the state court (the "Supplementary Proceeding"). (*Id.* at ¶ 8). Before it completed the attachment proceedings, however, Centrust sold its judgments against Ybarra to ABS Lincolnwood, LLC ("ABS"), and ABS sold them to PTCV Development, LLC ("PTCV"). (*Id.*). Once Centrust sold its judgments to ABS on July 29, 2020, it ceased to be a proper party to the Supplementary Proceeding.

Nevertheless, Ybarra's entities (as adverse claimants) continued litigating the defense of the Supplementary Proceeding *against Centrust*, as though Centrust still owned the judgments.

Even more strangely, PTCV did not attempt to collect against the judgments it had just purchased. (Dkt. 1 at ¶ 58). In the meantime, Ybarra and his straw entities repeatedly threatened Centrust with a malicious prosecution/abuse of process suit for having had the audacity to challenge the asset protection plan. (*Id*. at ¶¶ 62-63). It became apparent, based on these threats and the inexplicable behavior of the litigants to the Supplementary Proceeding, that:

- Ybarra had secretly created PTCV to acquire the judgments Centrust sold to ABS (*id*. at ¶ 56); and

- Ybarra then had PTCV, YRY, and BHA pose as unaffiliated adversaries in the Supplementary Proceeding to (i) prolong the proceedings; (ii) use the proceedings as a discovery vehicle for Ybarra's anticipated malicious prosecution/abuse of process suit against Centrust; and (iii) engineer a resolution of the Supplementary Proceeding that would bolster his anticipated malicious prosecution/abuse of process suit (*id*. at ¶¶ 56-58).

The Ybarra entities succeeded in prolonging the Supplementary Proceeding, and forcing Centrust to continue incurring expenses when it should have been out of the case. Defendants' collusive scheme resulted in nine months of extensive discovery, including third-party subpoenas, a motion to quash, and a sanctions motion. However, the bizarre, non-adversarial behavior of Ybarra's straw companies caused Judge Heneghan to ultimately conclude that something was wrong in the alignment of the parties and that Defendants might be misleading him. He then issued an opinion authorizing Centrust (and others) to serve discovery to ferret out collusion involving Defendants and PTCV. (Dkt. 1 at ¶¶ 58-59, Ex. 8). The prospect of an investigation promptly ended the attachment proceedings; Ybarra's straw companies sought leave to terminate the Supplementary Proceeding and retreated from the state court. (*Id*. at ¶ 60).

## III. <u>PROCEDURAL HISTORY</u>

### A. <u>DEFENDANTS FAILED TO TIMELY RESPOND TO THEIR FIRST ANSWER DEADLINE</u>

Centrust filed this action on May 12, 2021, (a) asserting an abuse of process claim arising

out of Defendants' conduct in the Supplementary Proceeding, and (b) seeking a declaratory judgment that Centrust did not abuse process or maliciously prosecute Defendants in that action. (Dkt. 1). YRY and BHA were required to answer by June 17 and June 18, 2021, but missed those deadlines. (Dkt. 7; Dkt. 8). On June 25, 2021—a week *after* their answers were due—Defendants moved for an extension of time to answer. (Dkt. 11). The Court granted the request. (Dkt. 14).

## B.     DEFENDANTS MOVED TO DISMISS ARGUING THEIR CLAIM WAS NOT RIPE

On July 22, 2021, Defendants moved to dismiss, in part, on the basis that Centrust's declaratory judgment counts were not ripe. (Dkt. 16). Defendants took the position that—even though they had sent Centrust a demand letter and had threatened Centrust with a lawsuit—there was no imminent threat of Defendants actually suing Centrust. According to Defendants, the claims that Centrust then anticipated Defendants filing were merely "hypothetical," "speculative," and "remote contingencies." (*Id*. at 1, 4-7). On that basis, Defendants urged the Court that they did not have a real (only a hypothetical) legal dispute against Centrust. (*Id*.). Centrust argued in response that its declaratory judgment claims were ripe because it had a reasonable apprehension of being sued by Defendants. (Dkt. 24). On reply, Defendants dismissed those concerns, arguing that there was no actual controversy of "sufficient immediacy and reality" to satisfy Article III. (Dkt. 25). Throughout their briefing, Defendants made clear that Centrust lacked a reasonable expectation of being sued. (*Id*. at 5; Dkt. 16 at 7). Such statements were misleading and false.

## C.     DEFENDANTS' DISCOVERY SCHEDULE FAILED TO EXPAND THE CASE

On July 27, 2021 (while the dismissal motion was still pending), the parties submitted their Joint Status Report. (Dkt. 19). Defendants omitted any suggestion that they would be filing counterclaims or third-party claims in this matter and created the impression that they would *not* be expanding this case. Specifically, the parties omitted any proposed dates for amendments or for adding parties. Defendants also jointly proposed a short discovery period, ending March 31,

2022. (Dkt. 19). On August 2, 2021, the Court stayed discovery due to the pending motion to dismiss. (Dkt. 20).

