IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRUST BANK, N.A, | ) | |
| | ) | Case No. 21-cv-02576 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Judge Sara L. Ellis |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, | ) | Hon. Magistrate Judge Maria Valdez |
| LLC and BOULDER HILL | ) | |
| APARTMENTS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION FOR LEAVE TO FILE COUNTERCLAIMS
AND THIRD-PARTY CLAIMS**

Christopher V. Langone
205 North Michigan Ave.
Suite 810
Chicago, IL 60601
(312) 720-9191
Chris@LangoneLaw.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .(ii)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS ALLEGED IN THE PROPOSED COUNTERCLAIM . . . . . . . . . . . . . . . . . . . . 2

REPONSE TO CENTRUST'S PROCEDURAL POSTURE . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1.      Defendants withdraw, without prejudice, the request for leave
        to name the CDR Parties as Third Party Defendants in 21-cv-02576
        and will move to re-file the claims as a Counterclaim in 21-cv-02702. . . . . . . . . 13

2.      The Proposed Counterclaim Is Permissive, not Compulsory . . . . . . . . . . . . . .     13

        A.      The issues of fact and law are different. . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
        B.      *Res judicata* would not bar a subsequent suit. . . . . . . . . . . . . . . . . . . . . . . . 15
        C.      Substantially the same evidence does not support
                or refute plaintiff's claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        D.      There is no logical relation between the
                claim and the counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

3.      Just because the Counterclaim is not compulsory does not necessarily
        mean it cannot, or should not, be brought in this case. 28 U.S.C. § 1367
        gives the Court discretion to assume (or relinquish) supplemental
        jurisdiction over permissive counterclaims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.      This Court should exercise its discretion in favor
        of allowing the Counterclaim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        A.      There Has Been No "Bad Faith" by Defendants. . . . . . . . . . . . . . . . . . . . . 21
        B.      There is no estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
        C.      Defendants have not engaged in undue delay . . . . . . . . . . . . . . . . . . . . . . . .24
        D.      There is no prejudice to Plaintiffs, let alone "undue" prejudice.
                The only prejudice is they would be required to defend on the merits,
                which is same position Plaintiffs would have been in had the
                Counterclaim been asserted six months before the
                Motion for Leave was filed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5.      The Proposed Counterclaim is not futile. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     28

        A.      The proposed Counterclaim states a claim for champerty. . . . . . . . . . . . . . . 28
        B.      The proposed Counterclaim states a claim for abuse of process. . . . . . . . . . . 29
        C.      The proposed Counterclaim states a claim
                for interference with contract. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

# TABLE OF AUTHORITIES

*Adam v. Jacobs*,
  950 F.2d 89 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Adamson v. Dataco Derex, Inc.*,
  178 F.R.D. 562 (D. Kan. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bell v. Allstate Life Ins. Co.,*
  160 F.3d 452 (8th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Buford v. Palisades Collection, LLC*,
  552 F. Supp. 2d 800 (N.D. Ill. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Carey v. Neal, Cortina & Assocs.*,
  576 N.E.2d 220 (Ill. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Carlson v. Northrop Grumman Corp.*,
  2014 U.S. Dist. LEXIS 149141 (N.D. Ill. Oct. 20, 2014) . . . . . . . . . . . . . . . . . . . 27

*Channell v. Citicorp National Services, Inc.*,
  89 F.3d 379 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Cohn v. Taco Bell Corp.*,
  1993 U.S. Dist. LEXIS 13901 (N.D. Ill. Oct. 1, 1993) . . . . . . . . . . . . . . . . . . . . . 26

*Del Webb Cmtys. V. Partington*,
  2009 U.S. Dist. LEXIS 149904 (D. Nev. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Feldman v. American Memorial Life Ins. Co.*,
  196 F.3d 783 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Fuller Family Holdings, LLC v. N. Tr. Co.*,
  863 N.E.2d 743 (Ill. App. 2007) ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ginsberg v. Valhalla Anesthesia Assocs.*,
  971 F. Supp. 144 (S.D.N.Y.1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Greene v. U.S. Dep't of Educ.*,
  770 F.3d 667 (7th Cir.  2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

*In re: 100% Grated Parmesan Cheese Litigation,*
  393 F. Supp. 3d 745 (N.D. Ill. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 26, 27

*Jones v. Ford Motor Credit Co.*,
  358 F.3d 205 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co., Inc.*,
    265 F.R.D. 341 (N.D. Ind. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kleinhans v. Lisle Sav. Profit Sharing Trust*,
    810 F.2d 618, 625 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*King v. Cooke*, 26 F.3d 720 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

*Kirk v. Bd. of Ed. of Bremen Cmty. High Sch. Dist. No. 228*,
    811 F.2d 347 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*McCoy v. Iberdrola Renewables, Inc.*,
    760 F.3d 674 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc.*,
    U.S. Dist. LEXIS 21544 (N.D. Ill. Dec. 1, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Oshana v. FCL Builders, Inc.*,
    994 N.E.2d 77 (Ill. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Parker v. EMC Mortg. Corp.*,
    2014 WL 7205474 (N.D. Ill. Dec. 18, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Pipeliners Local Union No. 798 v. Ellerd*,
    503 F.2d 1193 (10th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Plant v. Blazer Fin. Servs. of Georgia*,
    598 F.2d 1357 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Sanders v. Venture Stores, Inc.*,
    56 F.3d 771 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Spencer v. Banco Real, S.A.*,
    623 F. Supp. 1008 (S.D.N.Y.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Tragarz v. Keene Corp.*,
    980 F.2d 411 (7th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Whigham v. Beneficial Fin. Co. of Fayetteville*,
    599 F.2d 1322 (4th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Worlds v. National Railroad Passenger Corp.*, No. 84-C-10027
    1988 WL 139252 (N.D. Ill. Dec. 22, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## INTRODUCTION

At the outset, it must be emphasized that Defendants never took the position that "they would not be asserting any claims against Centrust," as repeatedly, and falsely, asserted by Centrust and the CDR Parties (collectively "Plaintiffs")[1] in their respective oppositions to *Defendants' Motion Leave to File Counterclaims and Third Party Claims* ("Motion for Leave").[2] Defendants merely took the position that at the time Plaintiffs filed their respective claims for declaratory judgment (the "DJA"), it was speculative as to whether, when, where, and if so what (and against whom) – legal claims Defendants might (or might not) bring. This assertion was true at the time, and to some extent is still true.[3]

Defendants never "omitted from their motion to dismiss" their "absolute intention" to file a counterclaim." (CDR Brf., p. 8). Indeed, the Motion to Dismiss argued Plaintiffs were attacking a "purported 'malicious prosecution' lawsuit – which has <u>not yet</u>[4] even been filed… " (Motion to

---

[1] When applicable Defendants will use the naming conventions used by Plaintiffs in their respective briefs without formally re-defining them herein. Thus, the "CDR Parties" are CNTRST Debt Recovery and Bruce Teitelbaum, as defined *in CDR Plaintiff's Opposition to Defendants' Motion for Leave to Filed Counterclaims and Third-Party Claims* (Dkt. 54, p.1)(hereinafter "CDR Brf.").

[2] Centrust and CDR repeat this accusation in multiple forms throughout their briefs. For instance, the CDR Parties state: Plaintiffs "misled the Court when they did not acknowledge their intention to bring claims," (CDR Brf., p. 2) and "implied they were not going to do so." (*Id.*) The CDR Parties also accuse Plaintiffs of "sidestepping" the issue, and "argu[ing] explicitly they never intended to bring the claims identified in the demand letter." (*Id.*, p. 3), "repudiated an intent to sue," (*Id.*, p. 4) "created the false impressions they did not plan to sue," (*Id.*, p. 4) "intentionally deceived the Court," (*Id.*, p. 4) engaged in "deceptive" actions (*Id.*, pp. 4 & 9), and "Defendants actions nearly violated, and may even violate their duty of candor to the Court." (*Id.*, p. 7). Centrust also repeatedly makes similar allegations. (*See e.g.*, Centrust Brf. at pp. 1, 12, & 13).

