IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CENTRUST BANK, N.A, | ) | |
| | ) | Case No. 21 C 02576 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. Judge Sara L. Ellis |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, | ) | Hon. Magistrate Judge Maria Valdez |
| LLC and BOULDER HILL | ) | |
| APARTMENTS, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| RUBEN YBARRA, YRY HOLDINGS, | ) | |
| LLC and BOULDER HILL | ) | |
| APARTMENTS, LLC, | ) | |
| | ) | |
| Counter-Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENTRUST BANK N.A. | ) | |
| | ) | |
| Counter-Defendant. | ) | |

## COUNTERCLAIM

NOW COME Defendants / Counter-Plaintiffs, Ruben Ybarra ("Ybarra"), YRY Holdings, LLC ("YRY") and Boulder Hill Apartments, LLC ("BHA") (collectively, "Counter-Plaintiffs"), by their attorneys, Christopher V. Langone of Langone Law LLC, and as Defendants' *Counterclaim*, against CENTRUST BANK N.A. (sometimes referred to herein as "Counter-Defendant")[1] state as follows:

---

[1] As noted in footnote 5 of *Defendant's Reply in Support of Its Motion for Leave to File Counterclaim*, Counter-Plaintiffs were required to file a prophylactic action against a potential (in a abundance of caution sense) trigger date for certain claims with a 2-year statute. Counter-

1

## Introduction

1.     In this case, Bruce Teitelbaum ("Teitelbaum") conspired with Counter-Defendant Centrust Bank, N.A., (the "Bank") and the Bank's agent Jim McMahon ("McMahon"), to use Teitelbaum's self-described "a-hole" lawyers to foment litigation for no purpose other than to extort a "$$ettlement," and harass Counter-Plaintiffs and interfere with their business relationships and prospective economic advantage, among other things, as alleged herein.

2.     Email communications between Teitelbaum and McMahon, an officer of the Bank, reveal a malicious campaign to "set up a contempt," against Ybarra to "beat him into submission." "using his own wife as the Club," and  "extract a seven-figure settlement."

3.     Unable to conceal their glee (describing it as "drawing to an inside straight") when they drew "old man White" as their judge– a judge they noted "could make the devil cry real tears" – they, Teitelbaum and the Bank, abused the process otherwise available to legitimate judgment creditors.

4.     At various times, for instance, Teitelbaum and McMahon exclaimed in emails "$$ettlement time!" and "I can't wait to visit our grand apartment complex when you get the keys soon." The "grand apartment complex" referred to is Boulder Hill Apartments ("Boulder Hill Apartments"), which is owned by Counter-Plaintiff BHA. The scheme to attempt to use litigation to take over Boulder Hill Apartments is alleged more fully below.

5.     Teitelbaum and McMahon also corresponded, with self-assured satisfaction, about how they were "driving up Ruben's attorneys' fee…."

6.     Part of Counter-Defendant's plan was to "set up a contempt." On June 7, 2017, for

---

Plaintiffs intend on pursuing those claims only in this forum now that leave his been granted to file Counterclaims.

instance, McMahon wrote an email that stated, in relevant part, "[k]eep these updates coming, Bruce. When Judge White is really ready to jail him and/or his wife for contempt of court (and he really will do it) your lawyers will have the opportunity to extract a seven-figure settlement."

7. "Take no prisoners!" the Teitelbaum and the Bank repeatedly exhorted each other. Additionally, Counter-Defendant's emails contained violent metaphors, "the noose is getting tighter," and "very close to getting the death knell."

8. As alleged herein, Teitelbaum and the Bank was also attempting to capitalize on the growing age-related cognitive challenges of Judge White. Counter-Defendant and Teitelbuam variously referred to Judge White as the "dear old gentleman" who "takes longer to get there."

9. Yet the Bank and Teitelbuam also knew "the old legal lion," "needed to retire." The pleadings in the State Court case were intentionally designed on their desire to capitalize on Judge White's alleged lack of memory and to deceive him into "jail[ing]" Ybarra.

10. Teitelbaum and the Bank also wanted to interfere with Ruben's existing relationships. In one email Teitelbaum exclaimed, "Good news, current lender very pissed off" and "Ruben will have another attorney to pay."

11. In connection with the scheme alleged herein, Teitelbaum and the Bank set up a shell entity called "CNTST Debt Recovery," which was merely a vehicle through which Counter-Defendant would implement the illegitimate and champertous goals of its secret, so-called "Cooperation Agreement."

## Parties and Relevant Entities

12. Defendant / Counter-Plaintiff Plaintiff Ruben Ybarra ("Ruben"), is an individual and citizen of the State of Texas.

13. Yolanda Ybarra ("Yolanda") is Ruben's wife and is a citizen of the State of Texas.

14.     Defendant / Counter-Plaintiff YRY Holdings, LLC ("YRY") is a limited liability company organized and existing under the laws of the State of Delaware.

15.     Defendant / Counter-Plaintiff Boulder Hill Apartments, LLC ("BHA") is a limited liability company organized and existing under the laws of the State of Illinois, with one member: YRY.

16.     Plaintiff / Counter-Defendant CENTUST BANK, N.A. is a Centrust is a national banking association with its main office is located at 385 Waukegan Rd, Northbrook, Illinois 60062.

## The Bank Obtains Judgments Against Ruben

17.     Prior to the great real estate crash of 2008 and 2009, Ruben established a real estate portfolio using money borrowed money from the Bank (the "Real Estate Portfolio").

