## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CENTRUST BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-2576 |
| | ) | (partially consolidated |
| | ) | with Case No. 21 2702) |
| RUBEN YBARRA, *et al*., | ) | |
| | ) | Judge Sara L. Ellis |
| Defendants. | ) | |
| | ) | |

### CDR PARTIES' MOTION FOR ORDERS GRANTING ADDITIONAL TIME TO RESPOND TO COUNTERCLAIM AND EXTENDING DISCOVERY DEADLINE

CNTRST Debt Recovery and Bruce Teitelbaum (the "**CDR Parties**")[1] by and through undersigned counsel, hereby request the entry of an Order granting each of them at least an additional seven (7) days to respond to the counterclaim (Dkt. 44 in Case No. 21-02702) filed by Ruben Ybarra, YRY Holdings LLC and Boulder Hill Apartments (collectively, the "Ybarra Parties"), and extending the deadline for the CDR Parties and Centrust Bank, N.A. to complete non-expert discovery to May 12, 2023. In support of their motion, the Plaintiffs state as follows:

---

[1] The CDR Plaintiffs filed suit against Ruben Ybarra YRY Holdings, LLC and Boulder Hill Apartments, LLC on May 19, 2021. That suit was assigned Case No. 21-02702. Centrust Bank, N.A. filed suit against the same defendants on May 12, 2021. That suit was assigned Case No. 21-02576. Eventually, both cases were consolidated with this Court. Since July of 2022, all docket entries have been made in Case No. 21-02576, including the Court's Order of January 6, 2023, which granted "Defendants' motion for leave to file counterclaims and third-party claims." (Dkt. No. 69)

## THE FILING OF THE COUNTERCLAIMS

1.     On January 13, 2023, the Defendants filed a document denominated Counterclaim against Centrust Bank in Case No. 21-02576 (Dkt. 70) and a nearly identical Counterclaim against the CDR Parties in Case No. 21-02702 (Dkt. 44).[2] The counterclaims each contain five (5) counts and the allegations relate to conduct in post-judgment proceedings that had been pending in the Circuit Court of Cook County.[3]

2.     On February 2, 2023, Centrust Bank filed "Centrust's Contingent Motion to Strike or Extend Time." (Dkt. No. 72). Centrust Bank's recent filing (the "Motion to Strike"), argues that the Counterclaim filed by the Ybarra Parties should

_____

[2] Case No. 21-02576, filed by Centrust Bank, N.A., and Case No. 21-02702, filed by the CDR Parties, have been consolidated for discovery. Since July of 2022, Court filings dealing with discovery issues and requests for extensions have generally been docketed in Case No. 21-02576, and thus the CDR Parties are filing this motion in Case No. 21-02576.

[3] On November 21, 2022, the Defendants filed an action in the Circuit Court of Cook County, 2022 L 10392, against the CDR Parties, Centrust Bank and several additional parties, including the Vice Chairman of Centrust Bank (the "State Court Action," attached as Exhibit 1). The allegations and causes of action asserted in the State Court Action are substantially similar to the allegations and causes of action asserted in the Counterclaim before this Court. By Order of January 23, 2023, the Hon. John J. Curry, Jr. dismissed the CDR Parties and Centrust Bank from the State Court Action without prejudice. A copy of the order is attached as Exhibit 2. The State Court Action remains pending, albeit against parties other than the CDR Parties and Centrust Bank, N.A.; although the President of Centrust Bank, N.A. remains a defendant in the State Court Action.

be stricken because "they did not include it within a pleading, so it was never properly before the Court." *Id.* P. 1. Centrust Bank also has argued that "[i]f the Court does not agree that this entire case has been dismissed or that the putative 'Counterclaim' should be stricken, Centrust would request that the Court grant it an extension of time [28 days] to address several additional issues via motion." *Id.* pp. 6-7

3. Had Centrust Bank not filed its Motion to Strike, the CDR Parties were prepared to ask the Court to extend by seven (7) days the time for the CDR Parties to respond to the Counterclaim filed against them in Case No. 21-02707. The CDR Parties believe this request would be unopposed by the Ybarra Parties based upon a phone conversation on February 1, 2023, during which the Ybarra Parties agreed to extend the time for the CDR Parties to respond to the Counterclaim.

4. In view of the issues raised by the Motion to Strike and the possibility that those issues could lead to revised pleading or response deadlines, or some other outcome, the CDR Parties request that the Court extend the time for the CDR Parties to respond to the Counterclaim in Case No, 21-02707 to a date conforming to any dates set with respect to the Counterclaim against Centrust Bank in Case No. 21-02756. In other words, if Centrust Bank is granted 28 days to respond to the Counterclaim, the CDR Parties request a similar extension.

5. Synchronizing the Counterclaim response dates for each of the CDR Parties and Centrust Bank is sensible because the Counterclaim against each of

them is nearly identical and entering separate and disparate briefing schedules invites further confusion, additional work for the Court and the parties, and uncertainty.

## DISCOVERY EXTENSION

6.      Prior to the Court's order granting the Ybarra Parties leave to file the Counterclaims, the Court set a non-expert discovery deadline of February 14, 2023. (Dkt. No. 66)  The CDR Parties believe there is good cause to extend the non-expert discovery deadline by at least an additional 90-days.

7.      First, the discovery deadline was set based upon issues and facts that were raised in the complaints filed by the CDR Parties and Centrust Bank, and did not contemplate the new facts or issues raised in the Counterclaim.  Additional time is thus needed to conduct discovery on these new facts and issues.

8.      Second, the parties are not yet at issue on the facts and issues raised in the Counterclaim.  In fact, as noted above, Centrust Bank has moved to strike the Counterclaim on the basis that it is procedurally not proper, and it is seeking at least 28 days after resolution of that issue before responding to the Counterclaim. Additional time is thus needed to help develop fully the facts and issues that are disputed and the discovery that will be needed from the parties, and third-parties, to address the disputed issues.

9.      Finally, counsel for the CDR Parties has discussed the discovery deadline with counsel for each of the other parties (e.g., the Ybarra Parties and Centrust Bank) and as a result of those discussions believes the parties generally

4

agree that additional time is needed to complete non-expert discovery.

10.     Accordingly, the CDR Parties request that the Court extend the existing non-expert discovery deadline by at least 90-days, and potentially longer.

WHEREFORE, for all the foregoing reasons, CNTRST Debt Recovery and Bruce Teitelbaum respectfully request that the Court extend to the same date provided to Centrust Bank, N.A. the time for them to answer or otherwise respond to the Counterclaim and extend the fact discovery deadline to May 12, 2023, at the earliest, and grant such other and further relief as is just and proper.

Dated:  February 3, 2023                    Respectfully submitted,

                                            **CNTRST DEBT RECOVERY AND
                                            BRUCE TEITELBAUM**.

                                            By: */s/   William J. Factor*
                                                  One of their Attorneys

William J. Factor
David Hassel
**FACTORLAW**
105 W. Madison Street, Suite 1500
Chicago, IL 60602
(312) 878-6146
wfactor@wfactorlaw.com

5

# Exhibit 1

All Law Division initial Case Management Dates will be heard via ZOOM.
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME/Zoom-Links/Agg4906_SelectTab/12
Remote Court date: 1/23/2023 9:30 AM

FILED
11/21/2022 12:00 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2022L010392
Calendar, I
20376785

FILED DATE: 11/21/2022 12:00 AM  2022L010392

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

RUBEN YBARRA, YRY HOLDINGS,    )
LLC and BOULDER HILL    )
APARTMENTS, LLC,    )
   )    Case No.
Plaintiffs,    )
   )    **2022L010392**
v.    )
   )
CNRTST DEBT RECOVERY, BRUCE    )
TEITELBAUM, ERIC FERLEGER,    )
CENTRUST BANK, N.A., JAMES    )
McMAHON, MARKOFF LAW LLC,    )
DOUG GEISE, KLUEVER & PLATT,    )
LLC, and M. REAS BOWMAN,    )          )
   )
Defendants.    )

### COMPLAINT

Plaintiffs, Ruben Ybarra, YRY Holdings, LLC, and Boulder Hill Apartments, LLC (collectively, "Plaintiffs"), by their attorneys, Christopher V. Langone of Langone Law LLC, and as their *Complaint*, state as follows:

### Introduction

1. The Defendants in this case all acted together to carry out a malicious and vindictive scheme to harass Ruben Ybarra and his family using post-judgment litigation pending the Circuit Court of Cook County with the case number 2010 L 050077 ("Case Number 50077"). Defendant Bruce Teitelbaum and his friend, employee, and co-conspirator, disbarred-attorney Eric Ferleger devised, implemented, and facilitated a champertous and malicious scheme to use Teitelbaum's self-described "a-hole" lawyers to foment litigation for no purpose other than to extort a "$$ettlement," interfere with Ruben's business relationships and economic advantage, and ultimately seize an apartment complex to which Teitelbaum had relinquished claims pursuant to a

1

prior settlement agreement (hereinafter the "Champerty & Interference Scheme").