### D. THIS COURT GRANTED DEFENDANTS' DISMISSAL MOTION, IN PART

On December 15, 2021, the Court granted Defendants' motion to dismiss Centrust's declaratory judgment claims. (Dkt. 27). The Court accepted Defendants' arguments that the declaratory judgment claims were unripe, and held that "the Court does not find that Plaintiffs have sufficiently suggested the existence of an actual controversy at this time, instead presenting a 'merely speculative' fear of litigation." (*Id*. at 8). The Court explained, "Defendants have taken no action since [October 2020] that indicates an intention to assert any claims against Plaintiffs." (*Id*. at 9). The Court dismissed Centrust's declaratory judgment claims, and allowed Centrust's abuse of process claim against Defendants to proceed.[1]

### E. DEFENDANTS HIDE THEIR PLAN TO ASSERT COUNTERCLAIMS

On December 15, 2021, the Court entered a scheduling order with a fact discovery deadline of July 22, 2022. (Dkt. 26). The Court did not include in this scheduling order any deadlines to amend pleadings or add new parties. Centrust reasonably understood this to mean that there would be no amended pleadings or additional parties allowed in this case. Defendants never suggested to the Court that the July 22, 2022 discovery deadline would be impractical, or that they were planning to file counterclaims. (Of course, had Defendants mentioned that they *did* plan on asserting counterclaims, it would have contradicted their earlier motion to dismiss.)

### F. DEFENDANTS FAILED TO TIMELY RESPOND TO SECOND ANSWER DEADLINE

Under Rule 12(a)(4), Defendants' answers were due on December 29, 2021. FED. R. CIV.

---

[1] Defendants could have saved everyone a lot of trouble had they simply filed their counterclaims instead of moving to dismiss by creating the false impression they did not plan to sue Centrust. The Court, for instance, never would have had to waste its time addressing Defendants' ripeness arguments.

P. 12(a)(4). On January 7, 2022—more than a week *after* their answers were due—Defendants moved for an extension of time in which to answer the Complaint. (Dkt. 29). This was the ***second*** time Defendants had missed their answer deadline. (*See supra*). Defendants did not provide any explanation for the delay, and never suggested to the Court or to Centrust that they intended to file counterclaims. (*Id*.). On January 12, 2022, the Court granted Defendants' requested extension and ordered Defendants to answer by January 28, 2022. (Dkt. 31).

G.     DEFENDANTS FAILED TO TIMELY ASSERT ANY COUNTERCLAIMS

Defendants filed their Answer on January 28, 2022. (Dkt. 35). The Answer did ***not*** include any counterclaims, despite Rule 13's requirement that counterclaims be asserted when a party serves its pleading. Defendants did not suggest they might later file counterclaims against Centrust or reserve any rights in that regard.

H.     DEFENDANTS HAVE UNILATERALLY DELAYED DISCOVERY

On February 11, 2022, Centrust served requests for admission, requests for production, and interrogatories on each Defendant, and Defendants served Centrust with requests for production and interrogatories. Centrust timely served its responses to all of Defendants' discovery requests, and Defendants timely served responses to Centrust's requests for admission - ***only***. Defendants failed to timely serve *any* responses to Centrust's requests for production or interrogatories.

By April 20, 2022—six weeks *after* the due date—Centrust had still not received any response to its interrogatories or requests for production, and therefore requested a telephonic discovery conference. By April 25, 2022, Defendants had not provided any written response to the April 20th letter, so Centrust sent Defendants yet another meet-and-confer request. On May 2, 2022, Defendants sent Centrust a letter stating, "Defendants will fully comply with written discovery on or before May 11, 2022"—more than **eight weeks** after discovery responses were actually due. Centrust, however, had never agreed to this unilateral extension of time that

Defendants had apparently granted to themselves.

On their self-extended deadline of May 11, 2022, Defendants finally responded to Centrust's requests for production with boilerplate answers and objections, in violation of Rule 34. Defendants did **not**, however, produce any documents on this date, or specify another date for production, as required by Rule 34(b)(2)(A). Moreover, Defendants did **not**, as promised, provide any responses to Defendants' interrogatories.

By May 18, 2022, Defendants had *still* not responded to Centrust's interrogatories in any way, and had still only produced limited documents, so Centrust sent them another Rule 37 letter requesting a meet-and-confer. On May 31, 2022—more than **15 weeks** after the interrogatories were served, and more than **11 weeks** after responses were due—Defendants finally provided answers to Centrust's interrogatories. Defendants still had not, however, provided a sufficient privilege log and had not produced ***any*** emails between the parties.

On June 21, 2022, the Court extended the discovery deadline to October 28, 2022.[2] (Dkt. 40). On June 28, 2022, Centrust moved to compel because Defendants' discovery responses were wholly inadequate. (Dkt. 41). The Court granted that motion, and required Defendants to supplement their responses and revise their privilege log. (Dkt. 43). Although Defendants did partially comply with the Court's order, their responses and privilege log still remain inadequate ***seven months*** after Centrust first served its discovery requests. Centrust is in the process of yet again meeting and conferring with Defendants, but it expects those efforts will be unsuccessful.