[3] Defendants, for instance, are still considering (and investigating) whether to sue Centrust's former lawyers in Illinois State Court for their role in the champertous conduct. But Defendants should not be required to share their pending work product in pleadings. (Evidently, according to Plaintiffs, the failure to openly declare the attorney work product regarding matters being investigated is somehow an improper "concealment").

[4] The plain definition of "not yet," is a phrase "used to describe that something is expected to happen but has not for the moment…." https://www.yourdictionary.com/not-yet.

1

Dismiss at p. 2, emphasis added). Moreover, in the Motion to Dismiss, Defendants explicitly left open the possibility a state court case would be filed, stating: "even if a subsequent suit is filed in state court, jurisdiction cannot be retroactively conferred," and "if a state court case is filed then this Court would need to consider whether to abstain pursuant to the *Wilton-Brillhart* doctrine." (Motion to Dismiss, p.7 & n.3). Plaintiffs are dramatically overstating the position taken in the Motion to Dismiss in their unbounded zeal to levy charges of misconduct against their despised litigation adversary. Defendants will further address Plaintiffs' pernicious allegations of "bad faith," and "gamesmanship" later in this brief. Defendants merely want to note at the outset that these allegations are a red herring based on an "attack-your-adversary-personally" litigation strategy.

Defendants' Motion for Leave was filed on July 12, 2022, approximately six weeks after cases 21-cv-2576 and 21-cv-02702 were consolidated (for discovery purposes), and less than a month after the CDR Parties' motion to extend discovery, filed June 17, 2022. At the time the Motion for Leave was filed, there was over 90 days left in the discovery period, written discovery was still in the process of being answered, and no depositions were taken. Indeed, even now as of the filing of this brief, neither Centrust nor the CDR Parties have taken a single deposition.

**FACTS ALLEGED IN THE PROPOSED COUNTERCLAIM**

Centrust disparages the facts set forth in the proposed counterclaim ("Counterclaim") as a "litany of petty grievances." (Centrust Brf. at 9). Respectfully, seeking to "set up a contempt" and get someone jailed in order to gain settlement leverage hardly seems petty. Nor is it petty to be concerned when a person who was suffering from buyers' remorse regarding a settlement he executed, decides to stir up otherwise dormant collection litigation in order to attempt to seize ownership of an apartment building, of which he'd previously relinquished control. Barratry is a

crime, regardless of whether it also gives rise to a private cause of action. It is hardly petty. And in November 2020, Centrust made the astounding admission in interrogatory answers that:

> Centrust did not initiate the monitoring of the CNTRST collection efforts between 2015 and July 2020. Centrust did not initiate or substantively communicate with Lead Counsel about the Joint Action Recovery Plan between 2015 and July 2020. Centrust was not aware that Teitelbaum or one of Teitelbaum 's LLCs had received more than a million dollars in June 2015…

(Centrust's Answer to Interrogatory No. 12 in 2010 L 050077).[5]

The putative Counterclaim alleges that Bruce Teitelbaum ("Teitelbaum") conspired with Centrust Bank, N.A., (the "Bank" or "Centrust"), and its agent Jim McMahon ("McMahon") to use Teitelbaum's self-described "a-hole" lawyers to foment litigation for no purpose other than to extort a "$$ettlement," and/or attempt to seize an apartment complex to which Teitelbaum had relinquished claims pursuant to a prior settlement agreement. (Countercl. at ¶ 1). The counterclaim relies on quotations and email communications between Teitelbaum and McMahon, an officer of the Bank, that reveal a malicious campaign to "set up a contempt" against Ybarra to "beat him into submission." "using his own wife as the Club," and "extract a seven-figure settlement." (*Id*. at ¶ 2). Unable to conceal their glee (describing it as "drawing to an inside straight") when they drew "old man White" as their judge– a judge they noted "could make the devil cry real tears" – they, Teitelbaum and the Bank, abused the process otherwise available to legitimate judgment creditors. (*Id*. at ¶ 3). At various times, for instance, Teitelbaum and McMahon exclaimed in emails "$$ettlement time!" and "I can't wait to visit our grand apartment

---

[5]       There may be a 2-year statute of limitations expiring in November linked to the discovery rule based on this admission. This may require that Defendants filed a "protective" claim in State Court prior to this Court's ruling on this motion. As mentioned before, Defendants should not have to preview their work product as they evaluate legal positions and requirements but is doing so herein to pre-empt more frivolous accusations of "concealment" from Plaintiffs. The questions presented in this complex multi-party dispute, that spans a decade of venomous litigation, are not simple. They involve multiple issues of forum shopping, pre-emption, application of the discovery rule and pleading of archaic torts with sparse case law, as well as issues of comity and federalism. It takes time to competently investigate the multiple contours of this case.

complex when you get the keys soon." The "grand apartment complex" referred to is Boulder Hill Apartments ("Boulder Hill Apartments"), which is owned by BHA. The scheme to use litigation to take over Boulder Hill Apartments is a core allegation in the Counterclaim. (*Id*. at ¶ 4), as was Teitelbaum and McMahon's desire to "driv[e] up Ruben's attorneys' fee" (*Id*. at ¶ 5).

Part of Counter-Defendants' plan was to "set up a contempt." (*Id*.). On June 7, 2017, for instance, McMahon wrote an email that stated in relevant part, "[k]eep these updates coming, Bruce, when Judge White is really ready to jail him and/or his wife for contempt of court (and he really will do it) your lawyers will have the opportunity to extract a seven-figure settlement." (*Id*. at ¶ 6). "Take no prisoners!" Teitelbaum and the Bank repeatedly exhorted each other. They were also attempting to capitalize on the growing age-related cognitive challenges of Judge White, whom they referred to as the "dear old gentleman" who "takes longer to get there," and "the old legal lion," who "needed to retire." Teitelbaum and the Bank's pleadings were intentionally designed on their desire to capitalize on Judge White's alleged lack of memory and to deceive him into "jail[ing]" Ybarra. (*Id*. at ¶ 8).

Teitelbaum and the Bank also wanted to interfere with Ruben's existing lender relationships. In connection with the scheme to do so, the Counterclaim alleges how Teitelbaum and the Bank set up a shell entity called "CNTST Debt Recovery," which was merely a vehicle through which Counter-Defendants would implement the illegitimate and champertous goals of their secret, so-called "Cooperation Agreement." (*Id*. at ¶ 10).

The Counterclaim explained how prior to the great real estate crash of 2008 and 2009, Ruben established a real estate portfolio using money borrowed money from the Bank (the "Real Estate Portfolio"), which collapsed in 2008 and 2009, resulting in the Bank obtained various judgments by confession against Ruben, totaling over $2.6 million (collectively the "Judgments").

(*Id*. at ¶¶ 18-20). One of these Judgments was obtained on January 28, 2010, in Case Number 10 L 50077 ("Case Number 50077"), in the amount of $1,142,414.88. The Bank was not diligent in collecting the Judgments prior to being approached by Teitelbaum, who proposed the Champertous Scheme more fully described and alleged in the Counterclaim. (*Id*.).