18.     In 2008 and 2009, during the great real estate crash, the Real Estate Portfolio of Ruben's corporate loans with the Bank and other lenders collapsed.

19.     Accordingly, in early 2010, the Bank obtained various judgments, by confession, against Ruben, totaling over $2.6 million (collectively the "Judgments"). One of these Judgments was obtained on January 28, 2010, in Case Number 10 L 50077 ("Case Number 50077"), in the amount of $1,142,414.88.

20.     The Bank was not diligent in collecting the Judgments prior to being approached by Teitelbaum, who proposed the Champertous Scheme more fully described and alleged below.

## The Teitelbaum and Yolanda Investments, Including in Boulder Hill and
## The Formation of YRY by Michael Tuchman

21.     Shortly after filing for bankruptcy (filed April 30, 2010), in approximately June of 2010, Teitelbaum approached Yolanda, Ruben's wife, and solicited her participation in certain business ventures. As their business ventures developed, Teitelbaum introduced Ruben

and Yolanda to his attorney, Michael Tuchman. With Tuchman's assistance, Yolanda created various entities that would enable Teitelbaum and Yolanda to participate in real estate transactions despite the Judgments against Ruben and his substantial unrelated debt. One of these entities was YRY.

22. On August 1, 2011, YRY was formed as a limited liability company organized and existing under the laws of the State of Delaware. The three members of YRY were: (a) the Yolanda Ybarra Revocable Trust, (b) the Ybarra Children Investment Trust, and (c) the Ruben Ybarra Family Insurance Trust.

23. Ruben was designated as the manager of YRY, which was a manager-managed LLC, *not* a member-managed LLC.

24. Ruben was *not a member* of YRY, and at all relevant times, Teitelbaum and the Bank knew that. Yet, as more fully alleged below, at various times throughout the state court proceedings, Teitelbaum and the Bank knowingly and falsely represented to the Court that Ruben was a member.

### The *Shayarin* Case and *Shayrin* Settlement

25. On October 6, 2011, Boulder 2011 LLC was incorporated with the Illinois Secretary of State. YRY, Shayarin LLC (of which Teitelbaum was manager), and Susan Goldner were the original members of Boulder 2011. Teitelbaum and Ruben were managers of Boulder 2011 LLC.

26. On August 18, 2014, Teitelbaum and his limited liability company Shayarin LLC filed suit against YRY, Boulder 2011, and Ruben (the "*Shayarin* Case."). In the *Shayarin* Case, Teitelbaum sought to dissolve Boulder 2011 LLC and to compel a sale of the Boulder Hill Apartments.

27.     In the *Shayarin* Case, Teitelbaum intentionally and falsely alleged that Ruben was a 100% member of YRY. This false allegation is important because Counter-Defendants were at all relevant times, fully aware that Ruben was not a member of YRY – nonetheless, they falsely, fraudulently, and repeatedly represented to the Illinois state court that he was.

28.     On April 24, 2015, Shayarin, Teitelbaum, Ruben, and YRY settled the *Shayarin* Case (the "*Shayarin* Settlement"). Pursuant to the *Shayarin* Settlement, YRY agreed to purchase, and did in fact purchase, Teitelbaum & Shayarin's membership interest in Boulder 2011 – and thus all interest in the Boulder Hill Apartments – for $1.16 million. After performance by YRY, the *Shayarin* case was dismissed in accordance with the *Shayarin* Settlement.

29.     Teitelbaum, however, had no intention of honoring the *Shayarin* Settlement. He had almost immediate buyer's remorse about the *Shayarin* Settlement, or maybe even hatched the scheme alleged herein prior to the *Shayarin* Settlement. But one thing was for sure, Teitelbaum's eyes were fixed on obtaining more, if not all, of the Boulder Hill Apartments for himself, and he was going to interlope into the then-dormant Centrust dispute and foment and maintain litigation for improper and extortionate purposes -- including, as emails quoted herein demonstrate, intentionally running up attorney's fees.

30.     Indeed, Teitelbaum's malice and intent is shown by an email he sent on June 10, 2015, right as the *Shayarin* Settlement was taking place. On that day, Teitelbaum sent an email to YRY's lenders, T2 and Union Bank.  The email  said: "Nice Guy."  Attached to the email were: (i) Select Funding's *lis pendens* on a property known as the Kingston Property (see below for a definition of the Kingston Property and *Kingston* Case); (ii) a  consent decree between the OCC and Ruben dated December 31, 2012; and, (iii) a listing for Ruben's former home in Park Ridge, with a  handwritten note, "Lost his House." Obviously, this email is evidence of Teitelbaum's

intent, and malice toward Ybarra. This kind of interference with Counter-Plaintiffs' relationship with lenders is not limited to this isolated email, as will be seen from the allegations below.

### The *Kingston* Case (a/k/a "the Small Case")

31.     Select Funding LLC holds itself out as making "hard money loans" for non-traditional investment properties. Eric Ferleger ("Ferleger") is a disbarred attorney, who is the "Office Manager" for Select Funding. Ferleger was also a friend of Teitelbaum and a part of the "mastermind" group behind the Champerty and Interference Scheme alleged herein.

32.     Select Funding held certain mortgage loans against a property in the Real Estate Portfolio, including one owned by 7550 Kingston LLC (the "Kingston Property"). Litigation was filed against Ruben and others in the Circuit Court of Cook County regarding this Kingston Property (the "*Kingston* Case").

33.     The complete circumstances of the *Kingston* Case are not fully relevant to Defendants' liability as alleged herein, other than to note it involved a unique issue regarding insurance and non-occupied buildings. And, more importantly, the *Kingston* Case formed a template for the larger Champertous extortion scheme relating to Boulder Hill Apartments, as alleged herein.