2.      In order to pursue the Champerty & Interference Scheme, Teitelbaum and Ferleger enlisted the assistance of complicit attorneys, as alleged more fully herein. Also complicit, and a co-conspirator, in this scheme was Centrust Bank, and the sham entity Defendants created: CNTRST Debt Recovery, which was the vehicle through which the tortious scheme was implemented. As alleged herein, the Defendant attorneys were purportedly representing Centrust Bank in what seemed to be a garden-variety post-judgment proceeding. But as Defendants knew the entire time – yet concealed from Plaintiffs and the Court – they were not genuinely representing Centrust Bank at all, but instead were doing the bidding of CNTRST Debt Recovery, which was a front for Teitelbaum, a disgruntled former business partner that settled a claim with Ybarra and then later regretted his deal. As a result of Defendants' tortious actions, Plaintiff had millions of dollars of assets tied up, paid hundreds of thousands in attorney's fees, and suffered other damages as alleged herein.

### Parties and Relevant Entities

3.      Plaintiff RUBEN YBARRA ("Ruben") is an individual and citizen of the State of Texas.

4.      YOLANDA YBARRA ("Yolanda") is Ruben's wife and is a citizen of the State of Texas.

5.      YRY HOLDINGS, LLC ("YRY") is a limited liability company organized and existing under the laws of the State of Delaware.

6.      YRY was formed as a limited liability company organized and existing under the laws of the State of Delaware on August 1, 2011.  At all relevant times, the three members of YRY were: (a) the Yolanda Ybarra Revocable Trust, (b) the Ybarra Children Investment Trust, and (c)

the Ruben Ybarra Family Insurance Trust. Ruben was designated as the manager of YRY, which was a manager-managed LLC, *not* a member-managed LLC. Ruben was *not a member* of YRY, and at all relevant times, Defendants (and each of them) knew that, indeed Defendants specifically and falsely represented to the Court that Ruben was a member of YRY for no other purpose other than to tie up and interfere with Ruben's assets and income stream, by preventing any distributions from YRY. Yet, as more fully alleged herein, at various times throughout the state court proceedings, Defendants knowingly and falsely represented to the Court that Ruben was a member of YRY.

7.      Boulder Hill Apartments, LLC ("BHA") is a limited liability company organized and existing under the laws of the State of Illinois, with one member: YRY.

8.      Defendant CNTRST DEBT RECOVERY, INC. ("CNTRST") is an Illinois corporation with its principal place of business in Illinois. CNTRST was a "shell" company, and the alter-ego of Teitelbaum.

9.      Defendant BRUCE TEITELBAUM ("Teitelbaum") was, at all relevant times, the President of CNTRST.

10.     Defendant ERIC FERLEGER ("Ferleger") is an individual and citizen of the State of Illinois. On information and belief, prior to his being disbarred Ferleger was a collection attorney and had close personal and professional relationships with Teitelbaum, as well as the law firms named as Defendants herein: Kluever and Platt, LLC and Markoff, LLC.

11.     Defendant CENTRUST BANK, N.A. (the "Bank") is a national banking association. The Bank's main office is located at 385 Waukegan Rd, Northbrook, Illinois 60062.

12.     Defendant JAMES McMAHON (McMahon") was, at relevant times, President of the Bank. Although, as alleged herein, on information and belief, McMahon may have taken

FILED DATE: 11/21/2022 12:00 AM    2022L010392

3

FILED DATE: 11/21/2022 12:00 AM    2022L010392

certain actions in his individual capacity only, and not as an agent of the Bank. Only discovery will reveal the truth.

13.     Defendant MARKOFF LAW LLC ("Markoff LLC") is an Illinois law firm. At all times relevant herein, attorney and Defendant DOUG GEISE ("Geise") of Markoff LLC (collectively "Markoff") claimed to be representing the interests of Centrust Bank in Case Number 50077. But according to Bank President McMahon's sworn Interrogatory Answers, Geise and Markoff were not, in fact, representing Centrust Bank.

14.     Defendant KLUEVER & PLATT, LLC ("Kluever LLC") is an Illinois law firm. At times relevant herein, and prior to the time Markoff appeared, attorney and Defendant M. REAS BOWMAN ("Bowman") of Kluever LLC (collectively "Kluever") claimed to be representing the interests of Centrust Bank in Case Number 50077. But according to Bank President McMahon's sworn Interrogatory Answers, Geise and Markoff were not, in fact, representing Centrust Bank. The Bank's position is belied by emails sent by McMahon, unless discovery reveals those emails were sent, not as an agent of the Bank, but as a rouge officer. Regardless, of whether the Bank was an active participant, or passively relinquished control, regardless of whether McMahon and the Bank were joint venturers, or co-conspirators, or both, they are jointly liable as alleged herein.

15.     Shortly after he filed for bankruptcy (filed April 30, 2010), in approximately June of 2010, Teitelbaum approached Yolanda, Ruben's wife, and solicited her participation in certain business ventures. As their business ventures developed, Teitelbaum introduced Ruben and Yolanda to his attorney, Michael Tuchman.  With Tuchman's assistance, Yolanda created various entities that would enable Teitelbaum and Yolanda to participate in real estate transactions despite the Judgments against Ruben and his substantial unrelated debt. One of

these entities was YRY.

**The *Shayarin* Case and *Shayarin* Settlement**

16.     On October 6, 2011, Boulder 2011 LLC ("Boulder 2011") was incorporated with the Illinois Secretary of State. YRY, Shayarin LLC (of which Teitelbaum was manager), and Susan Goldner were the original members of Boulder 2011. Teitelbaum and Ruben were managers of Boulder 2011.

17.     On August 18, 2014, Teitelbaum and his limited liability company Shayarin LLC filed suit against YRY, Boulder 2011, and Ruben (the "*Shayarin* Case."). In the *Shayarin* Case, Teitelbaum sought to dissolve Boulder 2011 and to compel a sale of the Boulder Hill Apartments.

18.     In the *Shayarin* Case, Teitelbaum intentionally and falsely alleged that Ruben was a 100% member of YRY. This false allegation is important because it shows that Defendants, including Kluever, and subsequently Markoff, were (or should have been) fully aware that Ruben was not a member of YRY – nonetheless, Defendants falsely, fraudulently, and repeatedly represented to Illinois courts that he was.

19.     On April 24, 2015, Shayarin, Teitelbaum, Ruben, and YRY settled the *Shayarin* Case (the "*Shayarin* Settlement"). Pursuant to the *Shayarin* Settlement, YRY agreed to purchase, and did in fact purchase, Teitelbaum & Shayarin's membership interest in Boulder 2011 – and, thus, all interest in the Boulder Hill Apartments – for 1.16 million dollars. After performance by YRY, the *Shayarin* case was dismissed in accordance with the *Shayarin* Settlement.

20.     Teitelbaum, however, had no intention of honoring the *Shayarin* Settlement. He had almost immediate buyer's remorse about the *Shayarin* Settlement, or maybe even hatched the scheme alleged herein prior to the *Shayarin* Settlement. But one thing was for sure, Teitelbaum's eyes were fixed on obtaining more, if not all, of the Boulder Hill Apartments for

5

FILED DATE: 11/21/2022 12:00 AM   2022L010392

himself, and he was going to interlope into the then-dormant Centrust collection action and foment and maintain litigation for improper and extortionate purposes, including intentionally running up attorney's fees.