## I.  DEFENDANTS MOVED FOR LEAVE TO AMEND

On July 12, 2022, Defendants moved for leave to "amend their Answer and file the

---

[2] On May 31, 2022, the Court consolidated this case with Case No. 1:21-cv-02702, for discovery purposes only. (Dkt. 36; Dkt. 39). On June 17, 2022, the plaintiffs in the related case moved to extend the discovery deadline. Case No. 1:21-cv-02702, Dkt. 36. Because the cases were consolidated for discovery purposes, the court also extended discovery here.

Counterclaims and Third-Party Complaint." (Dkt. 44 at ¶ 1). Defendants did not file a notice of motion until more than three weeks later.[3] (Dkt. 45). Attached to the Motion for Leave is Defendants' proposed "Counterclaim and Third Party Claim." (Dkt. 44-1). The proposed pleading is so expansive that it is difficult to summarize. However, broadly speaking, Defendants seek to assert claims arising out of several parties' attempts to collect on judgments against Ybarra in state court post-judgment proceedings. In other words, the proposed counterclaims arise out of the same transaction or occurrence that is the subject matter of Centrust's abuse of process claim (which, likewise, grew out of Centrust having obtained judgments against Ybarra in 2010, and which also focuses on conduct in the state court Supplementary Proceeding concerning judgments against Ybarra). Accordingly, the proposed claims are "compulsory counterclaims" under Rule 13(a)(1), which Defendants were required to assert at the time they served their original Answer.

The proposed pleading is comprised of a litany of petty grievances that, when stripped of hyperbole, spin and alarmism, represent nothing more than normal conduct by parties to post-judgment collection proceedings. Notwithstanding these infirmities, and despite that the proposed counterclaims arise out of the same transaction or occurrence as Centrust's abuse of process claim, the proposed pleading would dramatically expand the scope of, and change the very character of, this proceeding:

- Centrust presently asserts one narrow abuse of process claim against Defendants. Defendants, by contrast, seek to assert claims sounding in (a) maintenance, barratry, and champerty (Count I); (b) abuse of process (but based on different facts than Centrust's abuse of process claim) (Count II); (c) the Consumer Fraud Act (Count III); and (d) tortious interference with contract (Count IV).

- Centrust's claim is limited to the conduct in the Supplementary Proceeding (Case No. 10 L 50077, Circuit Court of Cook County). Defendants, by contrast, propose claims arising from conduct in the Supplementary Proceeding and *four other cases*: Case Nos. 10 L 50078; 10 L 50079; 10 L 50286; and 10 L 50287. (*See, e.g.*, Dkt. 44-1 at ¶ 71).

---

[3] The Court could have denied the Motion for Leave on this basis alone. *See* Local Rule 78.2.

- Centrust's claim is focused on conduct from the date it sold its judgments to ABS (July 29, 2020) until the termination of the Supplementary Proceeding (May 2021). Defendants, by contrast, base their proposed claims on related conduct going back to 2015, or earlier.

- The only parties to this action are Centrust, Ybarra, BHA, and YRY. Defendants, by contrast, seek to join CNTRST Debt Recovery, LLC ("Debt Recovery") and Bruce Teitelbaum ("Teitelbaum") as new parties.

- Centrust's claim is based on the conduct of Defendants, non-party PTCV, and their attorneys. Defendants, by contrast, propose claims concerning Centrust, Teitelbaum, Debt Recovery, Michael Tuchman, Shayarin LLC, Boulder 2011 LLC, T2, Union Bank, Select Funding, LLC, Eric Ferleger, 7550 Kingston LLC, Markoff Law, Kluever & Platt, Real Realty, and a host of other characters.

Perhaps most importantly, the proposed pleading is focused almost entirely on Debt Recovery's and Teitelbaum's alleged misconduct, *not* Centrust's actions. It would be a drastic transformation of this proceeding to focus on the alleged bad acts of two non-parties.

## IV. ARGUMENT

The Court should deny Defendants leave to amend under Rule 15. A party can amend its pleading once as a matter of course within twenty-one days after service. FED. R. CIV. P. 15(a)(1)(A). After that grace period, the plaintiff must obtain "the opposing party's written consent or the court's leave" to amend. FED. R. CIV. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* The Court, however, should deny leave to amend on the basis of "futility [of amendment], undue delay, undue prejudice, or bad faith." *Life Plans, Inc. v. Security Life of Denver Ins., Co.*, 800 F3d 343, 357 (7th Cir. 2015). Here, Defendants have caused undue delay and prejudice, they have acted in bad faith, and their proposed pleading is futile. Justice requires denying Defendants leave to amend.

### A. DEFENDANTS CAUSED UNDUE DELAY AND ACTED IN BAD FAITH

Defendants moved for leave to amend on July 12, 2022—more than a year after Centrust first filed this action; more than six months after Defendants' answer (and, thus, these proposed

compulsory counterclaims) were originally due; more than three months *after* the March 31, 2022 discovery deadline Defendants had originally proposed; a mere ten days before the first actual discovery deadline of July 22, 2022; and mere months before the extended discovery deadline of October 28, 2022.  Defendants have undoubtedly caused undue delay.