The Counterclaim pleads in detail the background, noting that shortly after filing for bankruptcy (filed April 30, 2010), in approximately June of 2010, Teitelbaum approached Yolanda, Ruben's wife, and solicited her participation in certain business ventures and helped create various entities to pursue these ventures. (*Id*. at ¶¶ 21-24). The Counterclaim describes how in August 2014, Teitelbaum and his limited liability company, Shayarin LLC, filed suit against YRY, Boulder 2011, and Ruben (the "*Shayarin* Case."). In the *Shayarin* Case, Teitelbaum sought to dissolve Boulder 2011 LLC and to compel a sale of the Boulder Hill Apartments. (*Id*. at ¶ 26). The Counterclaim details how, in the *Shayarin* Case, Teitelbaum intentionally and falsely alleged that Ruben was a 100% member of YRY. (*Id*. at ¶ 27). The Counterclaim also notes that on April 24, 2015, Shayarin, Teitelbaum, Ruben, and YRY settled the *Shayarin* Case (the "*Shayarin* Settlement"). Pursuant to the *Shayarin* Settlement, YRY agreed to purchase, and did in fact purchase, Teitelbaum & Shayarin's membership interest in Boulder 2011 – and thus all interest in the Boulder Hill Apartments – for $1.16 million. After performance by YRY, the *Shayarin* case was dismissed in accordance with the *Shayarin* Settlement. (*Id*. at ¶ 28)

The Counterclaim alleges that Teitelbaum had no intention of honoring the *Shayarin* Settlement and alleges he had almost immediate "buyer's remorse" about the *Shayarin* Settlement, and his desire to obtain more, if not all, of the Boulder Hill Apartments for himself.. (*Id*. at ¶ 29). The Counterclaim cites to specific emails that show Teitelbaum's malice, including an email he sent on June 10, 2015, right as the *Shayarin* Settlement was taking a place. On that day, Teitelbaum

sent an email to YRY's lenders, T2 and Union Bank. The email said: "Nice Guy." Attached to the email were: (i) Select Funding's *Lis Pendens* on a property known as the Kingston Property (see below for a definition of the Kingston Property and *Kingston* Case); (ii) a consent decree between the OCC and Ruben dated December 31, 2012; and, (iii) a listing for Ruben's former home in Park Ridge, with a handwritten note, "Lost his House." The Counterclaim alleges that this email is evidence of Teitelbaum's intent and malice toward Ybarra.

The Counterclaim also alleges details concerning the Kingston case and Select Funding LLC, which holds itself out as making "hard money loans" for non-traditional investment properties. Eric Ferleger ("Ferleger"), a disbarred attorney, is alleged to be the "Office Manager" for Select Funding. Ferleger, is a friend of Teitelbaum and a part of the "mastermind" group behind the Champerty and Interference Scheme alleged herein. (*Id*. at ¶ 31). The Counterclaim describes how Select Funding held certain mortgage loans against a property in the Real Estate Portfolio, including one owned by 7550 Kingston LLC (the "Kingston Property"). Litigation was filed against Ruben and others in the Circuit Court of Cook County regarding this Kingston Property (the "*Kingston* Case"). (*Id*. at ¶ 32). The Counterclaim details how this so-called "small case" became a model Teitelbaum and McMahon sought to replicate with respect to the Boulder Hill Apartments. As Teitelbaum reported in an email dated January 24, 2019: "Was paid $245,000 from the thief [referring to Ruben] in the small case. With legal fees and additional interest it cost the a-hole somewhere around $440,000 to settle what was a $180,000 debt." And in other emails Teitelbaum and McMahon noted that their efforts were just "like the small case" only on a larger scale. For instance, as Teitelbaum noted in an email dated September 21, 2018, "Following same pattern as small case." (*Id*. at ¶ 34).

The Counterclaim also makes specific factual allegations regarding the formation of

CNTRST, the Champertous Cooperation Agreement, and the taking control of the *Kingston* Case, a/k/a "The Small Case." (*Id.* at ¶¶ 37-42). Specifically, the counterclaim alleges how on August 18, 2015, the Bank and CNTRST executed a document entitled "Agreement of Creditors" (hereinafter the "Champertous Agreement"). As to the Champertous Agreement: (i) CNTRST's alleged respective claims were not identified; (ii) the Bank identified its "respective claims," (and all of them were against Ruben and companies owned by Ruben); (iii) YRY, BHA, and Yolanda were not identified as "Debtors"; (iv) the word "assignment" did not appear anywhere; (v) the agreement was drafted by Markoff Law; (vi) Jim McMahon, the Bank's president, signed the agreement; (vii) CNTRST was responsible for hiring, paying, and directing so-called "Lead Counsel;" (viii) the Bank was to get 30% of recovered money and CNTRST was to get the remaining 70%; and (ix) the Agreement was to be kept confidential. (*Id.* at ¶ 38). From August 18, 2015, through August 21, 2019, the Bank did not disclose the existence of the Champertous Agreement to YRY, BHA, Ruben, or any state court judge in any of the proceedings pending during this timeframe. (*Id.* at ¶ 39).

The Counterclaim then goes into detail concerning: the 2016 Motions for Charging Order and Bank's knowledge that Ruben was not a member of YRY. (*Id.* at ¶¶ 43-44); the appearance of Kluever and Platt and the improper motions for a receiver (*Id.* at ¶¶ 45-65); the interference with the junior lender relationship, T2 (*Id.* at ¶ 66), the seeking and obtaining of the conditional Judgments (Counderclaim ¶¶ 67-70); and the petitions to revive. (*Id.* at ¶¶ 71-74).

The Counterclaim also alleges facts regarding what it describes as "the ambush arrest of Ruben when he voluntarily appears at a citation proceeding" (*Id.* at ¶¶ 75-79) as well as facts regarding Plaintiffs' tortious interference with BHA and its lenders. (*Id.* at ¶¶ 80-88).

The Counterclaim explained how in Spring 2019, the Bank's then-counsel, Kluever & Platt,

was permitted to withdraw as counsel of record, citing unspecified "irreconcilable differences" with the Bank. Shortly thereafter, on April 10, 2019, Markoff Law filed its appearance on behalf of the Bank. Through Markoff, the Bank filed a motion entitled *Motion for Judicial Determination* to sell the Boulder Hill Apartments. When this motion was filed, there was still no attorney of record for Ruben or YRY and BHA. And yet again, when this motion was filed, it was unverified and falsely alleged that Ruben was a member of YRY. (*Id.* at ¶ 94).

The Counterclaim highlights an email sent on June 21, 2019, where Teitelbaum wrote, among other things, "good news, current lender very pissed off…." This email shows that it was always Counter-Defendants' intent to interfere with Counter-Plaintiffs' relations with their lenders – i.e., to "piss" them off. (*Id.* at ¶ 96).

By July, 12, 2019, in Case Number 50077, YRY and BHA filed petitions to intervene in the state-court collection proceedings. (*Id.* at ¶ 96), it was only then that Defendants were able to obtain the secret Champertous Agreement, (*Id.* at ¶ 99-105). On December 31, 2019, YRY and BHA filed their notice of adverse claim in opposition to the Bank's motion for judicial determination. (*Id.* at ¶ 106). Thereafter, YRY and BHA filed their submissions, amended submissions, and replies relating to the right to and scope of discovery pertinent to resolve their notice of adverse claim and to defend against the Bank's Motion for Judicial Determination. (*Id.* at ¶ 107).

On June 29, 2020, the Bank's counsel, yet again, filed a motion to withdraw. Like Kluever & Platt, Markoff Law cited "irreconcilable differences" with the Bank. (*Id.* at ¶ 110). On July 1, 2020, the parties appeared before the State Court per the its *sua sponte* order for status on pending motions. All matters were continued until July 10, 2020. The State Court ordered James McMahon, the President of the Bank, and Teitelbaum, the President of CNTRST, to be present on July 10, 2020, so that discovery and the briefing of motions could be addressed. (*Id.* at ¶ 111).

On that date, the parties appeared before the State Court for status. Markoff Law's motion to withdraw as the Bank's fourth counsel of record was granted. The State Court ordered the Bank's new counsel, their fifth, to file their appearance by July 31, 2020. The State Court further ordered that McMahon and Teitelbaum participate in the next court proceeding on August 4, 2020. The State Court repeatedly reiterated that it wanted to move the case along. Teitelbaum announced that the Champertous Agreement was soon to be terminated and CNTRST will "be exiting the case." (*Id*. at ¶ 112). On July 28, 2020, Teitelbaum sent an email to the parties and to the Court advising that the Champertous Agreement had been terminated and that McMahon would distribute proof shortly. (*Id*. at ¶ 115). On July 29, 2020, McMahon circulated the Termination Agreement to the parties and to the State Court and announced the Bank would not be engaging counsel. The Termination Agreement was dated July 10th, the same day as the last court appearance. The Termination Agreement recited: (i) mutual releases between the Bank and CNTRST; (ii) CNTRST was not entitled to payment or reimbursement of costs while the Agreement of Creditors (i.e., the Champertous Agreement") was in effect; and (iii) required CNTRST to indemnify the Bank for damages and attorneys' fees incurred or asserted against the Bank. (*Id*. at ¶ 116). Finally, the counterclaim alleges all the Counter-Defendants are jointly and severally liable for the claims alleged herein. (*Id*. at ¶¶ 118-122).