34.     This so-called "small case" became a model Teitelbaum and McMahon sought to replicate with respect to the Boulder Hill Apartments. As Teitelbaum reported in an email dated January 24, 2019: "Was paid $245,000 from the thief [referring to Ruben] in the small case. With legal fees and additional interest it cost the a-hole somewhere around $440,000 to settle what was a $180,000 debt." And in other emails Teitelbaum and McMahon noted that their efforts were just "like the small case" only on a larger scale. For instance, as Teitelbaum noted in an email dated September 21, 2018, "Following same pattern as small case."

35.     As to running up Counter-Plaintiffs' attorney's fees, even more than a year later,

Teitelbaum was boasting, "Now these legal fees will carry interest at 9%." The fact that Teitelbaum was gloating about the interest on the attorney's fees shows part of his intent, his obsession with attorney's fees, and evidences his desire to improperly use litigation to drive up Counter-Plaintiffs' fees.

36.     In subsequent emails, Teitelbaum and McMahon revealed their intent to try to replicate the extortion they had exacted in a "small case" on a larger level with Boulder Hill Apartments. After all, if the "a-hole" paid $440,000 on a "$180,000 debt, imagine what they could do in their efforts to run-up Ybarra's attorney's fees on the "bigger" case – as Teitelbaum's email of January 24, 2019, noted "they have $5,000,000 of equity in the apartments they bought me out of."

### The Formation of CNTRST, the Champertous Cooperation Agreement, & Taking Control of the *Kingston* Case, a/k/a "The Small Case"

37.     On August 8, 2015, CNTRST was incorporated with the Illinois Secretary of State. Teitelbaum was identified as CNTRST's president. CNTRST was created as a shell vehicle through which Teitelbaum, McMahon and the Bank would implement their Champertous Scheme.

38.     On August 18, 2015, the Bank and CNTRST executed a document entitled "Agreement of Creditors" (hereinafter the "Champertous Agreement").  As to the Champertous Agreement: (i) CNTRST's alleged respective claims were not identified; (ii)  the Bank identified its "respective claims," (and all of them were against Ruben and companies owned by Ruben); (iii) YRY, BHA, and Yolanda were not identified as "Debtors;"; (iv) the word "assignment" did not appear anywhere; (v) the agreement was drafted by Markoff Law; (vi) Jim McMahon, the Bank's president, signed the agreement; (vii) CNTRST was responsible for hiring, paying, and directing so-called "Lead Counsel;" (viii) the Bank was to get 30% of recovered money and  CNTRST was

to get the remaining 70%; and (ix) the Agreement was to be kept confidential.

39.     From August 18, 2015 through August 21, 2019, the Bank did not disclose the existence of the Champertous Agreement to YRY, BHA, Ruben, or any state court judge in any of the proceedings pending during this timeframe.

40.     On September 2, 2015, Select Funding LLC assigned the underlying mortgage in the *Kingston* Case and the rights to pursue that litigation to CNTRST (the "*Kingston* Assignments"). The *Kingston* Assignments were recorded with the Cook County Recorder on September 15, 2015. The *Kingston* Assignments were executed by Select Funding's "manager," disbarred attorney Eric Ferleger. Indeed, it is believed and thus alleged, disbarred attorney Ferleger was unethically preparing, or providing legal input into, many of the legal documents in the background, including the *Kingston* Assignments. Ferleger notarized the "manager's" (i.e., his own) signature.

41.     After recording, the *Kingston* Assignments were to be sent to attorney Richard Jones. Jones was the Bank's lawyer in Case Number 10 L 50077 from its initial filing in January 2010 through at least January 2016. CNTRST acquired its interest in the *Kingston* Case <u>after</u> the Champertous Agreement was executed in August 2015. The *Kingston* Case was not identified as a "Respective Claim" of CNTRST when the Champertous Agreement was executed.

42.     In December 2015, CNTRST formally substituted in as Plaintiff in the *Kingston* Case for Select Funding.

**The 2016 Motions for Charging Order and**
**Bank's Knowledge Ruben was Not A Member of YRY**

43.     On January 7, 2016, Plaintiff in Case No's. 2010 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287 filed motions for charging orders ("Motions for Charging Orders") against Ruben's alleged interest in YRY (of which, in truth, as Counter-Defendants

knew full well, there was none). The Motions for Charging Orders were noticed to proceed on January 26, 2017. The Motions for Charging Orders alleged that Ruben was the manager of YRY, and according to the LLC Act, a charging order would be appropriate.

44. The Motions for Charging Order in Case Number 50077 was withdrawn after counsel for Ruben and YRY advised the Bank's then counsel, Richard Jones: (a) that the Bank had not yet served citations on Ruben, Yolanda, or YRY; and (b) more importantly, Ruben was a manager but not a member of YRY. This latter fact, and the Bank's knowledge of it, assumes particular importance in light of Counter-Defendant's subsequent conduct, where they repeatedly, and knowingly, made false representations to the state courts that Ruben was a member of YRY when they knew he was not.

**Kluver and Platt Appears and Files Improper Motions for A Receiver**

45. On June 22, 2016, Kluever appeared, purportedly for the Bank, in Case Number 50077. The Babk's President, McMahon, later claimed in the Interrogatory Answers: "Centrust states that it was not involved with any post-judgment court filings and therefore has no knowledge of the same." and "Centrust states that it was not involved in engaging or compensating any of the aforementioned attorneys." Only discovery can reveal the truth in this regard, as this statement is undermined by emails from McMahon (unless he was only acting in an individual capacity, and not as an agent of the Bank, when he sent them).