**Select Funding, Eric Ferleger and the**
***Kingston* Case (a/k/a "the Small Case")**

21.     Select Funding LLC ("Select Funding") holds itself out as making "hard money loans" for non-traditional investment properties.

22.     Ferleger is a disbarred attorney, with a long history of discipline with the ARDC, including, but not limited to:

     (a)     In 1991, Ferleger was censured for giving gifts to clerks in collection courtrooms;

     (b)     In 2004, Ferleger was suspended for among other things (such as lying to a court and the ARDC and for drug abuse), abuse in collection proceedings, including personally serving a citation to discover assets when not authorized to do so (by pushing it into the respondent's chest saying "you're served asshole"), threatening to "get" the debtor, and attempting to force his way into the debtor's home;

     (c)     In 2006, further discipline was imposed on Ferleger for, among other things (such as driving under the influence while under and order from the ARDC to not drink, as part of his prior discipline): improperly practicing law during his suspension, failing to account for client funds, improperly threatening criminal prosecution to gain an advantage in a civil case, driving on a suspended license, and failing to follow client's directives; and

     (d)     In 2008, Ferleger was disbarred on consent.

23.     Ferleger claims to be the "Office Manager" for Select Funding.

24.     Ferleger was also a friend of Teitelbaum and a part of the "mastermind" group behind the Champerty & Interference Scheme alleged herein. It is believed that he improperly performed much of the legal work behind the scenes, in order to keep costs down for Defendants (and increase cost on Plaintiffs), who was forced to employ legitimate, legally-admitted, attorneys.

6

FILED DATE: 11/21/2022 12:00 AM   2022L010392

25.     Select Funding held certain mortgage loans against a property owned by 7550 Kingston LLC (the "Kingston Property"), a company in which some of the Plaintiffs held membership interests.  Litigation was filed against Ruben and others in the Circuit Court of Cook County regarding this Kingston Property (the "*Kingston* Case").

26.     The complete circumstances of the *Kingston* Case are not fully relevant to Defendants' liability as alleged herein, other than to note that the *Kingston* Case involved a unique issue regarding insurance and non-occupied buildings. More importantly, the *Kingston* Case formed a template for the larger Champertous extortion scheme, relating to Boulder Hill Apartments, as more fully alleged herein.

27.     This so-called "small case" (as it was called in emails eventually unearthed by Plaintiffs) became a model for what Teitelbaum (along with McMahon, the Bank, Kluever, and Markoff) sought to replicate with respect to the Boulder Hill Apartments.

28.     Teitelbaum reported in an email dated January 24, 2019: "Was paid $245,000 from the thief [referring to Ruben] in the small case. With legal fees and additional interest, it cost the "a-hole" (i.e., Ruben) somewhere around $440,000 to settle what was a $180,000 debt." In other emails Teitelbaum and McMahon noted that their efforts were just "like the small case" only on a larger scale. As noted in an email dated September 21, 2018, "Following same pattern as small case."

29.     With respect to the specific goal of increasing Plaintiffs' attorney's fees, even more than a year later, Teitelbaum was boasting, "Now these legal fees will carry interest at 9%." The fact that Teitelbaum was gloating about the interest on the attorney's fees shows part of his intent, his obsession with attorney's fees, and evidenced his desire to improperly use litigation to drive up Plaintiffs' fees.

FILED DATE: 11/21/2022 12:00 AM    2022L010392

30.     Further, in subsequent emails, Teitelbaum and McMahon revealed their intent to try to replicate the extortion they had enacted in the "small case" (i.e., the *Kingston* case) on a larger level with Boulder Hill Apartments. After all, if the "a-hole" paid $440,000 on a "$180,000 debt," imagine what they could do in their efforts to run-up Ybarra's attorney's fees on the "bigger" case – as Teitelbaum's email of January 24, 2019, noted: "they have $5,000,000 of equity in the apartments they bought me out of."

### The Formation of CNTRST, the Champertous Cooperation Agreement,<br>& Taking Control of the *Kingston* Case, a/k/a "The Small Case"

31.     As a result of the great real estate crash of 2008 and 2009, Ruben lost millions of dollars; as a result, various judgments totaling over $2.6 million (collectively the "Judgments") were entered against him.  One of these Judgments was obtained on January 28, 2010, Case Number 50077 in the amount of $1,142,414.88. The Bank was not diligent in collecting the Judgments prior to being approached by Teitelbaum, who proposed the Champertous Scheme more fully described and alleged herein.

32.     CNTRST was incorporated on August 8, 2015. Teitelbaum was identified as CNTRST's president. CNTRST was created as a vehicle through which Defendants would implement their Champertous Scheme. CNTRST was, and is, undercapitalized, did not maintain corporate formalities, and a mere alter-ego of Teitelbaum. Accordingly, any corporate "veil" between CNTRST and Teitelbaum should be disregarded.

33.     On August 18, 2015, the Bank and CNTRST executed a document entitled "Agreement of Creditors" (hereinafter the "Champertous Agreement").  As to the Champertous Agreement: (i) CNTRST's alleged respective claims were not identified; (ii)  the Bank identified its "respective claims," (and all of them were against Ruben and companies owned by Ruben); (iii) YRY, BHA, and Yolanda were not identified as "Debtors;"; (iv) the word "assignment" did not

appear anywhere; (v) the agreement was drafted by Defendant Markoff Law; (vi) McMahon, the Bank's president, signed the agreement; (vii) CNTRST was responsible for hiring, paying, and directing so-called "Lead Counsel;" (viii) the Bank was to get 30% of recovered money and CNTRST was to get the remaining 70%; and (ix) the Agreement was to be kept confidential.

34.     From August 18, 2015 through August 21, 2019, none of the Defendants disclosed the existence of the Champertous Agreement to YRY, BHA, Ruben, or any state court judge in any of the proceedings pending during this timeframe, including Case Number 50077.

35.     On September 2, 2015, Select Funding, presumably at the direction of Ferleger, assigned the underlying mortgage in the *Kingston* Case and the rights to pursue that litigation to CNTRST (the "*Kingston* Assignments"). The *Kingston* Assignments were recorded with the Cook County Recorder of Deeds on September 15, 2015. The *Kingston* Assignments were executed by Select Funding's "manager," disbarred-attorney Eric Ferleger. Indeed, it is believed, and thus alleged, Ferleger was unethically preparing, or providing legal input into, many of the legal documents in the background, including the *Kingston* Assignments. Ferleger notarized the "manager's" (i.e., his own) signature.

36.     After recording, the *Kingston* Assignments were sent to attorney Richard Jones. Jones was the Bank's lawyer in Case No. 10 L 50077 from its initial filing in January 2010 through at least January 2016. CNTRST acquired its interest in the *Kingston* Case <u>after</u> the Champertous Agreement was executed in August 2015. The *Kingston* Case was not identified as a "Respective Claim" of CNTRST when the Champertous Agreement was executed.

37.     In December 2015, CNTRST formally substituted in as plaintiff in the *Kingston* Case for Select Funding.

**The 2016 Motion(s) for Charging Order(s) and**
**False Allegations that Ruben was A Member of YRY**

FILED DATE: 11/21/2022 12:00 AM    2022L010392

FILED DATE: 11/21/2022 12:00 AM    2022L010392

38.     On January 7, 2016, Plaintiff in Case Nos. 2010 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287 filed motions for charging orders ("Motion[s] for Charging Order[s]") against Ruben's alleged interest in YRY (of which, in truth, as Defendants knew full well, there was none). The Motions for Charging Orders were noticed to proceed on January 26, 2017. The Motions for Charging Orders falsely alleged that Ruben was the manager of YRY, and according to the LLC Act, a charging order would be appropriate.