In analyzing whether the moving party has caused undue delay, courts consider "the moving party's explanation for waiting to raise the new claims, whether the moving party is attempting to introduce a new theory of the case, and whether granting the motion to amend will require new or duplicated discovery efforts."  *J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co., Inc.*, 265 F.R.D. 341, 347 (N.D. Ind. 2010) (collecting Seventh Circuit decisions).

### 1.   Defendants provide no explanation for their delay

Where the moving parties "have offered no explanation whatsoever for the delay," it weighs towards denying leave to amend.  *Sanders v. Venture Stores, Inc*., 56 F.3d 771, 775 (7th Cir. 1995).  Here, Defendants have provided *no explanation* for waiting to assert counterclaims.

### 2.   No facts have changed since Centrust filed this action

Defendants have provided no explanation for their delay because there is no valid excuse.  Every fact in the proposed counterclaim is alleged to have occurred during the Supplementary Proceeding (which ended in May 2021), or prior to the Supplementary Proceeding.  (Dkt. 44-1).  Thus, Defendants are privy to the exact same facts as they were on the date Centrust filed this action.  The fact that Defendants could have asserted their counterclaims against Centrust on the date their answer was originally due weighs heavily towards denying leave to amend.  *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1298 (7th Cir. 1993) (upholding denial of leave to amend where the "facts could have been pled at any time after the filing of the initial complaint.").

The simple truth is that Defendants' decision to withhold their counterclaims until now was not some mistake or oversight—it was a deliberate litigation strategy.  Instead of initially

answering, Defendants moved to dismiss Centrust's declaratory judgment action on the basis that they had no plans to file claims against Centrust, such that the declaratory judgment claims were unripe. After the Court accepted Defendants' argument and dismissed Centrust's declaratory judgment claims as unripe, Defendants would have looked duplicitous if they had immediately asserted as counterclaims the very claims they told the Court they had no plans to file. Waiting until now to file these compulsory counterclaims was certainly a litigation strategy. Courts have held that "[a]lthough a plaintiff ordinarily should be given at least one opportunity to amend, … she is not entitled … to amend if she made a considered, strategic choice not to include information known to her at" the time of the original pleading. *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 393 F. Supp. 3d 745, 754 (N.D. Ill. 2019); *see also Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 855 (7th Cir. 2017) (upholding denial of leave to amend where "the delay was strategic").[4]

### 3. Granting leave to amend will require new discovery efforts

Centrust has already issued first-party written discovery requests and third-party subpoenas. Centrust planned its discovery strategy based on Defendants' proposal for a brief discovery period, and on their representations that they would not be asserting claims against Centrust. Centrust's discovery requests are, therefore, focused solely on Centrust's narrow claim that Defendants abused process by creating sham litigation in the Supplementary Proceeding from June 2020 to May 2021. Although the proposed counterclaims arise out of the same transaction or occurrence as Centrust's abuse of process claim, the parties' discovery requests do **not** address

---

[4] *See also McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 687 (7th Cir. 2014) (upholding denial of leave to amend where "unexplained delay looks more like procedural gamesmanship than legitimate ignorance or oversight"); *Feldman v. Allegheny Int'l, Inc.*, 850 F.2d 1217, 1225 (7th Cir. 1988) ("[w]hile Fed. R. Civ. P. 15 favors amendments when required by justice, it is not a license for carelessness or game[s]manship.").

the issues included in Defendants' proposed counterclaims, as the proposed counterclaims are *far more expansive in scope* than Centrust's narrow claim. (*See supra*). Accordingly, if the Court were to grant leave to amend, Centrust would have to completely redo its discovery.

## B.    GRANTING LEAVE TO AMEND WOULD CAUSE UNFAIR PREJUDICE

Unfair prejudice exists where, as here, an amendment will cause the non-movant "to engage in substantial discovery." *Johnson v. Methodist Med. Ctr. of Illinois*, 10 F.3d 1300, 1304 (7th Cir. 1993). Unfair prejudice also exists where, as here, an amendment would "inject[] an entirely new theory of liability into the lawsuit…." *Murphy v. White Hen Pantry Co.*, 691 F.2d 350, 353 (7th Cir. 1982). Unfair prejudice is especially likely to result "when a combination of the [undue delay] factors listed above—delay in proceedings without explanation, no change in the facts since filing of the original complaint, and new theories that require additional discovery— occur together."[5] *J.P. Morgan*, 265 F.R.D. at 347.

"[A] party seeking an amendment carries the burden of proof in showing that ***no prejudice*** will result to the non-moving party." *King v. Cooke*, 26 F.3d 720, 724 (7th Cir. 1994) (emphasis added). Defendants fail to carry this burden. Defendants baldly state that there will be no prejudice because no oral discovery has been taken, the written discovery issued for Centrust's affirmative claim applies equally to the proposed counterclaims, there will be no need to extend any deadlines, and the parties will remain the same. (Dkt. 44 at ¶ 4). Each of these assertions is false.