The Counterclaim alleges claims for: (a) champerty (Count I, ¶¶ 123-132); (b) abuse of process (Count II, ¶¶ 133-137); (c) Unfair and Deceptive Acts and Practices (Count III, ¶¶ 138-146); and (d) Tortious Interference with Contract (Count IV, ¶¶ 147-150).

### REPONSE TO CENTRUST'S PROCEDURAL POSTURE

Typical of its "sully-your-adversary" tone in this litigation, Centrust's jaundiced recitation of the procedural posture is seeping with accusation and blame. Much of it is irrelevant to the

actual legal issue presented by the Motion for Leave. Defendants will only respond briefly to some of the arguments set for in Section III of Centrust's brief.

Section III-A is irrelevant, whether a party is tardy in filing their initial answer is not relevant to whether they should be granted leave to amend their answer pursuant to Rule 15.

Section III-B makes the false accusation that Defendants made "misleading and false" statements regarding their intention to sue (or not sue). This is addressed in argument 4-A below.

Section III-C asserts "Defendants' discovery schedule failed to expand the case," whatever that means. In this Section, Plaintiffs state that the July 27, 2021, Joint Status Report "omitted any suggestion they would be filing counterclaims" and "created the impression they would not be expanding this case." (Centrust Brf., p. 5). Somehow, Plaintiffs fault Defendants for agreeing to their proposed discovery deadlines. Plaintiffs could have requested to include a date to amend pleadings, should that have been of concern to them. The inferences Plaintiffs seek to draw from the July 2021 Joint Status Report are not warranted. Indeed, the undersigned counsel was only first retained by Defendants in July 2021 and had very little knowledge of the details of the state court matters, which was still theoretically being handled by Mr. Tannen at that time.

Section III-D correctly notes that this Court dismissed the DJA portion of Plaintiffs' respective complaints. As noted in Argument 4-B below, (and in the Introduction, above), there is nothing in this Court's opinion that suggests it relied on any "promises" (or representations) by Defendants "not to sue." To the contrary, the Court stated: "aside from the <u>uncertainty</u> that accompanies waiting to see <u>if Defendants do indeed file suit</u>, Plaintiffs have not identified any harm they face" (Opinion, Dkt. 27, at p. 9), showing that this Court clearly understood that there still existed a possibility that Defendants would indeed file a lawsuit against Plaintiffs. The Court saw the DJA for what it was: "an attempt by Plaintiffs to obtain a friendly venue for resolution

of a potential future lawsuit." (Id., at 9; the Court's quotation from the *Hyatt* case is also applicable here). Plaintiffs should not be able to gain offense from their forum shopping. Given the frequency of Plaintiffs' allegations of "gamesmanship," and litigation "strategy," one should wonder if there might be a bit of pot and kettle calling here.

Section III-E is provocatively entitled "Defendants hide their plan to assert counterclaims." In this section, Plaintiffs note that a scheduling order was entered on December 5, 2021, and that the Court did not include a deadline to amend the pleadings in this order. From this, Plaintiffs infer that Defendants were hiding something? The fact that Centrust "understood" the Court's Order to mean that there would be no amended pleadings is not a reasonable inference. Centrust states "Defendant's never suggested … they were planning to file counterclaims."[6] There is no evidence that Defendants were, in December 2021, planning to file *counterclaims*. Perhaps at that time, Defendants were planning on filing a separate state court action (or nothing at all.) Undersigned counsel affirmatively represents that as of December 2021, he was in the midst of his investigation pursuant to Illinois Supreme Court Rule 137. At that time, in December 2021, all of the applicable statutes of limitations were still well into the distance, and none of the contemplated claims were perceived as compulsory counterclaims. Quite simply, there was no "plan" to file *counterclaims* in December 2021. Admittedly, that did change in the next six months based on the manner in which discovery was proceeding, as well as other factors, including increasing concerns regarding whether Plaintiffs might, at some time, seek to claim that the claims might be compulsory to this action, and barred by virtue of claim preclusion if not asserted herein as a Counterclaim.

---

[6]    Again, it is unclear why a litigant should be compelled to announce their "plans" when those "plans" (and potential strategies) are still in the work-product / investigation phase.

11

Section III-F, like Section III-A, asserts that "Defendants filed to timely respond to their second answer deadline." Like the argument advanced in Section III-A, this is irrelevant; whether a party is tardy in filing their answer is not relevant to whether they should subsequently be granted leave to amend the answer to assert a counterclaim.

Section III-G notes that a Counterclaim was not included in the Answer and Affirmative Defenses filed on January 28, 2022, and that Defendants did not "reserve and rights in that regard." There is no requirement in the Federal Rules that a party "reserve" rights to seek to later amend under Rule 15.

Section III-H tries to blame Defendants for "unilaterally" delaying discovery. But this is not accurate. Defendants timely responded to the numerous requests for admission. Requests that, by the way, go far beyond the supposed "narrow" abuse of process claim. While it is true that Defendants did not respond to the interrogatories and document requests before the March 14, 2022, due date, it is also true that Centrust did not seek a Rule 37.2 conference until more than a month thereafter. In response, Defendants promised to respond to discovery – and did in fact respond – by May 11· 2022. Plaintiffs claim Defendants did not produce documents on this date, but neglect to mention that all these documents were provided months earlier contemporaneous with Defendants' Rule 26(a) disclosures.

In sum, written discovery began, in earnest, on May 31, 2022. Prior to that, both sides had served their first wave of written discovery, and responded to each other with boilerplate objections, as its too often typical. But unlike Plaintiffs, by May 31, 2022, Defendants had responded with extensive, substantive answers to discovery, which Plaintiffs still have not done. And Defendants provided a detailed privilege log, which was time-consuming and expensive to produce. Plaintiffs have still not produced any form of privilege log. May 31, 2022, was also the

date the cases were consolidated for discovery purposes. At the time the cases were consolidated, the discovery deadline was only seven weeks away, and was subsequently extended for a period of approximately three months. The discovery deadline was extended on June 21, 2022. Three weeks later, on July 12, 2022, the Motion for Leave was filed.

## ARGUMENT

1.  **Defendants withdraw, without prejudice, the request for leave to name the CDR Parties as Third Party Defendants in 21-cv-02576 and will move to re-file the claims as a Counterclaim in 21-cv-02702.**

Both Centrust and the CRD Parties object to Defendants seeking to amend the pleading in Case 21-cv-2576 to add the CDR Parties as third-party Defendants. This objection is based on the grounds that cases 21-cv-02576 and 21-cv-02702 (both of which are pending before this Court) were consolidated for discovery purposes only. Plaintiffs overlook that they were also consolidated pursuant to Local Rule 40 (relatedness) in part, on the grounds that the two cases are "susceptible of disposition in a single proceeding." *See* Local Rule 40.4(b)(4). Defendants were genuinely trying to act in the interest of economy by seeking to assert all claims in one (the lower numbered case) case in this consolidated action. But since Plaintiffs in both cases object, Defendants will withdraw, without prejudice, the Motion for Leave to file a counterclaim in 21-cv-02576, and formally refile it in case 21-cv-02702.