46. On July 28, 2016, in all of the cases *except* Case Number 50077, the Bank filed motions for charging order to impose a lien on Ruben's non-existent membership interest in YRY. The motions were scheduled to proceed on August 2, 2016.

47. In the late afternoon of August 1, 2016, however, the Bank filed so-called "corrected" motions for charging orders that changed the amount due and owing on the

judgments. Notice of these motions was sent to Ruben via regular mail, in his individual capacity, to an address in Boca Raton, Florida. This was an address at which Ruben did not reside.

48.     The motions were granted on August 2, 2016, as Ruben's interests were not represented due to the short (one day) notice to an invalid address. But Counter-Defendant was not interested in proper notice, after all it was trying to "set up" a contempt.

49.     Teitelbaum and the Bank could hardly contain their glee when Judge Alexander White was assigned to the case. As McMahon stated, "Judge White can make Satan cry real tears. You drew to an inside straight when your case was assigned to him. Take no prisoners!"

50.     Teitelbaum and the Bank knew something else about Judge White, something that every collection attorney that regularly appeared before him observed. Judge White was quite elderly at that time, and it was observed that his memory was deteriorating over time. With due respect to his Honor, but this is an important fact, it was easy for a slick attorney to confuse and mislead Judge White during that final phase in his otherwise illustrious career.

51.     Teitelbaum and the Bank were giddy with talk about the "threat of jail time." As McMahon wrote:

> I've seen the threat of jail time for contempt of court bring the mighty Bob Coe to his senses. It should work for Rubin as well. It got to the 23rd hour before Bob settled, so I imagine that Rubin will go right to the brink as well.

52.     On August 18, 2016, Teitelbaum and the Bank queried, "I trust if we get him thrown in jail, you have no interest in loaning him money to past bail?"

53.     As part of the scheme to "set up contempt" and confuse and deceive Judge White, the motions for charging order falsely and knowingly claimed YRY was an Illinois LLC, and falsely stated that Ruben was the managing member of YRY. The motion also wrongly invoked the charging order section of the Illinois LLC statute.

11

54.     But Teitelbaum and the Bank did not care. After all, as McMahon exhorted in emails: "Take no prisoners!"

55.     As before, YRY and Ruben were unrepresented at this time.

56.     In all cases other than Case Number 50077, on September 9, 2016, the Bank filed motions under the Illinois LLC Act to appoint disbarred attorney Eric Ferleger as a receiver to enforce the charging orders over Ruben's alleged – but as the Bank and Teitelbaum knew, non-existent – distributional membership interest in YRY.  The notices of motion stated that they were served via regular mail to Ruben in his individual capacity and as the manager of YRY.

57.     The motions for a receiver did not reveal Ferleger's role in assigning the *Kingston* Case to CNTRST, or other information showing he was in on the plan. A receiver is supposed to be a disinterested officer that reports to the Court, not a co-participant and co-mastermind behind a champerty scheme.

58.     The Bank again falsely alleged that Ruben was the managing member of YRY. The motion falsely alleged that YRY generates income that is ultimately distributed to Ruben.

59.     The motions (falsely) chronicled Ruben's supposed failure to comply with citations, charging orders, and the entry of body attachment orders – thus continuing to try to "set up" a contempt.

60.     As with the prior filings, the motions to appoint a receiver were not verified.

61.     The motions to appoint receiver were silent about Ferleger's qualifications to act as a receiver and did not allege that Ferleger was disinterested, which he clearly was not.

62.     Teitelbaum and the Bank knew these defects would be easy to slip past "old Man White."

63.     The motions for receiver were granted September 14, 2016.

64.    The orders appointing Ferleger as receiver required Ruben and YRY to: (a) turn over records; (b) to cooperate with  Ferleger; and (c) barred YRY from making distributions without prior notice to Ferleger.

65.    Counter-Plaintiffs continued to be unrepresented in the state court at this time.

### Interference with Junior Lender Relationship, T2

66.    On September 16, 2016, Ferleger sent an email to YRY's junior lender at the time, T2.  Ferleger informed T2 that: (a) he had been appointed the receiver of YRY and its members; (b) his appointment as a receiver likely would be a default under the senior mortgage in favor of Union Bank; and (c) Ferleger had an unidentified investor who was interested in buying T2's junior mortgage interest in the Boulder Hill Apartments. The purpose of this email was to interfere with Counter-Defendants' lending relationships, and was done with the knowledge, direction and approval of Teitelbaum and the Bank.

### The Conditional Judgments

67.    On November 2, 2016, Teitelbaum sent McMahon an email, with the subject "Motion to Compel and Conditional; Judgment," in which he stated: "still working and inching closer."

68.    On November 16, 2016, in Case Number 50077, the Court entered a conditional judgment against YRY in the amount of $1,142,414.88 for its alleged failure to comply with a third party citation. The order went on to state that the conditional judgment order could be sent to Ruben "consistent with the Court's order of September 14, 2016 granting Plaintiff leave to serve YRY via special order of court on YRY's managing member Ruben Ybarra." The Bank was permitted to serve YRY via certified mail and posting. Once again, as known to Counter-Defendants Ruben was never a member of YRY. YRY was unrepresented in Case Number 50077 at this time.