39.     The Motion for Charging Order in Case Number 50077 was withdrawn after counsel for Ruben and YRY advised the Bank's then counsel, Richard Jones: (a) that the Bank had not yet served citations on Ruben, Yolanda, or YRY; and (b) more importantly, Ruben was a manager but not a member of YRY. This latter fact, and the Defendants' knowledge of it, assumes particular importance in light of Defendants' subsequent conduct, where they repeatedly, and knowingly, made false representations to the state courts that Ruben was a member of YRY when they knew he was not, and did so for the sole purpose of interfering with Ruben's contracts and prospective economic advantage, as alleged below.

**Kluever Appears and Files Improper Motions for a Receiver**

40.     On June 22, 2016, Kluever appeared, purportedly for the Bank, in Case Number 50077. But as the Defendant McMahon later claimed in the Interrogatory Answers: "Centrust states that it was not involved with any post-judgment court filings and therefore has no knowledge of the same." and "Centrust states that it was not involved in engaging or compensating any of the aforementioned attorneys." Only discovery can reveal the truth in this regard, as this statement is undermined by emails from McMahon (unless he was only acting in an individual capacity, and not as an agent of the Bank, when he sent them).

41.     For instance, email communications between Teitelbaum and McMahon, an officer

10

FILED DATE: 11/21/2022 12:00 AM    2022L010392

of the Bank, reveal a malicious campaign to "set up a contempt," against Ybarra to "beat him into submission," "using his own wife as the Club," and "extract a seven-figure settlement."

42.     At various times, for instance, Teitelbaum and McMahon exclaimed in emails "$$ettlement time!" and "I can't wait to visit our grand apartment complex when you get the keys soon." The "grand apartment complex" referred to is Boulder Hill Apartments ("Boulder Hill Apartments"), which is owned by Plaintiff BHA. The scheme to attempt to use litigation to take over Boulder Hill Apartments is alleged more fully below.

43.     As alleged above, part of Defendants' plan was to "set up a contempt." On June 7, 2017, for instance, McMahon wrote an email that stated, in relevant part, "[k]eep these updates coming, Bruce, When Judge White is really ready to jail him and/or his wife for contempt of court (and he really will do it) your lawyers will have the opportunity to extract a seven-figure settlement."

44.     "Take no prisoners!" the Defendants repeatedly exhorted each other. Additionally, Defendants' emails contained violent metaphors, "the noose is getting tighter," and "very close to getting the death knell."

45.     On July 28, 2016, in all of the cases *except* Case Number 50077, Kluever, purportedly on behalf of the Bank, filed motions for charging orders to impose a lien on Ruben's non-existent membership interest in YRY. The motions were scheduled to proceed on August 2, 2016.

46.     In the late afternoon of August 1, 2016, however, Kluever, purportedly on behalf of the Bank, filed so-called "corrected" motions for charging orders that changed the amount due and owing on the judgments. Notice of these motions was sent to Ruben via regular mail, in his individual capacity, to an address in Boca Raton, Florida. Ruben did not reside at this address.

47.     The motions were granted on August 2, 2016, as Ruben's interests were not

FILED DATE: 11/21/2022 12:00 AM    2022L010392

represented due to the short (one day) notice to an invalid address. McMahon and Teitelbaum were not interested in proper notice; after all, they were trying to "set up" a contempt, as explained in more detail herein.

48.     McMahon and Teitelbaum could hardly contain their glee when Judge Alexander White was assigned to the case. As McMahon stated, "Judge White can make Satan cry real tears. You drew to an inside straight when your case was assigned to him. Take no prisoners!"

49.     McMahon, Teitelbaum and Kluever knew something else about Judge White, something that every collection attorney that regularly appeared before him had observed. Judge White was quite elderly at that time, and it was observed that his memory was deteriorating over time. With due respect to his Honor – but this is an important fact – it was easy for a slick attorney to confuse and mislead Judge White during that final phase in his otherwise illustrious career.

50.     As alleged herein, Defendants were also attempting to capitalize on the growing age-related cognitive challenges of Judge White. Defendants variously referred to Judge White as the "dear old gentleman" who "takes longer to get there." Yet they also knew "the old legal lion," "needed to retire."  Their pleadings were intentionally designed on their desire to capitalize on Judge White's lack of memory and to deceive him into "jail[ing]" Ybarra.

51.     McMahon and Teitelbaum were giddy with talk about the "threat of jail time." As McMahon wrote:

> I've seen the threat of jail time for contempt of court bring the mighty Bob Coe to his senses. It should work for Rubin as well. It got to the 23rd hour before Bob settled, so I imagine that Rubin will go right to the brink as well.

52.     On August 18, 2016, Defendants McMahon and Teitelbaum queried, "I trust if we get him thrown in jail, you have no interest in loaning him money to post bail?"

53.     As part of the scheme to "set up contempt" and confuse and deceive Judge White,

the motions for charging order falsely and knowingly claimed that Ruben was the managing member of YRY (as all Defendants knew, Ruben was not a member of YRY). The motions also wrongly invoked the charging order section of the Illinois LLC statute.

54.    But McMahon, Teitelbaum and Kluever did not care. After all, as McMahon exhorted in emails: "Take no prisoners!"

55.    As before, YRY and Ruben were unrepresented at this time.

56.    In all cases other than Case Number 50077, on September 9, 2016, Kluever, purportedly on behalf of the Bank, filed motions under the Illinois LLC Act to appoint disbarred-attorney Ferleger as a receiver to enforce the charging orders over Ruben's alleged but – as the Bank, Teitelbaum, and Kluever knew – non-existent distributional membership interest in YRY. The notices of motion stated that they were served via regular mail to Ruben in his individual capacity and as the manager of YRY.

57.    The motions for a receiver did not reveal Ferleger's role in assigning the *Kingston* Case to CNTRST, or other information showing he was in on the scheme. A receiver is supposed to be an honest, ethical, and disinterested officer that reports to the Court, not a co-participant and co-mastermind behind a champerty scheme.

58.    Kluever, purportedly on behalf of the Bank., falsely alleged that Ruben was the managing member of YRY. The motion also falsely alleged that YRY generates income that is ultimately distributed to Ruben.

59.    The motions (falsely) chronicled Ruben's supposed failure to comply with citations, charging orders, and the entry of body attachment orders – thus continuing to try to "set up" a contempt.

60.    As with the prior filings, the motions to appoint a receiver were not verified.

61.     The motions to appoint receiver were silent about Ferleger's qualifications to act as a receiver and did not allege that Ferleger is disinterested, which he clearly was not.

62.     McMahon, Teitelbaum and Kluever knew these defects would be easy to slip past "old Man White."

63.     The motions for receiver were granted September 14, 2016.

64.     The order required Ruben and YRY to: (a) turn over records; (b) to cooperate with Ferleger; and (c) barred YRY from making distributions without prior notice to Ferleger. Plaintiffs continued to be unrepresented in the state court at this time.

**The Conditional Judgments**

65.     On November 2, 2016, Teitelbaum sent McMahon an email, with the subject "Motion to Compel and Conditional; Judgment," in which he stated: "still working and inching closer."

66.     On November 16, 2016, in Case Number 50077, the Court entered a conditional judgment against YRY in the amount of $1,142,414.88 for its alleged failure to comply with a third-party citation. The order went on to state that the conditional judgment order could be sent to Ruben "consistent with the Court's order of September 14, 2016 granting Plaintiff leave to serve YRY via special order of court on YRY's managing member Ruben Ybarra." Kluever, purportedly on behalf of the Bank, was permitted to serve YRY via certified mail and posting. Once again, as known to Defendants Ruben was never a member of YRY. YRY was unrepresented in Case Number 50077 at this time.

67.     On November 18, 2016, CNTRST filed a motion for summary judgment in the *Kingston* Case. To support CNTRST's claim for attorney's fees, CNTRST attached the affidavit of Steve Werner, who was falsely identified as CNTRST's President. According to

FILED DATE: 11/21/2022 12:00 AM   2022L010392

FILED DATE: 11/21/2022 12:00 AM    2022L010392

records from the Illinois Secretary of State, Teitelbaum was, and had always been, CNTRST's President. Disbarred-attorney Ferleger notarized Werner's signature as President of CNTRST.