**First**, the reason Centrust has been unable to take oral discovery is because of Defendants' own delay caused by moving to dismiss in bad faith (on the basis that it had no plans to assert a claim against Centrust), in having ignored the deadlines of Rule 33 and Rule 34, and in refusing to produce a complete privilege log. **Second**, as explained above, the discovery Centrust issued

---

[5] Courts should also take into account the burden on the judicial system caused by a party "changing theories midstream." *J.P. Morgan*, 265 F.R.D. at 356.

to Defendants has little to do with the proposed counterclaims—Centrust will have to redo all of its discovery. **Third**, Defendants seek to considerably expand the scope of this case and add two new parties, yet the current discovery deadline is October 28, 2022. There will *certainly* be a need to extend discovery deadlines—by a year or more—if the Court grants leave to amend. **Fourth**, the parties would *not* remain the same, and it is absurd for Defendants to have suggested otherwise. The proposed amendment seeks to add as third-party defendants Debt Recovery and Teitelbaum; *neither* of whom are currently parties to this proceeding.[6] Adding two new parties here would greatly increase the complexity of this case, the cost of litigation, the timeframe the case might be completed, and the difficulty of taking this case to trial. In short, Defendants have failed to establish that their proposed amendment would not prejudice Centrust. Centrust would plainly be prejudiced.

## C. THE PROPOSED AMENDMENT WOULD BE FUTILE

District courts enjoy broad discretion to deny leave to amend where—as here—amendment would be futile. *Tribble v. Evangelides*, 670 F.3d 753, 761 (7th Cir. 2012).

### 1. The Proposed Third-Party Claim

Defendants seek leave to file a third-party complaint against non-parties Debt Recovery and Teitelbaum. Defendants' sole explanation is:

> CNTRST Debt Recovery and Bruce Teitelbaum are Plaintiffs in case 21-02702, which has been reassigned to this Court on the basis of relatedness. **Rather than assert two counter-claims in both 21-02576 and 21-02702, Defendants seek leave to file one counter-claim** that names CNTRST and Teitelbaum as Third-Party Defendants.

(Dkt. 44 at ¶ 6) (emphasis added). This is nonsensical. To begin, Defendants' argument is based

---

[6] Defendants assert that Debt Recovery and Teitelbaum are not new parties because they are presently "Plaintiffs in a separate suit that was consolidated" with this suit. (Dkt. 44 at ¶ 6). This is misleading. The two cases have not been consolidated into a single case; they have been consolidated *for discovery purposes only*. (Dkt. 36; Dkt. 39).

on a false premise, as the two cases were consolidated *for discovery purposes only*. (*See* Dkt. 36 (requesting consolidation "for discovery purposes only"); Dkt. 39 (granting "Centrust's motion to consolidate discovery")). More importantly, the Federal Rules quite obviously do not allow a party to assert a *third-party claim* in one case instead of filing a *counterclaim* in the correct case.

In reality, Rule 14—which Defendants do not even mention—governs third-party claims. The Federal Rules allow a third-party complaint only against a "nonparty who is or may be liable to [the original defendant] for all or part of the claim against [the original defendant]." FED. R. CIV. P. 14(a)(1). In other words, the derivative liability of the putative third-party defendant is the key requirement of a third-party claim.[7] Here, however, Defendants do not allege (or argue) any derivative or secondary liability on the part of Debt Recovery or Teitelbaum. Nor could they. If Defendants are found liable for abusing process against Centrust, there is no viable theory under which Debt Recovery or Teitelbaum could be found secondarily or derivatively liable to Defendants for that claim. Because Defendants seek to assert *independent* claims against Debt Recovery and Teitelbaum, those are not proper third-party claims under Rule 14.[8]

Technical barriers aside, it would be manifestly unfair to allow Defendants to draw two new parties into this dispute at this juncture. The proposed counterclaims focus almost *entirely* on

---

[7] *See U. S. Gen., Inc. v. City of Joliet*, 598 F.2d 1050, 1053 (7th Cir. 1979) ("under Rule 14 of the Federal Rules of Civil Procedure the additional parties could not be added as third-party defendants since there was no claim that any one of the additional parties would be secondarily liable to appellants [the defendants] in the event it was found in the original cause that appellants [the defendants] were liable to appellees [the plaintiffs]."); 6 Charles Alan Wright, et al., FEDERAL PRACTICE & PROCEDURE § 1446 (3d ed. 2010) ("The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against defendant by the original plaintiff. The mere fact that the alleged third-party claim arises from the same transaction or set of facts as the original claim is not enough.").

[8] Further, unless Defendants are granted leave to file their proposed third-party complaint (which, as explained above, they cannot be), their proposed counterclaim would be invalid because a counterclaim must be tethered to "a pleading." FED. R. CIV. P. 13(a)(1). A counterclaim is not a pleading, so a counterclaim cannot be filed as a standalone document. FED. R. CIV. P. 8(a) (specifying that a counterclaim is not a type of pleading allowed under the Federal Rules); *see also Crete Carrier Corp. v. Sullivan & Sons, Inc.*, No. ELH-21-328, 2022 WL 313865, at *6 (D. Md. Feb. 1, 2022) (collecting cases).

the purported bad acts of Debt Recovery and Teitelbaum. Defendants should not be allowed to muddy up Centrust's narrow abuse of process claim against Defendants with unrelated (and procedurally improper) third-party claims in this lawsuit.