2.  **The Proposed Counterclaim is Permissive, not Compulsory.**

Defendants believe it is important for this Court to determine whether the proposed Counterclaim is permissive or compulsory. Defendants believe this decision has significant bearing on the underlying issue of whether to grant leave to amend, as the compulsory or permissive nature of the counterclaims are fundamental in weighing the interests of justice and hardships to the respective parties. If the Counterclaim is compulsory, and leave to amend is

13

denied, then that would bar the claims entirely – a harsh result. If the Counterclaim is permissive, and leave to amend is denied, it still can be filed in state court, which was Defendants' preferred forum before Plaintiffs raced to court and attempted to file pre-emptive litigation here. And, if the Counterclaim is deemed permissive, as Defendants believe, and leave to amend is granted as Defendants request, then this Court could decide to exercise (or decline) supplemental jurisdiction pursuant to 28 U.S.C. 1367.

Plaintiffs assert – without analysis, citation to case law, or reference to the legal standard for determining whether a counterclaim is permissive or compulsory – that the proposed counterclaim is "compulsory." Defendants contend that the proposed Counterclaim is merely permissive, not compulsory. "A counterclaim is compulsory if: (1) the issues of fact and law raised by the claim and counterclaim are largely the same; (2) *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule; (3) substantially the same evidence supports or refutes plaintiff's claims as well as defendant's counterclaim; and (4) there is a logical relation between the claim and the counterclaim." *Adamson v. Dataco Derex, Inc.*, 178 F.R.D. 562, 564 (D. Kan. 1998). See also *Pipeliners Local Union No. 798 v. Ellerd*, 503 F.2d 1193, 1198 (10th Cir. 1974). Cf. *Whigham v. Beneficial Fin. Co. of Fayetteville*, 599 F.2d 1322, 1323 (4th Cir. 1979) (creditor's action on underlying debt not compulsory to plaintiff's Truth in Lending claim). Based on these factors, the proposed Counterclaim is permissive, not compulsory.

### A. The issues of fact and law are different.

Centrust, itself, details why the facts and law are different in its bullet-pointed list on pages 9 and 10 of its brief. In those five bullet points, Centrust admits: (a) Defendants' abuse of process claim is "based on different facts than Centrust's abuse of process claim;" (b) Centrust's claim is "limited to the conduct in the Supplemental Proceeding," and "Defendants, by contrast, propose

claims arising from conduct in the Supplementary Proceeding and four other cases" (c) "Centrust's claim is focused on conduct from the date it sold its judgments to ABS (July 29, 2020) until the termination of the Supplementary Proceeding (May 2021). Defendants, by contrast, base their proposed claims on related conduct going back to 2015 or earlier" (d) CDR and Teitelbaum are new parties; and "Centrust's claim is based on the conduct of Defendants, non-party PTCV, and their attorneys. Defendants, by contrast, propose claims concerning Centrust, Teitelbaum, Debt Recovery, Michael Tuchman, Shayarin LLC, Boulder 2011 LLC, T2, Union Bank, Select Funding, LLC, Eric Ferleger, 7550 Kingston LLC, Markoff Law, Kluever & Platt, Real Realty, and a host of other characters." (*Id.*, bullet 3 on page 10). Moreover, as quoted earlier, Centrust admits: "Injecting these new legal theories (and myriad new facts on which they are based) into this case would dwarf Centrust's narrow abuse of process claim." (Centrust Brf., p. 2).

### B. *Res judicata* would not bar a subsequent suit.

Illinois does not have a compulsory counterclaim rule. 735 ILCS 5/2-608(a) states that a party "may" assert a counterclaim. See also *Kirk v. Bd. of Ed. of Bremen Cmty. High Sch. Dist. No. 228*, 811 F.2d 347, 355 n.11 (7th Cir. 1987). As a result, a party's failure to assert a counterclaim that it could have asserted on a permissive basis does not preclude it from asserting the claim in a separate suit. *Id.* at 355.

Illinois courts at times have noted that, because "counterclaims are generally permissive rather than mandatory," *res judicata* does not always bar a defendant from bringing a claim against a plaintiff "by way of a separate action" in lieu of bringing a counterclaim in the initial suit. *Fuller Family Holdings, LLC v. N. Tr. Co.*, 863 N.E.2d 743, 755-56 (Ill. App. 2007). *Res judicata* bars a defendant from bringing a new suit only if success in that suit "would nullify the initial judgment or would impair rights established in the initial action." *Carey v. Neal, Cortina*

15

*& Assocs.*, 576 N.E.2d 220, 223-27 (Ill. App. 1991) (quoting Restatement Second of Judgments § 22 (1982)) (emphasis omitted); *see also Oshana v. FCL Builders, Inc.*, 994 N.E.2d 77, 87-88 (Ill. App. 2013).[7] Thus, the Seventh Circuit likened the "compulsory" nature of counterclaims to the factors evaluated in considering *res judicata*. *Greene v. U.S. Dep't of Educ.*, 770 F.3d 667, 669-670 (7th Cir. 2014).

### C. Substantially the same evidence does not support or refute Plaintiffs' claims.

Plaintiffs, themselves, by virtue of their responses to Defendants' discovery requests, do not believe that the same evidence is relevant to Plaintiffs' claims. To almost each and every request propounded by Defendants, Plaintiffs claimed the requests were not relevant to any issue in this case. The requests are clearly relevant to the proposed Counterclaim. They are perhaps relevant to the "narrow abuse of process claim" depending, of course, on how broadly the "transaction" is perceived. Plaintiffs want a broad construction of "transaction" when it comes to whether the counterclaim is compulsory, but a narrow one with respect to the "relevance" of discovery requests. Plaintiffs should not be able to have it both ways. Ascertaining the "relevance" of the discovery requests involves interpreting the scope of the "transaction," just as does determining the compulsory or permissive status of the putative Counterclaim.

---

[7]    The precise degree of leeway given defendants appears to be an open question. One view holds that the "question of whether *res judicata* bars bringing a permissive counterclaim in a separate action essentially collapses into the question of whether the second requirement of res judicata is met," *i.e.*, whether the two causes suits derive from a single group of operative facts. *Buford v. Palisades Collection, LLC*, 552 F. Supp. 2d 800, 806-07 (N.D. Ill. 2008). Another suggests the principal justification for allowing a defendant, consistent with *res judicata*, to file a new suit in lieu of bringing a permissive counterclaim in the original suit—that a "defendant generally should not be forced to assert his claims in the plaintiff's forum or proceeding but should be free to bring a separate action" if he so wishes, *Carey v. Neal, Cortina and Assoc.*, 576 N.E.2d 220, 223, 216 Ill. App. 3d 51 (1991).

### D. There is no logical relation between the claim and the counterclaim.

Although the "logical relationship" test does not require "an absolute identity of factual backgrounds," *id.* (internal citation omitted), the "'essential facts of the claims [must be] so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Adam v. Jacobs*, 950 F.2d 89, 92 (2d Cir. 1991). The only logical relation between Defendants' Counterclaim and Plaintiffs' claim is that they involve an overlapping phase in collection litigation. Much like cases where misconduct is involved in an underlying employment relationship,[8] this is not a sufficient logical relationship.

For instance, Centrust's own description of its cause of action shows Defendants' proposed counter-claims are not compulsory, but rather permissive. Centrust states:

> After the Court dismissed Centrust's declaratory judgment claims, this case proceeded on Centrust's **narrow abuse of process claim**. The abuse of process claims **center around** Defendants having improperly **created a sham entity** to control both sides of a state court post-judgment collection action.