69.     On November 18, 2016, CNTRST filed a motion for summary judgment in the *Kingston* Case.  To support CNTRST's claim for attorney's fees, CNTRST attached the affidavit of Steve Werner, who was falsely identified as CNTRST's President. According to records from the Illinois Secretary of State, Teitelbaum was, and had always been, CNTRST's President.  Disbarred attorney Ferleger notarized Werner's signature as President of CNTRST.

70.     On December 29, 2016, in Case Nos. 10 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287, the Bank filed notices of motion certifying that the Bank had simultaneously filed, "Plaintiff's Motion to Compel and for Conditional Judgment Against YRY Holdings." The motions were set to be heard on January 18, 2017. No motions to compel and/or for conditional judgment against YRY were attached to the notices of motion. Instead, the Bank attached five virtually identical pleadings simply titled "Motion."  The relief sought in the "Motions" was <u>revival</u> of the December 2010 Judgments. These incorrect notices of motion and the motions to revive judgments in *all five cases* were all filed *only* in Case Number 50078. The court dockets in Case Nos. 10 L 50077, 10 L 50079, 10 L 50286, and 10 L 50287 do not reflect that any such notices and motions were filed on December 29, 2016. The notices of motion to compel and for conditional judgment against YRY were, yet again, directed to Ruben at a condominium complex in Boca Raton, Florida.

### The Petitions to Revive

71.     On January 11, 2017, the Bank filed "Amended Notices of Motion" to present on January 18, 2017, Plaintiff's Motion to Revive Judgment.  These Amended Notices of Motion to Revive Judgment were filed in Case Nos. 10 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287. The Amended Notices of Motion stated the Petitions to Revive Judgment were attached.  They were not attached. The Amended Notices of Motion were directed via regular mail

only to Ruben at a condominium complex in Boca Raton, Florida. Once again, as Counter-Defendants knew, Ruben did not live in Boca Raton, Florida at this time.

72.     On January 28, 2017, the Bank's judgment in Case Number 50077 lapsed. The Bank's judgment lien on real property of Ruben also lapsed.

73.     On February 23, 2017, in Case Number 50077, the Court entered an order permitting service of the Bank's petition for revival by mailing the petition to Ruben's new lawyer Arnstein & Lehr. The order also contemplated an agreed-upon deposition of Ruben in the near future.

74.     On April 4, 2017, the Bank attempted to revive the judgment in the amount of $1,853,685.51 in Case Number 50077.

**The Ambush Arrest of Ruben
When He Voluntarily Appears at a Citation Proceeding**

75.     On April 21, 2017, by agreement of the parties, Ruben traveled from Texas to Chicago to sit for a preliminary citation exam at the office of the Bank's counsel, Kluever & Platt. The citation exam was "preliminary" because not all of the documents were then available. Despite the agreement of the parties that Ruben appear for a preliminary exam, the exam was terminated when the Cook County Sheriff arrested Ruben and brought him before Judge White.

76.     Unbeknownst to Ruben at the time, but known to Counter-Defendants who were still in the process of "setting up" Ruben, it was the intent of Teitelbaum and the Bank to execute a body attachment on Ruben at the citation.

77.     Teitelbaum was present when Ruben was seized pursuant to a body attachment and even took a photograph as a sort of trophy to document the occasion.

78.     From April 22, 2017 through May 20, 2020, the Bank never sought to re-depose Ruben following his body attachment.

15

79.     On June 7, 2017, McMahon wrote an email that stated:

> Keep these updates coming, Bruce, When Judge White is really ready to jail him and/or his wife for contempt of court (and he really will do it) your lawyers will have the opportunity to extract a seven-figure settlement."

80.     As time went by, however, Teitelbaum and the Bank became increasingly frustrated with "Old Man White." The following emails are illustrative:

(a).    On July 5, 2018, "No settlement until we get a receiver appointed [over Boulder Hill Apartments]. Judge White is sitting on a ruling for about 4 months. He needs to retire!"

(b).    On July 5, 2018, McMahon replied: "I forgot the dear old gentleman is hearing your case. He delivers justice but it takes him longer to get there now!"

(c).    Only July 6, 2018 "FYI judge White is not ruling on anything."

(d).    On August 2, 2018, Contempt equal jail for Ybarra."

(e).    On August 14, 2018, Teitelbaum asked "wonder if old man White can understand what below means…"

**Yolanda Sits for a Citation**

81.     On January 22, 2019, Yolanda sat for her citation exam in Case Number 50007. Yolanda testified that she makes the decisions for YRY and BHA; Ruben did not have an interest in YRY; Ruben cannot access YRY's account; she is the sole breadwinner for the family; and she created YRY as part of estate planning created by Michael Tuchman who was introduced to the Ybarras by Teitelbaum.

82.     Teitelbaum and the Bank knew at the time they were simply harassing Yolanda. As McMahon wrote in an email, "that's how we/you got those judgments against him which are using to beat him into submission. Using his own wife as the club."

83. On February 13, 2019, McMahon wrote an email to Teitelbaum stating, in relevant part, "I can't wait to visit our grand apartment complex when you get the keys soon."

### Kluever & Platt Withdraws & Markoff Law Appears

84. In Spring 2019, the Bank's then-counsel, Kluever & Platt was permitted to withdraw as counsel of record. Kluever & Platt cited unspecified "irreconcilable differences" with the Bank as grounds for withdrawal. Kluever & Platt alleged that CNTRST is managing the litigation on behalf of the Bank.

85. Teitelbaum sent an email to McMahon stating, "I am changing lawyers to Markoff Law… they think my old lawyers were approaching it wrong (receivership would take 18 months with Ruben the crook) and they are going to try to force a quick []..sale of the property…."