68.     On December 29, 2016, in Case Nos. 10 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287, Kluever, purportedly on behalf of the Bank, filed notices of motion certifying that they had simultaneously filed, "Plaintiff's Motion to Compel and for Conditional Judgment Against YRY Holdings." The motions were set to be heard on January 18, 2017. No motions to compel and/or for conditional judgment against YRY were attached to the notices of motion. Instead, the Bank attached five virtually identical pleadings simply titled "Motion." The relief sought in the "Motions" was <u>revival</u> of the December 2010 Judgments. These incorrect notices of motion and the motions to revive judgments in *all five cases* were all filed *only* in Case Number 50078. The court dockets in Case Nos. 10 L 50077, 10 L 50079, 10 L 50286, and 10 L 50287 do not reflect that any such notices and motions were filed on December 29, 2016. The notices of motion to compel and for conditional judgment against YRY were, yet again, directed to Ruben at a condominium complex in Boca Raton, Florida.

### The Petitions to Revive

69.     On January 11, 2017, Kluever, purportedly on behalf of the Bank, filed "Amended Notices of Motion" to present on January 18, 2017, Plaintiff's Motion to Revive Judgment. These Amended Notices of Motion to Revive Judgment were filed in Case Nos. 10 L 50077, 10 L 50078, 10 L 50079, 10 L 50286, and 10 L 50287. The Amended Notices of Motion stated the Petitions to Revive Judgment were attached. They were not. The Amended Notices of Motion were directed via regular mail, only to Ruben, at a condominium complex in Boca Raton, Florida. Once again, as McMahon, Teitelbaum and Kluever knew, Ruben did not live in Boca Raton, Florida at this time.

70.     On January 28, 2017, the Bank's judgment in Case Number 50077 lapsed. The

FILED DATE: 11/21/2022 12:00 AM    2022L010392

Bank's judgment lien on real property of Ruben also lapsed.

71.     On February 23, 2017, in Case Number 50077, the Court entered an order permitting service of the petition for revival by mailing the petition to Ruben's new lawyer Arnstein & Lehr. The order also contemplated an agreed-upon deposition of Ruben in the near future.

72.     On April 4, 2017, Kluever, purportedly on behalf of the Bank, attempted to revive the judgment in the amount of $1,853,685.51 in Case Number 50077.

### The Ambush Arrest of Ruben
### When He Voluntarily Appears at a Citation Proceeding

73.     On April 21, 2017, by agreement of the parties, Ruben traveled from Texas to Chicago to sit for a preliminary citation exam at the office of Kluever LLC. The citation exam was "preliminary" because not all of the documents were then available. Despite the agreement of the parties that Ruben appear for a preliminary exam, the exam was terminated when the Cook County Sheriff arrested Ruben and brought him before Judge White.

74.     Unbeknownst to Ruben at the time, but known to McMahon, Teitelbaum and Kluever -- who were still in the process of "setting up" Ruben -- it was the intent of McMahon, Teitelbaum and Kluever to execute a body attachment on Ruben at the citation.

75.     Teitelbaum was present when Ruben was seized pursuant to a body attachment; he even took a photograph as a sort of trophy to document the occasion. This was a violation of the General Orders of Cook County, which prohibit the taking of photographs in the courthouse.

76.     From April 22, 2017 through May 20, 2020, McMahon, Teitelbaum and Kluever never sought to re-depose Ruben following his body attachment.

77.     On June 7, 2017, McMahon wrote an email that stated:

Keep these updates coming, Bruce, When Judge White is really ready to jail

16

FILED DATE: 11/21/2022 12:00 AM    2022L010392

him and/or his wife for contempt of court (and he really will do it) your lawyers will have the opportunity to extract a seven-figure settlement."

78.     As time went by, however, McMahon and Teitelbaum became increasingly frustrated with "Old Man White." The following emails are illustrative:

(a)     On July 5, 2018, "No settlement until we get a receiver appointed [over Boulder Hill Apartments]. Judge White is sitting on a ruling for about 4 months. He needs to retire!"

(b)     On July 5, 2018, McMahon replied: "I forgot the dear old gentleman is hearing your case. He delivers justice but it takes him longer to get there now!"

(c)     Only July 6, 2018 "FYI judge White is not ruling on anything."

(d)     On August 2, 2018, Contempt equal jail for Ybarra."

(e)     On August 14, 2018, Teitelbaum asked "wonder if old man White can understand what below means…"

**Yolanda Sits for a Citation**

79.     On January 22, 2019, Yolanda sat for her citation exam in Case Number 50007. Yolanda testified that she makes the decisions for YRY and BHA; Ruben did not have an interest in YRY; Ruben cannot access YRY's account; she is the sole breadwinner for the family; and she created YRY as part of estate planning created by Michael Tuchman who was introduced to the Ybarras by Teitelbaum.

80.     McMahon and Teitelbaum knew at the time they were simply harassing Yolanda. As McMahon wrote in an email, "that's how we/you got those judgments against him which are using to beat him into submission. Using his own wife as the club."

81.     On February 13, 2019, McMahon wrote an email to Teitelbaum stating, in relevant part, "I can't wait to visit our grand apartment complex when you get the keys soon."

17

FILED DATE: 11/21/2022 12:00 AM   2022L010392

**Kluever Withdraws & Markoff Appears**

82.     In Spring 2019, the Bank's then purported counsel, Kluever, was permitted to withdraw as counsel of record. Kluever cited unspecified "irreconcilable differences" as grounds for withdrawal.

83.     Teitelbaum sent an email to McMahon stating, "I am changing lawyers to Markoff Law… they think my old lawyers were approaching it wrong (receivership would take 18 months with Ruben the crook) and they are going to try to force a quick []..sale of the property…."

**Markoff's "Motion for Judicial Determination"**

84.     On April 10, 2019, Markoff filed their appearance, purportedly on behalf of the Bank. Markoff, in the name of the Bank, filed a motion entitled "Motion for Judicial Determination" to sell the Boulder Hill Apartments pursuant to 735 ILCS 5/2-1402.

85.     When this motion was filed, there was no attorney of record for Ruben or YRY and BHA.

86.     Yet again, the motion was unverified.

87.     Yet again, the motion falsely alleged that Ruben was a member of YRY.

88.     On June 21, 2019, Teitelbaum wrote, among other things, "good news, current lender very pissed off…." This email shows that it was always Defendants' intent to interfere with Plaintiffs' relations with their lenders – i.e., to "piss" them off. The full text of the email Teitelbaum was as follows:

> Good news, current lender very pissed off. Ruben will have another attorney to pay. Should move the needle a little bit on the settlement. Believe there is a tiny legal opinion that your judgments can prime the first mortgage.

89.     As a result of the filing of the Motion for Judicial Determination, YRY was restrained from alienating, transferring, or selling the Boulder Hill Apartments.

FILED DATE: 11/21/2022 12:00 AM    2022L010392

90.    Also, Ruben was prevented from receiving any money or income due to freeze orders entered in conjunction with Case number 50077 (the "Freeze Orders").

91.    On July 12, 2019, in Case number 50077, YRY and BHA filed petitions to intervene in Case number 50077 to, among other things, dispute and try to secure relief from the Freeze Orders and prevent the efforts from Defendants' seizing and selling the Boulder Hill Apartments, in which Teitelbaum relinquished interest due to the *Shayarin* Settlement.

92.    On July 15, 2019, McMahon wrote, "Rubin is going to put up a struggle before settling. This looks like his last hand before folding…."

93.    On July 17, 2019, Real Realty produced documents responsive to the Bank's third-party citation rider.

94.    The documents produced by Real Realty re-enforced that Ruben did not own or control BHA's operating accounts and that the Boulder Hill Apartments were competently managed.

95.    After Real Realty produced documents, there was undoubtedly no good-faith basis to continue with either the Motion for Judicial Determination or the Freeze Orders (indeed, these motions were knowingly frivolous even before the documents were produced; but production of the documents eliminated any doubt as to this issue). Nonetheless, Defendants continued with their improper, abusive, and champertous scheme to interfere with Ruben's contracts and prospective economic advantage, and Tetielbaum's efforts to circumvent the *Shayarin* Settlement.