### 2. <u>Champerty, Maintenance, and Barratry</u>

In the proposed counterclaim, Defendants allege that in certain state court proceedings, Centrust entered into an agreement with Debt Recovery, by which Debt Recovery would pay for Centrust's legal fees and obtain a portion of the collections Centrust was able to recover on the judgments it then possessed. (Dkt. 44-1 at ¶¶ 37-42, 124-132). On that basis, Defendants claim Centrust is liable under the medieval theories of champerty, maintenance, and barratry. (*Id.*). A leading champerty and maintenance treatise explains these causes of action as follows:

> Maintenance is helping another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome, and barratry is a continuing practice of maintenance or champerty.
>
> Both champerty and maintenance are intended to prevent the interference of strangers having no pretense of right to the subject of a lawsuit, and standing in no relation of duty to the suitor, and to prevent traffic in doubtful claims. Champerty is the intermeddling of a stranger in the litigation of another, for profit, and maintenance is the financing of such intermeddling. Champerty differs from maintenance in that it involves compensation derived from the proceeds of the suit. Where there is no agreement to divide the thing in suit, the party intermeddling is guilty of maintenance only; but where one stipulates to receive part of the thing in suit, the person is guilty of champerty.

14 C.J.S. CHAMPERTY AND MAINTENANCE § 4.

Thus, the defining characteristic of these torts is that they are against *the intermeddler*— that is, the person improperly stirring up litigation—**not** the party who actually brings the cause of action. Here, however, the proposed counterclaim alleges that Centrust owned the judgments at issue and was attempting to collect on them. (Dkt. 44-1 at ¶¶ 20, 38). Accordingly, the intermeddler (if any) would be Debt Recovery, the party that allegedly paid Centrust's legal fees.

Because Defendants do not accuse Centrust of intermeddling in anyone else's lawsuit, there is no plausible claim of champerty or maintenance against Centrust.

The corollary of that point is that if a party has any interest in the subject matter of the litigation, that party cannot be found liable for maintenance (or, by implication, for champerty). *JS&A Group, Inc. v. Kruger*, 1985 WL 2916, at *1–2 (N.D. Ill. Sept. 26, 1985). Defendants agree that Centrust had an interest in the outcome of the post-judgment proceedings, as it owned the judgments at issue in those proceedings. (Dkt. 44-1 at ¶ 20.) Because Centrust had an interest in the outcome of the proceedings, it cannot be held liable for maintenance or champerty.

Moreover, a necessary aspect of a maintenance or champerty claim is that some party has stirred up a quarrel "with a view to promote strife or contention." *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 726 (N.D. Ill. 2014). There is no suggestion that the litigation that led to Centrust's judgments was illegitimate. Rather, the sole focus of the maintenance/champerty allegations is on the funding of *collection efforts for judgments in suits **that already occurred***. Efforts to collect on a judgment can *never* be the subject of a maintenance/champerty claim, as it is perfectly legitimate for a judgment creditor to try and collect what it is owed. There is no possible argument of "promoting strife" in such circumstances.

Because Centrust cannot be held liable for champerty or maintenance, it cannot be held liable for barratry (which is the continuing practice of the continuing practice of maintenance or champerty). Moreover, barratry did "not exist as a civil cause of action for damages at common law." *Galinski v. Kessler*, 134 Ill. App. 3d 602 (1st Dist. 1985). It is, instead, a criminal offense.

### 3. <u>Abuse of Process</u>

The first element of an abuse of process claim is "the existence of an **ulterior purpose** or motive for the use of regular court process." *Doyle v. Shlensky*, 120 Ill. App. 3d 807, 816 (1st Dist. 1983) (emphasis added). The *only* purpose Defendants ascribe to Centrust (as opposed to

Debt Recovery or Teitelbaum) is that Centrust sought to collect on the judgments it owned.[9] (*See, e.g.*, Dkt. 44-1 at ¶¶ 1, 20, 38). Indeed, Defendants specify that the purpose of the so-called "Champertous Scheme" was for "collecting the Judgments" Centrust had obtained against Ybarra. (*Id.* at ¶ 20). Collecting on judgments is not an "ulterior" purpose—it is the *entire* purpose of every post-judgment collection action. This cannot sustain an abuse of process claim. *McGrew v. Heinold Commodities, Inc.*, 147 Ill. App. 3d 104, 111 (1st Dist. 1986) (abuse of process claim fails where the conduct is consistent with the very purpose for which the process was created).

Defendants do allege that *Teitelbaum's* ulterior motive was attempting to obtain the Montgomery apartments.[10] (Dkt. 44-1 at ¶¶ 29, 135). But they do *not* allege that was an ulterior motive on the part of *Centrust*. Nor could they. Plainly, Centrust's motivation for attempting to attach the Montgomery apartments was collecting on the judgments it owned. Because the proposed counterclaim fails to identify any "ulterior" motive on Centrust's part, the claim fails.

Defendants also fail the second prong of an abuse of process claim: an act "in the use of the process" that is not proper in the regular prosecution of the proceeding. *Doyle*, 120 Ill. App. 3d at 816. "The test for sufficiency of the allegation pertaining to the second element is whether process has been used to accomplish some result which is beyond the purview of the process or which compels the party against whom it is used to do some collateral thing which he could not legally be compelled to do." *McGrew*, 147 Ill. App. 3d at 111. In this context, "'process is used in the literal, legal sense of something issued by the court … under its official seal." *Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 908 (N.D. Ill. 2014).