So, according to Centrust, the underlying transaction is the alleged creation of a sham entity (PTCV) to control "both sides" of State Court litigation. Unless, of course, the scope of the "transaction" is expanded. It could be said, for instance, that the transaction is the entirety of the Supplemental Proceedings before Judge Heneghan; or broader yet, the proceedings before Heneghan and White; or even broader, the entire effort to collect the Judgments; or broader yet, the litigation history between the parties; or even – as Centrust details in its complaint – the entire

---

[8]     *See, e.g., Spencer v. Banco Real, S.A.,* 623 F. Supp. 1008, 1011-12 (S.D.N.Y.1985) (counterclaims alleging that plaintiff misappropriated trade secrets and customer lists during employment not "logically related" to plaintiff's Title VII claims); *Ginsberg v. Valhalla Anesthesia Assocs.,* 971 F. Supp. 144, 147 (S.D.N.Y.1997) (counterclaim alleging breach of contract by employee not sufficiently related to discrimination claims where "sole connection is that the counterclaim relates to plaintiff's employment"); *Worlds v. National Railroad Passenger Corp.,* No. 84-C-10027, 1988 WL 139252, at *6 (N.D. Ill. Dec. 22, 1988) (counterclaim alleging fraudulent conduct by employee not sufficiently related to discrimination claim).

employment and post-employment relationship between these litigants. Indeed, this is the precise problem of infinite regress identified by the Seventh Circuit in *Greene v. U.S. Dep't of Educ.*, 770 F.3d 667 (7th Cir. 2014). There, the Court stated: "It isn't true that any counterclaim that *ultimately* arises out of the same transaction or occurrence as the other side's claim must be filed or lost. That could allow an infinite regress." *Id*. at 669.

This "regress" is exemplified further in the following statement made by Centrust: "the proposed counterclaims arise out of the same transaction or occurrence that is the subject matter of Centrust's abuse of process claim (which, likewise, grew out of Centrust having obtained judgments against Ybarra in 2010)…" And taking it further, these judgments arose out of Ybarra's misconduct when employed by the bank, etc. It is for this reason that Centrust's "arose-out-of" link chain is not the proper test to apply in determining whether the proposed Counterclaim is compulsory or permissive. Instead of trying to linguistically lasso the scope of a "transaction," the Seventh Circuit endorses examination of the four factors discussed above.

**3.     Just because the counterclaim is not compulsory does not necessarily mean it cannot, or should not, be brought in this case. 28 U.S.C. § 1367 gives the Court discretion to assume (or relinquish) supplemental jurisdiction over permissive counterclaims.**

Back in the day, there were applicable legal concepts such as ancillary and pendent jurisdiction. Those concepts became moot when 28 U.S.C. § 1367 ("Section 1367") was enacted. But at the time, the question existed whether Section 1367 was a codification of, or replacement of, the old doctrines of ancillary and pendent jurisdiction. The issue was relevant because there was a then-prevalent question of whether permissive counterclaims needed to show an independent basis for federal jurisdiction. See, e.g., *Plant v. Blazer Fin. Servs. of Georgia*, 598 F.2d 1357, 1359 (5th Cir. 1979). That question has since been answered – the answer is no, they do not. The case

law, however, examining the question of what is permissive and what is compulsory made in that context, is still relevant to the question presented herein.

Moreover, beyond that, still lurks the Section 1367 determination itself. This is because if the Court determines that the Counterclaim are permissive, and not futile, and there was no undue delay, or undue prejudice, then the Court still needs to determine whether, in its discretion, it should (or wants to) exercise discretion over those claims via supplemental jurisdiction as codified in Section 1367. Further briefing may be required on that issue.

*Channell v. Citicorp National Services, Inc.*, 89 F.3d 379 (7th Cir. 1996) is applicable here. In *Channell*, the Seventh Circuit vacated the dismissal of a permissive counterclaim and remanded for exercise of the discretion contemplated by Section 1367. *Channell* involved a creditor's counterclaim to collect debts in a class action alleging violations of the Consumer Leasing Act. The Court stated, "Now that Congress has codified the supplemental jurisdiction in § 1367(a), courts should use the language of the statute to define the extent of their powers." *Id.* at 385. The Court viewed section 1367's reach to the constitutional limits of Article III as requiring only "[a] loose factual connection between the claims," *id.* (internal quotation marks omitted), a standard that appears to be broader than "a common nucleus of operative facts." In *Channell*, the Court found the requisite "loose connection" to exist between the Consumer Leasing Act claim and the debt collection counterclaim. *Id.* at 385-86. The same situation exists here. The factual connection is not so close as to make the Counterclaim compulsory, but is sufficiently loose to be part of the same Article III controversy.

This was also the result in *Jones v. Ford Motor Credit Co.*, 358 F.3d 205 (2d Cir. 2004). There, the plaintiffs, both individually and as a class, brought an action against the defendant for racial discrimination under the Equal Credit Opportunity Act (ECOA). *Id.* at 207. The defendant

counterclaimed for the amount of the plaintiffs' unpaid car loans. The plaintiffs moved to dismiss the counterclaim, and the district court granted the motion on the grounds that the counterclaims were permissive, and as state law claims, had no independent subject matter jurisdiction. *Id.* at 208. The Second Circuit agreed with the district court that the counterclaims were permissive, finding that "[t]he essential facts for proving the counterclaims and the ECOA claim are not so closely related that resolving both sets of issues in one lawsuit would yield judicial efficiency." Nonetheless, the court found that the facts surrounding the defendant's counterclaims and the main ECOA claim had enough of a loose factual connection to satisfy the "same case or controversy" requirement of Article III, and therefore § 1367, even if the relationship was not enough to make the counterclaim compulsory. That loose factual connection was that both the ECOA claim and the debt collection claims arose from the plaintiffs' decisions to purchase the defendant's cars. In making its holding, the Second Circuit relied heavily on the Seventh Circuit's ruling in *Channell.* After holding that the permissive counterclaim was subject to supplemental jurisdiction under § 1367(a), the court then remanded the case to the district court so that it could consider the discretionary factors in § 1367(c). If the Court requests briefing on the Section 1367 factors, Defendants are prepared to do so. The issue may, however, be premature at this time.

Because the proposed Counterclaim is permissive, there is no *requirement* that it be asserted in this action, but it can be *permitted* here. Defendants are only seeking to do so in the interests of judicial economy. If the Court denies leave to amend the proposed permissive Counterclaim, it can still be asserted in Illinois State Court. Illinois is not a compulsory counterclaim jurisdiction. But Defendants do not want to risk the claims being barred later under a doctrine of *res judicata*. If the Counterclaim is compulsory, however, Defendants have no choice but to relent, and proceed in the forum to which Plaintiffs strategically raced.

**4.** **This Court should exercise its discretion in favor of allowing the Counterclaim.**

**A.** **There Has Been No "Bad Faith" by Defendants.**

Plaintiffs' response is provocative and falsely accusatory regarding Defendants' position in their motion to dismiss the declaratory judgment action ("Motion to Dismiss"). Centrust, for instance, asserts: "Defendants took the position they would **not** be asserting any claims against Centrust." This is not true. The CDR Parties go even further, stating "Defendant's actions nearly violate, and may even violate, their duty of candor to the Court." (CDR Brf., p. 7). This is, quite frankly, offensive. Yes, there is bad blood between these parties – but to suggest ethical impropriety on the part of opposing counsel transcends the bounds of decency.

First, there was never a statement that Defendants would never file a counterclaim (or state court complaint). The only assertion – which was, and is a true one – was that at the time the declaratory judgment action was filed, the potential claims were unripe and too ambiguous and undefined. As noted in the Introduction, the Motion to Dismiss explicitly referenced the possibility a lawsuit might be filed, stating: "....even if a subsequent suit is filed in state court, jurisdiction cannot be retroactively conferred" and noting that no state court case had "not yet" been filed. Motion to Dismiss at p. 2, 7, & n.3).

Second, the claims that were threatened in the Tannen demand letter (negligence and interference with contract), the claims that Plaintiffs sought a declaratory judgment regarding malicious prosecution and abuse of process, and the claims Defendants now seek to bring (champerty, abuse of process, interference with prospective economic advantage, and consumer fraud), do not correspond. No negligence claim was ever brought, nor was a declaratory judgment ever sought for such a claim. No malicious prosecution claim was ever asserted, showing there was no need for a declaratory judgment regarding such a claim. The claims for champerty and

consumer fraud were not mentioned in either the demand letter or the putative declaratory judgment action. Plaintiffs were guessing at possible claims Defendants might bring, and the fact they were guessing (and only guessed partially correct – i.e., one claim out of four) shows their Declaratory Judgment Action was premature. What Defendants asserted was true – it was speculative in 2021 regarding what claims, if any (where and against whom), Defendants might seek to bring, and against whom and in what forum. Indeed, if Plaintiffs never "raced" to federal court in an effort to launch their pre-emptive ligation attack, perhaps no claims would have been brought at all against anyone.