### The So-Called "Motion for Judicial Determination"

86. On April 10, 2019, Markoff Law filed its appearance on behalf of the Bank. Through Markoff, the Bank filed a motion entitled *Motion for Judicial Determination* to sell the Boulder Hill Apartments pursuant to 735 ILCS 5/2-1402. When this motion was filed, there was no attorney of record for Ruben or YRY and BHA. Yet again, the motion was unverified. Yet again, the motion falsely alleged that Ruben was a member of YRY.

87. On June 21, 2019, Teitelbaum wrote, among other things, "good news, current lender very pissed off…." This email shows that it was always Counter-Defendants' intent to interfere with Counter-Plaintiffs' relations with their lenders – i.e., to "piss" them off. The full text of the email Teitelbaum was as follows:

> Good news, current lender very pissed off. Ruben will have another attorney to pay. Should move the needle a little bit on the settlement. Believe there is a tiny legal opinion that your judgments can prime the first mortgage.

88. As a result of the filing of the Motion for Judicial Determination, YRY was

restrained from alienating, transferring, or selling the Boulder Hill Apartments.

89.     Also, Ruben was prevented from receiving any money or income due to freeze orders entered in conjunction with Case number 50077 (the "Freeze Orders").

90.     On July 12, 2019, in Case number 50077, YRY and BHA filed petitions to intervene in Case number 50077 to, among other things, dispute and try to secure relief from the Freeze Orders and prevent the efforts from Teitelbaum and the Bank seizing and selling the Boulder Hill Apartments, in which Teitelbaum relinquished interest due to the *Shayarin* Settlement.

91.     On July 15, 2019, McMahon wrote, "Rubin [sic] is going to put up a struggle before settling. This looks like his last hand before folding…."

92.     On July 17, 2019, Real Realty produced documents responsive to the Bank's third-party citation rider.

93.     The documents produced by Real Realty re-enforced that Ruben did not own or control BHA's operating accounts and that the Boulder Hill Apartments were competently managed.

94.     After Real Realty produced documents, there was undoubtedly no good-faith basis to continue with either the Motion for Judicial Determination or the Freeze Orders (indeed, these motions were knowingly frivolous even before the documents were produced; but production of the documents eliminated any doubt as to this issue).

95.     Nonetheless, Teitelbaum and the Bank continued with their improper, abusive, and champertous scheme to interfere with Ruben's contracts and prospective economic advantage.

**Counter-Plaintiffs' Efforts to Obtain the Secret Champertous Agreement**

96.     On August 13, 2019, in Case Number 50077, the Bank refused to voluntarily hand over any agreement that set forth the relationship between the Bank and Teitelbaum and instead

directed YRY and BHA to issue a formal document production request for this data, which they did,

97.     On August 21, 2019, the Bank filed an emergency motion in Case Number 50077 for an *in camera* inspection of the Champertous Agreement. The motion was denied on the ground there was no emergency.

98.     The State Court directed the parties to craft a protective order that would permit YRY and BHA to see the "Assignment Agreement," (i.e., the Champertous Agreement) but would limit its dissemination.

99.     On August 23, 2019, the Bank's counsel distributed a proposed protective order to counsel for YRY and BHA, as well as to counsel for adverse claimants T2 and Real Realty.

100.    On August 28, 2019, the parties appeared on the Bank's motion for an *in camera* inspection of the agreement between the Bank and CNTRST.  The Court denied the Bank's motion to withhold the agreement from YRY and BHA.

101.    The Court also  ruled that the Bank cannot shield from YRY and BHA materials relating to the negotiation of the agreement. During the hearing, the Bank's counsel stated that Ferleger was employed by Teitelbaum and that Teitelbaum referred to Ferleger as his "librarian and translator."

102.    On December 17, 2019, Teitelbuam and the Bank exchanged emails that stated, in relevant part: "Much ado about nothing. Pages of legal fees being generated in order to get legal fees. When does Bruce get the deed and master keys to all of the apartments."

103.    On December 31, 2019, in Case No. 10 L 50077, YRY and BHA filed their notice of adverse claim in opposition to the Bank's motion for judicial determination.

104.    During the late winter 2019 and early spring 2020, in Case Number 50077, YRY

and BHA filed their submissions, amended submissions, and replies relating to the right to and scope of discovery pertinent to resolve their notice of adverse claim and to defend against the Bank's Motion for Judicial Determination.

**Markoff Law Withdraws &**
**Counter-Defendants Acrimoniously "Terminate" their Champertous Scheme**

105.     On June 29, 2020, the Bank's counsel, yet again, filed a motion to withdraw. Like Kluever & Platt, Markoff Law cited "irreconcilable differences" with the Bank.

106.     On July 1, 2020, the parties appeared before the Court per the Court's *sua sponte* order for status on pending motions.  All matters were continued until July 10, 2020. The Court ordered James McMahon, the President of the Bank, and Teitelbaum, the President of CNTRST, to be present on July 10, 2020, so that discovery and the briefing of motions could be addressed.

107.     Over Counter-Plaintiffs' objection, the Freeze Orders remained in place.

108.     On July 10, 2020, the parties appeared before the Court for status. Markoff Law's motion to withdraw as the Bank's fourth counsel of record is granted.  The Court ordered the Bank's new counsel, their fifth, to file their appearance by July 31, 2020.  The Court further ordered that McMahon and Teitelbaum participate in the next court proceeding on August 4, 2020. The Court repeatedly reiterated that it wanted to move the case along. Teitelbaum announced that the Champertous Agreement was soon to be terminated and CNTRST will "be exiting the case."