**Plaintiffs' Efforts to Obtain the Secret Champertous Agreement**

96.    On August 13, 2019, in Case Number 50077, Markoff refused to voluntarily hand over any agreement that set forth the relationship between the Bank and Teitelbaum and instead directed YRY and BHA to issue a formal document production request for this data, which they

did.

97.     On August 21, 2019, Markoff, purportedly on behalf of the Bank, filed an emergency motion in Case Number 50077 for an *in-camera* inspection of the Champertous Agreement. The motion was denied on the ground there was no emergency.

98.     The State Court directed the parties to craft a protective order that would permit YRY and BHA to see the "Assignment Agreement," (i.e., the Champertous Agreement) but would limit its dissemination.

99.     On August 23, 2019, Markoff distributed a proposed protective order to counsel for YRY and BHA, as well as to counsel for adverse claimants T2 and Real Realty.

100.     On August 28, 2019, the parties appeared on the motion for an *in camera* inspection of the agreement between the Bank and CNTRST. The Court denied the motion to withhold the agreement from YRY and BHA.

101.     The Court also ruled that Defendants could not shield from YRY and BHA materials relating to the negotiation of the agreement. During the hearing, Markoff stated that Ferleger was employed by Teitelbaum and that Teitelbaum referred to Ferleger as his "librarian and translator."

102.     On December 17, 2019, McMahon sent an email that stated, in relevant part: "Much ado about nothing. Pages of legal fees being generated in order to get legal fees. When does Bruce get the deed and master keys to all of the apartments."

103.     On December 31, 2019, in Case No. 10 L 50077, YRY and BHA filed their notice of adverse claim in opposition to the Motion for Judicial Determination.

104.     During the late winter 2019 and early spring 2020, in Case Number 50077, YRY and BHA filed their submissions, amended submissions, and replies relating to the right to and

FILED DATE: 11/21/2022 12:00 AM   2022L010392

scope of discovery pertinent to resolve their notice of adverse claim and to defend against the Bank's so-called "Motion for Judicial Determination."

**Markoff Withdraws &**
**Defendants Acrimoniously "Terminate" their Champertous Scheme**

105.    On June 29, 2020, Markoff filed a motion to withdraw. Like Kluever, Markoff cited "irreconcilable differences" as the basis for withdrawal.

106.    On July 1, 2020, the parties appeared before the Court per the Court's *sua sponte* order for status on pending motions.  All matters were continued until July 10, 2020. The Court ordered Defendant McMahon, the President of the Bank, and Defendant Teitelbaum, the President of CNTRST, to be present on July 10, 2020, so that discovery and the briefing of motions could be addressed.

107.    Over Plaintiffs' objection, the Freeze Orders remained in place.

108.    On July 10, 2020, the parties appeared before the Court for status. Markoff's motion to withdraw was granted.  The Court ordered new counsel file an appearance on behalf of the Bank by July 31, 2020.  The Court further ordered that McMahon and Teitelbaum participate in the next court proceeding on August 4, 2020. The Court repeatedly reiterated that it wanted to move the case along. Teitelbaum announced that the Champertous Agreement was soon to be terminated and CNTRST will "be exiting the case."

109.    Markoff's withdrawal sent Teitelbaum and McMahon scrambling. On July 13, 2020, Teitelbaum sent McMahon, for his review, "a simple termination agreement between the Bank and Centrust." Teitelbaum was also careful to note he'd lawyered up – "Mr. Mack will be representing me in this matter," he wrote, "If Mr. Rappin or yourself has any questions or comments, please call Mr. Mack."

110.    McMahon responded, "This looks like half the story, per a call I received from

FILED DATE: 11/21/2022 12:00 AM    2022L010392

FILED DATE: 11/21/2022 12:00 AM    2022L010392

one of your other advisors, Bruce. Who continues with the litigation to collect on the Centrust judgments? Not Steve Rappin and me. So let's see that other half when you are ready to identify that investor. And that investor's documentation to take over prosecution of the case."

111.    On July 28, 2020, Teitelbaum sent an email to the parties and to the Court advising that the Champertous Agreement had been terminated and that McMahon would distribute proof shortly.

112.    On July 29, 2020, McMahon circulated the Termination Agreement to the parties and to the Court and announced the Bank would not be engaging counsel. The Termination Agreement was dated July 10th, the same day as the last court appearance. The Termination Agreement recited: (i) mutual releases between the Bank and CNTRST; (ii) CNTRST was not entitled to payment or reimbursement of costs while the Agreement of Creditors (i.e., the Champertous Agreement") was in effect; and (iii) required CNTRST to indemnify the Bank for damages and attorneys' fees incurred or asserted against the Bank.

113.    On October 09, 2020, Teitelbaum sent an email to McMahon that stated, "in relevant part … Believe I can be like ruben (sic) 12 months later. Sorry you are involved. Do not believe either of us did anything wrong."

**Allegations of Joint Venture**

114.    Through the Champertous Agreement, the Bank, Teitelbaum and CNTRST entered were engaged in a joint venture (the "Joint Venture"). As joint venturers, the Bank, Teitelbaum and CNTRST employed, as agents, the Attorney Defendants, Kluever and Markoff.

115.    Defendants, and each of them, engaged in acts in furtherance of the Joint Venture; as such, they are jointly and severally liable for the claims alleged herein.

**Allegations of Civil Conspiracy**

FILED DATE: 11/21/2022 12:00 AM   2022L010392

116.     Through the Champertous Agreement, the Bank, Teitelbaum and CNTRST entered into an agreement to commit a tort, or other wrong, specifically, but not limited to champerty and maintenance. The Attorney Defendants, Kluever and Markoff, knew of this agreement, its illegality, yet nonetheless engaged in champerty, as alleged herein.

117.     Defendants, and each of them, engaged in wrongful acts in furtherance of this agreement, including, among other things as alleged herein: concealing the agreement from the State Court and Plaintiffs; improperly moving for appointment of a receiver, as alleged above; improperly subjecting Ruben to a body attachment; improperly interfering with junior lenders, as alleged above; seeking to circumvent the *Shayarin* Settlement.

118.     Defendants' acts, as alleged herein, were in furtherance of the Champertous Agreement.

119.     Plaintiffs suffered damages as a result of Defendants' acts in furtherance of their conspiracy.

120.     As a result of Defendants' conspiracy, they are jointly and severally liable for the claims alleged herein.

**Admissions By the Bank in Interrogatory Answers**

121.     On November 20, 2020, Defendant Centrust Bank, though bank-president Jim McMahon, made the following statement in interrogatory answers in Case Number 50077 (hereinafter "Interrogatory Answers"):

> Centrust did not initiate the monitoring of the CNTRST collection efforts between 2015 and July 2020.  Centrust did not initiate or substantively communicate with Lead Counsel about the Joint Action Recovery Plan between 2015 and July 2020. Centrust was not aware that Teitelbaum or one of Teitelbaum 's LLCs had received more than a million dollars in June 2015…

(Centrust's Answer to Interrogatory No. 12 in Case Number 50077).

FILED DATE: 11/21/2022 12:00 AM    2022L010392

122.     Elsewhere in the Interrogatory Answers, Centrust stated:

(a)     "Centrust answers that it is not aware of any action of any kind that was taken to collect the Judgments." (Centrust's Answer to Interrogatory No. 5);

(b)     "Centrust states that it was not involved with any post-judgment court filings and therefore has no knowledge of the same." (Centrust's Answers to Interrogatories 6, 7, 8, 9, & 11); and

(c)     "Centrust states that it was not involved in engaging or compensating any of the aforementioned attorneys" (including the Attorney Defendants herein). Centrust's Answer to Interrogatory No. 15).

**The Federal Lawsuits**

123.     During the course of Case Number 50077, Plaintiffs' counsel therein claimed, via a letter, that the Bank might have committed torts, including malicious prosecution.