---

[9] In fact, Defendants suggest this purpose in the very first paragraph of the proposed counterclaim when they state that Centrust's interest in prosecuting the Supplementary Proceeding was to "extort a '$$ettlement'" from Ybarra. (Dkt. 44-1 at ¶ 1). *Of course* Centrust hoped for a settlement from a judgment debtor that owed it millions of dollars—*it was a post-judgment collection proceeding*.

[10] Defendants also allege that *Teitelbaum* had malice against Ybarra. (Dkt. 44-1 at ¶ 30). But Teitelbaum is not Centrust. And, in any event, malice is not the same as an "ulterior motive."

Defendants' overarching theory seems to be that because Ybarra did not have any interest in BHA, YRY, or the Montgomery apartments, Centrust's attempt to attach the Montgomery apartments was an act outside the purview of the process. But whether Ybarra actually had any interest in the Montgomery apartments, BHA, or YRY is irrelevant to an abuse of process claim. Indeed, even the "[i]nstitution of frivolous proceedings is insufficient conduct to support a claim of abuse of process." *McGrew*, 147 Ill. App. 3d at 112. The *McGrew* court held that the institution of wage garnishment proceedings where there was no underlying debt did not support an abuse of process claim, as the garnishment summons "were used to collect money, the very purpose for which the process was created." *Id*. at 111. Similarly, in *Dixon v. Smith-Wallace Shoe Co*., 283 Ill. 234, 242 (Ill. 1918), the Illinois Supreme Court held that there would be no abuse of process even if a creditor had filed the suit knowing it to be false at the outset and "an attachment was maliciously issued and levied upon lands and a judgment in attachment and order of sale obtained without reasonable or probable cause and without actual notice to defendant."[11] Abuse of process exists only "where a party employs [the process issued by the court] for some unlawful object or purpose [for] which it was not intended by the [court] to effect." *Dixon*, 283 Ill. at 241–242.

Defendants do not allege anything outside of the purview of process normally issued in post-judgment collection actions, or that Defendants were compelled to do anything that a court in a post-judgment citation proceeding could not compel them to do. The only process at issue in the proposed counterclaim was unquestionably intended to help collect money, which is the proper purpose of *every* supplementary proceeding.

---

[11] Further, in a case where a party failed to obey court orders, the court found no abuse of process for "procuring the writ of attachment and arrest warrant to obtain compliance with the … orders [because those] were acts that were not extraneous to the purpose of the proceedings, but were proper in the regular course of the suit." *Kumar v. Bornstein*, 354 Ill. App. 3d 159, 170 (2d Dist. 2004).

### 4. **Consumer Fraud Act**

The proposed counterclaim includes an Illinois Consumer Fraud and Deceptive Practices Act ("Consumer Fraud Act") claim. (Dkt. 44-1 at ¶¶ 138-146). The Consumer Fraud Act requires, among other things, a consumer nexus, and trade practices directed to the market generally. *3Com Corp. v. Elecs. Recovery Specialists, Inc.*, 104 F. Supp. 2d 932, 939 (N.D. Ill. 2000); *Lake Cnty. Grading Co. of Libertyville, Inc. v. Advance Mech. Contractors, Inc.*, 275 Ill. App. 3d 452, 460 (Ill. App. Ct. 1995). The proposed Counterclaim includes neither. Indeed, it would be hard to imagine anything with *less* of a consumer nexus than a bank's post-judgment collection proceeding against a particular judgment debtor. The post-judgment proceeding was a singular event—there was no consumer nexus, there were no "trade practices" directed to the market generally, and there was not even a collateral impact on consumer protection concerns.

In addition, a Consumer Fraud Act claim requires a "deceptive act." *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill. 2d 482, 501 (Ill. 1996). The supposedly deceptive act at issue here is Centrust not revealing an alleged source of litigation financing to its adversaries. We have not found a single Illinois decision suggesting that a litigant has a duty to reveal sources of litigation funding to its adversaries, or that the failure to do so is deceptive. To hold otherwise would cause a sea-change in how third-party litigation funding is handled in Illinois.[12] "[W]hen given a choice between an interpretation of Illinois law which reasonably restricts liability, and one which greatly expands liability, [a federal court] should choose the narrower and more reasonable path…." *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc).

---

[12] Even the new Consumer Legal Funding Act (which would not apply in this matter), does not require the disclosure of third-party litigation funding to defendants. 815 ILCS 121/1, *et seq.*

Moreover, a Consumer Fraud Act claim requires some proximate cause between the deceptive act and the alleged injury. *Connick*, 174 Ill. 2d at 501. There is no possible scenario in which the alleged non-disclosure of third-party litigation funding (as opposed to the litigation itself) caused Defendants injury.