As argued in the Motion to Dismiss, at page 3:

The Demand Letter was sent by attorney Michael Tannen, on behalf of YRY and BHA, almost a year ago. The Demand Letter does not purport to be written on behalf of Ybarra, and does not threaten any action against Plaintiffs herein (it threatens an action against Centrust Bank, which is not a party to this lawsuit). Indeed, the Demand Letter does not even threaten a claim for "malicious prosecution," or "abuse of process" (as Counts I and II seek a declaratory judgment regarding) but rather for negligence and intentional interference with contract and prospective economic advantage. (See Exhibit 1). The claim for declaratory judgment action is really a request for an advisory opinion about a hypothetical and contingent dispute – a dispute that does not even involve the Plaintiffs herein.

Defendants took the position that as of the date the declaratory judgment action was filed (which is when jurisdiction is measured), it was too speculative to conclude, at that time, that a dispute was ripe. Circumstances change. Perhaps if the Plaintiff never attempted to forum shop and file a pre-emptive lawsuit the Pandora's box of litigation would never have been opened. But Plaintiffs opened it, not Defendants. Defendants never "promised" they would never seek to sue Centrust, or anyone else. Centrust is correct, "Defendants successfully obtained dismissal of Centrust's declaratory judgment claim as unripe." At the time, it was unripe.

The CDR Parties state: "At best, Defendants created the false impression they did not plan to sue the CDR Parties, and at worst, they intentionally deceived the Court." (CDR Brf., p. 4). This

is not accurate. Plaintiffs overlook the distinction between considering and investigating, threatening, and even fully intending on suing someone, and seeking a declaratory judgment on specific claims, which are hypothetical and mere guesses as to what claims might someday be asserted. At the time Plaintiff's filed their pre-emptive declaratory action, they speculated about what claims Defendants might bring, if any. Based on the threat letter sent by Michael Tannen, which referenced negligence and malicious prosecution, they ran to court seeking to declare there was no malicious prosecution. Malicious prosecution is not even of the claims sought to be pursued in the proposed Counterclaim.

To be clear, Ybarra has never denied that he had been considering suing Defendants (and indeed, potentially their state court lawyers, along with Ferleger) for what they did to him, his family, and his legal and business interests. He has consulted lawyers on this topic. Such entries show in the privilege log tendered to Plaintiffs. It was, as Plaintiffs note, "no secret." But planning and striking are two different things. And pre-emptively striking, as Plaintiffs have, is an altogether different third thing.

Undersigned counsel has been engaged in Rule 11 and Rule 137 investigation regarding Defendants potential claims, as is his independent and non-delegable duty. A competent Rule 137 investigation takes time, especially in a fact-pleading jurisdiction like Illinois state court. Illinois State court is, and would have been, Defendants' preferred forum for this dispute. And if the proposed Counterclaim is indeed permissive, then there would never have been a need to seek to assert it herein. So long as it was filed in State Court prior to the expiration of the statute of limitations; the cases are apples and oranges.

But what if the Counterclaim is compulsory? Without waiving work product, that issue weighed into the circumstances and timing of the Motion for Leave. Frankly, undersigned counsel

does not want to be "wrong" after-the-fact on the permissive / compulsory determination. So, in an abundance of caution Defendants decided to seek to assert them (at least as to these parties) in this federal forum, chosen by them. Defendants must succumb to Plaintiffs' forum shopping, lest they be wrong on a close issue of law (compulsory vs. permissive) and risk a claim preclusion.

**B.  There is no estoppel.**

The CDR Parties argue estoppel (CDR Brf., pp. 9-10) but do not discuss its three elements.: (1) whether "a party's later position must be clearly inconsistent with its earlier position;" (2) whether "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled;" and (3) whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine,* 532 U.S. 742, 750-751 (2001).

These elements are not met. The positions are not clearly inconsistent. The Motion to Dismiss stated a lawsuit was still possible, but had yet not been filed., Also, the Court in its ruling acknowledged a future suit was possible, citing *Hyatt*. There is nothing inconsistent about claiming at time "A" a dispute was unripe, even if it becomes ripe at some later time.

**C.  Defendants have not engaged in undue delay.**

Plaintiffs argue that Defendants' have engaged in undue delay, citing *J.P. Morgan Chase Bank, N.A. v. Drywall Serv. & Supply Co., Inc.*, 265 F.R.D. 341, 347 (N.D. Ind. 2010) (collecting Seventh Circuit decisions). But upon examination of the decisions collected in *Chase*, it can be seen they presented circumstances dramatically different than here. Indeed, and in almost all cases – unlike here – the motion for leave to file an amended pleading was filed after discovery had

closed, and often well into summary judgment proceedings. For instance, in *Sanders v. Venture Stores, Inc.*, 56 F.3d 771, 775 (7th Cir. 1995) the court stated: "Plaintiffs did not seek leave to amend their complaint until … after discovery was completed, after Venture filed its motion for summary judgment, after the district court indicated its inclination to grant the summary judgment and after it referred the matter to a magistrate judge." Similarly, in *Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 625 (7th Cir. 1987), [t]he motion to amend was made six months after discovery closed" and was "an apparent attempt to avoid the effect of summary judgment [on his other claims]." Finally, in *Feldman v. American Memorial Life Ins. Co.*, 196 F.3d 783, 793 (7th Cir. 1999), the motion was filed six months after the close of discovery and three months after the district court set a briefing schedule for Prairie States' motion for summary judgment." Indeed, there, although movant claimed she did not discover the facts necessitating the amendment until April, she still did not file her motion to amend for another five months.

Both Plaintiffs cite *Feldman v. Allegheny Intern., Inc.*, 850 F.2d 1217, 1225 (7th Cir. 1988) for its language about "carelessness or gamesmanship." But in *Feldman*, the motion to amend was sought "on the eve of trial," and then again "after presentation of the evidence." 850 F.2d at 1225.

In this case, in contrast, the amendment is required by justice. This motion is not brought on the eve of trial -- indeed no trial date is currently set. It was filed over three months prior to the close of discovery, and not a single deposition has proceeded. Also, if the counterclaim is deemed compulsory, and leave denied, that would impose the severe consequence of barring the claim entirety – justice requires Defendants be given a reasonable opportunity to have their Counterclaim decided on the merits.

Unlike in *In re: 100% Grated Parmesan Cheese Litigation,* 393 F. Supp. 3d 745 (N.D. Ill. 2019) and other cases cited by Plaintiffs, there has been no "strategic" "gamble" made by

Defendants here. For instance, in *Parmesan Cheese* the Plaintiffs specifically withheld information about the amount of cellulose in the grated cheese (and a corresponding anti-caking claim) in order to roll the dice and hope that their different "100% theory" would survive a motion to dismiss. When it did not – and the motion to dismiss was granted – the *Parmesan Cheese* plaintiffs attempted to assert their alternate, caking theory. The court held that because the plaintiff knowing and calculatedly "gambled and loss," this was a factor against exercising its discretion in favor of amendment. 393 F. Supp. 3d at 754.

Plaintiffs' delay argument is premised primarily on the simple passage of time rather than articulating actual prejudice. The mere passage of time is not sufficient, as the Seventh Circuit held in *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 687 (7th Cir. 2014), a case relied upon by Plaintiffs: "The underlying concern is the prejudice to the defendant rather than simple passage of time. *Id.;* see also *Bell v. Allstate Life Ins. Co.,* 160 F.3d 452, 454 (8th Cir.1998) ("Delay alone is insufficient justification; prejudice to the nonmovant must also be shown.")