109.     Markoff's withdrawal sent Teitelbaum and McMahon scrambling. On July 13, 2020, Teitelbaum sent McMahon, for his review, "a simple termination agreement between the Bank and Centrust." Teitelbaum was also careful to note he'd lawyered up – "Mr. Mack will be representing me in this matter," he wrote, "If Mr. Rappin or yourself has any questions or comments, please call Mr. Mack."

20

110.    McMahon responded, "This looks like half the story, per a call I received from one of your other advisors, Bruce. Who continues with the litigation to collect on the Centrust judgments? Not Steve Rappin and me. So let's see that other half when you are ready to identify that investor. And that investor's documentation to take over prosecution of the case."

111.    On July 28, 2020, Teitelbaum sent an email to the parties and to the Court advising that the Champertous Agreement had been terminated and that McMahon would distribute proof shortly.

112.    On July 29, 2020, McMahon circulated the Termination Agreement to the parties and to the Court and announced the Bank would not be engaging counsel. The Termination Agreement was dated July 10th, the same day as the last court appearance.  The Termination Agreement recited: (i) mutual releases between the Bank and CNTRST; (ii) CNTRST was not entitled to payment or reimbursement of costs while the Agreement of Creditors (ie., the Champertous Agreement") was in effect; and (iii) required CNTRST to indemnify the Bank for damages and attorneys' fees incurred or asserted against the Bank.

113.    On October 09, 2020, Teitelbaum sent an email to McMahon that stated, "Believe NO! I can be like ruben (sic) 12 months later. Sorry you are involved. Do not believe either of us did anything wrong."

### Allegations of Joint Venture

114.    Through the Champertous Agreement, the Bank, Teitelbaum and CNTRST entered were engaged in a joint venture (the "Joint Venture"). As joint venturers, the Bank, Teitelbaum and CNTRST employed, as agents, Kluever and Markoff.

115.    Counter-Defendant, along with Teitelbuam and CNTRST, and each of them, engaged in acts in furtherance of the Joint Venture; as such, they are jointly and severally liable for the tortious

alleged herein and alleged as to CNTRST and Teitelbaum in case 21-02702.

## Allegations of Civil Conspiracy

116.    Through the Champertous Agreement, the Bank, Teitelbaum and CNTRST entered into an agreement to commit a tort, or other wrong, specifically, but not limited to champerty and maintenance.

117.    Counter-Defendant engaged in wrongful acts in furtherance of this agreement, including, among other things as alleged herein: concealing the agreement from the State Court and Counter-Plaintiffs; improperly moving for appointment of a receiver, as alleged above; improperly subjecting Ruben to a body attachment; improperly interfering with junior lenders, as alleged above; seeking to circumvent the *Shayrin* Settlement.

118.    Counter-Defendant's acts, as alleged herein, were in furtherance of the Champertous Agreement.

119.    Counter-Plaintiffs suffered damages as a result of Counter-Defendant's acts in furtherance of their conspiracy.

120.    As a result of Counter-Defendant's conspiracy, they are jointly and severally liable (along with Teitelbaum and CNTRST) for the claims alleged herein, as .alleged as to CNTRST and Teitelbaum in Case Number 21-02702.

## Count I
## Champerty

121.    Counter-Plaintiffs incorporate and re-allege allegations 1-120, as if set forth fulling herein.

122.    Teitelbaum and CNTRST were strangers to the litigation involving Ruben and the Bank.

123.    Teitelbaum was motivated by malice against Ruben as a result of the *Shayarin* Case

and *Shayarin* Settlement.

124.   Teitelbaum wanted to obtain a larger share of the Boulder Hill Apartments than he had agreed to in the *Shayarin* Settlement.

125.   The Bank had all but abandoned its efforts to collect on the Judgments.

126.   Teitelbaum approached McMahon and the Bank pursuant to his desire to "stir up litigation" between the Bank and Ruben, and in an effort to accomplish by covert duplicity what he could not do directly – obtain profits from the Boulder Hill Apartments (and Counter-Plaintiff BHA) in breach of the *Shayarin* Settlement.

127.   Maintenance is assistance to a litigant in pursuing or defending a lawsuit provided by someone who does not have a bona fide interest in the case.

128.   Champerty is a form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter if a favorable result ensues.

129.   The doctrines of champerty and maintenance were developed at common law to prevent officious intermeddlers, such as Counter-Defendants here, from stirring up strife and contention, as they did here, by vexatious and speculative litigation – (e.,g, "I can't wait to visit our grand apartment complex when you get the keys soon") -- to which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law

130.   The Bank, agreed to allow Teitelbaum and CNTRST to control and fund litigation in exchange for a share of the proceeds pursuant to the Champertous Agreement. This constitutes the tort of champerty and maintenance.

131.   The Bank, Teitelbaum, and CNTRST are all jointly and severally liable as co-conspirators, as alleged more fully above.

WHEREFORE, Counter-Plaintiffs Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC pray that this Court: (a) enter judgment in their favor for actual damages

against all Counter-Defendants in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count II**
**Abuse of Process**

132.    Counter-Plaintiffs incorporate and re-allege allegations 1-120 and 122-131, as if set forth in full herein.

133.    Counter Defendant engaged in willful acts in the use of process that was not proper in the regular conduct of the proceeding, as alleged above, including, but not limited to: (a) willfully sending notices to the wrong address in Boca Raton; (b) making misrepresentations to the state court; (c) concealing the Champertous Agreement from the State Court and opposing litigants; (d) making and abandoning frivolous motions for a receiver; (e) interfering with the junior lender as alleged above; (f) deceiving Ruben into coming to a citation, which was set as a trap to seize him pursuant to a body attachment in order to intimidate him, and (g) using the services of a disbarred lawyer to facilitate the unauthorized practice of law.