124.     As a result, the Bank and CNTRST filed pre-emptive lawsuits in the United States District Court for the Northern District of Illinois (hereinafter the "Federal Lawsuits"). In the Federal Lawsuits Defendant CNTRST and the Bank sought a declaratory judgment that they did not commit the tort of malicious prosecution (the "Federal Declaratory Judgment Claims"). They also made allegations against Plaintiffs, claiming Plaintiffs had engaged in abuse of process by serving discovery calculated to obtain facts to support possible claims by Plaintiffs against the Bank and CNTRST in connection with conduct that occurred in Case Number 50077 (the "Federal Abuse of Process Claims").

125.     The Federal Declaratory Judgment Claims were dismissed as speculative and premature.

126.     The Federal Abuse of Process Claims remain pending.

127.     Plaintiffs have sought leave to file some of the claims herein as counterclaims in the Federal Lawsuits in the event they are deem compulsory counterclaims and the district judge allows

FILED DATE: 11/21/2022 12:00 AM    2022L010392

leave to amend and assert them. These claims, however, are likely permissive counterclaims under federal law, not compulsory counterclaims. Plaintiffs are currently awaiting a ruling on this issue in the Federal Lawsuits, with said ruling expected in January 2023.

128.    The Attorney Defendants are not parties in the Federal Lawsuits.

**Count I**
**Champerty**

129.    Plaintiffs incorporate and re-allege allegations 1-128, as if set forth full herein.

130.    Teitelbaum and CNTRST were strangers to the litigation involving Ruben and the Bank.

132.    Teitelbaum was motivated by malice against Ruben as a result of the *Shayarin* Case and *Shayarin* Settlement.

133.    Teitelbaum wanted to obtain a larger share of the Boulder Hill Apartments than he had agreed to in the *Shayarin* Settlement.

134.    The Bank had all but abandoned its efforts to collect on the Judgments.

135.    Teitelbaum approached McMahon and the Bank pursuant to his desire to "stir up litigation" between the Bank and Ruben, and in an effort to accomplish by duplicity what he could not do directly – obtain ownership and/or profits from the Boulder Hill Apartments (and Plaintiff BHA) in breach of the *Shayarin* Settlement.

136.    Maintenance is assistance to a litigant in pursuing or defending a lawsuit provided by someone who does not have a bona fide interest in the case.

137.    Champerty is a form of maintenance in which a nonparty undertakes to further another's interest in a suit in exchange for a part of the litigated matter if a favorable result ensues.

138.    The doctrines of champerty and maintenance were developed at common law to prevent officious intermeddlers, such as Defendants here, from stirring up strife and contention,

Case: 1:21-cv-02576 Document #: 74 Filed: 02/03/23 Page 32 of 41 PageID #:1077



as they did here, by vexatious and speculative litigation – (e.g, "I can't wait to visit our grand apartment complex when you get the keys soon") -- to which would disturb the peace of society, lead to corrupt practices, and prevent the remedial process of the law.

139.     The Bank, through McMahon; and McMahon, individually, agreed to allow Teitelbaum and CNTRST to control and fund litigation in exchange for a share of the proceeds pursuant to the Champertous Agreement. This constitutes the tort of champerty and maintenance.

140.     The Attorney Defendants, Kluever and Markoff, knowingly engaged in champerty by suing purportedly in the name of the Bank.

141.     All Defendants are jointly and severally liable as joint venturers, as alleged more fully above in paragraphs 114-115.

142.     Alternatively, and in addition, all Defendants are jointly and severally liable as co-conspirators, as alleged more fully above in paragraphs 116-120.

WHEREFORE, Plaintiffs 2pray that this Court: (a) enter judgment in their favor for actual damages against all Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count II**
**Abuse of Process**

143.     Plaintiffs incorporate and re-allege allegations 1-128 and 130-142, as if set forth in full herein.

144.     Defendants engaged in willful acts in the use of process that was not proper in the regular conduct of the proceeding, as alleged above, including, but not limited to: (a) willfully sending notices to the wrong address in Boca Raton; (b) making misrepresentations to the state court; (c) concealing the Champertous Agreement from the State Court and opposing litigants; (d) making and abandoning

FILED DATE: 11/21/2022 12:00 AM   2022L010392

FILED DATE: 11/21/2022 12:00 AM   2022L010392

frivolous motions for a receiver; (e) interfering with the junior lender as alleged above; (f) deceiving Ruben into coming to a citation, which was set as a trap to seize him pursuant to a body attachment in order to intimidate him, and (g) using the services of a disbarred lawyer to facilitate the unauthorized practice of law.

145.    Defendants possessed an ulterior purpose other than resolving a legal dispute in connection with the above-alleged conduct. Specifically, Teitelbaum was attempting to do indirectly what he could not do directly (as a result of the Shayarin Settlement) – obtain an interest in the Boulder Hill Apartments.

146.    Defendants allowed Teitelbaum to use CNTRST as a sham or straw entity to conceal his involvement.

147.    Had Ruben known the truth from the inception, be would have been able to, among other things, dismiss the State Court litigation pursuant to Section 2-619 of the Illinois Code of Civil Procedure, as barred by prior release.

148.    Although some of the actions taken by Defendants occurred more than 2 years ago, which is the limitations period for abuse of process, Plaintiffs only discovered – on November 20, 2020 – a when the Bank served its Interrogatory Answers – that the Bank disclaimed any knowledge or involvement of the collection proceedings in Case Number 50007.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count III**
**Unfair and Deceptive Business Practices**

149.    Plaintiffs incorporate and re-allege allegations 1-128, 130-142, and 144-148, as if set

FILED DATE: 11/21/2022 12:00 AM   2022L010392

forth in full herein.

150.    Defendants, and each of them, are "persons" as that term is defined in the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS 505/1(c).

151.    Defendants, and each of them, were engaged in trade or commerce in the State of Illinois.

152.    Defendants, and each of them, have engaged in unfair and deceptive acts and practices in connection with that trade or commerce, including: setting up CNTRST as a "straw" entity to conceal the real parties in interest and circumvent the provisions of the *Shayarin* Settlement and engaging in the champerty and maintenance as alleged herein.

153.    In interpreting unfair conduct under the Consumer Fraud Act, Illinois courts look to three considerations of whether conduct is unfair under the Consumer Fraud Act: (a)    if    it offends public policy as established by statutes, the common law or otherwise, or in other words, whether it is at least within the penumbra of some established concept of unfairness (b) whether it is immoral, unethical, oppressive, or unscrupulous; (c) whether it causes substantial injury to consumers.

154.    Champerty and maintenance is an offense against public justice and public policy as established by long-standing common law, as it keeps alive strife and contention, and perverts the remedial process of the law into an engine of oppression.

155.    Champerty is unethical and unscrupulous.

156.    It causes substantial injury to consumers to stir up litigation as alleged herein. It is heavy-handed and oppressive litigation conduct – including to "set up a contempt" – by judgment creditors that if, unaccounted for, would hurt cause substantial injury to consumers of financial services products across the board.

FILED DATE: 11/21/2022 12:00 AM   2022L010392

157.    The conduct of Defendants, as alleged herein, violates the public policies of honesty and candor to the courts and against champerty and maintenance.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Defendants, jointly and severally, in an amount to be proved at trial; (b) attorneys fees' pursuant to the Consumer Fraud Act, (c) court costs; and (d) any other relief this Court deems just.

**Count IV**
**Tortious Interference with Contract**

158.    Plaintiffs incorporate and re-allege allegations 1-128 and 130-142, as if set forth in full herein.

159.    YRY and BHA had a contractual relationship with its lender T2.

160.    On June 11, 2018, BHA executed a note and mortgage in favor of T2 for $9,000,000. The note was secured by a mortgage on the Boulder Hill Apartments.

161.    In September 2018, the Bank filed an emergency motion in Case Number 50077 to appoint a receiver for the Boulder Hill Apartments pursuant to 735 ILCS 5/2-1402.

162.    As Teitelbaum noted in an email dated September 21, 2018, "Following same pattern as small case."

163.    In connection with this motion, the Bank requested an expedited briefing schedule. As a part of the order, BHA agreed that pending resolution of the Bank's emergency motion for appointment of receiver BHA's operating account would be frozen for the month during which the receiver motion was pending.