Finally, the Consumer Fraud Act claim appears premised *entirely* on the theory of maintenance discussed above. (*See* Dkt. 44-1 at ¶¶ 141, 143-45). But there is simply no modern application of champerty or maintenance. "[O]ver the centuries, maintenance and champerty have been narrowed to a filament." *Miller UK Ltd. v. Caterpillar, Inc.*, 17 F. Supp. 3d 711, 727 (N.D. Ill. 2014). In fact, there was nearly nothing left of these torts in Illinois even 130 years ago, when the Illinois Appellate Court noted as follows:

> A hundred years ago Justice Buller expressed his contempt for [the doctrines of maintenance and champerty]. *Masters v. Miller*, 4 D. & E. 320. It has been so pruned away and exceptions so grafted upon it, that there is nothing of substance left of it in this State, and it has been wholly abandoned in others.

*Dunne v. Herrick*, 37 Ill. App. 180, 182 (1st Dist. **1890**); *see also Berlin v. Nathan*, 64 Ill. App. 3d 940, 956–57, 381 N.E.2d 1367, 1378–79 (1st Dist. 1978) (explaining why there is no longer any need for these torts). Were the Court to allow a maintenance claim to proceed as though it is a violation of the Consumer Fraud Act, it would reverse that trend and drastically *increase* the applicability of the tort (while also allowing recovery of attorneys' fees). Illinois courts would not allow this. Because the maintenance claim fails, so too does the Consumer Fraud Act claim.

### 5. Tortious Interference

In Count IV of the proposed counterclaim, YRY attempts to plead a tortious interference with contract claim. (Dkt. 44-1 at ¶¶ 147-150). This type of claim requires "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach

of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 154–55 (Ill. 1989) (quotations omitted). YRY does not state a valid tortious interference claim for the following reasons.

- YRY vaguely alleges that it "had a contractual relationship with its lender T2." (Dkt. 44-1 at ¶ 148). The invocation of a vague "contractual relationship" is far removed from properly pleading the existence of a valid and enforceable contract. YRY fails to allege the terms of this alleged relationship, the scope of the relationship, or any other indicia of a valid contract. Under *Iqbal/Twombly*, this is the type of conclusory allegation that the Court need not take as true.

- YRY never alleges that Centrust ever knew of its alleged "contractual relationship" with T2, let alone that Centrust knew of any specific contract within that relationship.

- YRY alleges that Centrust interfered with the alleged "contractual relationship" by "seeking appointment of a receiver knowing full well the Ruben was not a member of YRY." (Dkt. 44-1 at ¶ 149). This appears to refer back to Paragraph 56 of the proposed counterclaim, which alleges that Centrust filed motions to appoint a receiver to enforce charging orders over Ybarra's distributional membership interest in YRY. YRY does not, however, explain how merely *moving for the appointment of a receiver* could have caused the breach of any contract between YRY and T2. Indeed, there is no conceivable basis under which the mere filing of a motion could have caused the breach of any contract.

- YRY *never alleges any breach by T2* (much less a breach caused by Centrust's conduct). YRY complains that it was damaged due to "freezing [of] its bank accounts," but YRY fails to connect that freezing to any alleged breach of any contract by T2. (Dkt. 44-1 at ¶ 150).

As such, YRY does not state a valid claim for tortious interference with contract.

## V. <u>CONCLUSION</u>

For all the foregoing reasons, Centrust respectfully requests that the Court deny Defendants' Motion for Leave to Amend, and thereby reject Defendants' prejudicial (and purposeful) strategy of withholding their compulsory counterclaims until nearly the end of discovery.

Dated:  September 20, 2022

Respectfully submitted,

**CENTRUST BANK, N.A**., **Plaintiff**

*/s/  Adam B. Rome*
By:  One of its Attorneys

Adam B. Rome (ARDC 62784341)
GREIMAN, ROME & GRIESMEYER, LLC
205 West Randolph St., Ste. 2300
Chicago, Illinois  60606
arome@grglegal.com
Telephone: (312) 428-2750

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2022, I electronically filed the foregoing ***Opposition to Defendants' Motion for Leave to File Counterclaims and Third-Party Claims***, with the Clerk of the Court via the CM/ECF System, which will send notification of such filing to those registered to receive electronic notices via email transmission at the email addresses provided by them including:

| | |
|---|---|
| Christopher V. Langone | Rakesh Khanna |
| PO Box 5084 | Ariel Weissberg |
| Skokie, IL 60077 | Weissberg & Associates |
| LangoneLaw@gmail.com | 564 W. Randolph St., 2nd Floor |
| | Chicago, IL 60661 |
| | rakesh@weissberglaw.com |
| | ariel@weissberglaw.com |

I further certify that I sent the foregoing to those individuals listed below via email transmission at the email address listed before 5:00 p.m. on September 20, 2022 from 205 W. Randolph St., Chicago, IL 60606:

William Factor
Factor Law
105 W. Madison St., #1500
Chicago, IL 60602
wfactor@wfactorlaw.com

    */s/ Adam B. Rome*
    Adam B. Rome (ARDC 62784341)
    GREIMAN, ROME & GRIESMEYER, LLC
    205 West Randolph St., Ste. 2300
    Chicago, Illinois 60606
    arome@grglegal.com
    Telephone: (312) 428-2750