    **D.**     **There is no prejudice to Plaintiffs, let alone "undue" prejudice. The only prejudice is they would be required to defend on the merits, which is same position Plaintiffs would have been in had the Counterclaim been asserted six months before the Motion for Leave was filed.**

The Seventh Circuit has indicated, "delay is an insufficient basis for denying a motion to amend unless this delay results in undue prejudice to the opposing party." *Tragarz v. Keene Corp.*, 980 F.2d 411, 432 (7th Cir. 1992). *See also, McCoy v. Iberdrola Renewables, Inc.,* 760 F.3d 674, 687 (7th Cir. 2014) ("The underlying concern is the prejudice to the defendant rather than simple delay, almost every amendment to a complaint causes some form of prejudice to the defendant such as the possibility of further discovery or a delay of the trial date; courts only deny a motion for leave to amend where the amendment would cause "undue prejudice."). The non-moving party

bears the burden of demonstrating undue prejudice. *Parker v. EMC Mortg. Corp.*, 2014 WL 7205474, at *3 (N.D. Ill. Dec. 18, 2014).

Of course, nearly every pleading amendment results in some prejudice to the opponent. *See Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc*., No. 02 C 2523, 2003 U.S. Dist. LEXIS 21544, at *2 (N.D. Ill. Dec. 1, 2003). Thus, the relevant inquiry is whether the resulting prejudice is undue. *Id*. Undue prejudice may exist where a proposed amendment brings new and separate claims, adds new parties, or would require substantial additional discovery. *Id*. However, just because additional discovery will be necessary is not a reason by itself to deny a motion to amend. *Cohn v. Taco Bell Corp*., No. 92 C 5852, 1993 U.S. Dist. LEXIS 13901, at *3 (N.D. Ill. Oct. 1, 1993). *Carlson v. Northrop Grumman Corp.*, No. 13 C 2635, 2014 U.S. Dist. LEXIS 149141, at *9 (N.D. Ill. Oct. 20, 2014).

Similarly, in *King v. Cooke*, 26 F.3d 720 (7th Cir. 1994), the Court of Appeals for the Seventh Circuit stressed that "delay alone will not generally justify denying a motion to amend a pleading absent a showing of prejudice from the delay." *Id.* at 723. In *King*, the plaintiff contended important evidence had gone stale and he was unable to locate witnesses. *Id.* Unlike in *King*, here, there is no showing that the mere passage of time itself caused any such prejudice, such as lost evidence or failed memories.

In evaluating prejudice, it is important the Court not lose sight of the conceptual and qualitative distinction between seeking to amend a complaint with an amended complaint, and seeking to amend an answer to include, for the first time, a counterclaim, When amending a complaint with a superseding complaint there is much more opportunity to play strategic games than merely seeking to assert a counterclaim for the first time. For instance, in amending complaints, there is a very real concern a plaintiff might plead theory "A" and keep theory B in

"reserve" with the intent to trot our theory B if judicial decisions indicate theory A is going nowhere. This, for instance, is what happened in *Parmesan Cheese*. Changing horses midstream might certainly prejudice discovery strategy.

But this is different than asserting a counterclaim before any oral discovery has commenced. Plaintiffs say that if Counterclaim is permitted, then discovery will need to be made into it. But this would also be true if the Counterclaim had been asserted at the time the answer was filed, in January 2022. It is not like Plaintiffs would not have issued the written discovery they issued regarding their own claims. They would have issued that regardless. It simply means Plaintiffs would have also issued additional document requests earlier. But Plaintiffs can issue those document requests now. There is no limit to the number of document requests under the federal rules. Moreover, and most importantly, all the documents that relate to the proposed Counterclaim were already produced as part of the Rule 26(a) disclosures. The need to propound additional document requests is no undue prejudice. The need for an extension of discovery does not create prejudice. Discovery was never marked "final," no briefs or litigation positions (such as summary judgment papers) have been filed in reliance on the notion discovery is closed and fixed. None of the circumstances of prejudice where courts have denied amendment exist here.

**5.      The Proposed Counterclaim is not futile.**

**A.      The proposed Counterclaim states a claim for champerty.**

Centrust argues it is not liable for champerty because it is not the intermeddler, the CDR Parties are (Centrust Brf. at 16, stating "the intermeddler (if any) would be Debt Recovery, the party that allegedly paid Centrust's legal fees."). Other than adopting Centrust's argument, the CDR Parties make no other argument why a claim for champerty cannot be stated against them. Although ancient, champerty still exists as a cause of action in Illinois. The United States District Court for the District of Nevada did an excellent job tracing and discussing the tort's roots in

28

English Common Law in *Del Webb Cmtys. V. Partington*, 2009 U.S. Dist. LEXIS 149904 (D. Nev. 2009). Illinois, like Nevada, incorporates pre-Revolution English law, 5 ILCS 50/1. Accordingly, like in Del Webb, the cause of action should be sustained. If the claim is going to be abolished (and some state courts have, like Minnesota in 2020) then that should potentially be an exclusive matter for the state courts and possibly invoke one of the exceptions under 28 U.S.C 1367.

**B.    The proposed Counterclaim states a claim for abuse of process.**

Centrust concedes "Defendants do allege that Teitelbuam's ulterior motive was attempting to obtain the Montgomery apartments." (Centrust Brf., p. 18). The CDR Parties do nothing more than adopt Centrust's arguments; so, as to them, this element is undisputedly met. As to Centrust, once again, the Counterclaim seeks to hold them liable under a theory of co-conspirator liability, which they do not address. Moreover, trying to "set up a contempt," as the Counterclaim alleges, seems sufficient ulterior motive. After all, intent can be pleaded generally. Fed. R. Civ. P. 9(b).

Centrust completely misinterprets the "use of process" prong. This is not an issue of whether citations are typically used in collection cases, it is an issue of whether the use of process was justified at all. In *McGrew* all the court held was that it was not an abuse of process to initiate garnishment when there was no underlying debt. This is sensible enough: parties can believe in good faith if there is a valid debt when there is no one. But here, Centrust is alleged to have conspired to "set up" a contempt to extort a settlement. This is seeking to use process to compel something (settlement) that could not ordinarily been compelled (as settlement is a voluntary act). Invoking contempt and trying to get Ruben thrown in jail is an abuse of process. Especially when, at the end of it all, it is learned that "Centrust did not initiate the monitoring of the CNTRST collection efforts between 2015 and July 2020. Centrust did not initiate or substantively communicate with Lead Counsel about the Joint Action Recovery Plan between 2015 and July

2020," as was revealed in their November 2020 interrogatory answers in State Court. The fact that Centrust allowed the litigation to proceed, knowing it was the real party in interest, but allowing the case to be captained by entities Centrust knew had malicious motive, makes Centrust culpable.

**C.      The proposed Counterclaim states a claim for interference with contract.**

Admittedly, the interference with contract count can be pled with more specificity. Defendants request leave to do so if this Court grants leave to file the counterclaim and exercises its discretion to retain supplemental jurisdiction under 28 U.S.C. 1367 (or, alternatively, deems the counterclaim compulsory). Centrust claims, for instance, there is no allegation that Centrust knew of the contract with lender, T2. Perhaps that is true. But Teitelbaum did. And Centrust is alleged to be liable a co-conspirator. The fact Centrust wants to keep the two consolidated lawsuits separate complicates matters, as its liability is alleged to be joint, as a co-conspirator. Since Defendants must seek leave to assert the claims as to the CDR Parties in 21-cv-02702 due to the Rule 14 objection, Defendants (and proposed counter-claimants) will bolster these allegations in the draft counterclaim attached thereto.

WHEREFORE, Defendants Ruben Ybarra, YRY Holdings, LLC, and Boulder Hill Apartments, LLC, ("Defendants") respectfully request: (a) they be permitted to withdraw the Motion for Leave to file a counterclaim in 21-cv-02576, and formally refile it in case 21-cv-02702, and that it be granted in that case: (b) that the proposed Counterclaim be deemed permissive not compulsory, and that Defendants be granted leave to file it pursuant to 28 U.S.C 1367 in the respective cases.

Respectfully Submitted,

Christopher V. Langone
One of Defendants' Attorneys

30