134.    Teitelbaum possessed an ulterior purpose other than resolving a legal dispute in connection with the above-alleged conduct. Specifically, Teitelbaum was attempting to do indirectly what he could not do directly (as a result of the Shayarin Settlement) – obtain an interest in the Boulder Hill Apartments. The Bank is alleged to also be liable as a co-conspirator and co-joint venturer with Teitelbaum.

135.    The Bank knowingly allowed Teitelbaum to use CNTRST as a sham or straw entity.

136.    Had Ruben known the truth from the inception, be would have been able to, among other things, dismiss the State Court litigation pursuant to Section 2-619 of the Illinois Code of Civil Procedure, as barred by prior release.

WHEREFORE, Counter-Plaintiffs Ruben Ybarra, YRY Holdings, LLC and Boulder Hill

Apartments, LLC pray that this Court: (a) enter judgment in their favor for actual damages against all Counter-Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count III**
**Tortious Interference with Contract**

137.    Plaintiffs incorporate and re-allege allegations 1-128 and 122-136, as if set forth in full herein.

138.    YRY and BHA had a contractual relationship with its lender T2.

139.    On June 11, 2018, BHA executed a note and mortgage in favor of T2 for $9,000,000. The note was secured by a mortgage on the Boulder Hill Apartments.

140.    In September 2018, the Bank filed an emergency motion in Case Number 50077 to appoint a receiver for the Boulder Hill Apartments pursuant to 735 ILCS 5/2-1402.

141.    As Teitelbaum noted in an email dated September 21, 2018, "Following same pattern as small case."

142.    In connection with this motion, the Bank requested an expedited briefing schedule. As a part of the order, BHA agreed that pending resolution of the Bank's emergency motion for appointment of receiver BHA's operating account would be frozen for the month during which the receiver motion was pending.

143.    On October 2, 2018, Judge McGing denied a virtually identical petition pursuant to Section 2-1402 of the Illinois Code of Civil Procedure, which sought (on a supposed "emergency" basis) to appoint a receiver for the Boulder Hill Apartments. In denying CNTRST's emergency motion, Judge McGing discussed the *Shayarin* Case and the release Shayarin and Teitelbaum executed with YRY.  Judge McGing noted that Shayarin and Teitelbaum received $1.16 million dollars; the *Shayarin* Case was dismissed with prejudice, and "as a result, the [Shayarin] case was

dismissed with prejudice and Teitelbaum gave up any rights to BHA and the Boulder Hill Apartments, an asset of considerable value that Defendants [YRY] now control." Judge McGing also commented that he was troubled that Teitelbaum was asserting that the estate planning regime the Ybarras established by Leventhal Perlstein 2011 was fraudulent, since it was Teitelbaum who introduced Yolanda Ybarra to Michael Tuchman of Leventhal Perlstein in the first place.

144.     CNTRST did not appeal the order denying its motion for receiver.

145.     On October 16, 2018, the Bank did not proceed to hearing in Case Number 50077 on its emergency motion to appoint receiver of the Boulder Hill Apartments.

146.     On June 4, 2019, The Bank withdrew its emergency motion per Section 2-1402 to appoint a receiver for the Boulder Hill Apartments, which had been fully briefed since early October 2018.

147.     Nonetheless, the Bank did not agree to withdraw or vacate the portion of the briefing schedule which froze BHA's operating account.

148.     The freezing of that account caused substantial economic damage to Counter-Plaintiffs.

149.     The Bank intentionally and unjustifiably interfered with this relationship by seeking appointment of a receiver knowing full well the Ruben was not a member of YRY.

150.     The actions of Counter-Defendants caused damage to BHA and YRY by freezing its bank accounts, causing it to lose liquidity and profits, and loss of business opportunities.

WHEREFORE, Counter-Plaintiffs Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC pray that this Court: (a) enter judgment in their favor for actual damages against all Counter-Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

## Count IV
### Tortious Interference with Prospective Economic Advantage

151.    Counter-Plaintiffs incorporate and re-allege allegations 1-128 and 122-136, and 138-150, as if set forth in full herein.

152.    By virtue of the Motion for Judicial Determination, the restraining citations, the motion(s) for appointment of receiver, and the Freeze Orders, Counter-Plaintiffs' ability to alienate or sell the BHA apartment building was held up for years, causing Counter-Plaintiffs significant damages.

153.    Boulder Hill obtained title to the Boulder Hill Apartments and recorded special warranty deeds in June 2015.

154.    On or about June 11, 2018, Boulder Hill obtained a loan from T2. T2 secured its loan to Boulder Hill with a mortgage.

155.    In May 2018, Boulder Hill entered into a property management agreement with Real Realty LLC.

156.    On August 30, 2018, the Bank filed a motion to appoint a receiver to operate the Boulder Hill Apartments. The receiver motion was not filed pursuant to a mortgage or any other written contract, but instead was sought pursuant to an arcane section of 735 ILCS 5/2-1402. The Bank's motion for receiver was fully briefed by the parties, and then inexplicably withdrawn in 2019.

WHEREFORE, Counter-Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against Counter-Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

Respectfully Submitted,

/s/ Christopher V. Langone

Christopher V. Langone
205 North Michigan Ave.
Suite 810
Chicago, IL 60601
(312) 720-9191
Chris@LangoneLaw.com