164.    On October 2, 2018, Judge McGing denied a virtually identical petition pursuant to Section 2-1402 of the Illinois Code of Civil Procedure, which sought (on a supposed "emergency" basis) to appoint a receiver for the Boulder Hill Apartments. In denying CNTRST's emergency

29

motion, Judge McGing discussed the *Shayarin* Case and the release Shayarin and Teitelbaum executed with YRY. Judge McGing noted that Shayarin and Teitelbaum received $1.16 million dollars; the *Shayarin* Case was dismissed with prejudice, and "as a result, the [Shayarin] case was dismissed with prejudice and Teitelbaum gave up any rights to BHA and the Boulder Hill Apartments, an asset of considerable value that Defendants [YRY] now control." Judge McGing also commented that he was troubled that Teitelbaum was asserting that the estate planning regime the Ybarras established by Leventhal Perlstein 2011 was fraudulent, since it was Teitelbaum who introduced Yolanda Ybarra to Michael Tuchman of Leventhal Perlstein in the first place.

165. CNTRST did not appeal the order denying its motion for receiver.

166. On October 16, 2018, the Bank did not proceed to hearing in Case Number 50077 on its emergency motion to appoint receiver of the Boulder Hill Apartments.

166. On June 4, 2019, The Bank withdrew its emergency motion per Section 2-1402 to appoint a receiver for the Boulder Hill Apartments, which had been fully briefed since early October 2018.

167. Nonetheless, the Bank did not agree to withdraw or vacate the portion of the briefing schedule which froze BHA's operating account.

168. The freezing of that account caused substantial economic damage to Plaintiffs.

169. Defendants intentionally and unjustifiably interfered with this relationship by seeking appointment of a receiver knowing full well the Ruben was not a member of YRY.

170. The actions of Defendants caused damage to BHA and YRY by freezing its bank accounts, causing it to lose liquidity and profits, and loss of business opportunities.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Defendants, jointly and severally, in an amount to be proved at trial; (b)

FILED DATE: 11/21/2022 12:00 AM    2022L010392

court costs; and (c) any other relief this Court deems just.

**Count V**
**Tortious Interference with Prospective Economic Advantage**

171.     Plaintiffs incorporate and re-allege allegations 1-128, 130-142, and 159-170, as if set forth in full herein.

172.     By virtue of the Motion for Judicial Determination, the restraining citations, the motion(s) for appointment of receiver, and the Freeze Orders, Plaintiffs' ability to alienate or sell the BHA apartment building was held up for years, causing Plaintiffs significant damages.

173.     Boulder Hill obtained title to the Boulder Hill Apartments and recorded special warranty deeds in June 2015.

174.     On or about June 11, 2018, Boulder Hill obtained a loan from T2. T2 secured its loan to Boulder Hill with a mortgage.

175.     In May 2018, Boulder Hill entered into a property management agreement with Real Realty LLC.

176.     On August 30, 2018, the Bank filed a motion to appoint a receiver to operate the Boulder Hill Apartments. The receiver motion was not filed pursuant to a mortgage or any other written contract, but instead was sought pursuant to an arcane section of 735 ILCS 5/2-1402. The Bank's motion for receiver was fully briefed by the parties, and then inexplicably withdrawn in 2019.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Defendants, jointly and severally, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

**Count VI**
**Breach of Contract**
**(Against Teitelbaum)**

FILED DATE: 11/21/2022 12:00 AM    2022L010392

177.     Plaintiffs incorporate and re-allege allegations 1-128 as if set forth in full herein.

178.     Pursuant to the *Shayarin* Settlement, Teitelbaum relinquished any claim to, or interest in, the Boulder Hill Apartments, or profits therefrom.

179.     By virtue of his actions, as alleged herein, and through the Champertous & Interference Scheme, Teitelbaum breached the *Shayarin* Settlement.

WHEREFORE, Plaintiffs pray that this Court: (a) enter judgment in their favor for actual damages against all Teitelbaum, in an amount to be proved at trial; (b) court costs; and (c) any other relief this Court deems just.

### Count VI
### Illinois Attorney Act
### (Against Eric Ferleger)

180.     Plaintiffs incorporate and re-allege allegations 1-128, as if set forth full herein.

181.     Very few documents were produced in Case Number 50077 relative to the universe of documents likely to exist.

182.     On document that was produced, however, shows that Ferleger was being consulted for legal advice and input by Markoff, as if he was some kind of co-counsel.

183.     For instance, on August 23, 2019 Geise sent the following email:

> From: Douglas Giese
> Sent: Friday, August 23, 2019 10:29 AM
> To: Eric P. Ferleger <ericpferleger@sbcglobal.net>; Bruce Teitelbaum <BruceT@visionrp.com>
> Cc: Tanina Rodriguez <trodriguez@markofflaw.com>; Jeffrey Albert <jeff@markofflaw.com>; Bob Markoff <bob@markofflaw.com>
> Subject: O=368313 Centrust N.A. vv. Ruben Ybarra 2010 L 050077
> Eric-
>
> Kim McMahon at Centrust has approved the Draft Protective Order, and I did respond to Bruce's inquiry.  Please advise whether you have any changes or additions to this Order before 11:30 am today.  I need to get it over to All Counsel for Review and comment, and I plan on doing that by

FILED DATE: 11/21/2022 12:00 AM    2022L010392

12:00 Noon today.

Thank you for your attention to this e-mail.

184..    There would be no legitimate reason for Ferleger to be proving input on the drafting of protective order other than as a "behind the scenes" (unlicensed) lawyer.

185.    Ferleger was a collection attorney and Case Number 50077 was a collection case.

186.    Ferleger improperly practiced law when on ARDC suspension for his other ethical lapses, as the ARDC subsequently determined. So Ferleger has shown propensity to engage in unauthorized practice of law.

187.    The Illinois Attorney Act, 705 ILCS 205/0.01 prohibits the unauthorized practice of law.

WHEREFORE, Plaintiffs Ruben Ybarra, YRY Holdings, LLC and Boulder Hill Apartments, LLC pray that this Court, pursuant to 735 ILCS 205/1: (a) hold Eric Ferleger in contempt; (b) a civil penalty in the amount of $5,000 paid to the Illinois Equal Justice Foundation; and (c) actual damages incurred by Plaintiffs.

Respectfully Submitted,

/s/ Christopher V. Langone

Attorney for Plaintiffs

Christopher V. Langone
205 North Michigan Ave.
Suite 810
Chicago, IL 60601
(312) 720-9191
Chris@LangoneLaw.com

# Exhibit 2

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

RUBEN YBARRA, YRY HOLDINGS, LL )
And BOULDER HILL APARTMENTS, LLC )
              Plaintiffs, )        22 L 10392
                              )
             v. )        Calendar I
                              )
CNTRST DEBT RECOVERY, BRUCE )
TEITELBAUM, ERIC FERLEGER, CENTRUST )
BANK NA, JAMES MCMAHON, MARKOFF )
LAW LLC, DOUG GEISE, KLUEVER & PLATT,)
LLC, AND M. REAS BOWMAN, )
              Defendants. )

**ORDER**

This matter coming before the Court for initial status, and none of the Defendants having

yet been served, it is hereby ORDERED:

1.    Plaintiff's oral motion to voluntarily dismiss, without prejudice, certain Defendants

pursuant to 735 ILCS 5/2-1009 is granted. Defendants CNTRST DEBT RECOVERY, BRUCE

TEITELBAUM and CENTRUST BANK NA, are dismissed without prejudice.

2.    This matter is continued for status on service on remaining Defendants: ERIC

FERLEGER, JAMES MCMAHON, MARKOFF LAW LLC, DOUG GEISE, KLUEVER &

PLATT LLC, AND M. REAS BOWMAN, on March 13, 2023, at 9:00 am.

ENTERED:

Dated: _____

Order Prepared By:
Christopher V. Langone, Esq
205 North Michigan Ave.
Suite 810
Chicago, IL 60601
(312) 720-9191
langonelaw@gmail.com

Judge John J. Curry, Jr.

JAN 23 2023

Circuit Court—2126